IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| ACCEPTANCE INSURANCE COMPANIES INC., Plaintiff, | |
| v. | No. 03-2794 (Judge Wheeler) |
| THE UNITED STATES, Defendant. | |

**DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT**

Pursuant to Rule 56.1 of the Rules of the Court of Federal Claims and this Court's January 31, 2006 order, defendant, the United States, respectfully files these proposed findings of uncontroverted fact in support of our renewed motion to dismiss or, in the alternative, for summary judgment.

## I. Federal Involvement In The Crop Insurance Industry

### A. Federal Crop Insurance Corporation ("FCIC")

1. The Federal Crop Insurance Corporation ("FCIC") was established by Congress in 1938 through the Federal Crop Insurance Act "as an agency of and within the Department [of Agriculture]." 7 U.S.C. § 1503; Def. App.[1] 5.

2. FCIC was created "[t]o carry out the purposes of the [Federal Crop Insurance] Act." 7 U.S.C.§ 1503. The stated purpose of the Federal Crop Insurance Act is "improving the economic stability of agriculture through a sound system of crop insurance." 7 U.S.C. § 1502(a).

3. Congress has granted FCIC authority to carry out the purposes of the Federal

[1] "Def. App." refers to defendant's appendix in support of its renewed motion to dismiss or, in the alternative, for summary judgment, which has been filed in paper form.

Crop Insurance Act by offering crop insurance or reinsurance. 7 U.S.C. § 1508(a)(1). Congress has also authorized the FCIC to "issue regulations, necessary in the conduct of its business." 7 U.S.C. § 1506(l). The regulations that the FCIC has promulgated are set forth in 7 C.F.R. Ch. IV.

4. One of those regulations provides that FCIC "will offer Standard Reinsurance Agreements to eligible Companies under which the [FCIC] will reinsure policies which the Companies issue to producers of agricultural commodities." 7 C.F.R. § 400.164.

5. Since 1998, the private insurance companies reinsured by FCIC have sold and serviced all Multi Peril Crop Insurance ("MPCI") policies authorized by the Federal Crop Insurance Act. Def. App. 7.

6. FCIC approves the MPCI Common Crop Insurance Policy and the other policies that private insurance companies issue that are federally reinsured." 7 C.F.R. § 457.8 (emphasis added

**B. Risk Management Agency ("RMA")**

7. Like FCIC, the Risk Management Agency ("RMA") is also an agency within the United States Department of Agriculture. 7 U.S.C. § 6933(a). The purpose of RMA is to supervise FCIC and administer all programs authorized pursuant to the Federal Crop Insurance Act. 7 U.S.C. § 6933(b)(1)-(2).

8. The Administrator of RMA is appointed by the Secretary of Agriculture, and also serves as Manager of FCIC. 7 U.S.C. § 6933(c)(1)-(2).

9. Ross Davidson became RMA Administrator in March 2002. Def. App. 38 (Davidson 14:18-21).

10. Immediately before his appointment, Mr. Davidson had served as Vice President, Industry Affairs and Vice President, Corporate Finance for USAA, an insurance company, where he was responsible for risk management and structuring financial transactions, among many other duties from 1988 to 2001. Def. App. 39-41 (Davidson 19:4-25:5)[2]. Mr. Davidson also has held positions involving risk management and financial analysis for Tesoro Petroleum, Zapata Corporation, and Aetna Life and Casualty. Def. App. 41-43 (Davidson 25:9-35:14).

## II. The Standard Reinsurance Agreement ("SRA")

### A. Overview And History

11. Crop insurance providers who wish to sell and service federally reinsured multi-peril crop insurance ("MPCI") policies must sign a Standard Reinsurance Agreement ("SRA") with FCIC. 7 C.F.R. § 400.164.

12. The SRA that was in effect at the time of the proposed transaction was known as the 1998 SRA, because it first took effect during the 1998 reinsurance year, which began on July 1, 1997. Def. App. 375-417 (Depo. Ex.[3] 37).

13. Insurers enter into a separate SRA for each reinsurance year, which runs from July 1st through June 30th. Def. App. 29-30 (Pl. Resp. to Def. RFA[4]s 3-6, 8); Def. App. 375 (Depo. Ex. 37). The 1998 SRA was used during the 1999, 2000, 2001, 2002, 2003, and 2004 reinsurance years. Def. App. 49 (Davidson 57:1-58:8).

14. The first paragraph of the 1998 SRA states "[t]his is a cooperative financial

---

[2] Cites to deposition transcripts are shown by the witness's last name and page:line.

[3] "Depo. Ex." refers to deposition exhibits included in defendant's appendix.

[4] "Pl. Resp. To Def. RFAs" refers to plaintiff's responses to defendant's requests for admission.

assistance agreement between FCIC and the Company to deliver eligible crop insurance under the authority of the Act." Def. App. 375. The first paragraph also states "[t]his Agreement is authorized by the Act and regulations promulgated thereunder codified in 7 C.F.R. chapter IV. Such regulations are incorporated into this Agreement by reference." Id.

**B. Key Terms Defined In The 1998 SRA**

15. The "Definitions" section of the 1998 SRA states "'Agreement'" means this Standard Reinsurance Agreement, all Appendices, all referenced documents including Manual 13 and the Approved Manual 14." Def. App. 376 (emphasis added).

16. The "Definitions" section of the 1998 SRA states "'Book of business' means the aggregation of all eligible crop insurance contracts in force between the Company and its policyholders that have a sales closing date within the reinsurance year and are eligible to be reinsured under this Agreement." Def. App. 376.

17. The "Definitions" section of the 1998 SRA states "'Cancellation date' means the date by which the Company or policyholder must notify the other that coverage under an eligible crop insurance contract issued by the Company is canceled for a succeeding crop year. The day following this date is considered as the date a continuous eligible crop insurance contract carried over from the previous crop year is renewed for the subsequent crop year." Def. App. 376.

18. The "Definitions" section of the 1998 SRA states "'Carryover crop insurance contract' means eligible crop insurance contract that has been in force for at least one crop year term and continues in force for another crop year term after the cancellation date." Def. App. 376.

19. The "Definitions" section of the 1998 SRA states "'Crop insurance contract'

means an agreement (with the terms in effect as of the contract change date) to insure the insurable interest of an eligible producer in a single crop in a single county as provided by the application, the General, or Common Crop Insurance Policy, the Crop Endorsement, the Basic Provisions, the Crop Provisions, the Special Provisions, the Catastrophic Risk Protection Endorsement, as applicable, the Actuarial Table, and any other instrument or endorsement as approved by FCIC." Def. App. 377.

20. The "Definitions" section of the 1998 SRA states "'Eligible crop insurance contract' means a crop insurance contract that is sold and serviced consistent with the [Federal Crop Insurance] Act, 7 C.F.R. chapter IV, FCIC approved regulations and procedure, at applicable rates, terms, and special conditions; having a sales closing date within the reinsurance year, to an eligible producer, covering a crop in an area approved by FCIC; and on forms approved in writing by FCIC." Def. App. 378.

21. The "Definitions" section of the 1998 SRA states "'Eligible producer' means a person who meets all the conditions for eligibility specified in 7 C.F.R. chapter IV." Def. App. 378.

22. The "Definitions" section of the 1998 SRA states "'Reinsurance year' means the period from July 1 of any year through June 30 of the following year and identified by reference to the year containing June. All eligible crop insurance contracts with sales closing dates within the reinsurance year are subject to the terms of the Agreement applicable to that reinsurance year"). Def. App. 379 (emphasis added).

23. The "Definitions" section of the 1998 SRA states "'Sales Closing Date' means the date established by FCIC as the last date on which a producer may apply for an eligible crop

insurance contract on a crop in a specific county." Def. App. 380.

**C. Key General Terms Of The 1998 SRA**

24. Section II.A. of the 1998 SRA, titled "General Terms," states "1. Only eligible crop insurance contracts will be reinsured and subsidized under this Agreement." Def. App. 381.

25. Section II.A. of the 1998 SRA, titled "General Terms," states "2. Except as specified below, the Company must offer all approved plans of insurance for all approved crops in any State in which it writes an eligible crop insurance and must accept and approve all applications from all eligible producers." Def. App. 381 (emphasis added).

26. Section II.A. of the 1998 SRA, titled "General Terms," states that "3. In exchange for the reinsurance premiums provided by the Company pursuant to this Agreement, FCIC will provide the Company with reinsurance pursuant to the provisions of this Agreement" Def. App. 381 (emphasis added).

27. Section II.A. of the 1998 SRA, titled "General Terms," states that "4. All eligible crop insurance contracts reinsured and subsidized under this Agreement must conform to the regulations published at 7 C.F.R., chapter IV or as approved in writing by FCIC." Def. App. 381.

28. Section II.A. of the 1998 SRA, titled "General Terms," states that "5. FCIC will not provide reinsurance, A&O subsidy, or risk subsidy for any eligible or ineligible crop insurance contract that is sold or serviced in violation of the terms of this Agreement, 7 C.F.R., chapter IV, FCIC approved procedures or any written instructions of FCIC." Def. App. 381 (emphasis added).

29. Section II.A. of the 1998 SRA, titled "General Terms," states that "7. Only the

amount of net book premium authorized by FCIC in the approved Plan of Operations may be reinsured and subsidized under this Agreement." Def. App. 382 (emphasis added).

30. Section II.A. of the 1998 SRA, titled "General Terms," states that "8. To be eligible for an Agreement, or to continue to hold an Agreement: a. The Company must have adequate financial resources at the beginning of the reinsurance year as required by 7 C.F.R. part 400, subpart L. If at any time during the reinsurance year the Company no longer has adequate financial resources, the Company must timely obtain such resources." Def. App. 382.

31. Sections II.B-D. set the terms by which the insurer may designate eligible crop insurance contracts to one of three funds established by FCIC for reinsurance purposes. Def. App. 382-89. Section III sets the terms on which FCIC provides subsidies to the insurer for risk and for administrative and operating expenses incurred in servicing the eligible crop insurance contracts. Def. App. 390-92.

**C. Other Key Terms Of The 1998 SRA**

32. Section V.G.1. of the 1998 SRA, titled "Plan of Operations," states:

> a. This Agreement becomes effective with respect to any reinsurance year upon approval of the Company's Plan of Operations by FCIC. . . .
>
> c. The Company may submit a request to amend an approved Plan of Operations at any time to reflect changing business considerations and sales expectations. Such amendments must be in writing and must be approved by FCIC in writing before implementation by the Company.
>
> d. The Plan of Operations is incorporated by this Agreement by reference. Material failure to follow the Plan of Operations may be a basis for FCIC to terminate this Agreement.

Def. App. 396.

33. Section V.G.2. of the 1998 SRA, titled "General Operations," states "g. The company must use crop insurance contracts, standards, procedures, methods, and instructions as issued or approved by FCIC in the sales, service, and loss adjustment of eligible crop insurance contracts." Def. App. 398 (emphasis added).

34. Section V.I. of the 1998 SRA, titled "Compliance and Corrective Action," states "1. The Company must be in compliance with the provisions of this Agreement, the laws and regulations of the United States, the laws and regulations of the States and locales in which the Company is conducting business under this Agreement, unless such State and local laws and regulations are in conflict with this Agreement, and all bulletins, handbooks, instructions, and procedures of FCIC." Def. App. 398 (emphasis added).

35. Section V.J. of the 1998 SRA, titled "Suspension," states "FCIC may suspend this Agreement for cause due to a material failure to perform or comply with obligations under this Agreement. If this Agreement is suspended for cause: . . . . 2. While suspended, the Company may not sell any new crop insurance contracts under this Agreement." Def. App. 401 (emphasis added).

36. Section V.L. of the 1998 SRA, titled "Disputes and Appeals," states "1. The Company may appeal any actions, finding, or decision of FCIC under this Agreement in accordance with the provisions of 7 C.F.R. 400.169." Def. App. 401.

37. Section V.P. of the 1998 SRA, titled "Disputes and Appeals," states:

> Whenever the Company and its policy issuing company, if applicable, are unable to fulfill their obligations to any policyholder by reason of a directive or order duly issued by any Department of Insurance, Commissioner of Insurance, or by any court of law having competent jurisdiction, or under similar authority of any jurisdiction to which the Company is subject, all

> eligible crop insurance contracts affected by such directive or order that are in force and subject to this Agreement as of the date of such inability or failure to perform will be immediately transferred to FCIC without further action of the Company **by the terms of this Agreement**. FCIC will assume all obligations for unpaid losses whether before or after the date of transfer, and the Company must pay FCIC all funds in its possession with respect to all such eligible crop insurance contracts transferred including, but not limited to, premiums collected. The Company hereby assigns to FCIC the right to all uncollected premiums on all such policies.

Def. App. 402-03 (emphasis added).

38. Section V.Y. of the 1998 SRA, titled "Resolution of Disagreements," states:

> If the Company disagrees with an act or omission of FCIC, except those acts implemented through the rulemaking process, the Company shall provide written notice of such disagreement to the Manager of FCIC. Within 10 business days of receipt of notice, the Manager or a designee will schedule a meeting with the company in an attempt to resolve the disagreement. Notwithstanding any other provision in this section, any subsequent decision by FCIC on the act or omission will be final in the administrative process and, therefore subject only to review the by the Board of Contract Appeals in a matter relating to this Agreement or to judicial review.

Def. App. 406 (emphasis added).

**D. Section 4.C(9) of FCIC Crop Insurance Handbook**

39. Each crop year, FCIC issues a Crop Insurance Handbook. Def. App. 1. The crop year differs from the reinsurance year, which runs from July 1 to June 30. The crop year is defined in the Common Crop Insurance Policy as "[t]he period within which the insured crop is normally grown, regardless of whether or not it is actually grown, and designated by the calendar year in which the insured crop is normally harvested." 7 C.F.R. § 457.8 (emphasis added).

40. Section 2 of the 2002 Crop Insurance Handbook states "Insurance Providers that have a Standard Reinsurance Agreement (SRA) with FCIC must use this handbook or

comparable procedures approved by RMA to deliver MPCI coverage." Def. App. 2.

41. Section 4.C(9) of FCIC's 2002 Crop Insurance Handbook, titled "Transfer of Policies," states "[t]o be effective, transfer requests must be signed by the cancellation date and received by the ceding Insurance Provider no later than 45 days after the cancellation date. . . . (9)(b) Requirements. The assuming Insurance Provider must complete and have the insured sign a Cancellation/Transfer of Experience Data Form for each policy (crop) being transferred. . . . (9)(e)2 All Insurance Providers are required to transmit experience (premium and loss data) and APH data to RMA." Def. App. 3.

42. John Joyce, the former chairman of crop insurance provider Rain and Hail LLC, explained that Section 4.C(9) provides that "annually, before the sales closing date for that particular crop, have that choice that a farmer can make. If they want to change from where they are, make changes in their coverage, they must do so on a signed form prior to the sales closing date. Once the sales closing date is reached, it's all over for that year. Consequently, for Acceptance and Rain and Hail, in my view, to do anything with the business that was referenced here as in[-]force, would have had significant discussion of how to do that with the least possible disruption to the client, to the agent, to everybody else and the maximum assurance of service to that policyholder." Def. App. 109 (Joyce 47:6-21).

43. Mr. Joyce testified that "4.C(9) does not provide any real rights to transfer of an in[-]force policy. There's none." Def. App. 108, 109 (Joyce 44:21-23, see also 46:11-16).

44. Section 4.C(9) requires that each policy that is transferred must be individually canceled and rewritten by another insurer. Def. App. 3. Section 4.C(9) does not provide any procedure for transferring a block of policies. Id.

## III. American Growers Suffers Large Losses In 2002

### A. Acceptance And Its Subsidiaries

45. John Martin is the chairman, chief executive officer ("CEO"), and president of plaintiff Acceptance Insurance Companies Inc. ("Acceptance") and Acceptance Insurance Company ("AIC"). Def. App. 159 (Martin 7:17-8:20).

46. Mr. Martin was hired as CEO and president of Acceptance in December 1999. Def. App. 161 (Martin 23:24-24:9).

47. Acceptance is a publicly traded insurance holding company. Def. App. 162 (Martin 26:1-7, 79:24-80:3). It has never issued any crop insurance policies. Def. App. 175 (Martin 79:6-23).

48. When Mr. Martin joined Acceptance in December 1999, the company had incurred significant losses both in the property and casualty area as well as in their crop insurance operations, where a product named CRC Plus had caused losses and regulatory problems. Def. App. 160, 162 (Joyce 19:25-20:21, 26:1-18).

49. In December 1999, Acceptance's board of directors had decided to downsize the property and casualty segment and increase the company's commitment to the agricultural risk sector. Def. App. 161 (Joyce 21:2-6).

50. In a June 2002 PowerPoint presentation to then-new RMA Administrator Ross Davidson, Mr. Martin contrasted the Acceptance family corporate structure in 1999 to 2002 to portray that agricultural risk had become the "total focus" of Acceptance and its subsidiaries. Def. App. 162-63 (Joyce 28:18-30:19, 31:20-32:2), Def. App. 314-15 (Depo. Ex. 25,

AUS[5] 013988-89).

51. American Growers Insurance Company, Acceptance Insurance Company ("AIC"), and American Agrisurance, Inc. were wholly owned subsidiaries of Acceptance. Def. App. 175-76 (Martin 80:18-81:12), Def. App. 315 (Depo. Ex. 35, AUS 013989), Def. App. 29 (Pl. Resp. to Def. RFAs No. 1).

52. The crop insurance business conducted by American Growers and American Agrisurance, Inc. was marketed under the name "AmAg." Def. App. 179 (Martin 109:23-110:9), Def. App. 425-1 (Depo. Ex. 38, AUS 014062).

53. AIC historically was engaged in property and casualty insurance business. Def. App. 422 (Depo. Ex. 38, AUS 014055).

54. Mr. Martin served as President and CEO of American Agrisurance, Inc. in November 2002. Def. App. 284.

55. American Growers entered the 1998 SRA with FCIC for the 1998, 1999, 2002, and 2003 reinsurance years. Def. App. 29-30 (Pl. Resp. to Def. RFAs Nos. 4-5, 8).

56. RMA required AIC to enter the 1998 SRA with FCIC for the 2000 and 2001 reinsurance years as a result of the problems caused by CRC Plus in 1999. Def. App. 174 (Martin 74:6-75:8), Def. App. 506-41.

57. Although American Growers once again became the SRA holder for the 2002 and 2003 reinsurance years, no SRA was ever signed by American Growers after the SRA signed by Mr. Martin for the 2001 reinsurance year. Def. App. 375, 407 (Depo. Ex. 37), Def. App. 511.

---

[5] "AUS ______" identifies by Bates number pages within documents produced by plantiff during discovery.

58. Mr. Martin understood that RMA required Acceptance and its operating subsidiaries to submit financial statements and plans of operation to RMA so that the companies "could issue crop insurance policies that were reinsured by the government." Def. App. 173 (Martin 69:20-70:2).

59. American Growers and AIC issued crop insurance policies. Def. App. 167 (Martin 47:1-23).

**B. American Growers Acquires IGF's MPCI Policies**

60. In June 2001, Acceptance purchased the entire book of business of in-force MPCI crop insurance policies of IGF Insurance Company. Def. App. 165-66, 173 (Martin 40:2-44:6, 71:12-14). Mr. Martin testified that IGF's MPCI policies "were assigned to American Growers and so American Growers then became the owner of those policies." Def. App. 168-69 (Martin 52:24-53:1) (emphasis added).

61. Mr. Martin testified that in November 2002, the principal assets that American Growers owned were "[p]olicies issued or assumed by American Growers from other insurance companies." Def. App. 176 (Martin 81:20-82:8). Mr. Martin agreed that the value of the policies was the stream of premiums that they generated. Id. (Martin 82:13-16).

62. Mr. Martin testified that he understood that RMA made an exception from its normal transfer procedures to effect a mass transfer of IGF's MPCI policies. Def. App. 169 (Martin 53:13-21) (emphasis added).

63. Mr. Martin testified that "RMA required the transfer of prior liabilities" from IGF to Acceptance, which he understood RMA had required in prior acquisitions of crop insurance policies. Def. App. 171, 169 (Martin 61:6-21; see also 55:24-56:3).

64. Mr. Martin, on behalf of Acceptance, signed a "SRA Assignment and Assumption Agreement" with IGF that states "Acceptance hereby agrees that it will assume all financial responsibilities associated with all crop insurance policies reinsured under the 2001 [SRA] and previous years held by IGF." Def. App. 168 (Martin 50:1-15), Def. App. 373 (Depo. Ex. 36), Def. App. 169 (see also 55:19-23). Acceptance and its subsidiaries honored this commitment. Def. App. 172 (Martin 66:7-16).

65. Mr. Martin agreed that had Acceptance not agreed to assume any liabilities of IGF, Acceptance would have had no responsibility for satisfying any liabilities that IGF incurred. Def. App. 170 (Martin 57:16-20).

## IV. Acceptance Negotiates Letter Of Intent With Rain and Hail

### A. Rain and Hail

66. In November 2002, John Joyce was the Chairman and senior executive of both Rain and Hail Insurance Service, Inc., a holding company, and its principal operating subsidiary, Rain and Hail LLC ("Rain and Hail"). Def. App. 135-36 (Joyce 183:21-185:22).

67. Rain and Hail was the managing general agent for ACE, an insurance company that had signed an SRA with FCIC for the 2002 reinsurance year. Def. App. 138 (Joyce 196:21-25).

68. Mr. Joyce has worked for crop insurance companies since 1967, and was involved through industry associations in the legislation that led to private companies offering multi-peril crop insurance ("MPCI") policies to farmers. Def. App. 136-37 (Joyce 186:14-190:22). He is familiar with RMA's policies and procedures for federally reinsuring crop insurance policies, and has had oversight at Rain and Hail over the process of issuing MPCI policies to farmers.

Def. App. 138 (Joyce 193:17-194:8).

69. Mr. Joyce understood that the SRA incorporates by reference the policies and regulations established by RMA, and commented that "we're all driven by the standard reinsurance agreement and all the referenced documents." Def. App. 138, 139 (Joyce 196:13-17, 198:2-4).

70. Mr. Joyce explained that the SRA has much broader effect than a typical reinsurance agreement between two private parties: "It sets the terms and conditions under the entire operation of the MPCI program under that cooperative agreement that someone mentioned earlier and lays out, along with the references to various attachments, plan of operation, exactly how the program is going to function. So it's a multi[-]purpose agreement. It isn't like a typical insurance agreement where it's strictly a financial authorization. It sets out all kind of things or references." Def. App. 150-51 (Joyce 268:22-269:6).

**B. <u>Negotiations For American Growers' Insurance Policies</u>**

71. ACE was approached by Philo Smith & Co. in the middle of October 2002 regarding buying the book of business crop insurance policies issued by American Growers and marketed by American Agrisurance Company ("AmAg"). Def. App. 143-44 (Joyce 223:13-226:12), Def. App. 418-38 (Depo. Ex. 38).

72. Mr. Joyce testified that through the transaction proposed in the letter of intent, Rain and Hail was "not buying one of the affiliates. We were buying the book of business, their crop insurance book of business, from Acceptance and/or one of its affiliates, which in this case I believe to be American Growers. That's what we were buying, we were not buying the show. We were buying the renewal list and the rights." Def. App. 134 (Joyce 178:2-14).

73. Mr. Martin too testified that ACE and Rain and Hail were "only interested in purchasing the book of business, small B, not the SRA definition. But the primary focus would be MPCI policies. But the primary point of number 1, as I said, was to purchase a book of policies, not a corporate structure." Def. App. 179 (Martin 111:5-112:15).

74. Rain and Hail did not intend to assume any of the prior years' liabilities for American Growers: "without getting rid of those past liabilities, we were not willing to expose our shareholders to all of whatever those potentials may be, whether it be RMA driven or whether it be state litigation driven or where it comes from." Def. App. 127 (Joyce 136:9-14).

75. Rain and Hail was interested in what Mr. Joyce described as AmAg's "a pretty solid book of business that had grown heavy preponderance in the midwest," including "the Dakotas to Nebraska, Iowa, Illinois, Missouri." Def. App. 144, 145 (Joyce 225:4-14, 229:25-230:11). Mr. Joyce testified that profits on crop insurance in the midwest states are attractive "[o]ver most of them and over an extended period of time." Def. App. 145 (Joyce 230:12-19).

76. Rain and Hail determined that it would only be able to retain approximately 50 percent of AmAg's book of business, or $250 million in premiums. Def. App. 148 (Joyce 257:23-258:20).

77. When Rain and Hail evaluated what portions of AmAg's book of business it expected to retain, it excluded the Texas business (approximately $70 million) because there was a jumbo agent affiliated with AmAg who delivered and managed most of AmAg's business in Texas, which Mr. Joyce testified "created a whole separate set of issues and contractual terms that had to be affixed." Def. App. 147 (Joyce 253:24-254:17, 256:6-14), Def. App. 306, 308 (Depo Ex. 33 – "excluding Texas Business").

78. Mr. Joyce testified that "[t]he rate of return in Texas on an underwriting basis was less than what the historical average of the books and business has been" for Rain and Hail. Def. App. 147 (Joyce 254:24-255:12).

79. In their initial meeting with Acceptance's representatives, representatives of Rain and Hail said that they did not want the Texas portion of AmAg's book of business because it was a large book and they had a concentration concern. Def. App. 179-80 (Martin 112:22-113:23), Def. App. 439 (Depo. Ex. 39).

### C. <u>Terms Of November 18, 2002 Letter Of Intent</u>

80. Acceptance conducted negotiations with Rain and Hail that produced a letter of intent dated November 18, 2002 that recorded the terms of a proposed asset sale of American Growers' MPCI policies and other assets to Rain and Hail. Def. App. 294-302 (Depo. Ex. 29).

81. The letter of intent reserved for Rain and Hail the option to decline purchasing five contracts that were not cancelable on 30 days or less written notice, including the contract with AmAg's agent in Texas. Def. App. 157 (Joyce 349:11-20), Def. App. 300 (Depo. Ex. 29, p. 3, ¶ 4).

82. The letter of intent the letter of intent stated that it was not a "binding obligation" on either Acceptance or Rain and Hail "to enter into or consummate the Proposed Transaction," and stated further that the parties' obligations "to consummate the Proposed Transaction shall be subject in all respects to the negotiation, execution, and delivery of a definitive agreement . . . and the satisfaction of the conditions contained in the definitive agreement." Def. App. 294.

83. Both Mr. Joyce and Mr. Martin agreed that neither party was required to consummate the transaction proposed in the letter of intent. Def. App. 140 (Joyce 209:10-

212:2), Def. App. 187-88 (Martin 144:17-145:2).

84. The letter of intent identified the assets that Rain and Hail was buying as the in-force policies and renewal rights, among the other assets listed. Def. App. 141-42 (Joyce 216:22-217:8), Def. App. 300 (Depo. Ex., p. 3, "Assets" ¶¶ 1-5).

85. Mr. Martin testified that the in-force policies listed as one of the assets that Rain and Hail was purchasing were carried on American Growers' books as assets. Def. App. 181 (Martin 117:19-118:16).

86. Mr. Martin testified that "[m]y understanding is MPCI policies that are in force after the sales closing date are not transferable." Def. App. 183 (Martin 125:20-22).

### D. Acceptance Announces American Growers $130 Million Third Quarter Loss

87. On November 19, 2002, Acceptance filed its third-quarter Form 10-Q with the United States Securities and Exchange Commission, whose filing had been delayed from November 15, 2002. Def. App. 448-86.

88. The 10-Q reported that American Growers had suffered a $130 million loss in the third quarter. Def. App. 451.

## V. Rain and Hail Discusses Proposed Transaction With RMA

89. Mr. Joyce and other Rain and Hail representatives met in person with Ross Davidson and other RMA representatives at RMA's offices on Wednesday, November 20, 2002 to discuss the proposed transaction with Rain and Hail that was set forth in the Monday, November 18, 2002 letter of intent. Def. App. ____ (Joyce 90:11-93:8; Depo. Ex. 32).

90. Mr. Joyce's recollection about who attended the meeting was later recorded in a letter from Rain and Hail's counsel. Def. App. 303.

91. Rain and Hail, with Acceptance's approval, provided a copy of the letter of intent to RMA. Def. App. 121 (Joyce 103:14-104:6).

92. Mr. Joyce also spoke to Mr. Davidson and other RMA representatives by telephone on Thursday, November 21, 2002 and Friday, November 22, 2002. Def. App. 119-20 (Joyce 96:14-98:22), Def. App. 303-04 (Depo. Ex. 32).

93. During the telephone call on November 21, 2002, two additional RMA representatives who had been with RMA for a significant period of time and had a more detailed understanding of how the crop insurance program worked, Kim Arrigo and Garland Westmoreland, participated. Def. App. 122 (Joyce 115:13-22).

**A. <u>Rain and Hail Requests Waivers From RMA</u>**

94. Rain and Hail requested that RMA waive its requirements regarding the transfer of insurance policies whose sales closing dates had passed, which Mr. Joyce referred to as "in-force policies": "We needed to make sure that we could handle the in-force policies that were already written and on the books and that did require RMA cooperation and/or waiver, whatever you wish to call it. And that is contained in 4.C(9), yes." Def. App. 106 (Joyce 26:2-6).

95. Mr. Joyce testified that although Rain and Hail and RMA did not refer specifically to Section 4.C(9), the parties discussed at length Rain and Hail's request that RMA waive its requirements for the transfer of policies: "We didn't particularly talk about 4.C(9). But the idea of an agreement between the two parties of how we were going to handle the in-force premium that was already there, absolutely, that's part and parcel of that whole several segments in there. . . . there was substantial time spent on various sales closing dates, which generates this whole reference to in-force policies and the complications that that brought to the table as far as

how to handle that book of business without, I'll say, interruption of the policyholder along with what paper would be issued, what insurance policies would be on it, and the financial implications of that. So yes, that's part and parcel of that whole segment. " Def. App. 106 (Joyce 26:21-27:1, 27:17-28:3) Def. App. 124, 132 (see also Joyce 121:20-122:7, 169:9-20), Def. App. 289-90 (Depo. Ex. 25).

96. Mr. Joyce testified that the reason that Rain and Hail sought a waiver of Section 4.C(9) was that "Somebody had to deal with the people who already had made a selection of agent, company, et cetera. . . . So Acceptance either had to keep those people – to try to run an operation – now, this is my view, not Acceptance's – had to try to keep together a group of people to service the 2003 business that was already sold. That had to tried to be maintained, or you had to somehow get RMA to allow us– to assume that book of business for service and ongoing policy – yeah, ongoing policy service. . . . there's all kinds of service issues, track issues, records issues, when you start trying to split a year." Def. App. 107 (Joyce 29:21-30:15, 31:8-10).

97. Mr. Joyce testified that "The big fall sales closing date is . . . September 30th." Def. App. 114 (Joyce 75:24-76:1).

98. Mr. Joyce testified that "we're talking about being here in November – massive numbers of fall seeded winter wheat customers who are out there" whose sales closing date has passed, and who consequently "don't have a choice yet at that point [to transfer to another insurer], but they are entitled to be serviced and taken care of." Def. App. 107 (Joyce 32:6-13).

99. Mr. Joyce testified that RMA required that as a condition of allowing Rain and Hail to step into the shoes of AmAg for the in-force policies, Rain and Hail would be required to

assume the liability for all previous years for those policies. Def. App. 157 (Joyce 348:25-349:10).

100. Mr. Joyce testified that "the place that we would agree that RMA – or at least I agree – that RMA – there was a request being made – would have been made or was made to RMA that was an exception to the norm is the in-force policies. That I believe to be correct, because there is no ability to transfer that policy once we have crossed the sales closing date." Def. App. 109 (Joyce 46:2-10).

101. Mr. Joyce agreed that in order to effect the transaction as proposed by Rain and Hail, RMA would have to grant its permission for Rain and Hail to substitute itself for American Growers on the in-force policies issued by American Growers and start servicing those policies, because "that is an exception to what is normally done." Def. App. 153-1, 153-2 (292:23-293:11, 305:8-306:20).

102. Rain and Hail requested that RMA permit a mass transfer of the in-force American Growers policies to Rain and Hail. Def. App. 128 (Joyce 139:13-19).

103. Mr. Joyce believed that the management of Acceptance understood that when Rain and Hail met with RMA, it was "going to be requesting a waiver of the provisions of Section 4.C(9)." Def. App. 106 (Joyce 27:2-6).

104. Mr. Martin testified that when he first spoke to Ross Davidson on November 15, 2002 about the proposed acquisition of American Growers' insurance policies, Mr. Martin was aware that Acceptance had assumed liability for IGF's policies for prior years. Def. App. 128 (Martin 138:7-14).

105. Mr. Martin believed that RMA would need to approve plan of operations changes

for American Growers as well as Rain and Hail. Def. App. 126-27 (Martin 132:24-133:14).

106. Rain and Hail also requested that RMA grant Rain and Hail accommodations regarding quality control, compliance reviews, and penalties for late filings for the American Growers policies that Rain and Hail proposed to buy. Def. App. 110 (Joyce 50:12-21), Def. App. 129, 131, 154 ( see also Joyce 141:23-142:18, 157:14-159:4, 322:4-323:10).

**B. RMA Required Rain and Hail To Assume Liability For Prior Years**

107. Ross Davidson, RMA Administrator testified that in past transactions, when one crop insurer bought the book of business from another crop insurer, if the acquiring insurer requested that RMA waive the SRA's requirements that governed the transfer of policies from one insurer to another, RMA required that the acquiring company always assume all liability for all past years for the policies acquired as a condition for granting the waiver. Def. App. 50-51 (Davidson 64:17-66:7), Def. App. 208-13 (Depo. Ex. 2)

108. Mr. Joyce testified that before Rain and Hail met with RMA regarding the proposed purchase of American Growers' policies, "[w]e knew from just – or at least general conversations said that RMA had always required that a transaction of this type, that the assuming company, which would have been Rain and Hail, had to take the old liabilities. And we simply were not going to do that." Def. App. 104 (Joyce 18:17-23) (emphasis added), Def. App. 153 (see also Joyce 287:9-288:11).

109. Mr. Joyce testified that during the November 21, 2002 telephone discussion, "the discussion hinged around the past liabilities." Def. App. 122 (Joyce 116:7-8).

110. Mr. Joyce testified that "RMA said that they would not accept that transaction unless we were willing to take the old liabilities with it. That is my belief and understanding,

yes." Def. App. 105 (Joyce 22:14-17). Mr. Joyce also testified that Ross Davidson, RMA's Administrator, said that "that has been their past practice." Def. App. 105 (Joyce 23:1-3).

111. Mr. Joyce testified that "if we did it, we had to take the old liabilities with it. That's a better – maybe a better way to put it." Def. App. 121 (Joyce 103:2-4).

112. Mr. Joyce testified that Rain and Hail abandoned the proposed transaction because "we were not going to assume any potential past liability, period. And we never got past that point. When RMA said that we couldn't do it, the world stopped. But that was clearly known from day one." Def. App. 116 (Joyce 81:12-16).

113. Rain and Hail was not prepared to accept any indemnifications from Acceptance for American Growers' past year's liabilities "simply because of their financial issues." Def. App. 116 (Joyce 82:17-83:2).

### C. Rain and Hail Planned Not To Retain All American Growers' Agents

114. Mr. Joyce testified that "[t]here were certain agents out there, because of our other business plans or models and/or past relationships with those agents that on a go[-]forward basis with proper notice we would not guarantee that we would take them all on, and particularly under the terms and conditions under which they were currently operating." Def. App. 113 (Joyce 69:6-13).

115. Mr. Joyce testified that the Rain and Hail representatives told RMA that Rain and Hail did not intend to keep all of American Growers' agents, though "[w]e probably didn't say that too loudly." Def. App. 126 (Joyce 132:1-3), Def. App. 288 (Depo. Ex. 23).

116. Mr. Joyce agreed that the agents that Rain and Hail did not pick up would have to find another company. Def. App. 129 (Joyce 141:3-6).

**D. <u>RMA Declined To Grant The Waivers Requested By Rain and Hail</u>**

117. During the Friday, November 22, 2002 telephone conversation, RMA representatives told Rain and Hail "basically what the [November 25, 2002 letter from RMA] says, that they would – could not accept leaving the liabilities behind and the other two or three issues that they raised." Def. App. 124 (Joyce 124:8-11), Def. App. 289-90 (Depo. Ex. 25).

118. Mr. Joyce recalls some discussion during the November 22, 2002 telephone call about the alternatives proposed by RMA regarding assumption of past years' liabilities, but "it didn't rise to the level of solving the problem in my mind. . . . because it would still wind up with us holding onto the liabilities and we were not going to do that." Def. App. 125, 132 (Joyce 128:11-16; <u>see also</u> 172:6-10).

119. On November 22, 2002, Rain and Hail sent a letter to RMA informing it that Rain and Hail had decided to "discontinue pursuit of the asset purchase outlined in the Non-Binding Letter of Intent. We have notified Acceptance accordingly." Def. App. 288 (Depo. Ex. 23).

120. On November 26, 2002, Mr. Joyce sent a letter to Mr. Davidson responding to Mr. Davidson's November 25, 2002 letter to Mr. Joyce. Def. App. 292-93. Mr. Joyce stated that "we were not willing to 'guarantee' that we would continue[] to do business with all agents." <u>Id.</u> 293.

**VI. <u>American Growers Is Placed Into Supervision By The Nebraska Department of Insurance</u>**

121. On November 22, 2002, the Director of Insurance for the State of Nebraska entered an Order of Supervision naming American Growers as a respondent. Def. App. 487-491.

122. The Order of Supervision included Findings of Fact, which stated that American Growers' policyholder surplus had declined "in excess of 50% in a nine month period,

constituting a financial condition which renders the continuation of American Growers' business hazardous to the public and its insureds." Def. App. 488 (first ¶ 4).

123. The Order of Supervision provided that "[d]uring the period of supervision, American Growers shall not undertake, engage in, commit to initiate, accept or renew any insurance business." Def. App. 488 (second ¶ 4).

124. The Order of Supervision prohibited American Growers from transferring any of its MPCI policies. Def. App. 489 (¶¶ (a), (e)).

125. At approximately 6:30pm on November 22, 2002, after the Order of Supervision was entered by the Nebraska Department of Insurance, RMA Administrator Ross Davidson sent John Martin at American Growers by facsimile a letter suspending American Growers pursuant to Section V.J of the SRA. Def. App. 282 (Depo. Ex. 21).

126. The letter directed American Growers to cease and desist the selling of any new insurance contracts "under its reinsurance agreements with the FCIC," and advising American Growers that FCIC would not reinsure any new insurance contracts. Id.

127. Mr. Martin responded by letter on November 25, 2002. Def. App. 284-85.

128. On December 20, 2002, the district court of Lancaster County, Nebraska entered an Order of Rehabilitation by consent of American Growers. Def. App. 492-98. The Order of Rehabilitation stated that "American Growers is in such condition that the further transaction of business by American Growers would be hazardous financially to its insureds or creditors or the public." Id. 492 ( ¶ 2).

129. On March 24, 2005, the Nebraska Department of Insurance entered an Amended Order of Liquidation for American Growers. Def. App. 499-505.

## VII. GAO Report

130. The General Accounting Office[6] ("GAO") prepared a report dated June 2004 that analyzed the collapse of American Growers that occurred in 2002. Def. App. 223-78.

131. The GAO report stated "American Growers' failure was the result of a series of company decisions that reduced the company's surplus, making it vulnerable to collapse when widespread drought erased anticipated profits in 2002." Def. App. 235.

132. The GAO report identified three principal business decisions that led to the company's collapse: the CRC Plus product; payment of agent commissions that were 12 percent higher than other crop insurers; and the IGF acquisition. Def. App. 230.

133. The GAO report stated "[w]hether the sale of American Growers' policies to Rain and Hail could have saved taxpayers all or some of the costs of the dissolution if the proposed sale had been completed is unclear. . . . even with the cash infusion from the sale of assets to Rain and Hail, the company may still have been found to be in a financially hazardous condition." Def. App. 267.

[6] Now known as the Government Accountability Office.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Mark A. Melnick by Donald E. Kinner

MARK A. MELNICK
Assistant Director

OF COUNSEL:

DONALD A. BRITTENHAM, JR.
Attorney
Community Development Division
Office of the General Counsel
U.S. Department of Agriculture
1400 Independence Ave., S.W.
Washington, D.C. 20250

s/ John H. Williamson

JOHN H. WILLIAMSON
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
1100 L St., N.W., 8th floor
Washington, D.C. 20530
Tel: (202) 307-0277
Fax: (202) 307-0972

February 10, 2006

Attorneys for Defendant

CERTIFICATE OF SERVICE

I certify under penalty of perjury that on this 10th day of February, 2006, a copy of the foregoing "DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ John H. Williamson