# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ACCEPTANCE INSURANCE COMPANIES INC.,

Plaintiff,

v.

THE UNITED STATES OF AMERICA,

Defendant.

**CASE NO. 03-2794**

Judge Thomas C. Wheeler

## PLAINTIFF'S CONSOLIDATED MOTION FOR SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION TO DEFENDANT'S RENEWED MOTION TO DISMISS OR FOR SUMMARY JUDGMENT

Lewis S. Wiener, Esq.
SUTHERLAND ASBILL & BRENNAN LLP
1275 Pennsylvania Avenue, NW
Washington, D.C. 20004
202.383.0140 - phone
202.637.3593 - fax
Counsel for Plaintiff Acceptance Insurance Companies Inc.

OF COUNSEL:
Ronald Massumi, Esq.
Carter L. Williams, Esq.
SUTHERLAND ASBILL & BRENNAN LLP
1275 Pennsylvania Avenue, NW
Washington, D.C. 20004
202.383.0100

Patrick Griffin, Esq.
Kutak Rock, LLP
The Omaha Building
1650 Farnam Street
Omaha, NE 68102-2186
402.346.6000

March 24, 2006

Attorneys for Plaintiff

**TABLE OF CONTENTS**


I. STATEMENT OF THE CASE ........ 1

II. STATEMENT OF FACTS ........ 6

III. ARGUMENT IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ........ 7

A. Acceptance is Entitled to Summary Judgment As a Matter of Law Because There Are No Genuine Issues of Material Fact in Dispute That Preclude Entry of Judgment in Its Favor ........ 7

1. Legal Standard Under RCFC 56 ........ 7

B. Acceptance Had a Compensable Property Interest in the Crop Insurance Business That Would Have Been Sold to Rain & Hail ........ 8

C. The RMA's Rejection of the Acceptance/Rain & Hail Transaction Effected a Categorical Taking of Acceptance's Business ........ 16

1. The Government's Arguments Against a Categorical Taking Are Unavailing ........ 19

D. Even Assuming Arguendo That There Was Not a Categorical Taking, the RMA's Action Constituted a Compensable Regulatory Taking Under the Penn Central Test ........ 21

1. The Economic Impact of the Government's Rejection of the Acceptance/Rain & Hail Transaction Rendered Acceptance's Crop Insurance Business Valueless ........ 22

2. The Government Unfairly Imposed on Acceptance a Burden That Should Be Borne By the Public Generally ........ 22

3. Acceptance Held A Reasonable Investment-Backed Expectation That It Would Be Permitted To Sell Its Business Including In-force Crop Insurance Policies to Rain & Hail ........ 29

IV. ARGUMENT IN OPPOSITION TO GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT ........ 32

A. If the Court Does Not Render Summary Judgment in Favor of Acceptance, the Court Must Deny the Government's Motion for Summary Judgment Because it is Premised Entirely on Assertions as to Which There Are Genuine Issues of Material Fact ........ 32

V. ARGUMENT IN OPPOSITION TO THE GOVERNMENT'S RENEWED MOTION TO DISMISS ..... 36

A. This Court Should Refuse to Reconsider the Government's Motion to Dismiss For Lack of Subject Matter Jurisdiction Because the Government Has Demonstrated No Exceptional Circumstances That Would Justify Doing So ..... 36

1. There Are No Extraordinary Circumstances to Support the Government's Renewed Motion to Dismiss ..... 37

2. The Government is Barred by Laches for Unreasonably Delaying the Filing its Renewed Motion to Dismiss ..... 40

3. Under the Law of the Case Doctrine, the Court Should Reject Reconsideration of Judge Hodges' Ruling on Defendant's Motion to Dismiss ..... 40

4. Even if the Court Were to Reconsider Defendant's Motion to Dismiss, Defendant's Arguments Still Lack Merit and do not Justify or Support Dismissal ..... 43

VI. CONCLUSION ..... 50

**TABLE OF AUTHORITIES**

*Cases:* *Pages*

*ACE Property & Casualty Co. v. United States*,
60 Fed. Cl. 175 (2004) ....................47

*Adickes v. S. H. Kress & Co.*,
398 U.S. 144 (1970).................... 7-8

*Agins v. Tiburon*,
447 U.S. 255 (1980)....................22

*Ambase Corp. v. United States*,
58 Fed. Cl. 32 (2003) ....................28

*American Growers Ins. Co. v. FCIC*,
210 F. Supp. 2d 1088 (S.D. Iowa 2002) .................... 47-48

*American Pelagic Fishing Co., L.P. v. United States*, 379 F.3d 1363 (Fed. Cir. 2004),
*cert. denied*, 125 S. Ct. 2963 (2005) .................... 12-15, 18

*Amoco Production Co. v. Hodel*,
815 F.2d 352 (5th Cir. 1987) ....................44

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986).................... 7-8, 33

*Armstrong v. United States*,
364 U.S. 40 (1960).................... 17, 24-25

*Augustine v. Principi*,
343 F.3d 1334 (Fed. Cir. 2003)....................37, 42

*Avenal v. United States*,
100 F.3d 933 (Fed. Cir. 1996)....................8

*Bastek v. FCIC*,
145 F.3d 90 (2d Cir. 1998)....................48

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)....................3, 8

*Christianson v. Colt Indus. Operating Corp.*,
486 U.S. 800 (1988)....................37

*Cienega Gardens v. United States*,
67 Fed. Cl. 434 (2005) .......................................................................................22

*Cienega Gardens v. United States*,
331 F.3d 1319 (Fed. Cir. 2003)........................................................... 28-29, 30

*Conti v. United States*,
291 F.3d 1334 (Fed. Cir. 2002)...........................................................12, 14, 15

*Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*,
424 F.3d 1293 (Fed. Cir. 2005).....................................................................8

*Farmers Alliance Mut. Ins. Co. v. FCIC*, No. 00-2347-JWL,
2001 WL 30443 (D. Kan., Jan. 3, 2001).........................................................47

*Florida Rock Indus. v. United States,*
18 F.3d 1560 (Fed. Cir. 1994).....................................................................22

*Fru-Con Constr. Corp. v. United States*,
44 Fed. Cl. 298 (1999) .......................................................................................39

*General Mills, Inc. v. Hunt-Wesson, Inc.*,
103 F.3d 978 (Fed. Cir. 1997).....................................................................33

*Gould, Inc. v. United States*,
67 F.3d 925 (Fed. Cir. 1995)......................................................... 37-39, 42

*Lingle v. Chevron U.S.A., Inc.*,
544 U.S. 528, 125 S.Ct. 2074 (2005).............................................. 16-17, 22

*Loveladies Harbor, Inc. v. United States*,
28 F.3d 1171 (Fed. Cir. 1994)...................................................................20, 22

*Lucas v. South Carolina Coastal Council*,
505 U.S. 1003 (1992)............................................................... 8-9, 17, 19

*M&J Coal Co. v. United States*,
47 F.3d 1148 (Fed. Cir. 1995)...................................................................8, 17

*Maritrans Inc. v. United States*,
342 F.3d 1344 (Fed. Cir. 2003).............................................................9, 18, 22

*Members of the Peanut Quota Holders Ass'n, Inc. v. United States*,
421 F.3d 1323 (Fed. Cir. 2005)......................................................... 14-15

*National Crop Ins. Servs., Inc. v. FCIC*,
351 F.3d 346 (8th Cir. 2003) ....................................................................45, 46

*Norman v. United States*, 429 F.3d 1081 (Fed. Cir. 2005), *petition for cert. filed*,
74 U.S.L.W. 3487 (U.S. Feb. 15, 2006) (No. 05-1050)........................................17

*Palm Beach Isles Assocs. v. United States*,
231 F.3d 1354 (Fed. Cir. 2000)......................................................................... 18-21

*Palm Beach Isles Assocs. v. United States*,
208 F.3d 1347 (Fed. Cir. 2000)......................................................................... 19-20

*Penn Central Transportation Co. v. New York City*,
438 U.S. 104 (1978)........................................................................................ *passim*

*Pennsylvania Coal Co. v. Mahon*,
260 U.S. 393 (1922)...............................................................................................17

*Perkin-Elmer Corp. v. Computervision Corp.*,
732 F.2d 888 (Fed. Cir. 1984)...........................................................................37, 42

*Rain & Hail Ins. Service, Inc. v. FCIC*,
229 F. Supp. 2d 710 (S.D. Tex. 2002) ....................................................................47

*Rith Energy, Inc. v. United States*,
247 F.3d 1355 (Fed. Cir. 2001).......................................................................... 17-18

*Stockton East Water Dist. v. United States*,
62 Fed. Cl. 379 (2004) ......................................................................................37, 42

*Suel v. Secretary of HHS*,
192 F.3d 981 (Fed. Cir. 1999)............................................................................37, 42

*In re 2000 Sugar Beet Crop Ins. Litigation*,
228 F. Supp. 2d 999 (D. Minn. 2002)....................................................................45

*Texas Peanut Farmers v. United States*,
409 F.3d 1370 (Fed. Cir. 2005)................................................... 36, 38-40, 43, 44

*Texas Peanut Farmers v. United States*,
59 Fed. Cl. 70 (2003) ..................................................................... 38-39, 43, 44

*United Nuclear Corp. v. United States*,
912 F.2d 1432 (Fed. Cir. 1990)......................................................................... 29-31

*Wyatt v. United States*,
271 F.3d 1090 (Fed. Cir. 2001)....................8

*Yuba Goldfields, Inc. v. United States*,
723 F.2d 884 (Fed. Cir. 1983)....................8, 33

<u>*Federal Constitution, Statutes and Regulations*</u>:

U.S. Const. amend V.................... *passim*

U.S. Const. amend V, cl.4....................16

7 U.S.C. § 1506(d)....................43, 44

7 U.S.C. § 1508(j)....................43, 48

7 U.S.C. § 6912(e).................... 40, 47-48

28 U.S.C. § 1346....................43

28 U.S.C. § 1491(a)(1)....................43

7 C.F.R. § 24.4(b)....................47

7 C.F.R. § 400.169....................39, 47, 48

7 C.F.R. § 400.169(a)....................46, 47

7 C.F.R. § 400.169(d).................... 46-47

<u>*Miscellaneous*</u>:

Chase Insurance website, www.chaseinsurancecompany.com....................10

Society of Actuaries, *Insurance Industry Mergers & Acquisitions* (2005) .............9-10, 11

United States Court of Federal Claims Rule 56....................3, 7

# INDEX TO PLAINTIFF'S APPENDIX[1]


| Tab | | Page |
|---|---|---|
| 1 | 30(b)(6) Deposition of the United States (by Ross Davidson, Administrator, MA) | 1 |
| 2 | Deposition of Rain & Hail | 106 |
| 3 | Deposition of John Joyce (Nov. 7, 2003) | 234 |
| 4 | Deposition of John Martin | 263 |
| 5 | Deposition of J.B. Penn | 344 |
| 6 | Deposition of Hunt Shipman | 353 |
| 7 | Deposition of L. Tim Wagner | 371 |
| 8 | Depo. Ex. 17 (RMA Briefing Material – American Growers Insurance Company) | 418 |
| 9 | Depo. Ex. 18 (Ross Davidson Documentation of Action Taken By RMA) | 420 |
| 10 | Depo. Ex. 38 (Philo Smith & Co. AmAg Information Memorandum) | 426 |
| 11 | Depo. Ex. 35A (August 6, 2003 letter from Ross Davidson to Rep. Lee Terry) | 467 |
| 12 | Depo. Ex. 57 (Tim Wagner Handwritten Note) | 471 |
| 13 | August 10, 2004 letter from John Martin to Lawrence Dyckman | 472 |
| 14 | Confidential Transcript of Ross Davidson | 473 |
| 15 | Depo. Ex. 19 (**Confidential** RMA List of Recipients of American Growers Crop Ins. Policies | 481 |
| 16 | Judge Hodges' August 14, 2004 Order | 482 |
| 17 | Comparison of Plaintiff's 7 U.S.C. § 6912(e) Arguments in Original and Renewed Motion to Dismiss | 485 |


[1] In an effort to avoid unnecessarily burdening the Court by submitting additional copies of documents already submitted by Defendant, Plaintiff incorporates by reference the following documents included in Defendant's Appendix ("Def. App."): the 2002 FCIC Crop Insurance Handbook, Sections 2 and 4.C(9), Plaintiff's Responses To Defendant's First Requests For Admission, and Deposition Exhibits ("Depo. Ex.") 2, 14, 15, 21, 22, 23, 25, 26, 29, 32, 33, 36, 37, 38, and 39. Where applicable, Plaintiff will refer the Court to references in Def. App.

18 Grant Thornton LLP November 30, 2005 Expert Report on Damages…………………...489

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| ACCEPTANCE INSURANCE COMPANIES INC., Plaintiff, | |
| v. | **CASE NO. 03-2794** |
| THE UNITED STATES OF AMERICA, Defendant. | Judge Thomas C. Wheeler |

## STATEMENT OF CASE

Plaintiff, Acceptance Insurance Companies Inc. ("Acceptance"), pursuant to Rule 56 of the Rules of the United States Court of Federal Claims, moves for Summary Judgment and responds in opposition to the United States' ("Government" or "Defendant") February 10, 2006 Renewed Motion to Dismiss for Lack of Subject Matter Jurisdiction or, in the Alternative, For Summary Judgment ("Defendant's Mot."), and states as follows:

### I. STATEMENT OF THE CASE

On November 18, 2002, following a quarter in which it sustained in excess of $130 million in losses, Acceptance agreed to sell its in-force crop insurance policies and other tangible and intangible insurance assets to Rain & Hail LLC ("Rain & Hail"), an experienced and financially secure crop insurance provider. Specifically, Acceptance and Rain & Hail agreed to a transaction whereby Rain & Hail would purchase Acceptance's in-force crop insurance policies held in the name of Acceptance's wholly-owned subsidiary, American Growers Insurance Company, policy renewal rights and other of Acceptance's tangible and intangible assets for not less than $21.5 million and, depending on the outcome of certain conditions, as much as $70 million.

On November 20, 2002, representatives from Rain & Hail, including John Joyce, Rain & Hail's then-President, and others, met with Ross Davidson and others from the Risk Management Agency ("RMA"), a sub-agency within the U.S. Department of Agriculture, to discuss the proposed transaction. According to the Government, Rain & Hail requested that the RMA: (1) waive the requirements of Section 4.C(9) of the Crop Insurance Handbook, which requires policyholders to execute a cancellation and transfer of experience form to permit the transfer of crop insurance policies from one crop insurance provider to another; (2) allow Rain & Hail to acquire Acceptance's policies on a going forward basis without accepting prior year liabilities; (3) agree that Rain & Hail would not be obligated to keep all of Acceptance's agents; and (4) make accommodations regarding quality control and compliance review, and waive penalties for late filings.

Ross Davidson, the then Administrator of the RMA, told the parties initially that he supported the proposed transaction. During this time, Davidson was in daily contact with Tim Wagner, the Director of the Nebraska Department of Insurance, John Joyce of Rain & Hail, and representatives from Acceptance. Davidson created the impression in Wagner's mind and the in minds of Acceptance's principals, that the RMA supported the proposed transaction. On November 22, 2002, however, Davidson advised Acceptance, Rain & Hail and Wagner that the RMA would not approve the proposed transaction.

The RMA's rationale for rejecting the transaction was two-fold: first, Davidson stated that the agency would not waive and had never waived the requirements of Section 4.C(9) of the Crop Insurance Handbook unless the acquiring company agreed to accept prior year liabilities on the acquired policies. Doing so, according to the RMA, would create confusion among "producers" (i.e., the farmers eligible for crop insurance) and add to taxpayer costs. Second,

despite the fact that the issue was never discussed with Rain & Hail, the RMA concluded that Rain & Hail would "cherry pick" agents and elect not to provide coverage to all producers, which would undermine the integrity of the crop insurance program. According to Davidson, agents whose contracts Rain & Hail elected not to assume presented a significant litigation risk to the agency.

Rain & Hail disputes that it requested a waiver of Section 4.C(9). Moreover, the plain language of Section 4.C(9) reveals that it is inapplicable in the bulk sales context when a company is selling its entire book of in-force policies and is leaving the business entirely. Section 4.C(9) of the Crop Insurance Handbook applies only in situations where a farmer wants to transfer crop insurance carriers. In such a case, the farmer must affirmatively elect to change carriers by executing a cancellation and transfer of experience form as provided in Section 4.C(9) prior to the policy's sales closing date.

The RMA's concern about producers who might be left without coverage was baseless. Rain & Hail unequivocally committed to provide coverage for all eligible producers. Rain & Hail stated specifically that "we have never taken the position that we wanted to choose which producers we would insure. We will insure any eligible producer, period." Rain & Hail November 26, 2002 letter to Ross Davidson, November 26, 2002 (Depo. Ex. 26, Def. App. 293).[1]

As for agents that Rain & Hail might not pick up who allegedly presented a litigation risk to the agency, Rain & Hail blunted this concern by committing to the RMA that it would accept

[1]Plaintiff has submitted its exhibits pursuant to RCFC 56 with the supporting affidavit of John E. Martin. Defendant has not supported its documents by affidavit and it is, therefore, questionable whether Defendant has made the showing contemplated by *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (U.S. 1986).

all agents who had written in-force policies, but the company wanted to be free to select its own agents in later years. According to Rain & Hail, for "policies that were already in-force and for which the sales closing date had passed, we always intended to honor the agent agreements of Acceptance and pay the agents accordingly." *Id.* In any event, to the extent that agents who might not be picked up by Rain & Hail presented a potential litigation risk, it is hard to fathom why or on what basis the RMA thought *it*, rather than Rain & Hail or Acceptance, might have liability.

The evidence in this case shows that, despite the fact that it was never able to quantify the liability risk from hypothetically disgruntled agents, the RMA's principal motivation in assessing and ultimately rejecting the proposed transaction was to avoid the specter of potential litigation by these agents. Support for this is found in the RMA's analysis of the proposed transaction and in the representations Davidson made to Tim Wagner and others. In its November 22, 2002 analysis, one of only three documents relied on by the agency to support its rejection of the proposed transaction under the heading "Taxpayer Cost" is "[h]igh risk of costly lawsuits from adverse agent/producer selection by R&H (agents, companies and producers)." Depo. Ex. 15 (Def. App. 279). The RMA avoided that risk by denying Acceptance the right to realize the value of its business through the sale to Rain & Hail. At the time the RMA blocked the proposed transaction, it knew that immediately following the RMA's announcement the Nebraska Department of Insurance would put the business under supervision, and ultimately into liquidation, thus giving the RMA the ability to take control of and distribute the in-force policies to Rain & Hail and Acceptance's other crop insurance competitors without risk of liability.

As the RMA knew would happen, immediately following announcement of the RMA's decision, the Nebraska Department of Insurance placed Acceptance into regulatory supervision

and the RMA took control of those policies for which Rain & Hail had been willing to pay in excess of $21.5 million and transferred them to Acceptance's former competitors, free of charge. Rain & Hail received the greatest number of policies. Significantly, the policies were transferred without prior year liabilities and without the obligation that the acquiring companies retain Acceptance's former agents, the same terms that Rain & Hail had earlier proposed but that the RMA had rejected. The only difference was that following the RMA's consummation of the transaction, Acceptance received *no remuneration* and the RMA eliminated its litigation risk.

According to Wagner, the RMA's actions caused great confusion among policyholders. More significantly, the American taxpayers ended up footing an approximately $50 million bill to wind up the affairs of Acceptance's subsidiary American Growers Insurance Company. Had Rain & Hail been permitted to acquire Acceptance's assets on the terms it proposed, the money that Rain & Hail would have paid—in excess of $21.5 million—in combination with Acceptance's other financial assets, would have been available to cover prior year losses. According to John Martin and Tim Wagner, those assets would have been sufficient to cover the losses that were ultimately borne by the taxpayers. As John Joyce noted prophetically, immediately following the rejection by RMA, "[f]rom big-picture perspective, we believed the proposed transaction was in the best interests of the Federal Crop Insurance program and minimized disruption of policyholder services." Depo. Ex. 26 (Def. App. 293). Why then did the government take this more cumbersome, confusing and ultimately more costly path: to avoid the potential for "costly lawsuits from adverse agent/producer[s]" as highlighted in its analysis of the proposed transaction.

As discussed more fully below, there are no material issues of fact in dispute that preclude the court from finding as a matter of law that by rejecting the proposed

Acceptance/Rain & Hail transaction to protect the RMA and USDA from potential litigation risk, the United States effectuated a taking of Acceptance's property for which Acceptance is owed just compensation. First, Acceptance had a compensable property interest in the assets affected by the RMA's rejection of the proposed transaction. Second, the Government's actions with respect to those assets eliminated 100% of their value – a total wipeout -- constituting a categorical taking. Third, assuming *arguendo* that the Government's taking was not categorical, Acceptance can nevertheless establish that the Government effectuated a taking of its property by application of the three-part *Penn Central* test. As further discussed below, the Government's arguments that Acceptance did not have a compensable property interest and that even if it did, the Government did not effectuate a fifth amendment taking are not supported by the facts or the law. In addition, Acceptance can demonstrate that material issues of fact exist that preclude the Court's entry of summary judgment in Defendant's favor. Finally, in response to Defendant's Motion for Summary Judgment, the Government's renewed Motion to Dismiss fails to raise any issues that were not previously considered and specifically rejected by Judge Hodges upon his denial of Defendant's earlier filed Motion to Dismiss.

## II. STATEMENT OF FACTS

Plaintiff's statement of facts are set forth in its proposed statement of uncontroverted fact filed along with this motion and in those of Defendant's proposed statement of fact filed on February 10, 2002 with which Acceptance agrees or filed corrected statements of fact as noted in its Responses and Objections to Defendant's Proposed Statement of Uncontroverted Fact filed along with this motion.

## STATEMENT OF ISSUES

1. Whether Acceptance had a Fifth Amendment compensable property interest in the American Growers insurance assets and the other tangible and intangible property interests that

Acceptance proposed to sell to Rain and Hail LLC as outlined in the November 18, 2002 letter of intent between Acceptance and Rain and Hail, LLC?

2. Whether the Government effected a categorical taking of Acceptance's property compensable under the Fifth Amendment when it announced that it would not accept or approve the proposed Acceptance/Rain & Hail transaction and subsequently distributed or made available to Acceptance's former competitors, including Rain & Hail for no cost Acceptance's assets in the form of in-force crop insurance policies?

3. If there was no categorical taking, whether Acceptance has satisfied the *Penn Central* three-part test to establish that the Government effected a compensable regulatory taking when it announced that it would not accept or approve the proposed Acceptance/Rain & Hail transaction and subsequently distributed or made available to Acceptance's former competitors, including Rain & Hail for no cost Acceptance's assets in the form on in-force crop insurance policies?

## III. ARGUMENT IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

### A. Acceptance is Entitled to Summary Judgment As a Matter of Law Because There Are No Genuine Issues of Material Fact in Dispute That Preclude Entry of Judgment in Its Favor

#### 1. Legal Standard Under RCFC 56

Summary judgment is appropriately granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* RCFC 56 (providing that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law"); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Adickes v.*

*S. H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1302 (Fed. Cir. 2005). It is well-settled that only disputes over material facts, defined as those facts that might affect the outcome of the suit under governing law, preclude an entry of judgment. *Anderson*, 477 U.S. at 248. Disputes over facts that are not outcome-determinative will not preclude the entry of summary judgment. *See id.* Having cross-moved, each party bears the burden of demonstrating entitlement to judgment, as well as the absence of issues of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986).

"Whether or not a taking has occurred is a question of law based on factual underpinnings." *Wyatt v. United States*, 271 F.3d 1090, 1096 (Fed. Cir. 2001). In general, a court should avoid "precipitous grants of summary judgment" in takings cases owing to the "fact-intensive" nature of such claims. *Yuba Goldfields, Inc. v. United States*, 723 F.2d 884, 887 (Fed. Cir. 1983). However, the fact that this is a "takings case does not affect the availability of summary judgment when appropriate to the circumstances." *Avenal v. United States*, 100 F.3d 933, 936 (Fed. Cir. 1996). A grant of summary judgment for Acceptance under the facts of this case is appropriate because there are no issues of material fact that would preclude the entry of such a judgment in its favor. By contrast and as explained in greater detail below, material issues of fact exist that preclude the Government's Motion for Summary Judgment.

### B. Acceptance Had a Compensable Property Interest in the Crop Insurance Business That Would Have Been Sold to Rain & Hail

To establish a taking, a claimant must establish that it held a protected property interest and that the governmental action at issue amounted to a compensable taking of that property interest. *See, e.g.*, *M&J Coal Co. v. United States*, 47 F.3d 1148, 1154 (Fed. Cir. 1995) (explaining that claimant must show that "the use interest proscribed by the governmental action was part of the owner's title to begin with") (citing *Lucas v. South Carolina Coastal Council*,

505 U.S. 1003 (1992)); *Maritrans Inc. v. United States*, 342 F.3d 1344, 1351 (Fed. Cir. 2003) ("Second, once a court has determined that a property interest exists, it must determine whether a taking occurred.").

The evidentiary record establishes that Acceptance held a protected property interest in the crop insurance business that would have been sold to Rain & Hail. In 2002, Acceptance was a publicly traded insurance holding company for several operating companies, including American Growers. *See* Martin 79:24-25; 80:1-4, 18-23 (Pl. App. 284). Although structured as a sale of assets, the proposed transaction between Acceptance and Rain & Hail was, in fact, a sale by Acceptance of its wholly-owned subsidiary, American Growers. *See* Plaintiff's Responses to Defendant's First Set of Interrogatories at Response 8. Thus it was Acceptance, not American Growers, that was to benefit from the sale of assets. *Id.* The proceeds from the proposed transaction would have been received and held by Acceptance. *Id.* at Response 13. That Acceptance is the proper party in interest is further highlighted by the fact that the proposed sales transaction was between Rain & Hail and Acceptance, not American Growers. *See* Depo. Ex. 29 (Letter of Intent at 1; Def. App. 294).

A central premise of the Government's argument that Acceptance is not entitled to compensation under the Fifth Amendment is the startling suggestion that a corporate parent does not have a cognizable property interest in the realizable value of its wholly-owned subsidiary. It is elementary that there are two ways by which a corporate parent can realize the value of a subsidiary: either by the sale of the stock of the subsidiary or by the sale of the assets of the subsidiary.[2] In either case, the reality is that the parent is selling a *business*, namely the business

---

[2] *See generally,* Society of Actuaries, *Insurance Industry Mergers & Acquisitions* at 42-43 (2005).

it has conducted through the vehicle of its subsidiary.[3] Here, Acceptance had decided to exit the crop insurance business and had in fact agreed in the Letter of Intent not to compete in that business for a period of five years following the acquisition by Rain & Hail. See Depo. Ex. 29 (November 18, 2002 letter of intent; Pl. App. 299).

Holding company corporate structures are extremely common, if not universal, in the insurance business. The holding company is *not* an insurance company and does not have the necessary licenses to be one. Rather, it conducts the business of insurance through subsidiaries that *are* licensed as insurance companies. The business of insurance is regulated by the states, with the primary regulator always being the state in which an insurance company is incorporated.[4] Variations in state law sometimes compel that a line of business be conducted through more than one insurance company. For example, in the life insurance industry it is common for a company conducting business nationwide to have at least two subsidiaries under a holding company, one domesticated in New York in order to meet that state's unique requirements, and one or more domesticated elsewhere to conduct business in the remaining states.[5] Separate subsidiaries are also necessary in order to do business in different lines of insurance. For example, life, property and casualty, mortgage and title insurance are all separate lines of insurance and cannot be conducted by any single insurance company due to the unique licensing requirements for each. Thus, if one wished to do business in all these lines, one would

---

[3] *See id.* at 43 ("If the seller wants to sell substantially all of its assets, the seller is seeking to sell its business * * *.')

[4] *See id.* at 16 ("The insurance regulatory authority of an insurer's state of domicile is the primary regulator of that insurer.")

[5] For a typical example, see the Chase Insurance website, www.chaseinsurancecompany.com: "Chase Insurance consists of * * * Chase Insurance Life Company * * * licensed in all states, except New York * * * Chase Insurance Life Company of New York * * * licensed in New York."

be compelled to create a holding company system with at least four separately licensed insurance company subsidiaries. In addition to the regulatory factors that create impetus for the creation of insurance holding company systems, there are any number of business reasons that may favor the use of holding company systems.

The Government apparently concedes that if Acceptance had planned to dispose of its crop insurance business by selling the stock of its crop insurance company subsidiaries, there could be a compensable taking. *See* Defendant's Mot. at 25-26. But because of the happenstance that disposition of that business was to be through an asset sale rather than a stock sale, the Government argues that Acceptance is not entitled to be compensated for the loss of the value of its crop insurance business because Acceptance was not the direct owner of those assets. This is a monumental elevation of form over substance. In the first place, by definition a holding company does not directly create or hold insurance assets because it is not licensed to issue insurance policies; rather, it participates in the business of insurance through its insurance company subsidiaries. That hardly means that an insurance holding company should be denied compensation for value taken merely because the intended mechanism for realizing the value of its insurance business was an asset sale instead of a stock sale. The economic reality is that asset sales and stock sales are merely alternate means by which the corporate parent realizes the value of its subsidiary's business.

In the insurance industry, the transfer of insurance business is frequently accomplished through asset-based transactions.[6] An asset transaction assures the buyer that it will be assuming only the insurance liabilities associated with the business, and not any possible unknown corporate liabilities it might get if it purchased the corporate entity itself via a stock sale. And in

---

6 *Insurance Industry Mergers & Acquisitions* at 42-43.

small insurance transactions, such as the one at issue here, there is a disincentive to buying the stock and thus making the company another subsidiary of the buyer because maintaining any insurance company as a separate entity entails perpetual "entity level costs" comprising the ongoing regulatory costs every insurance company incurs, including the costs of compliance and the filing of the specialized annual statements required by the states, as well as the costs of maintaining the corporate entity itself and its separate personnel. It is more economically feasible to fold the newly acquired business into a pre-existing insurance company through an asset acquisition, thus avoiding duplicative "entity level costs." And in this particular case, the asset-based approach was compelled by the fact that Rain & Hail wished to acquire the business on a going-forward basis only, without assuming any of the pre-2003 crop year insurance liabilities, an aim that could most logically be accomplished by *not* purchasing the Acceptance subsidiaries by way of a stock purchase, because a stock purchase transfers the entire corporate entity and presumes assumption of all of the corporation's liabilities.

In attempting to demonstrate that Acceptance did not have a compensable interest in the crop insurance business it was selling to Rain & Hail, the Government relies on two completely inapposite lines of cases: the *Hughes Communications/Sun Oil* "government contract" cases and the *American Pelagic/Conti* "revocable permit" cases.

The "government contract" cases stand for the obvious proposition that when the alleged "taking" consists of no more than the impairment by contrary government action of a private party's contract rights under a contract between that party and the government, the remedy is an action against the government for breach of contract, rather than a Fifth Amendment "takings" claim. This is not a government contract case. The transaction in question was the private sale of an insurance business from one private party to another. Acceptance has no contract law

remedy against the Government for the loss of the value of its crop insurance business, and the Government does not assert that it does. This is fatal to any argument based on this line of cases. The hallmark of the government contract cases is that there *is* a contractual remedy against the Government. The availability of that remedy for breach of the contract means that nothing was "taken" – the contract remedy for breach by the Government is all the counterparty had in the first place. The government contract cases would only have relevance here if there had been a contract between Acceptance and the Government pursuant to which the Government would purchase Acceptance's crop insurance business, if the Government breached that contract, and if Acceptance had a cause of action for breach of that contract. But of course nothing of the sort was involved here. The government contract cases simply have no pertinence to the present case.

The "revocable permit" cases are equally unavailing. The question in those cases is whether a revocable permit constitutes "property" in which a person can have a cognizable "property interest" for purposes of the Takings Clause. Such cases deal with the nature of permits. The present case is not a permits case.

The logic of the permits cases is that one cannot possess a property right to conduct an activity that may be engaged in only by grace of a revocable permit. Thus, for example, in *American Pelagic Fishing Co., L.P. v. United States*, the owner of a fishing boat did not possess a "property right" to fish for Atlantic mackerel because the opportunity to do so at all was created by and totally dependent upon a government-issued permit that was explicitly revocable at any time and for any reason. 379 F.3d 1363, 1382-83 (Fed. Cir. 2004), cert. denied, 125 S. Ct. 2963 (2005). Moreover, the right to fish for mackerel is not inherent in ownership of a boat. *Id.* In stark contradistinction, the right to sell tangible assets *is* inherent in those assets, indeed the

alienability of property is fundamental to the very concept of "property rights." It is not created by permit. Indeed, in *American Pelagic*, the boat could be, and in fact was, sold -- and that had nothing to do with whether the fishing permit was or was not granted. This simply points up the critical distinction that the Government seeks to obscure: Insurance policies are tangible assets and the right to sell them is indeed inherent. By contrast, particular uses of tangible assets where such uses are solely the product of and entirely dependent upon the grant of a revocable permit, such as the privilege of fishing for mackerel in controlled waters, are not inherent in the assets. The distinction may be restated as that between "property rights" and "permit rights." Permit rights grant a privilege in a particular *use*, but neither the privilege nor the use are property rights. Alienability of assets is inarguably a fundamental property right and not the creation of a permitting system. As the Federal Circuit has stated, the "rights to sell, assign, or otherwise transfer are traditional hallmarks of property." *Conti v. United States*, 291 F.3d 1334, 1341 (Fed. Cir. 2002).

In the modern commercial world, regulatory conditions on the sale of property are a commonplace. For example, the public offering of securities requires registration and a prospectus. The owner of a hotel cannot select among buyers of its accommodations in a racially discriminatory way. And in the field of insurance, the issuance and sale of insurance policies requires the authorization of state and sometimes federal regulators. But such conditions have never been construed as negating the fundamental property right of transferability. Merely because the right to transfer may be subject to conditions, that does not defeat the existence of a property interest. Even an intangible such as a quota constitutes a property right if it is transferable, even if transfer is subject to restrictions. In *Members of the Peanut Quota Holders Ass'n, Inc. v. United States*, 421 F.3d 1323 (Fed. Cir. 2005), the Federal Circuit held that farmers

had a property interest cognizable under the Fifth Amendment in the peanut quota allocated to them under federal statute. Unlike the permits in such cases as *American Pelagic* and *Conti*, the peanut quotas were transferable, and thus constituted property, notwithstanding that transferability was subject to various restrictions. Alcohol and firearms are classic examples of goods that are subject to pervasive restrictions on their sale, yet there is no question that they are property. The restrictions on the ability to transfer peanut quotas did "not distinguish quotas from other transferable goods that are inarguably property, e.g., alcohol and firearms. The mere fact that transfers of allotments are not unrestricted does not undermine the importance of transferability to the characterization of quotas as a form of property." *Peanut Quota Holders*, 421 F.3d at 1332. Likewise, insurance policies by their very nature are subject to restrictions on transferability – for example, an insurance company cannot sell the policies it has issued to just any other company, they can only be sold to another carrier that possesses the appropriate authorization under state law to conduct the line of insurance business involved – yet that clearly does not undermine their characterization as a form of property.

Nevertheless the Government argues here that there is no property interest possible in crop insurance policies reinsured by the FCIC because of the alleged presence of restrictions on transferability.[7] Oddly, the particular restrictions the Government points to, Section 4.C(9) of the Crop Insurance Handbook, actually address not the sale of policies from one insurer to another, but rather apply to the situation where *the policyholder* wishes to switch its coverage from one company to another and thus constitute restrictions and conditions on *the policyholder's* ability to change carriers. That is not what was going on here, so it is unclear why

[7] *See* Defendant's Mot. at 28: "Neither American Growers nor Acceptance could hold any property interest that entitled them to transfer American Growers' in-force policies to another insurer."

the Government premises its entire argument regarding transfer restrictions on this section of the Handbook. In fact, relying on this plainly irrelevant section renders the Government's argument a flagrant non sequitur.

Nevertheless, assuming that the procedures of Section 4.C(9), which deal primarily with documentation, timing and the transmission of underwriting data, are somehow applicable to the present case, they certainly do not undermine the characterization of insurance policies as property. In fact, to the extent that the Handbook procedures require written acknowledgment and acceptance by the policyholder of the assignment of the policy to another carrier, they are essentially no different from state insurance laws that require policyholder consent to assignment of a policy. Such a requirement does not destroy transferability, but merely conditions it, and so long as transferability exists there is no argument that insurance policies lose their characterization as property. The Government's assertion to the contrary is simply incorrect.

Insurance policies are property for purposes of the Fifth Amendment and a governmental action that ruins the value of a portfolio of policies constitutes a compensable taking. The Government's argument offers absolutely no support for any other conclusion.

### C. The RMA's Rejection of the Acceptance/Rain & Hail Transaction Effected a Categorical Taking of Acceptance's Business

Having established Acceptance's compensable property interest in the assets that are the subject of this lawsuit, the uncontroverted facts show that the Government effectuated a categorical taking – a complete wipeout of the value – of those assets.

The Fifth Amendment prohibits the Government from taking private property "for public use, without just compensation." U.S. Const. amend V, cl. 4. Although the language of this clause does not prohibit the government from taking private property altogether, it does prohibit the government from "forcing some people alone to bear public burdens which, in all fairness

and justice, should be borne by the public as a whole." *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 125 S.Ct. 2074, 2080 (2005) (quoting *Armstrong v. United States*, 364 U.S. 40, 49 (1960)). In addition to taking property by physical occupation or confiscation, a taking may occur where the Government regulates private property so pervasively that it is tantamount to a physical taking. *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393 (1922).

As clarified by the Federal Circuit, although the Government may regulate property to some extent without giving rise to a compensable taking, "if regulation goes 'too far' it will constitute a compensable taking." *M & J Coal*, 47 F.3d at 1153 (quoting *Mahon*, 260 U.S. at 415). While in general, determining whether or not a compensable taking has occurred involves consideration of the three-prong *Penn Central* framework, when a taking is determined to be "categorical" -- meaning complete -- it is "compensable without case specific inquiry into the public interest advanced in support of the restraint." *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1015 (1992). Under *Lucas*, a categorical taking can be found where regulation leaves property owners with no economically viable use of their property. *Id.* at 1017; *see also Norman v. United States*, 429 F.3d 1081, 1090 (Fed. Cir. 2005) ("A 'categorical' taking is a regulatory taking in which government action deprives the landowner of all beneficial use of his property, such that the government action is the functional equivalent of a physical invasion."), petition for cert. filed, 74 U.S.L.W. 3487 (U.S. Feb. 15, 2006) (No. 05-1050).

Following the guidance of *Lucas*, the Federal Circuit has explained that the threshold inquiry with respect to regulatory takings is "to determine at the onset whether a particular claimed taking was 'categorical' or not." *Rith Energy, Inc. v. United States*, 247 F.3d 1355, 1362 (Fed. Cir. 2001). This initial inquiry is significant because "when the taking is categorical * * * 'analyzing whether compensation is due does not require an inquiry into whether the

plaintiff had reasonable investment-backed expectations that were defeated by the regulatory measure that gave rise to the takings claim.'" *American Pelagic*, 379 F.3d at 1372 (quoting *Rith Energy*, 247 F.3d at 1362 (citing *Palm Beach Isles Assocs. v. United States*, 231 F.3d 1354, 1357 (Fed. Cir. 2000))). If, on the other hand, the taking is not categorical, "the court will undertake the fact-based inquiry enumerated in *Penn Central* to evaluate whether the governmental action constituted a compensable taking of the property interest." *Id.* (citing *Maritrans*, 342 F.3d at 1351).

The uncontroverted facts establish that the RMA's rejection of the proposed Acceptance/Rain & Hail transaction resulted in a categorical taking of Acceptance's property. It is undisputed that Acceptance and Rain & Hail executed a signed letter of intent dated November 18, 2002, pursuant to which Rain & Hail agreed to purchase Acceptance's in-force crop insurance assets at a value of not less than $21.5 million and, subject to the fulfillment of certain conditions subsequent, as much as $70 million. As confirmed by the testimony of John Joyce, Rain & Hail's President, absent the rejection of the proposed transaction by the RMA, Rain & Hail would have consummated the deal outlined in the letter of intent. November 7, 2003 Deposition of John Joyce at 35:9-13, 70-15-20 (Pl. App. 242, 251).

Following its rejection of the proposed transaction, the RMA distributed or made available to Acceptance's former competitors, including Rain & Hail, the former American Grower's crop insurance policies for which Rain & Hail had been willing to pay in excess of $21 million. Through the Government's lawyers, Rain & Hail received the greatest number of American Growers' policies. Depo. Ex. 17 (Pl. App. 418); Wagner Depo. 36:7-21, 37:14-21. (Pl. App. 380, 381). By rejecting this proposed transaction, the Government prevented Acceptance from realizing any of the value of its assets; immediately following the RMA's

rejection of the proposed transaction, the Nebraska Department of Insurance, acting in concert with the RMA, placed America Growers under supervision, thus eliminating any possibility that Acceptance could sell its assets elsewhere. Wagner Depo. 35:2-13 (Pl. App. __). But for the action of the RMA, Acceptance would have received in excess of $21.5 million for the crop insurance business Rain & Hail had agreed to purchase. The RMA thus effected a categorical taking of Acceptance's crop insurance assets. *See Lucas*, 505 U.S. at 1017; *Palm Beach Isles Assocs.*, 231 F.3d at 1357.

### 1. The Government's Arguments Against a Categorical Taking Are Unavailing

In its motion, the Government argues that Acceptance can not establish a categorical taking as a matter of law. Defendant's Mot. at 28-30. The Government is wrong and its arguments against a categorical taking are flawed because the uncontroverted facts establish that: (1) the RMA's rejection of the proposed Acceptance/Rain & Hail transaction rendered Acceptance's property valueless; and (2) the RMA mischaracterizes its action in an attempt to improperly infuse investment-backed expectations into the categorical takings analysis.

The Government's argument is premised largely on the assertion that the "RMA did not 'reject' the proposed transaction, as Acceptance alleges." Defendant's Mot. at 29. Instead, the Government portrays the RMA's action as a decision not to waive restrictions found in Section 4.C(9) of the Crop Insurance Handbook in order to permit the bulk transfer of in-force crop insurance policies. *See id.* The Government appears to be attempting to blur the distinction between categorical and non-categorical takings and cloud the analysis by introducing impermissibly the concept of investment-backed expectations.

As the Federal Circuit has made clear, investment-backed expectations are to play no part in the analysis of a categorical taking. *See Palm Beach Isles Associates v. United States*, 208

F.3d 1374 (Fed. Cir. 2000); *Loveladies Harbor, Inc. v. United States*, 28 F.3d 1171 (Fed. Cir. 1994). Thus, the Government ignores the express holding of *Palm Beach Isles Associates* that when a regulatory taking results in "a total wipeout" of a property's value, the plaintiff's investment-backed expectations play no role in the court's analysis. *Palm Beach Isles Assocs.*, 231 F.3d at 1362-63. That is, if a regulatory taking is categorical, the question of investment-backed expectations is removed from the analytical equation. *Id.* at 1363.

In addition to ignoring these cases, the Government mischaracterizes the RMA's action. The uncontroverted facts establish that the Government's *post hoc* attempt to describe the RMA's role in regulating bulk sales of crop insurance policies as one of granting waivers -- in order to show that investment-backed expectations are weakened -- is unavailing. Plaintiff's Deposition Exhibit 36 (Def. App. 373), an SRA Assignment and Assumption Agreement executed in connection with the earlier purchase by Acceptance of IGF Insurance Company's crop insurance business establishes that rather than granting or denying waivers, as the Government now argues, the RMA actually approves or rejects transactions. The Assignment and Assumption Agreement reveals that, as Acceptance has always maintained, it specifically sought and received FCIC approval for the bulk purchase of crop insurance policies from IGF. Notably, the Agreement is countersigned by the FCIC and states that "the FCIC *approves* this Assignment as of Closing." *Id.* (emphasis added).

Moreover, the evidentiary record in this case shows that Ross Davidson, the Administrator of the RMA, told John Joyce, Rain & Hail's President, on November 22, 2002 that the RMA would not accept the proposed transaction. Rain & Hail Depo 22:14-17, 102:19-23 (Pl. App. 112, 132). On or about the same date, Davidson told Tim Wagner, the Director of the

Nebraska Department of Insurance that the RMA would not approve the proposed transaction. Wagner 76:17-23 (Pl. App. 390).

The Government's claim that the RMA's decision did not render Acceptance's policies valueless is also flawed, as the record establishes that, as a result of the RMA's action, Acceptance's crop insurance business, previously worth a minimum of $21.5 million and estimated at the time the letter of intent was executed, as much as $70 million, were rendered valueless. Specifically, Acceptance's policies were distributed for free to each of its former competitors, including Rain & Hail, which received the single largest number of those policies. Depo. Ex. 17 (Pl. App. 418); Wagner Depo. 36:7-21, 37:14-21 (Pl. App. 380, 381). Thus, by and through the Government's actions, Rain & Hail received for free assets for which it had been willing to pay in excess of $21.5 million. RMA thus effected a categorical regulatory taking of Acceptance's insurance assets. *See Palm Beach Isles Assocs.*, 231 F.3d at 1357. Faced with this categorical taking, the question of investment-backed expectations plays no role in the Court's analysis.

### D. Even Assuming Arguendo That There Was Not a Categorical Taking, the RMA's Action Constituted a Compensable Regulatory Taking Under the Penn Central Test

Even if the Court finds that the RMA has not effected a categorical taking, the RMA's rejection of the Acceptance/Rain & Hail transaction nonetheless constitutes a compensable taking when analyzed under the test announced in *Penn Central Transportation Co. v. New York City*, 438 U.S. 104 (1978). In *Penn Central*, the Supreme Court articulated a three-part test for determining whether government action constitutes a compensable regulatory taking. Under the *Penn Central* test, the Court must consider:

(1) the economic impact of the action on the claimant;

(2) the character of the governmental action; and

(3) the extent to which the action interfered with the plaintiff's reasonable investment-backed expectations.

*See Penn Central*, 438 U.S. 104; *Loveladies Harbor*, 28 F.3d at 1179. All three prongs of the *Penn Central* test are satisfied here.

### 1. The Economic Impact of the Government's Rejection of the Acceptance/Rain & Hail Transaction Rendered Acceptance's Crop Insurance Business Valueless

In analyzing the economic impact of a regulation, the Federal Circuit has held that "the owner's opportunity to recoup its investment or better, subject to the regulation, cannot be ignored." *Florida Rock Indus. v. United States,* 18 F.3d 1560, 1567 (Fed. Cir. 1994). Here, Acceptance was stripped of the opportunity to receive any money for its property. As the evidence shows, and as discussed above, the RMA's rejection of the proposed sale of Acceptance's in-force crop insurance policies rendered Acceptance's property valueless.

### 2. The Government Unfairly Imposed on Acceptance a Burden That Should Be Borne By the Public Generally.

The Federal Circuit has explained that assessing the character of the governmental action requires an analysis both of the purpose of the regulation and of the actions taken by the government to serve that purpose. *See Cienega Gardens v. United States*, 67 Fed. Cl. 434, 466 (2005) (citing *Maritrans*, 342 F.3d at 1356). "This inquiry concerns not only the societal benefit sought to be achieved by the governmental action but also whether the burdens imposed by the action were spread broadly over a large portion of the population or placed particularly on a relatively few property owners." *Id.* (citing *Lingle*, 125 S. Ct. at 2084); *see also Agins v. Tiburon*, 447 U.S. 255, 261 (1980) (explaining that consideration of the character of the government action, involves a balancing of the public and private interests at stake). Here,

several factors militate in favor of placing the financial burden of rejecting the proposed transaction on the public generally rather than solely on Acceptance.

First, although the Government sought to achieve a public benefit by rejecting the Acceptance/Rain & Hail transaction, the burden imposed by the RMA's action was not spread over a large portion of the population, but rather placed solely on Acceptance. The only analysis of the proposed transaction conducted by the RMA reveals that the RMA's principal motive in rejecting the proposed transaction was to avoid the perceived "[h]igh risk of costly lawsuits from adverse agent/producer selection by [Rain & Hail]." Depo. Ex. 15 (Def. App. 279). Although the Government never quantified this risk, the idea appears to be that crop insurance agents that Rain & Hail may have decided not to employ and other crop insurance carriers might sue the RMA for approving the Acceptance/Rain & Hail transaction. See Depo. Ex. 35A (Pl. App. 467). As the Government explains in its Motion, RMA was "concerned that other insurers, agents, or farmers who considered that their interests had been harmed by RMA waiving the SRA's restrictions on transfer of policies were very likely to sue RMA and FCIC, exposing taxpayers to the possibility of costly lawsuits." Defendant's Mot. at 32 (citing Def. App. 74 (RMA/Davidson Depo. 294:12-17)). In addition, Ross Davidson told Tim Wagner, the Director of the Nebraska Department of Insurance, that if the RMA approved the transaction there was a concern that the RMA would be a sued. Wagner Depo. 50:14-19, 60:10-15 (Pl. App. 384, 386); Depo. Ex. 57 (Pl. App. 471). The avoidance of litigation exposure was the public benefit, the entire burden of which has been sustained by Acceptance.

The injustice of singling out Acceptance is revealed by a comparison of the proposed transaction that the RMA rejected and the subsequent distribution of the assets that were to be the subject of that transaction. By denying the proposed Acceptance/Rain & Hail transaction, the

Government afforded itself the opportunity to consummate a transaction virtually identical to the proposed transaction. The only difference is that under the proposed transaction, Acceptance stood to receive between $21.5 million and $70 million. Instead, due to RMA's rejection, it received $0 and the Government relieved itself – at Acceptance's expense – of the potential liability it feared would result from its approval of the proposed transaction.

The Government claims that it rejected the transaction as proposed because: (1) the proposal contemplated the bulk transfer of a large portfolio of policies without requiring each policyholder to sign a transfer form pursuant to Section 4.C(9) of the FCIC Crop Insurance Handbook, the requirements of which the RMA would not waive; (2) Rain & Hail intended to purchase the business on a going forward basis only, without taking on prior year liabilities; and (3) Rain & Hail might have elected not to assume all of Acceptance's agency contracts. Yet the governmental action in rejecting the transaction led to a virtually identical result. Following the rejection, the Government (1) transferred or made available Acceptance's in-force policies to other crop insurers, principally Rain & Hail, without requiring the new insurers to accept prior year liabilities, and (2) allowed the new insurers to select their own agents -- and eliminating the perceived litigation risk for RMA.

In short, the character of the governmental action at issue in this case can be summarized as follows: The Government, motivated by the public purpose of avoiding potential litigation exposure, brought about the same results that it rejected -- except that Acceptance received nothing, rather than between $21.5 million and $70 million it would have received from Rain & Hail. In effect, Acceptance "paid" more than $21.5 million to eliminate the Government's litigation risk. The Government imposed upon Acceptance the entire financial burden of its public purpose in avoiding feared liability. *Armstrong v. United States,* 364 U.S. 40, 49 (1960)

(stating that the Takings Clause is intended to "bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole").

A surprising element of this case is the superficiality of the Government's review and analysis of the proposed transaction. The Government admits in its Objections and Responses to Plaintiff's First Set of Interrogatories that the RMA relied upon only three principal documents in deciding to reject the proposed transaction: (1) "Rain and Hail's November 18, 2002 letter of intent (and attached term sheet) to Acceptance"; (2) "An analysis prepared by RMA Administrator Ross Davidson"; and (3) the "FCIC Crop Insurance Handbook Section 4.C(9)". Def. App. at 202-03. The second of these documents consists of a mere three pages of bullet points. In addition, the Government never provided an explanation of its fear of litigation. Similarly, although the Government's analysis cites the need for a "[Department of] Justice determination," presumably to review antitrust concerns, the Government provides no basis or explanation for any potential antitrust concerns. Govt. App. at 279. In fact, no one from the RMA ever contacted DOJ to discuss such concerns or even to determine whether DOJ actually had any concerns. RMA/Davidson Depo. 392:14-19, 393:6-14 (Pl. App. 102). Perhaps more startling, the ultimate decision-maker, Ross Davidson, had no background or experience in crop insurance and had never analyzed a proposed transaction prior to the proposed Acceptance/Rain & Hail transaction. RMA/Davidson Depo. 17:8-10, 15-18, 18:15-23 (Pl. App.5, 6). Moreover, J.B. Penn, Davidson's superior, could recall nothing about his review of the proposed transaction, even though Davidson told Tim Wagner, the Director of the Nebraska Department of Insurance that despite his [Davidson's] support for the proposed transaction, it was rejected by

his superiors. Penn Depo. 13:22-23–14:1-3, 15:5-7, 20:4-9, 19-23 (Pl. App. 347-48, 349); Wagner Depo. 22:9-22, 23:8-10, 46:14-17 (Pl. App. 377, 383).

In addition:

- The RMA did not undertake any analysis to determine whether agents would in fact be harmed by the proposed transaction. RMA/Davidson Depo.. 259:2-7, 261:2-18 (Pl. App. 67, 68);
- The RMA did not discuss with Rain & Hail its concerns about alleged "producer, agent lapses; potential concentration of losses; potential instability for other companies" despite the fact that the RMA had significant concerns about these issues. Rain & Hail Depo. 144:25-145:1-12, 146:7-9, 148:1-2, 150:12-17, 152:19-23, 154:12-16, 163:5-14 (Pl. App. 142-43, 144, 145, 147);
- The RMA based its decision on the faulty assumption that Rain & Hail would not accept all eligible producers and would leave some producers without crop insurance coverage. In fact, Rain & Hail committed to insure all eligible producers. Rain & Hail Depo. 351:8-22 (Pl. App. 226);
- The RMA ignored the recommendation of the Director of the Nebraska Department of Insurance to approve the proposed transaction. Wagner Depo. 19:21, 20:23-25-21:1, 30:12-18 (Pl. App. 376, 379);
- The GAO concluded that "RMA's oversight was inadequate to evaluate the overall financial condition of companies selling Federal crop insurance." GAO Report at 15 (Def. App. 241)
- Ross Davidson, testifying on behalf of the Government, admitted:

- The process by which the RMA staff evaluated American Growers' financial condition was insufficient to allow the RMA to assess the overall financial health of the company, and did not provide the RMA with an accurate picture of the company's financial condition. RMA/Davidson Depo. 166:17-23-167:1-3, 168:1-7, 172:15-20 (Pl. App. 44, 45, 46);
- The RMA made its decision regarding the proposed transaction based on incomplete, narrowly focused and dated information. RMA/Davidson Depo. 172:21-23-173:1 (Pl. App. 46); and
- The RMA did not use (because none exists) any written criteria to assess American Growers' financial ability to pay prior year losses and there is no written record of any analysis that Mr. Davidson may have performed. RMA/Davidson Depo. 186:11-23-187:1-6 (Pl. App. 49).

Although the Government has argued that "the character of RMA's action is not consistent with a taking, because RMA acted to promote the public good when it enforced the SRA's restrictions on transferring MPCI policies," Defendant's Mot. at 31, this argument misses the point of the Fifth Amendment and the entirety of takings jurisprudence. Having a "public use" does not eliminate the requirement of just compensation. To the contrary, a public use is an element of a compensable taking.

In an equally unavailing attempt to defend the character of the governmental action at issue, the Government claims that the "RMA's suspension of American Growers from writing new policies is analogous to a banking regulator exercising its powers to protect the assets of a failing bank." Defendant's Mot. at 33. This is circular reasoning. If the Government had let Acceptance transfer its crop insurance business to Rain & Hail, a stable and highly experienced

crop insurer, there would have been no need to take *any* regulatory action against Acceptance. Moreover, over $21.5 million would have been available to service prior year liabilities, which ended up being borne by the American taxpayers. As noted by Tim Wagner "from a – both a business perspective and a regulator's perspective, an insurance regulator's perspective, it just seemed to be a – for me, a no-brainer." Wagner Depo. 19:21, 20:23-25-21:1. Further commenting on the proposed transaction, Mr. Wagner testified "I don't know how one could rationalize that it wasn't in the best interest of the taxpayers." Wagner Depo. 43:11-20.

The banking analogy also fails because in cases involving "highly regulated" industries other than banking, the fact that industries are "highly regulated" has not precluded the assertion of takings claims. For example, in *Ambase Corp. v. United States*, 58 Fed. Cl. 32, 50 (2003), the Court of Federal Claims explained that it "is not correct" that "no taking claim may be brought in an area such as banking because the investors should expect 'any' regulatory exaction." *Id.* Instead, the court stated that "even in an area regulated as heavily as banking, numerous possible government actions would invoke the Fifth Amendment." *Id.* "For example, confiscating a healthy and legally compliant bank to serve as a government bank. Also, confiscating a bank's stock from the bank's owner so that the stock could be given to a failing bank as capital could constitute a taking under the Fifth Amendment." *Id.* While the court asserted that it could come up with numerous other examples, it explained that "it should be clear that what investment-backed expectations exist are determined by the facts of each regulatory regime and what is foreseeable within that regime." *Id.*

Similarly, in *Cienega Gardens v. United States*, 331 F.3d 1319 (Fed. Cir. 2003), the Federal Circuit provided support for the notion that the fact that an industry is highly regulated does not mean that no takings claim can arise. *See id.* at 1334 (holding that despite the highly

regulated federal housing program, the enactment of legislation preventing the owners of low-income apartments from prepaying their federally subsidized mortgages after twenty years, thus freeing themselves from regulatory restrictions governing mortgages, was a taking of their property) (citing *United Nuclear Corp. v. United States*, 912 F.2d 1432 (Fed. Cir. 1990) (reversing a holding that a leasehold interest to mine on some land did not constitute property for purposes of the Fifth Amendment because mining is a regulated industry)). The *Cienega Gardens* court explained that while "[t]he range of expectations that is reasonable may be reduced in proportion to the amount of regulation,***this is not a blanket rule that disqualifies parties' expectations without inquiry." *Id.* As explained below, Acceptance held reasonable investment-backed expectations that its proposed bulk transfer to Rain & Hail would be approved.

### 3. Acceptance Held A Reasonable Investment-Backed Expectation That It Would Be Permitted To Sell Its Business Including In-force Crop Insurance Policies to Rain & Hail

In this case, the Government created the very expectations that it now claims are unreasonable. First, despite its statement that the RMA has no authority to approve or reject transactions like the proposed Acceptance/Rain & Hail transaction, the evidence establishes that the RMA approved in writing Acceptance's 2001 acquisition of IGF. See Depo Ex. 36 (Def. App. 373). Consummation of this transaction created in Acceptance's eyes the impression that insurance assets could be bought and sold by approved crop insurance policies. Second, the RMA initially advised Acceptance's principals that it would approve the Acceptance/Rain & Hail transaction. Martin Depo. 130:12-16 (Pl. App. 297). Because there are no published standards or regulations by which the RMA determines whether to approve or disapprove transactions, or even grant/reject waivers, which it claims it did in this case, Acceptance could

only base its expectations on RMA's past actions and on its assurances. Case law in the Federal Circuit confirms the reasonableness of similarly created investment-backed expectations.

For example, in *Cienega Gardens*, the Federal Circuit held that the owners' expectations that they would be permitted to prepay their mortgages, in accordance with assurances made by the government through authorization of the mortgage notes and in the contemporaneous regulations, were reasonable. In so doing, the court dismissed the government's contention that the appellants "operate in a highly regulated field, and, therefore, they should have expected that the government might change its mind about allowing appellants to exercise the rights set forth in their deed of trust notes." *Id.* at 222.

The Federal Circuit similarly held in *United Nuclear v. United States*, 912 F.2d 1432, 1436 (Fed. Cir. 1990), that even though the Appellant had "voluntarily submitted" itself to a regulatory scheme, it did not unreasonably expect that the government would not change the fundamental rules under that scheme. In *United Nuclear*, the court found a taking based on the government's refusal to permit mining in accordance with leases it had approved allowing the Appellant to mine uranium on land within an Indian reservation. *Id.* at 1438. With respect to the reasonableness of the Appellant's investment-backed expectations, the Court rejected the holding below that "it would have been reasonable and prudent for [the Appellant] to question at the outset whether rules, regulations and requirements under the existing scheme, to which it voluntarily submitted itself, would change during the 10-year term of its lease." *Id.* at 1436 (Appellant "justifiably believed and expected" that it would be permitted to mine in accordance with the leases). Significantly, the Court was not persuaded by language in the leases subjecting them to "all regulations of the [Secretary] now or hereafter in force and relative to such leases." *Id.* The Court found that even though the Appellant "agreed that the leases would be subject to

future regulations," it reasonably did not contemplate that the government would change its policies and thereby frustrate the Appellant's investment-backed expectations. *Id.*

In short, the cases make clear that the mere fact that economic activities are subject to government regulation, no matter how pervasive, does not render a person's investment-backed expectations unreasonable where the government itself expressly created those expectations, whether by agreement or through its regulations. Based on this case law, the Government's argument that "Acceptance could not have had any reasonable investment-backed expectations that American Growers could transfer its MPCI policies on any terms other than those set by the SRA through the Crop Insurance Handbook," Defendant's Mot. at 34, is without merit.

Crop insurance portfolios are regularly bought and sold. Acceptance, having in fact bought much of its book of business from other insurers, had absolutely no reason to think it would not be just as able to sell that business, especially to a particularly strong and stable insurer like Rain & Hail. Moreover, the absence of any published standards defining when a sale will *not* be approved, coupled with the Government's assurances that it would be flexible regarding the assumption of prior year liabilities in order to facilitate approval, furthered Acceptance's reasonable investment-backed expectations that it could sell its business. When it built its crop insurance business, Acceptance had every reason to expect that it could sell it to another qualified crop insurer, and it most certainly had no reason to suspect that an orderly and efficient sale would be rejected by the Government in favor of driving the business into liquidation and causing a lengthy and expensive redistribution of that business through liquidation, thus depriving Acceptance of any return on the value of its business.

## IV. ARGUMENT IN OPPOSITION TO GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT

### A. If the Court Does Not Render Summary Judgment in Favor of Acceptance, the Court Must Deny the Government's Motion for Summary Judgment Because it is Premised Entirely on Assertions as to Which There Are Genuine Issues of Material Fact

The Government's Motion for Summary Judgment rests principally on the assertion that Acceptance held no compensable property interest in the property that was allegedly taken by the Government. As noted in section III.B, above, the Government is wrong. Acceptance had a compensable property interest in the value of its wholly-owned subsidiary, American Growers. The Government next argues that, assuming Acceptance had a compensable property interest, the Government did not effectuate a taking (categorical or otherwise) of Acceptance's property. Again, as discussed in greater detail in sections III.C and D, above, the government is wrong. First, the RMA's action rendered Acceptance's property completely valueless, and thus effectuated a categorical taking. Second, even if Acceptance could not establish a categorical taking, it can nevertheless establish a taking under the tripartite *Penn Central* analysis. For these reasons, Acceptance believes that the uncontroverted facts enable this Court to enter summary judgment in its favor. Should the Court conclude that a material issue of fact exists that precludes the entry of judgment in favor of Acceptance, then it must likewise deny the Government's summary judgment motion because it is premised entirely on assertions as to which there would be genuine issues of material fact.

Should the Court reject Acceptance's arguments, it is foreseeable that the Court could find at least six issues of material fact that would preclude the entry of summary judgment for either party. These issues include:

1. Whether Acceptance had a compensable property interest in the value of American Growers;

2. Whether the Government's rejection of the proposed transaction and subsequent distribution of Acceptance's assets to its former competitors triggered a compensable taking of Acceptance's property;

3. Whether Rain & Hail requested that the RMA approve a request for waivers;

4. Whether the Government's actions led to a diminution in value of Acceptance's assets sufficient to constitute a compensable taking;

5. Whether the requirements of Section 4.C(9) of the Crop Insurance Handbook apply to the proposed bulk transfer of the insurance assets of one crop insurance provider to another; and

6. Whether the RMA rejected or did not approve the proposed transaction.

A material fact "is one that may affect the decision, so that the finding of that fact is relevant and necessary to the proceedings." *General Mills, Inc. v. Hunt-Wesson, Inc.*, 103 F.3d 978, 980 (Fed. Cir. 1997), *citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249. A genuine issue exists when "a reasonable fact finder could decide the question in favor of the non-moving party." *General Mills*, 103 F.3d at 980. In the context of takings claims, the development of a complete factual record through trial is frequently required given the fact-intensive nature of the claims. *See Yuba Goldfields, Inc. v. United States*, 723 F.2d 884, 887 (Fed. Cir. 1983).

Potential Material Issue of Fact 1: The Government argues Acceptance did not have a protected property interest in the crop insurance business conducted through its wholly-owned insurance company subsidiary. Defendant's Mot. at 23-28. The Government makes this argument notwithstanding that Acceptance, as the owner of the subsidiary, had the option of realizing the value of the business conducted through the subsidiary either through a sale of the subsidiary's stock or through a sale of its assets. Plaintiff's Counterstatement of Proposed

Findings of Uncontroverted Fact ¶ 14 ("Plaintiff's Counterstatement"). Acceptance asserts that because it had the prerogative of realizing the value of its owned subsidiary, that constitutes a compensable property interest in the subsidiary and the business of the subsidiary, irrespective of the form of the transaction. The Government's summary judgment motion cannot be granted because its premise, that there was no compensable interest, would be a disputed issue of fact.

Potential Material Issue of Fact 2: The Government argues that there was not a "categorical taking." Defendant's Mot. at 28-30. Acceptance states that the loss of the value, not to mention the physical possession, of the crop insurance policies as a result of the RMA's rejection of the transaction and its redistribution of them to other insurers, took away all of their value from Acceptance and constituted a categorical taking. Plaintiff's Counterstatement ¶¶ 59, 60, 117, 124, 125. In this regard, the Government raises a causation argument, suggesting that nothing that the RMA did or did not do "caused" the loss, but instead the voluntary action of Rain & Hail in abandoning the transaction, coupled with the actions of the Nebraska Department of Insurance, are the real cause. Defendant's Mot. at 29-30. Acceptance controverts the Government's position and states that it lost the opportunity to realize the value of its crop insurance business because the RMA blocked the transaction that would have allowed it to do so. Thus, the Government's theory on causation would involve disputed issues of material fact.

Potential Material Issue of Facts 3 and 4: The Government argues that the RMA's actions do not amount to a type of governmental action that would support a takings claim. Defendant's Mot. at 28-31. Stated otherwise, the Government claims that its denial of Rain & Hail's alleged request for waivers did not trigger a taking of Acceptance's property, regardless of the subsequent actions by non-Federal actors. Acceptance disputes that assertion that (1) Rain & Hail requested a waiver of Section 4.C(9), Plaintiff's Counterstatement ¶¶ 16, 22, and (2) states

that the RMA, acting in its regulatory capacity and for perceived public benefit, blocked the transaction, and subsequently seized control of the crop insurance policies at issue and redistributed them to other insurers without Acceptance realizing any value from them. Plaintiff's Counterstatement ¶¶ 59, 60, 117, 124, 125. Thus, the Government's theory that the RMA did not do anything amounting to a taking would engender material questions of fact.

Potential Material Issue of Fact 5: The Government asserts that Section 4.C(9) of the Crop Insurance Handbook was the operative regulatory hurdle that Acceptance and Rain & Hail could not meet. Acceptance states that Section 4.C(9), on its face, has no application at all. Plaintiff's Counterstatement ¶¶ 18, 20, 23, 24, 25, 26; Defendant's Statement of Unopposed Facts, AICI Corrected Statement ¶¶ 41, 42, 43, 44. Thus, the Government's motion would raise a material issue of fact as to the applicability of Section 4.C(9).

Potential Material Issue of Fact 6: The Government claims that it neither approved nor disapproved the proposed transaction. The evidentiary record in this case establishes that on at least one prior occasion, the RMA specifically approved a transaction similar to the transaction proposed between Acceptance and Rain & Hail. Depo. Ex. 36 (Def. App. 373). Further, the testimony of three witnesses establishes that Ross Davidson told them that the RMA would "not approve," or "would not allow" the proposed transaction. Plaintiff's Counterstatement ¶¶ 62, 63, 65. In addition, Mr. Davidson outlined the RMA's approval process: "the management representatives of [a] purchasing company [to] come to us and meet with RMA management and verbally describe, orally describe, the proposed transaction, the general terms of the transaction; and then follow up with – we would always request something in writing that shows, you know, the proposed agreement with the seller; and then ask for additional information." Plaintiff's Counterstatement ¶ 43.

In the event the Court elects not to grant Acceptance's motion for summary judgment, it surely must deny the Government's because, as noted above, the principal arguments upon which the Government's Motion for Summary Judgment are based raise material issues of fact.

## V. ARGUMENT IN OPPOSITION TO THE GOVERNMENT'S RENEWED MOTION TO DISMISS

### A. This Court Should Refuse to Reconsider the Government's Motion to Dismiss For Lack of Subject Matter Jurisdiction Because the Government Has Demonstrated No Exceptional Circumstances That Would Justify Doing So

Preceding its arguments in support of its motion for summary judgment, the Government invites this Court to revisit Judge Hodges' previous decision rejecting the Government's motion to dismiss on jurisdictional and other grounds that Judge Hodges already fully considered and rejected. The Court should decline the Government's invitation. The Government offers no compelling reason why the Court should not respect Judge Hodges' prior decision denying its motion to dismiss as law of the case. The Government offers only two insubstantial justifications.

First, the Government states that "at the time it denied our motion to dismiss, the Court did not have the benefit of the guidance provided by the Federal Circuit when it issued its opinion in Texas Peanut Farmers in May 2005." Defendant's Mot. at 7. In addition, the Government alleges that "discovery established certain uncontroverted facts that were unavailable to the Court when it ruled upon our initial motion, and that provide a basis for dismissing the complaint because Acceptance failed to exhaust administrative remedies." *Id.* The Court should not revisit Judge Hodges' ruling on these issues because neither of these proffered explanations presents anything new or provides any basis, let alone establishes extraordinary circumstances, for the Court to reconsider these issues. In addition, the Government's renewed motion is procedurally infirm.

### 1. There Are No Extraordinary Circumstances to Support the Government's Renewed Motion to Dismiss

Under the law of the case doctrine, "'a court will generally refuse to reopen or reconsider what has already been decided at an earlier stage of the litigation.'" *Augustine v. Principi*, 343 F.3d 1334, 1339 (Fed. Cir. 2003) (quoting *Suel v. Secretary of HHS*, 192 F.3d 981, 985 (Fed. Cir. 1999)); *see also Stockton East Water Dist. v. United States*, 62 Fed. Cl. 379, 393 (2004). In *Suel*, the Federal Circuit explained that "[l]aw of the case is a judicially created doctrine, the purpose of which is to prevent relitigation of issues that have been decided. *Suel*, 192 F.3d at 984 (citing *Gould, Inc. v. United States*, 67 F.3d 925, 927-28 (Fed. Cir. 1995)). The court continued, "[t]he doctrine operates to protect the settled expectations of the parties and promote orderly development of the case." *Id.* (citing *Mendenhall v. Barber-Greene Co.*, 26 F.3d 1573, 1582 (Fed. Cir. 1994); *Little Earth of United Tribes, Inc. v. United States Dep't of HUD*, 807 F.2d 1433, 1441 (8th Cir. 1986)). In short, the doctrine "ensures judicial efficiency and prevents endless litigation. Its elementary logic is matched by elementary fairness—a litigant given one good bite at the apple should not have a second." *Perkin-Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 890 (Fed. Cir. 1984). Defendant's attempt to repackage its subject matter jurisdiction argument is nothing more than a request for a second bite at the arguments that Judge Hodges squarely denied.

Although there are exceptions to the law of the case doctrine, none applies to this case. As the Supreme Court has explained, "[a] court has the power to revisit prior decisions of its own or of a coordinate court in any circumstance, although as a rule courts should be loath[] to do so in the absence of extraordinary circumstances." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988). In *Gould*, the Federal Circuit explained that such extraordinary circumstances may exist if: (1) the evidence in a subsequent trial is substantially different; (2)

controlling authority has since made a contrary decision of the law applicable to the issues; or (3) the earlier ruling was clearly erroneous and would work a manifest injustice. *Gould*, 67 F.3d at 930. Although Defendant conveniently ignores the law of the case doctrine and fails to even suggest how its renewed motion to dismiss could be justified by any extraordinary circumstances, Defendant apparently believes that: (1) the Federal Circuit's decision in *Texas Peanut Farmers v. United States*, 409 F.3d 1370 (Fed. Cir. 2005), justifies departing from the law of the case; and (2) the evidence it allegedly discovered regarding exhaustion of administrative remedies is substantially different than that presented in its prior motion. However, neither position has any merit.

The Government is not able to escape its burden of satisfying the high threshold of demonstrating extraordinary circumstances to support its request that the court revisit Judge Hodges' prior ruling simply by bringing what is essentially a motion for reconsideration in the guise of a "renewed motion" and cannot artfully plead around the requirement of showing "extraordinary circumstances." The Government suggests that the Federal Circuit's decision in *Texas Peanut Farmers* justifies reconsidering its motion to dismiss; and that there is evidence it allegedly discovered regarding exhaustion of administrative remedies that is substantially different than that presented in its prior motion. However, neither position has any merit.

First, while the Federal Circuit's decision in *Texas Peanut Farmers* may be an intervening decision of a controlling legal authority, it is not a "contrary decision of the law applicable to the issues" as required by *Gould*. *Gould*, 67 F.3d at 930. Rather, in *Texas Peanut Farmers*, the Federal Circuit simply concurred with the Court of Federal Claims' dismissal of plaintiffs' action for lack of subject matter jurisdiction. Thus, because Judge Hodges considered and rejected the Government's argument based on the original decision in *Texas Peanut Farmers*

*v. United States*, 59 Fed. Cl. 70 (2003), the Federal Circuit's *concurrence* with that decision cannot justify revisiting this Court's prior rejection of the Government's motion to dismiss for lack of subject matter jurisdiction. In short, the Federal Circuit's opinion simply does not add or change anything.

Second, while the Government makes a conclusory allegation that it discovered evidence that supports its exhaustion argument, it has presented no evidence that substantially differs from that presented in its original motion to dismiss, as required by *Gould*. In reality, the Government has not presented any new evidence whatsoever, as it *never explains what alleged new evidence it unearthed through discovery*. The only references that were not contained in the Government's earlier motion are to the 2002 FCIC Crop Insurance Handbook—notably, a document that has always been in the Government's possession and control—and to its own proposed findings of uncontroverted fact. *Compare* the Government's February 9, 2004 Motion ("Defendant's Orig. Mot.") at 8-10 *with* Defendant's Mot. at 15-18. Moreover, such evidence does not differ at all, let alone "substantially" from that presented in the original motion. The crux of the Government's argument remains the same—that plaintiff did not timely submit a written request for a final administrative decision pursuant to 7 C.F.R. § 400.169—an action that this Court has already determined that Plaintiff was not obligated to take. It is clear that the Government is merely attempting to use the guise of alleged new evidence, much like it attempts to use the guise of new authority, to get Judge Wheeler to revisit Judge Hodges' decision.

Because the Government can show no "extraordinary circumstances" justifying its motion, the Court should ignore the Government's barren recapitulation of "cases and arguments considered by the court before rendering its original decision." *Fru-Con Constr. Corp. v. United States*, 44 Fed. Cl. 298, 301 (1999) (quotation omitted). Indeed, it would have been difficult for

the Government to have done less to alter its original argument than it has done in its renewed motion to dismiss.[8]

### 2. The Government is Barred by Laches for Unreasonably Delaying the Filing its Renewed Motion to Dismiss

Assuming, *arguendo*, the Federal Circuit's *Texas Peanut Farmers* opinion did change anything, the Government has unreasonably delayed in bringing the case to the Court's attention. The Federal Circuit issued its opinion on May 31, 2005, nearly nine months before the Government filed its renewed motion to dismiss. Nonetheless, the Government explains that its renewed motion is based in part on the fact that the Court did not have the benefit of the Federal Circuit's opinion when it ruled on the Government's original motion to dismiss. Defendant's Mot. at 7. What the Government does not explain, however, is why it waited nine months to renew its motion if it thought that *Texas Peanut Farmers* supported reconsideration. The fact that the Federal Circuit's opinion was issued before Judge Hodges reassigned this case suggests that the Government made a conscious decision not to bring *Texas Peanut Farmers* to Judge Hodges' attention. Instead, the Government hopes to use the reassignment to its advantage by asking Judge Wheeler to do what it would not ask Judge Hodges to do—reopen its motion to dismiss—in the hope that Judge Wheeler will be more favorably inclined to it than Judge Hodges. Clearly, this Court should not condone such unabashed judge-shopping.

### 3. Under the Law of the Case Doctrine, the Court Should Reject Reconsideration of Judge Hodges' Ruling on Defendant's Motion to Dismiss

In its renewed motion to dismiss, the Government presents the exact same arguments that Judge Hodges considered and rejected in his August 13, 2004 Order that denying the original

---

[8] For example, the Government adds very little to its four-page argument that 7 U.S.C § 6912(e) mandates that exhausting administrative remedies is a jurisdictional prerequisite to filing suit. *See* Ex. _ (comparing argument from the Government's original motion with that of its renewed motion).

motion to dismiss. For example, it once again argues that this court lacks subject matter jurisdiction over this suit because Congress has granted Federal District Courts exclusive jurisdiction over all suits challenging actions taken by RMA for FCIC. *Compare* Defendant's Orig. Mot. at 6-8 *with* Defendant's Mot. at 10-14, Exhibit _. Judge Hodges addressed and rejected this argument in his August 13 Order, stating "[t]his is a claim against the United States alleging a Fifth Amendment taking. The Court of Federal Claims has jurisdiction to hear and determine taking claims against the United States." August 13, 2004 Order at 2 (citing *Blanchette v. Connecticut Gen. Ins. Corps.*, 419 U.S. 102, 126 (1974) ("The general rule is that***'[if] there is a taking, the claim is 'founded upon the Constitution' and within the jurisdiction of the Court of Claims to hear and determine.'") (citing *United States v. Causby*, 328 U.S. 256, 267 (1946)).

Similarly, Defendant presents an argument alleging Plaintiff's failure to exhaust administrative remedies that is virtually identical to the argument presented in its original motion to dismiss (*compare* Defendant's Orig. Mot. at 8-10 *with* Defendant's Mot. at 15-18), an argument that Judge Hodges also rejected. Noting that Section 1503 of the Federal Crop Insurance Act establishes an agency to regulate crop insurance companies, Judge Hodges found that "[t]hat statute's purpose does not appear to be inconsistent with this court's Tucker Act jurisdiction to hear takings claims against the United States." August 13, 2004 Order at 2. Judge Hodges continued, "[a]s the two statutes are 'capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.'" *Id.* (quoting *Blanchette*, 419 U.S. at 133-34 (citing *Morton v. Mancari*, 417 U.S. 535, 551 (1974)); *see also id.* at 2 n.2 (citing *Cyprus Amax Coal Co. v. United States*, 205 F.3d 1369, 1375

(Fed. Cir. 2000) (holding that resorting to IRS administrative process is unnecessary where Export Clause of the Constitution was implicated because the Clause is self-executing)).

Judge Hodges' decision on both of these subject matter jurisdiction arguments is the law of the case, and the Court should reject the invitation to revisit these arguments because the Government has articulated no reason for the Court to do so.[9] Under the law of the case doctrine, "'a court will generally refuse to reopen or reconsider what has already been decided at an earlier stage of the litigation.'" *Augustine v. Principi*, 343 F.3d 1334, 1339 (Fed. Cir. 2003) (quoting *Suel,* 192 F.3d at 985); *see also Stockton East Water Dist. v. United States*, 62 Fed. Cl. 379, 393 (2004). In *Suel*, the Federal Circuit explained that "[l]aw of the case is a judicially created doctrine, the purpose of which is to prevent relitigation of issues that have been decided. *Suel*, 192 F.3d at 984 (citing *Gould, Inc. v. United States*, 67 F.3d 925, 927-28 (Fed. Cir. 1995)). The court continued, "[t]he doctrine operates to protect the settled expectations of the parties and promote orderly development of the case." *Id.* (citing *Mendenhall v. Barber-Greene Co.*, 26 F.3d 1573, 1582 (Fed. Cir. 1994); *Little Earth of United Tribes, Inc. v. United States Dep't of HUD*, 807 F.2d 1433, 1441 (8th Cir. 1986)). In short, the doctrine "ensures judicial efficiency and prevents endless litigation. Its elementary logic is matched by elementary fairness—a litigant given one good bite at the apple should not have a second." *Perkin-Elmer Corp.*, 732 F.2d at 890. Clearly, the Government's attempt to repackage its subject matter jurisdiction argument is nothing more than a request for a second bite at the arguments that Judge Hodges considered and rejected.

[9] The law of the case doctrine is only abrogated where: (1) the evidence in a subsequent trial is substantially different; (2) controlling authority has since made a contrary decision of the law applicable to the issues; or (3) the earlier ruling was clearly erroneous and would work a manifest injustice. *Gould*, 67 F.3d at 930. As explained in the text, the Government is nowhere near reaching this threshold.

### 4. Even if the Court Were to Reconsider Defendant's Motion to Dismiss, Defendant's Arguments Still Lack Merit and do not Justify or Support Dismissal

#### a. *Texas Peanut Farmers* Remains Inapposite and Defendant's Argument That 7 U.S.C. § 1506(d) Divests This Court's Jurisdiction Over Takings Claims Is Without Merit

Judge Hodges' Order makes it clear that he found *Texas Peanut Farmers* to be not on point. *See* August 13, 2004 Order at 2 ("Texas Peanut Farmers v. United States, 59 Fed. Cl. 70 (2003)***do[es] not address the effect of Section 1506(d) on takings claims against the United States"). Like the Court of Federal Claims' decision, the Federal Circuit opinion in *Texas Peanut Farmers* simply does not address takings claims. Rather, the Federal Circuit reviewed appellants' challenge to the Court of Claims' Dismissal Order, which held that 7 U.S.C. §§ 1508(j) and 1506(d) placed exclusive jurisdiction over Appellants' breach of contract claims in the federal district courts. Appellants argued that because they did not name the FCIC as a defendant, Sections 1508(j) and 1506(d) do not apply, and the Court of Federal Claims thus had concurrent jurisdiction under the Tucker Act, 28 U.S.C. § 1491(a)(1), and the Little Tucker Act, 28 U.S.C. § 1346. *Texas Peanut Farmers*, 409 F.3d at 1372. In rejecting this argument, the Federal Circuit found that the "true nature of the action" was that of a breach of contract claim against the FCIC. *Id.* Thus, the court found "Appellants' strategic decision not to name the FCIC as a defendant [to be] merely an attempt to avoid the strictures of the [Multiple Peril Crop Insurance policies] and sections 1508(j) and 1506(d)." *Id.* at 1373.

This is simply not a case of a plaintiff trying to artfully plead around jurisdictional requirements or strategically not name the FCIC. Rather, as Judge Hodges recognized, Acceptance has brought a Fifth Amendment takings claim against the United States, the only actor who can exercise the power of eminent domain. August 13, 2004 Order at 2 ("This is a claim against the United States alleging a Fifth Amendment taking."). There is no artifice here.

The Complaint names the United States in its sovereign capacity, and the sole remedy sought is just compensation from the United States. *See, e.g.*, *Amoco Production Co. v. Hodel*, 815 F.2d 352, 359 (5th Cir. 1987) (explaining that an action is "against the sovereign if the judgment sought would expend itself against the public treasury"). Thus, *Texas Peanut Farmers* is easily distinguished.

Moreover, the Government's Section 1506(d) argument is misleading. While it is true that *Texas Peanut Farmers* discussed Section 1506(d), it did so only in the context of non-monetary claims asserted against the FCIC alleging violation of due process and requesting injunctive relief. The Government argues that the meaning of *Texas Peanut Farmers* resides in an *omission*: "[a]lthough the plaintiff in *Texas Peanut Farmers* asserted a breach of contract claim, the Federal Circuit *did not exclude* taking claims or any other category of claims when it stated that this court lacks jurisdiction over 'claims against the FCIC.'" Defendant's Mot. at 9 (emphasis added). That omission simply cannot bear the weight the Government would like it to. The Federal Circuit's opinion in *Texas Peanut Farmers*, like the Court of Federal Claims' decision that Judge Hodges considered, simply does not support the assertion that Section 1506(d) ousts this Court of jurisdiction over a takings claim.

#### b. There Were No Administrative Remedies for Plaintiff to Exhaust Prior to Filing This Takings Action

Defendant once again asserts that this suit cannot be maintained because Acceptance has failed to exhaust administrative remedies under Department of Agriculture statutes and regulations. Defendant's Mot. at 15. In addition to the fact that this Court has already considered and rejected Defendant's virtually identical argument, this argument fails because, as noted in Plaintiff's March 9, 2004 Opposition to the Government's original Motion to Dismiss at 6-11, there are no applicable administrative remedies that Acceptance is required to exhaust.

The administrative procedures that Defendant identifies apply only to matters relating to the FCIC's reinsurance obligations arising under the Standard Reinsurance Agreement ("SRA"). *See id.* at 15-17. They do not apply to a case premised on the FCIC's intervention against the sale of an insurer's crop insurance business assets.

Although Defendant's renewed motion wisely eschews its previous reliance on *In re 2000 Sugar Beet Crop Ins. Litigation*, 228 F. Supp. 2d 999 (D. Minn. 2002), Defendant does not even attempt to distinguish *National Crop Ins. Servs. v. FCIC,* 351 F.3d 346 (8th Cir. 2003), wherein the Eighth Circuit reversed and remanded *In re 2000 Sugar Beet Crop Ins. Litigation*. Such omission is clearly by design, as *National Crop Ins.* makes it clear that Defendant's exhaustion argument lacks merit. In that case, the Eighth Circuit held that the mandatory administrative appeals process afforded under agency regulations is limited in scope to only cases pertaining to coverage under an FCIC reinsurance contract. Specifically, the regulations "require administrative appeals when a dispute between an insurance provider and the FCIC *pertains to coverage under a reinsurance contract.*" *Id.* at 349 (emphasis added). Since the case before the court in *National Crop Ins.* was "not such a dispute," there was no requirement to exhaust administrative remedies and the insurer was entitled to bring the matter directly before the district courts. *Id.*

Likewise, the claims asserted by Acceptance do not relate or pertain to coverage under a reinsurance contract. Rather, Acceptance presents a Fifth Amendment takings claim based on the Government's actions in preventing Acceptance from selling its in-force crop insurance business and other insurance-related assets, and thereby obtaining value for its assets, including payment of at least $21.5 million in cash under the terms of the signed letter of intent with Rain & Hail. This case concerns the Government's actions in derogation of the right of an individual

to sell and receive value for its assets, and has nothing to do with disputing the amount of reinsurance coverage available under a Standard Reinsurance Agreement.

Although, Defendant has once again ignored *National Crop Ins.*, that decision accurately depicts the scope of the administrative appeals process established in the regulations as limited to disputes concerning coverage under a reinsurance contract. In those cases, and only in those cases, there are two levels of administrative review, *see* 7 C.F.R. § 400.169(a) and (d), and both are limited to disputes concerning reinsurance contracts. Section 400.169(a) sets forth the first level of agency appeal and defines its scope:

> (a) If the company believes that the [FCIC] has taken an action that is not in accordance with the provisions of the Standard Reinsurance Agreement, or any reinsurance agreement with the FCIC, except compliance issues, it may request the Deputy Administrator of Insurance Services to make a final administrative determination addressing the disputed action.

Thus, the kinds of actions that may be appealed under this section are those that deal with the FCIC's obligations arising under the provisions of the reinsurance agreement, such as disputes as to the amount of indemnification and the like. In effect, the matter disputed must be in the nature of a breach of contract by the FCIC, because it must be premised upon an action by the FCIC that is "not in accordance with the provisions" of the contract. The appeal procedure is essentially designed to give the company a means of enforcing the terms of the reinsurance agreement.

If the Deputy Administrator's "final administrative determination" in matters involving disputes over the reinsurance agreement is adverse to the company, the company may, under Section 400.169(d), seek a second level of review by the Board of Contract Appeals:

> (d) Appealable final administrative determinations * * * under paragraph (a) or (b) of this section may be appealed to the Board of Contract Appeals in accordance with the provisions of subtitle A, part 24 of title 7 of the Code of Federal Regulations.

The section setting forth the Board of Contract Appeals' jurisdiction, 7 C.F.R. § 24.4(b), makes it clear that the scope of cases appealable to the Board are those pertaining to the FCIC's contractual obligations, exactly as stated in Section 400.169: "The Board shall have jurisdiction of appeals of final administrative determinations * * * pertaining to standard reinsurance agreements under 7 C.F.R. § 400.169(d)." Thus, at each level of the administrative appeal process, the category of cases subject to that process is explicitly circumscribed. The administrative appeal process must only be traversed when the basis of the claim is the FCIC's failure to fulfill its contractual obligations under the reinsurance contract. This Fifth Amendment takings claim against the United States, based upon the FCIC's interdiction of the sale of Acceptance's in-force business and other insurance-related assets, does not fall within the parameters of the agency appeal proceedings designed for FCIC reinsurance contract disputes and would not be a claim cognizable in such proceedings.

Defendant's renewed motion to dismiss presents only one case not addressed in its original motion to support the proposition that 7 U.S.C. § 6912(e) mandates that exhausting administrative remedies is a prerequisite to filing this suit, *ACE Property & Casualty Co. v. United States*, 60 Fed. Cl. 175, 184 (2004). *Compare* Defendant's Orig. Mot. at 8-10 *with* Defendant's Mot. at 15-18. However, like the other cases relied on by Defendant, *ACE Property* involved claims that sought to address a breach of the SRA. *See ACE Prop.*, 60 Fed. Cl. at 176; *see also Rain & Hail Ins. Serv., Inc. v. FCIC*, 229 F. Supp. 2d 710 (S.D. Tex. 2002) (holding that administrative appeal under Section 400.169(a) and (d) was required where the plaintiff crop insurer was seeking damages for breach of contract under the SRA); *Farmers Alliance Mut. Ins. Co. v. FCIC*, No. 00-2347-JWL, 2001 WL 30443 (D. Kan., Jan. 3, 2001) (finding an action for breach of the SRA subject to the Section 400.169 review process); *American Growers Ins. Co. v.*

*FCIC*, 210 F. Supp. 2d 1088 (S.D. Iowa 2002) (using prescribed administrative procedure for review of the breach of contract claims against the FCIC for violation of the SRA).

Since this case is not an action against the FCIC to enforce the provisions of the SRA or to redress the breach of those provisions, it is outside the purview of the limited review procedure established under 7 C.F.R. § 400.169, and Acceptance was not required to seek recourse through that procedure. Consequently, this case is not subject to the exhaustion requirement of 7 U.S.C. § 6912(e) because, for this case, there is no administrative appeal procedure to be exhausted.

Moreover, Defendant's continued reliance on *Bastek v. FCIC*, 145 F.3d 90 (2d Cir. 1998), Defendant's Mot. at 17-18 and Defendant's Orig. Mot. at 10, bespeaks the Government's fundamental mischaracterization of Acceptance's claim and undercuts the Government's exhaustion argument. The plaintiffs in *Bastek* alleged that the FCIC violated the Federal Crop Insurance Act. *Id.* at 93. Specifically, the plaintiffs filed suit under 7 U.S.C. § 1508(j). *Id.* at 92 n.1. Defendant cites *Bastek* for the proposition that the court may not dispense with the statutory exhaustion requirement set forth 7 U.S.C. § 6912(e), Defendant's Mot. at 17 and Defendant's Orig. Mot. at 10, which mandates that:

> Notwithstanding any other provision of law, a person shall exhaust all administrative appeal procedures established by the Secretary or required by law before the person may bring an action in a court of competent jurisdiction against—
>
> a) the Secretary [of Agriculture];
> b) the Department [of Agriculture]; or
> c) an agency, office, officer or employee of the Department [of Agriculture].

7 U.S.C. § 6912(e). In *Bastek,* the Court of Appeals for the Second Circuit held that Section 6912(e) required the plaintiffs to exhaust their administrative remedies before filing suit against the FCIC. *Bastek*, 145 F.3d at 95.

Unlike the plaintiffs in *Bastek*, however, Acceptance has not filed suit under the Federal Crop Insurance Act nor against the FCIC. Id. at 90. Rather, Acceptance has filed a takings claim against the sovereign for just compensation pursuant to the Fifth Amendment. This case therefore is readily distinguishable from *Bastek*, in which the plaintiff's suit fell squarely within the administrative exhaustion mandates of the Federal Crop Insurance Act. Acceptance, likewise, is not required to exhaust administrative remedies, assuming there are any, before bringing a constitutional claim against the United States. For these reasons, Defendant's renewed motion to dismiss Acceptance's claim should be denied.

## VI. CONCLUSION

For the foregoing reasons, this Court should grant Plaintiff's Motion for Summary Judgment, deny Defendant's Motion for Summary Judgment, and deny Defendant's Renewed Motion to Dismiss.

Dated: March 24, 2006

Respectfully Submitted,

/s/ Lewis S. Wiener
Lewis S. Wiener, Esq.
SUTHERLAND ASBILL & BRENNAN LLP
1275 Pennsylvania Avenue, NW
Washington, D.C. 20004
202.383.0140 - phone
202.637.3593 - fax
Counsel for Plaintiff Acceptance Insurance Companies Inc.

OF COUNSEL:
Ronald Massumi, Esq.
Carter L. Williams, Esq.
SUTHERLAND ASBILL & BRENNAN LLP
1275 Pennsylvania Avenue, NW
Washington, D.C. 20004
202.383.0100

Patrick Griffin
Kutak Rock, LLP
The Omaha Building
1650 Farnam Street
Omaha, NE 68102-2186
402.346.6000