**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| ACCEPTANCE INSURANCE COMPANIES INC., Plaintiff, | ) | |
| v. | ) | **CASE NO. 03-2794** |
| | ) | Judge Thomas C. Wheeler |
| THE UNITED STATES OF AMERICA, Defendant. | ) | |

**PLAINTIFF'S COUNTERSTATEMENT OF PROPOSED FINDINGS OF UNCONTROVERTED FACT**

Pursuant to Rule 56(h) of the Rules of the United States Court of Federal Claims and this Court's January 18, 2006 order, as modified, Plaintiff Acceptance Insurance Companies Inc. ("Acceptance") respectfully files this Counterstatement of Proposed Findings of Uncontroverted Fact in support of Plaintiff's Motion for Summary Judgment. Acceptance incorporates herein by reference those of Defendant's February 10, 2006 Proposed Findings of Uncontroverted Fact to which Acceptance has noted its agreement and those corrected statements of fact submitted by Acceptance in its March 24, 2006 Response and Objections to Defendant's Proposed Findings.

## I. The June 2001 Acceptance/IGF Transaction

1. American Growers Insurance Company was the wholly-owned crop insurance subsidiary of Acceptance Insurance Companies Inc. Depo. Ex. 35 (Def. App. 315); Defendant's Statement of Unopposed Fact ¶ 51.

2. In June 2001, Acceptance, with the explicit approval and encouragement of the FCIC, purchased the entire book of in-force multi-peril crop insurance policies of IGF Insurance Company. Martin 40:2-44:6, 71:12-14 (Pl. App. 274-75, 282).[1]

3. In connection with the 2001 Acceptance/IGF transaction, Acceptance and IGF executed a SRA Assignment and Assumption Agreement. That agreement provides "Acceptance hereby agrees that it will assume all financial responsibilities associated with all crop insurance policies reinsured under the 2001 [SRA] and previous years held by IGF." Martin 50:1-15 (Pl. App. 277); Acceptance agreed to take on responsibility for IGF's liabilities for 2001 and previous crop years. Martin 55:19-25 – 56:1-5 (Pl. App. 278); Depo. Ex. 36 (Def. App. 373).

4. Phyllis Honor, the Acting Manager of the FCIC, specifically and in writing approved the Acceptance/IGF transaction, noting on the Agreement "[t]he FCIC approves this Assignment as of closing." Depo Ex. 36 (Def. App. 373).

5. Acceptance purchased IGF's assets. "The purchase agreement is Acceptance and its entities and affiliates." Martin 33:3-15 (Pl. App. 273).

6. The assets purchased by Acceptance included "the in-force policies, * * * certain fiscals, assets, the assumption of a number of liabilities and employment of a large percentage of their staff and acquisition of all software and crop-related assets of IGF, which would have included trademarks, etc." Martin 40:16-25 (Pl. App. 274).

7. Part of the money that Acceptance paid to IGF was put into escrow to cover certain losses. "If Acceptance incurred expenses, payments related to a certain group of policies,

[1] References to Pl. App. are to Plaintiff's Appendix of Exhibits filed pursuant to RCFC 5.2. To avoid unnecessary duplication, included in Plaintiff's Appendix of Exhibits are only those exhibits not included in Defendant's Appendix of Exhibits. Where appropriate, Plaintiff's cross references are to exhibits included in Defendant's Appendix ("Def. App.").

Acceptance's payments were reimbursed to Acceptance from the escrow fund." Martin 59:15-25 – 60:1-2 (Pl. App. 279).

8. Following the purchase by Acceptance, IGF's policies were transferred first to the Acceptance Standard Reinsurance Agreement and then "assigned to American Growers and coded as American Growers issued policies by RMA and the accounting process." Martin 44:17-20, 46:16-22, 53:4-7 (Pl. App. 275, 276, 278).

## II. The November 18, 2002 Acceptance/Rain & Hail Letter of Intent and the Proposed Transaction

9. In mid-to-late October 2002, ACE Insurance Company, through Rain & Hail LLC, its managing agent, began negotiations with Acceptance regarding the purchase of most of Acceptance's crop insurance assets, including but not limited to the insurance assets that Acceptance had purchased from IGF and that had been assigned and coded to Acceptance's subsidiary American Growers. Rain & Hail Depo. 223:13-226:12 (Pl. App. 162-163); Depo. Ex. 38 (Pl. App. 426).

10. On November 18, 2002, Rain & Hail and Acceptance executed a non-binding letter of intent detailing the terms of a deal between the parties for the sale and purchase of Acceptance's crop insurance business assets. Depo. Ex. 29 (Def. App. 294).

11. The letter of intent provides that it is not a "binding obligation" on either Acceptance or Rain & Hail "to enter into or consummate the Proposed Transaction," and states further that the parties' obligations "to consummate the Proposed Transaction shall be subject in all respects to the negotiation, execution, and delivery of a definitive agreement * * * and the

satisfaction of the conditions contained in the definitive agreement." Depo. Ex. 29 (Def. App. 294).

12. The letter of intent provides further that "[p]rior to Closing, Seller shall provide to Purchaser proof, satisfactory to Purchaser, of all required governmental, regulatory and third-party consents." Depo. Ex. 29 (Def. App. 301).

13. Rain & Hail would have paid Acceptance $21.5 million in cash by no later than December 4, 2002, plus profit sharing and other amounts that could have increased the total purchase price to as much as $70 million in exchange for:

1. [p]remium, the FCIC administrative and operating subsidy ("A&O") and underwriting gain or loss for all of Seller's FCIC 2003 Crop year MPCI policies in force at Closing . . .;
2. [a]ll renewal rights of MPCI policies under Seller's SRA, whether or not presently in force, and all other crop insurance products . . . whether or not presently in force;
3. [c]urrent contracts between Seller and independent crop insurance agents and independent crop insurance adjusters. It is understood that these contracts are cancelable by Purchaser on thirty (30) days or less written notice;
4. [a]t Purchaser's option, any of the approximately five (5) current contracts between Seller and independent crop insurance agents not cancelable by purchaser on thirty (30) days or less written notice;
5. Other crop insurance assets of Seller identified by purchaser and included in a schedule to be developed mutually satisfactory to Seller and Purchaser.

Depo. Ex. 29 (Def. App. 300).

14. Acceptance, not American Growers or its subsidiaries, would have received the funds from Rain & Hail had the transaction been consummated. Martin: 170:7-15 (Pl. App. 307); Depo. Ex. 29 (Def. App. 294).

15. John Joyce testified that (a) as of November 22, 2002, all of the material terms of the proposed transaction had been negotiated and agreed to between the parties, and (b) had the

RMA approved the transaction as proposed, Rain & Hail would have consummated the deal proposed in the November 18, 2002 letter of intent. November 7, 2003 deposition of John Joyce at 35:9-13, 70:15-20 (Pl. App. 242, 251).

16. The letter of intent does not mention Section 4.C(9) of the Crop Insurance Handbook, Rain & Hail Depo. 25:18-21 (Pl. App. 113), and Rain & Hail did not request a waiver of Section 4.C(9). Rain & Hail Depo. 26:21-25 – 27:1 (Pl. App. 113).

17. Mr. Davidson admitted that compliance with Section 4.C(9) is "preferred" and admitted further that there are other ways policyholders may be notified of the assignment of their policies from one company to another to effectuate the intent of Section 4.C(9). RMA/Davidson Depo. 140:13-23 – 141:1-7 (Pl. App. 38).

18. The RMA has never required an acquirer of the in-force crop insurance policies of another approved crop insurance provider to comply with the terms of Section 4.C(9). RMA/Davidson Depo. 178:5-17 (Pl. App. 47).

19. The RMA has specifically approved transactions whereby one crop insurance provider proposed to acquire the assets of another crop insurance provider through a bulk transfer. RMA/Davidson Depo. 238:17-22 (Pl. App. 62).

20. Mr. Joyce testified correctly that "there is nothing in writing or any other documentation to support the theory that you have to take it with you, the old liabilities with you, with the exception of past precedent of RMA." Rain & Hail Depo. 19:1-5 (Pl. App. 111).

21. Mr. Joyce also testified that to the extent Rain & Hail wanted the RMA to depart from its past practice, whether or not such practice is authorized, "we thought that under the circumstances, we had a good chance of being able to get a waiver , if you want to, I'll use your

[DOJ John Williamson's] term, waiver, to get an exception to that fact." Rain & Hail Depo. 288:18-22 (Pl. App. 178).

22. The first time Rain & Hail was aware of the RMA's objections based on Section 4.C(9) was when it received the RMA's November 25, 2002 letter detailing the RMA's rationale for rejecting the proposed transaction. Rain & Hail Depo. 122:11-19 (Pl. App. 137).

23. The Government admitted that Section 4.C(9) does not apply to the bulk transfer of an entire book of in-force policies from one approved crop insurance provider to another. RMA/Davidson Depo. 145:21-23 (Pl. App. 39).

24. The procedures outlined in Section 4.C(9) apply only when a producer/farmer intends to change crop insurance providers. Pursuant to Section 4.C(9), the producer/farmer must make such an election prior to the policy sales closing date. After the policy sales closing date (and once the policy becomes in-force), a producer/farmer may not change or transfer his, her or its policy to another crop insurance carrier. Rain & Hail Depo. 45:3 (Pl. App. 118), 44:14-23 (Pl. App. 117); 46:11-16 (Pl. App. 118).

25. There are no written guidelines or regulations governing or outlining the process or criteria by which a request to waive the requirements of Section 4.C(9) will be assessed by the RMA. RMA/Davidson Depo. 66:11-13, 68:7-10 (Pl. App. 18).

26. Section 4.C(9) does not require that a company acquiring the entire in-force business of another approved crop insurance provider accept the seller's prior years liabilities.

27. According to Acceptance's damages expert, had the proposed transaction been consummated, Acceptance would have received from Rain & Hail between $36,863,000 and $38,041,000. (Pl. App. 500).

28. The United States has not engaged a damages expert to calculate the amount that Acceptance would have received had the proposed transaction been consummated.

## III. November 18-22, 2002 Discussions Among The RMA, Acceptance, Rain & Hail and the Nebraska Department of Insurance

29. Ross Davidson reported to Dr. J.B. Penn, the Department of Agriculture Undersecretary for Farm and Foreign Agricultural Services and Hunt Shipman, a Deputy Undersecretary for Farm and Foreign Agricultural Services at the USDA. Penn Depo 10:7-9 (Pl. App. 347); RMA/Davidson Depo. 208:4-22 (Pl. App. 55).

30. Dr. Penn has held the position of the Department of Agriculture Undersecretary for Farm and Foreign Agricultural Services since 2001. Penn Depo. 4:16-19 (Pl. App. 345).

31. Mr. Shipman held the position of Deputy Undersecretary for Farm and Foreign Agricultural Services at the USDA from January 2001 to January 2003. Shipman Depo. 7:20-23, 8:1-2 (Pl. App. 355).

32. Dr. Penn testified that prior to his appointment as the Department of Agriculture Undersecretary for Farm and Foreign Agricultural Services he had no experience in crop the insurance industry. Penn Depo. 8:14-18 (Pl. App. 346).

33. Dr. Penn testified that prior to his appointment as the Department of Agriculture Undersecretary for Farm and Foreign Agricultural Services and prior to his consideration of the proposed Acceptance/Rain & Hail transaction, he had never been involved in the decision-making with respect to the proposed consolidation/acquisition of one federally insured crop insurance company by another. Penn Depo. 20:9-15 (Pl. App. 349).

34. Mr. Shipman testified that the proposed Acceptance/Rain & Hail transaction was "a large magnitude decision." Shipman Depo. 33:8 (Pl. App. 361). Mr. Shipman explained "[b]ecause of the dollars in play here, the size of the company – [Acceptance] was one of the largest, if not the largest, crop insurance companies that USDA had done business with – because of the book of business, the potential liability if all of those policies had claims filed against them, because of the precedent that the decision would set for potential future mergers of crop insurance companies, it was a large decision. It was a big decision o make with large implication." Shipman Depo. 33:10-18 (Pl. App. 361).

35. Mr. Shipman testified that he was concerned about what might have happened to Acceptance's assets that Rain & Hail did not intend to acquire, Shipman Depo. 35:7-23 – 36:1-23 (Pl. App. 362), but that he did not have personal knowledge of the terms of the proposed transaction, all of his information came from Mr. Davidson, and that he did not know first-hand what might have happened with any of Acceptance's assets that Rain & Hail might not accept. Shipman Depo. 37:1-20 (Pl. App. 362).

36. Mr. Shipman testified that with respect to the proposed Acceptance/Rain & Hail transaction Dr. Penn "made a decision," Dr. Penn "certainly gave Mr. Davidson guidance on how to handle the request that had been made of the agency," that the decision "took more of [Dr. Penn's] attention, thought, consideration than a decision of much lesser magnitude . . . meaning that [Dr. Penn] spent more time in offering guidance and/or making a decision that he trans – that transferred back to Ross [Davidson] to implement with regard to this request" and that he believed that Dr. Penn made the ultimate decision regarding the proposed transaction. Shipman Depo. 29:4, 11-13, 33:23 – 34:1-14 (Pl. App. 360, 361-62).

37. Mr. Shipman has no recollection of the guidance that Dr. Penn provided to Mr. Davidson regarding the proposed Acceptance/Rain & Hail transaction. Shipman Depo. 29:15-16 (Pl. App. 360).

38. Dr. Penn testified that he does not know the criteria used by the RMA to assess the proposed Acceptance/Rain & Hail transaction. Penn Depo. 17-19 (Pl. App. 348-49).

39. Dr. Penn testified that he did not know whether Rain & Hail had committed to insure all eligible producers but that this fact would have been significant to his consideration of the proposed transaction. Penn Depo. 22:10-17, 25:10-23 (Pl. App. 350).

40. Mr. Shipman testified that his understanding was if the proposed transaction were approved, "it was not Rain & Hail would take all of the policies," meaning that Rain & Hail would have the right to reject and not insure certain producers/farmers. Shipman Depo. 59:13-14 (Pl. App. 368).

41. Mr. Shipman testified that he could not recall any discussion within the RMA regarding alternatives to the transaction proposed by Acceptance and Rain & Hail. Shipman Depo. 53:10-14, 57:19-21 (Pl. App. 366, 367).

42. Mr. Shipman could not recall whether Rain & Hail requested a waiver of Section 4.C(9). Shipman Depo. 61:3-7 (Pl. App. 368).

43. As described by Ross Davidson, the process by which one crop insurance provider a company proposing to acquire the assets of another crop insurance provider includes "the management representatives of the purchasing company typically would come to us and meet with RMA management and verbally describe, orally describe, the proposed transaction, the general terms of the transaction; and then follow up with – we would always request

something in writing that shows, you know, the proposed agreement with the seller; and then ask for additional information." RMA/Davidson Depo. 59:1-8 (Pl. App. 16).

44. According to Mr. Davidson "[a]ll of the transactions that I have seen have the caveat that they are subject to regulatory review." RMA/Davidson Depo. 61:13-15 (Pl. App. 16).

45. Over the course of the week of November 18-22, 2002, Mr. Davidson and Mr. Wagner, the Director of the Nebraska Department of Insurance, spoke "almost daily." Wagner Depo 18:20-21, 30:5-7 (Pl. App. 376, 379).

46. Mr. Wagner also spoke frequently with representatives from Acceptance and Rain & Hail. Wagner Depo. 46:18-25 – 47:1-16, 48:8-24 (Pl. App. 383).

47. Mr. Wagner told Mr. Davidson that he supported the proposed Acceptance/Rain & Hail transaction. "from a – both a business perspective and a regulator's perspective, an insurance regulator's perspective, it just seemed to be a – for me, a no-brainer." Wagner Depo. 19:21, 20:23-25 – 21:1 (Pl. App. 376, 377).

48. According to Mr. Wagner "I expressed support for the transaction, that we [Wagner and Davidson] needed to work together to get this to – and – and what I received from Mr. Davidson was almost a reciprocal view, you know this would be great to get – we need, you know, this – this – we needed to get the – this consummated." Wagner Depo. 30:12-18 (Pl. App. 379).

49. On November 20, 2002, Mr. Joyce and other representatives from Rain & Hail and ACE met in Washington, D.C. with Ross Davidson and other employees of the RMA to

discuss the terms of the proposed transaction as set forth in the November 18, 2000 letter of intent. Rain & Hail Depo. 90:11-93:8 (Pl. App. 129-30).

50. The parties at the November 20th meeting discussed principally Rain & Hail's position that it would not accept prior year liabilities on the American Grower's policies and the process by which a bulk transfer of the in-force policies could be effectuated. Rain & Hail Depo. 18:17-22, 108:21-25 – 109:1-7 (Pl. App. 111, 133-34).

51. John Joyce, Rain & Hail's then-President, testified "there is nothing in writing or any other documentation to support the theory that you have to take it with you, the old liabilities with you, with the exception of past precedent of RMA." Rain & Hail Depo. 19:1-4 (Pl. App. 111).

52. The participants in the November 20th meeting at the RMA did not discuss Section 4.C(9). Rain & Hail Depo. 121:20-23 (Pl. App. 137).

53. Mr. Davidson admitted that at the time of his consideration of the proposed transaction, he did not have a good understanding of the bulk transfer process. RMA/Davidson Depo. 235:18-23 – 236:1-4 (Pl. App. 61-62). Davidson also admitted he had no training, background or experience in crop insurance and had never been involved in risk associated with crop insurance policies. RMA/Davidson Depo. 17:8-10, 17:15-18, 18:15-21 (Pl. App. 5-6).

54. On or about November 20, 2002, Acceptance provided a copy of the November 18, 2002 letter of intent to the Nebraska Department of Insurance. Representatives of Acceptance also discussed the terms of the proposed transaction with L. Tim Wagner, the Director of the Nebraska Department of Insurance. Wagner Depo. 17:15-25 – 18:1-8 (Pl. App. 376).

55. On or about November 18, 2002, representatives from Acceptance, including John Martin, Acceptance's President, had conversations with Mr. Davidson regarding the proposed transaction. Martin Depo. 129:21-25—130:1-16 (Pl. App. 297).

56. Mr. Davidson advised Mr. Martin that he supported the proposed transaction. Martin Depo. 130:12-16 (Pl. App. 297).

57. According to Mr. Joyce, few, if any, issues that had not been discussed the day prior were discussed during the November 21st telephone meeting. Rain & Hail Depo. 115:16-21, 116:3-8, 21-25, 118:7-9; 126:15-19.

58. Prior to November 22, 2002, the RMA prepared an internal briefing memo. That memo noted that "if Rain and Hail and ACE purchases [sic] American Growers, American Growers will receive about $21.5 million in December 2002 and an additional $5 million in February 2003. The $26.5 million will likely prevent American Growers from reaching a deficit financial position, but will not prevent them from liquidation on their Federal book of business." Depo. Ex. 17 (Pl. App. 418).

59. The memo also noted that "if the purchase does not take place and no other purchase offer in rendered, RMA will distribute policyholder files to other companies beginning with the 2003 crop year." Depo. Ex. 17 (Pl. App. 418).

60. The RMA knew that as a consequence of its rejection of the proposed Acceptance/Rain & Hail deal, the RMA would distribute the Acceptance/American Growers policyholder files, for which Rain & Hail was prepared to pay in excess of $21.5 million, to Acceptance's competitors, including Rain & Hail, free of charge. Depo. Ex. 17 (Pl. App. 418).

61. On November 22nd, employees of the RMA met to discuss the proposed Acceptance/Rain & Hail transaction. RMA/Davidson Depo. 212:16-20, 213:8-20 (Pl. App. 56).

62. Following the internal RMA meeting on November 22, 2002, Mr. Joyce and Mr. Davidson spoke by phone. During this call, Mr. Davidson told Mr. Joyce that the RMA would not accept the proposed transaction and would not allow Rain & Hail to complete the transaction. Rain & Hail Depo. 22:14-17, 102:19-25 – 103:1 (Pl. App. 112, 132).

63. Davidson called Acceptance and advised its representatives of the RMA's decision to reject the proposed transaction. Martin Depo. 130:24-25—131:1-9 (Pl. App. 297).

64. Among the reasons for the RMA's action was concern over lawsuits by other crop insurance carriers who might view themselves as having been harmed competitively by the RMA's approval and specifically "costly lawsuits to the agency by producers, agents and other companies.". RMA/Davidson Depo. 226:10-23 – 227:1-10 (Pl. App. 59); Depo. Ex. 15 (Def. App. 279); Depo. Ex. 18 (Pl. App. 421).

65. On November 22, 2002, Mr. Davidson told Mr. Wagner that the RMA <u>would not approve</u> the proposed transaction because it did not include a transfer of all of Acceptance's business to Rain & Hail, the RMA was concerned about "the concentration of business with one underwriter" and "there was a reference to the department of justice." Wagner Depo. 23:11-21, 76:1-23, 77:16-25 (Pl. App. 377, 390).

66. Mr. Davidson also told Mr. Wagner that the RMA had concerns about the impact of the proposed transaction on taxpayers and that the agency was concerned about potential lawsuits against the RMA if the RMA approved the proposed transaction. Wagner Depo. 26:2-3, 49:25 – 50:1 (Pl. App. 378).

67. According to notes taken by Mr. Wagner contemporaneously with his November 22, 2002 conversation with Mr. Davidson, Mr. Davidson stated a concern that "if they would approve the transfer, there was this – this – this concern on the RMA's part that they would be sued." Wagner Depo. 50:14-19, 60:10-15; Depo. Ex. 57.

68. Mr. Wagner testified that Mr. Davidson told him that the decision to reject the Acceptance/Rain & Hail transaction "was not his [Davidson's]" and had been made by his superiors. Wagner Depo 22:9-22, 23:8-10, 46:14-17 (Pl. App. 377, 383).

69. Dr. Penn testified that he has no recollection of a meeting with Mr. Davidson and other employees of the RMA on November 22, 2002, has no recollection of the specifics of the proposed Acceptance/Rain & Hail transaction, has no recollection of the RMA's analysis of the proposed transaction (Depo. Ex. 15 (Def. App. 279)), and has no recollection of any discussions regarding the effects in the marketplace if the proposed transaction were rejected. Penn Depo. 13:22-23 – 14:1-3; 15:5-7; 20:4-9, 19-23 (Pl. App. 347-48, 349).

70. Dr. Penn testified that he never made a decision regarding the proposed Acceptance/Rain & Hail transaction. Penn Depo. 16:17-19 (Pl. App. 348).

71. On November 22, 2002, Rain & Hail wrote to Ross Davidson memorializing their conversation earlier that day stating "[t]his will confirm our telephone conversation earlier today wherein RMA explained to us that it will not allow the transaction as set forth in the terms of the [November 18, 2002] Non-Binding Letter of Intent. Specifically, RMA is not willing to allow the following:

1. Allow a transfer to Rain and Hail and ACE all renewal rights of MPCI policies under Acceptance's SRA, while maintaining the right of Rain & Hail and ACE to control which current agents of Acceptance that are willing to appoint; and Allow a transfer to Rain and Hail and ACE all renewal rights of MPCI policies

under Acceptance's SRA, while maintaining the right of Rain & Hail and ACE to control which current agents of Acceptance that are willing to appoint; and

2. Allow Rain and Hail and ACE to proceed with the transaction without assuming Acceptance's obligations arising from insurance policies issued under Acceptance's 2002 and prior SRAs with respect to indemnities, compliance, litigation or regulatory issues."

Depo. Ex. 23 (Def. App. 288).

72. Also on November 22, 2002, Mr. Davidson sent a letter to Acceptance suspending American Growers' SRA citing section V.J. of the SRA. Depo. Ex. 21 (Def. App. 282). The letter advised Acceptance of certain actions they were obligated to take with respect to notification of agents. (Def. App. 282).

73. On November 25, 2002, Acceptance responded to Mr. Davidson's November 22nd letter, challenging the RMA's reliance on Section V.J. of the SRA, which provides that the "FCIC may suspend [the SRA] for cause due to a material failure to perform or comply with the obligations under the [SRA]," and noting that "there has been no 'material failure to perform or comply with the obligations under [the SRA.]" Acceptance nevertheless voluntarily complied with the RMA's directive. Depo. Ex. 22 (Def. App. 284).

74. As of November 25, 2002, there had been no material failure by Acceptance or any of its subsidiaries to perform or comply with its obligations under the SRA.

75. On November 25, 2002, Ross Davidson on behalf of the RMA wrote to Rain & Hail detailing the rationale of its decision to reject the proposed transaction.

76. In the November 25th letter the RMA stated that Rain & Hail "requested that RMA waive section 4.C(9) of the 2002 Crop insurance Handbook, which requires approved insurance providers to use cancellation/transfer of experience forms to cancel policies and

transfer the insurance experience from one approved insurance provider to another, accommodations regarding quality control, compliance review, and waiver of penalties for any late filings." Depo. Ex. 25 (Def. App. 289).

77. The November 25th letter also stated that "[w]aivers have been granted in the past that would allow the approved insurance provider obtaining the policies to receive all of the insurance experience without the need to cancel the policies. In these situations, the approved insurance provider was required to provide a letter to all producers that gave them the option of selecting another insurance company by canceling their existing policy." Depo. Ex. 25 (Def. App. 289).

78. The November 25th letter continued "[g]iven its past precedent, the risk that producers will be left without insurance protection for the 2003 crop year, and the adverse affect this would have on the integrity of the program, RMA could not approve the waivers and accommodations requested by" Rain & Hail. Depo. Ex. 25 (Def. App. 290).

79. On November 26, 2002, despite the fact that the proposed transaction was not going to be consummated, Rain & Hail felt compelled to respond to Mr. Davidson's November 25th letter, "to clarify the nature of our requests 'for the record.'" Rain & Hail advised the RMA:

> The primary issue from our perspective has always been our unwillingness to assume liabilities associated with the 2002 and prior SRAs of Acceptance. These liabilities potentially include all of the following exposures: indemnities to policyholders, disputed claims, RMA compliance issues, agent errors and omissions, and regulatory issues. Such liabilities are of a 'log tail' nature , are difficult to fully evaluate, and can include significant litigation cost and risk. We had specifically addressed this issue with Acceptance, and we were not receiving any financial consideration for assuming such risks. For all of the reasons, we have steadfastly maintained that we were not willing to accept such risks and were not willing to ask our shareholders to expose their investment to such potential liabilities. From our perspective, a favorable response to

> this particular request was crucial, and without a favorable response, the transaction could not go forward.

Depo. Ex. 26 (Def. App. 292).

80. The November 26 Rain & Hail letter corrected the record with respect to the RMA's misstatements and misassumptions regarding Rain & Hail's position concerning Acceptance's agents and producers and noted further:

> With regard to 2003 fall seeded policies that were already in force and for which the sales closing date had past, <u>we always intended to honor the agent agreements of Acceptance and pay the agents accordingly</u>. On a going forward basis, we were certain that agents that we did not select would find another company to appoint them. However, we were not willing to 'guarantee' that we would continued [sic] to do business with all agents or the we would offer them 'the same deal' as they presently operated under with Acceptance.
>
> We want to be clear that <u>we have never taken the position that we wanted to chose which producers we would insure. We will insure any eligible producer, period</u>. However, if a producer's policy is presently placed with an agent whom we do not appoint, it would be necessary for the producer to utilize a different agent, and agent that we have appointed, in order to place coverage through us. In such situations, <u>we have always stood ready to assist the producer in locating a new agent, if they so choose, or, in the alternative, place the coverage through our customer service center, which is specifically intended to ensure we are able to fulfill our commitment to insure every producer who would like to place coverage with us</u>. Of course, this decision remains the sole providence [sic] of the producer. (Emphasis added).

Rain & Hail concluded its letter, somewhat prophetically:

> From a big-picture perspective, we believed the proposed transaction was in the best interests of the Federal Crop insurance programs and minimized disruption of policyholder services.

Depo. Ex. 26 (Def. App. 293).

## IV. The RMA's Rejection the Proposed Acceptance/Rain & Hail Transaction

81. The principal documents relied on by the RMA to analyze and ultimately reject the proposed Acceptance/Rain & Hail transaction were:

1. the November 18, 2002 letter of intent;

2. an analysis prepared by Ross Davidson; and

3. Section 4.C(9) of the FCIC Crop Insurance Handbook.

Defendant's Response to Plaintiff's Interrogatory No. 1 (Def. App. 202-03); Depo. Ex. 15 (Def. App. 279).

82. The analysis prepared by Ross Davidson dated November 22, 2002 identifies RMA's projection of the effect that the proposed transaction would have on, among others, producers, taxpayers and the crop insurance program. Depo. Ex. 15 (Def. App. 279).

83. Under the heading "Producer Impact" the RMA concluded that if the proposed transaction were approved "[s]ome producers and agents may not find a home." Depo. Ex. 15 (Def. App. 279).

84. Rain & Hail advised the RMA that "[w]e want to be clear that we have never taken the position that we wanted to chose which producers we would insure, We will insure any eligible producer, period." Depo. Ex. 26 (Def. App. 293). Rain & Hail also advised the RMA specifically and unequivocally that "[w]ith regard to the 2003 fall seeded policies that were already in force and for which the sales closing date had already past, we always intended to honor the agent agreements of Acceptance and pay the agents accordingly." Depo. Ex. 26 (Def. App. 293).

85. Mr. Joyce testified on Rain & Hail's behalf "never at any point in time that I'm aware of was there any discussion [between Rain & Hail and the RMA] that we would not accept a producer. That's a gross distortion by someone." Rain & Hail Depo. 59:19-22 (Pl. App. 121).

86. Mr. Joyce, on behalf of Rain & Hail testified further that Rain & Hail set up a mechanism so that if a producer could purchase crop insurance coverage directly from the company should the producer find him/her/itself without an agent. Rain & Hail Depo. 60:1-12, 66:9-18, 73:9-21 (Pl. App. 121, 123, 125).

87. Mr. Joyce testified that the RMA never asked him in any of their discussions about the RMA's presumption that Rain & Hail would not accept all eligible producers. Rain & Hail Depo. 68:8-9 (Pl. App. 123).

88. Davidson never asked Rain & Hail about how much business they thought they would retain. RMA/Davidson Depo. 307:19-23 (Pl. App. 79).

89. The first item listed under the heading "Taxpayer Cost" in Mr. Davidson's November 22, 2002 analysis is "[h]igh risk of costly lawsuits from adverse agent/producer selection by R&H (agents, companies and producers). The second item listed in "[c]ould harm other companies." Depo. Ex. 15 (Def. App. 279).

90. The RMA did not prepare any analysis or quantify the alleged "high risk" of potential "costly lawsuits from adverse agent/producer selection by R&H." RMA/Davidson Depo. 227:6-10, 234:1-11 (Pl. App. 59, 61). There was no quantification of cost of potential lawsuits or on the alleged adverse effect consummation of the proposed transaction would have on other companies. RMA/Davidson Depo. 304:6-15 (Pl. App. 79).

91. The RMA did not undertake any analysis of how many agents might be affected adversely by the proposed Acceptance/Rain & Hail transaction. RMA/Davidson Depo. 259:3-7; 261:2-18 (Pl. App. 67, 68).

92. The RMA was concerned about a potential glut of agents that Rain & Hail elected not to appoint hitting the market at the same time. That concern notwithstanding, Ross Davidson admitted that the effect of the RMA's rejection of the proposed transaction was to flood the market with former Acceptance/American Growers' agents. RMA/Davidson Depo. 254:11-22 (Pl. App Rain & Hail had no contractual obligation to renew agent contracts that expired at the end of the calendar year. Davidson 245:13-23 – 246:1-11 (Pl. App. 64).

93. Davidson admitted that there was no difference between Rain & Hail not accepting certain agents, as feared by the RMA, and Rain & Hail not renewing agent contracts upon expiration. RMA/Davidson Depo. 247:17-22 (Pl. App. 64).

94. In John Joyce's opinion, the RMA's concern that an agent that Rain & Hail elected not to appoint might be stigmatized or "blacklisted" was unjustified. Rain & Hail Depo. 146:18-25 – 147:1-6, 23-25, 182:6-11 (Pl. App. 143, 152); RMA/Davidson Depo. 254:16-22 (Pl. App. 66).

95. At the time of its decision, the RMA had a database that Ross Davidson, Administrator of the RMA, did not know about. It containing information about agent affiliations. Through this database the RMA could have determined, but did not, whether and how many agents might have been left without any carrier affiliation had Rain & Hail elected not to appoint all of the former Acceptance/American Growers' agents. RMA/Davidson Depo. 272:5-23 (Pl. App. 71).

96. The RMA did not prepare an assessment and made a "very speculative" guess at how much business might shift had the proposed transaction been consummated. RMA/Davidson Depo. 288:10-16, 289:11-19 (Pl. App. 75).

97. Under the heading "Timliness" [sic] in Mr. Davidson's November 22, 2002 analysis is mention of "possible delays due to * * * [Department of] Justice determination." Depo. Ex. 15 (Def. App. 279).

98. No one from RMA spoke to anyone at the Department of Justice prior to November 22, 2002 in connection with the proposed Acceptance/Rain & Hail transaction to determine whether DOJ had or might have any concerns regarding the proposed transaction. RMA/Davidson Depo. 392:14-19, 393:6-14 (Pl. App. 102).

99. Among the items listed under the heading "Program Integrity" in Mr. Davidson's November 22, 2002 analysis are: "[p]roducer, agent lapses; potential concentration of losses; potential instability for other companies." (Def. App. 279).

100. The RMA did not mention or discuss any of these concerns with Rain & Hail or Acceptance prior to rejecting the proposed transaction. Rain & Hail Depo. 144:25 – 145:1-12, 146:7-9, 148:1-2, 150:12-17, 152:19-23, 154:12-16, 163:5-14 (Pl. App. 142-43, 144, 145, 147).

101. In August 2003, Ross Davidson responded to a letter from Congressman Lee Terry who inquired about the RMA's decision-making process in rejecting the proposed Acceptance/Rain & Hail transaction. Depo. Ex. 35A (Pl. App. 467).

102. In Mr. Davidson's response, he explained the RMA's decision-making, noting "one reason that RMA has refused to allow bulk transfers of policies with the agreement to accept all policies is to protect the interests of producers by ensuring that they receive uninterrupted service. If the purchasing or assuming reinsured company could pick and choose which agents or producers to bring over to their book of business, some insureds might be left without coverage without their knowledge. Such picking and choosing of insureds is illegal

under the laws of most States. Rain and Hail stated that their intention was to acquire only about one-third of Growers' book of business. Since Growers was the largest reinsured company at the time, this could have left a significant number of producers without insurance for the 2003 crop year." Depo. Ex. 35A (Pl. App. 469).

103. Mr. Davidson's August 6, 2003 letter to Congressman Terry explained further "[t]he interests of the program were protected because the requirement that the acquiring company assume all the policies precludes an acquiring company from selecting only the best performing business and leaving the poor performing business for other reinsured companies to assume. Currently reinsured companies are required to accept all producers that apply for insurance with them regardless of their loss history. This policy insures that the risk associated with the good business and bad is spread among the companies. If Rain and Hail had been permitted to pick only the best business, it would have concentrated losses with the remaining reinsured companies. This would have provided a disincentive for these companies to underwrite the business and it could have adversely affected their financial stability." Depo. Ex. 35A (Pl. App. 469).

104. Rain & Hail committed to provide insurance to all eligible producers/farmers, as required by the SRA. Eligible in this context means any producer or farmer who qualifies for crop insurance under the RMA's program. Rain & Hail Depo. 351:8-22 (Pl. App. 226). Thus, RMA's fears of Rain & Hail "selecting only the best performing business and leaving the poor business for other reinsured companies" thereby "concentrating losses with the remaining reinsured companies" was unfounded.

105. Rain & Hail never represented that it intended to acquire only one-third of Growers' business. Rain & Hail Depo. 374:6-18 (Pl. App. 231). Rain & Hail projected that it would retain renewals of Growers' business in future years of between 50%-60%. The decision whether to renew with Rain & Hail would be the producer/farmer's, not Rain & Hail's. Consequently, RMA's conclusion that approving the proposed transaction "could have left a significant number of producers without insurance for the 2003 crop year" is incorrect. Rain & Hail Depo. 258:8-11 (Pl. App. 171).

106. Mr. Davidson also volunteered to Congressman Terry that "[t]he interests of the Government are protected by making sure that if there were overpayments in past years and the previous reinsured company is no longer in business, RMA could still recover such overpayments. Further, it provides a convenience to the Government to be able to collect the funds from only the entity with which RMA is currently doing business because the fund transfer mechanisms are already in place. In these situations, RMA has never precluded the company purchasing the business from entering into a hold harmless agreement with the company selling the business that would cover these previous reinsurance years' liability. RMA would still collect any overpayments from the purchasing or assuming reinsured company, which could then collect from the selling or transferring reinsured company." Depo. Ex. 35A (Pl. App. 469).

107. Acceptance planned to retain the monies that it was to receive from Rain & Hail – approximately $36 - $38 million – plus its existing assets, to cover prior year losses that would not be acquired by Rain & Hail. Thus, the RMA would have a ready source from which it could recover overpayments, if any. Martin Depo. 131:10-17 (Pl. 297).

108. According to Ross Davidson, part of the RMA's assessment of the proposed Acceptance/Rain & Hail transaction included an assessment by the RMA of American Growers' financial capability to retain prior year losses. RMA/Davidson Depo. 156:3-12 – 157:1-20 (Pl. App. 42).

109. According to the GAO's June 2004 Report, the RMA's oversight was inadequate to evaluate the overall financial condition of companies selling Federal Crop Insurance. Depo. Ex. 14 (Def. App. 241).

110. Mr. Davidson admitted that the process by which the RMA staff evaluated American Growers' financial condition was insufficient, as concluded in the GAO report, to allow the RMA to assess the overall financial health of the company. RMA/Davidson Depo. 166:17-23 – 167:1-3, 168:10-17 (Pl. App. 44, 45).

111. Mr. Davidson admitted that at the time it undertook to assess American Growers' financial condition it did not have an accurate picture of the company's financial condition. RMA/Davidson Depo. 172:15-20 (Pl. App. 46).

112. Mr. Davidson admitted that the RMA made its decision regarding the proposed Acceptance/Rain & Hail transaction based on incomplete, narrowly focused and dated information. RMA/Davidson Depo. 172:21-23 – 173:1 (Pl. App. 46).

113. Mr. Davidson admitted that there are no written criteria, and he did not apply any written criteria, and no written record exists of his assessment of American Growers' financial ability to pay prior year losses. RMA/Davidson Depo. 186:11-23 – 187:1-6 (Pl. App. 49).

114. The RMA's true motivation in rejecting the proposed transaction – avoidance of potential litigation risk – is confirmed by the final rationale for the RMA's decision offered by

Mr. Davidson. "RMA was concerned with the legal ramifications of granting a waiver of the procedures and Rain and Hail refused to accept either condition, while denying similar waivers to other companies. Such a decision could be challenged as arbitrary and capricious." Depo. Ex. 35A (Pl. App. 469). There is no evidence that any other companies had requested the same so-called waivers allegedly requested by Rain and Hail, nor that such requests were denied by the RMA.

115. Following the RMA's decision to reject the proposed transaction, Mr. Wagner informed John Martin that the Nebraska Department of Insurance was going to place American Growers under the Supervision of the Department of Insurance. Wagner Depo. 64:1-25 – 65:1-7 (Pl. App. 387-88).

116. During Messrs. Davidson and Wagner's November 22, 2002 phone conversation, Mr. Wagner advised Mr. Davidson that as a consequence of the RMA's decision to reject the proposed Acceptance/Rain & Hail transaction, the Nebraska Department of Insurance "would have to take action," meaning that American Growers would be put into liquidation. Wagner Depo. 35:2-13 (Pl. App. 380).

117. As a consequence of the RMA's decision to reject the proposed Acceptance/Rain & Hail transaction, Mr. Davidson advised Mr. Wagner that the RMA would take control over the in-force policies that would have been transferred to Rain & Hail and distribute them to Acceptance's former competitors, including Rain & Hail. Wagner Depo. 36:7-21, 37:14-21 (Pl. App. 380, 381).

118. Also following the RMA's decision to reject the proposed transaction, the RMA and the Nebraska Department of Insurance entered into a Memorandum of Understanding to,

among other things, coordinate the transfer of the policies. Wagner Depo. 38:14-25 – 39:1-7 (Pl. App. 381).

119. Mr. Wagner believed that approval of the proposed transaction would have been in the best interests of the taxpayers. Wagner Depo. 43:18-20 (Pl. App. 382).

120. Mr. Wagner testified "I didn't understand or grasp or comprehend the – how this transaction would have been a negative to the taxpayer because it would have put at least $21 million in the taxpayers; pocket, in a sense." Wagner Depo. 26:2-8 (Pl. App. 378).

121. Approval of the proposed Acceptance/Rain & Hail transaction would have been in the best interests of the taxpayer because it would have put at least $21 million in the system, eliminated certain expenses that were incurred ultimately by the RMA and the American taxpayers and would have allowed the company to survive. According to Mr. Wagner "I don't know how one could rationalize that it wasn't in the best interests of the taxpayers." Wagner Depo. 43:11-20 (Pl. App. 382); RMA/Davidson Depo. 222:1-14 (Pl. App. 58).

122. Mr. Davidson admitted that it would have cost less for Acceptance to administer the payment of claims on policies that Rain & Hail did not propose to purchase than it cost the Government to administer and service the same book of business. RMA/Davidson Depo. 312:18-23 – 313:1 (Pl. App. 81).

123. Mr. Wagner did not believe that the integrity of the crop insurance program would have been adversely affected had the RMA approved the proposed transaction. Wagner Depo. 44:1-5 (Pl. App. 382).

124. Following the rejection of the proposed Acceptance/Rain & Hail transaction, the RMA distributed the former Acceptance/American Growers' policies free of charge to other crop

insurance providers, including Rain & Hail. Depo. Ex. 19 (Pl. App. 481); Rain & Hail Depo. 179:21-25 – 180:1-9 (Pl. App. 151); RMA/Davidson Depo. (**confidential record** 14:18-23 – 15:1-10) (Pl. App. 477).

125. Rain & Hail received the single largest number of redistributed policies. Depo. Ex. 19 (Pl. App. 481).

126. As a consequence of the manner in which the RMA distributed the former Growers' policies, Rain & Hail was permitted select only those of the former Acceptance/Growers' agents it chose. Davidson 359:2-18 (Pl. App. 93).

127. Despite the fact that the RMA would not allow Rain & Hail to acquire the in-force policies without accepting prior year liabilities, the companies to whom the RMA distributed the former Acceptance/American Growers policies did not have to accept prior year liabilities. Depo. Ex. 17 (Pl. App. 418).

128. The prior year liabilities on those policies were paid by the American taxpayers. Wagner Depo. 52:5-25, 53:1-4 (Pl. App. 384, 385).

129. Tim Wagner testified that he has difficulty understanding the RMA's decision in light of the fact that the RMA ended up passing prior year liabilities on to the American taxpayers when those liabilities could have remained with Acceptance and there would have been in excess of $21 million in private funds available to satisfy those liabilities. Wagner Depo. 53:2-25 – 54:1-12 (Pl. App. 385).

130. As a consequence of the RMA's rejection of the proposed Acceptance/Rain & Hail transaction, the American taxpayers have paid in excess of $41 million to, among other things, pay prior year losses on the former Acceptance/American Growers' policies as well as

other costs associated with the liquidation of American Growers. Wagner Depo. 54:4-25 – 55:1-8 (Pl. App. 385); RMA/Davidson Depo. 220:8-9 (Pl. App. 58).

131. At the time it made the decision to reject the proposed transaction, the RMA had not undertaken a thorough analysis of the costs that would have to be borne by the American taxpayers as a consequence of the RMA's decision. As admitted by Ross Davidson, at the time of its decision, the RMA "didn't have a really good handle on" the costs that the American taxpayers would have to incur as a consequence of the RMA decision to reject the proposed transaction. RMA/Davidson Depo. 216:18-23, 218:5-13, 223:3-8 (Pl. App. 57, 58).

132. According to John Joyce, Rain & Hail's former President the "RMA's own actions and inactions created more disruption and confusion than possibly [could have] occurred under the proposed transaction." Rain & Hail Depo. 76:13-16. Mr. Joyce continued "the turmoil that occurred out of the final disposition of that business, based on RMA's own published plans would have exceeded anything in the world that ever would have occurred under the proposed transaction." Rain & Hail Depo. 77:21-25 – 78:1 (Pl. App. 126).

Dated: March 24, 2006

Respectfully Submitted,

/s/ Lewis S. Wiener

Lewis S. Wiener, Esq.
SUTHERLAND ASBILL & BRENNAN LLP
1275 Pennsylvania Avenue, NW
Washington, D.C. 20004
202.383.0140 - phone
202.637.3593 - fax
Counsel for Plaintiff Acceptance Insurance Companies Inc.

OF COUNSEL:
Ronald Massumi, Esq.
Carter L. Williams, Esq.
SUTHERLAND ASBILL & BRENNAN LLP
1275 Pennsylvania Avenue, NW
Washington, D.C. 20004
202.383.0100

Patrick Griffin, Esq.
Kutak Rock, LLP
The Omaha Building
1650 Farnam Street
Omaha, NE 68102-2186
402.346.6000