**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| ACCEPTANCE INSURANCE COMPANIES INC., | ) | |
| Plaintiff, | ) | CASE NO. 03-2794 |
| v. | ) | Judge Thomas C. Wheeler |
| THE UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

**PLAINTIFF'S OBJECTIONS AND RESPONSES TO DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT**

Pursuant to Rule 56(h)[1] of the Rules of the United States Court of Federal Claims and this Court's January 18, 2006 order, as modified, Plaintiff Acceptance Insurance Companies Inc. files these Objections and Responses to Defendant's proposed findings of uncontroverted fact in support of Defendant's renewed motion to dismiss or, in the alternative, for summary judgment. In support of its Cross-Motion for Summary Judgment, Plaintiff will submit a separate set of proposed findings of uncontroverted fact.

## I. Federal Involvement In The Crop Insurance Industry

### A. Federal Crop Insurance Corporation ("FCIC")

1. The Federal Crop Insurance Corporation ("FCIC") was established by Congress in 1938 through the Federal Crop Insurance Act "as an agency of and within the Department [of Agriculture]." 7 U.S.C. § 1503; Def. App. 5.

[1] Defendant's Proposed Findings of Uncontroverted Fact, filed February 10, 2006, and Plaintiff's Objections and Responses thereto are filed pursuant to Rule 56(h) of the Rules of the United States Court of Federal Claims. The undersigned counsel for Plaintiff has confirmed that Defendant's reference to Rule 56.1 in its Proposed Findings was inadvertent.

**AICI RESPONSE:** Agreed.

2. FCIC was created "[t]o carry out the purposes of the [Federal Crop Insurance] Act." 7 U.S.C.§ 1503. The stated purpose of the Federal Crop Insurance Act is "improving the economic stability of agriculture through a sound system of crop insurance." 7 U.S.C. § 1502(a).

**AICI RESPONSE:** Agreed.

3. Congress has granted FCIC authority to carry out the purposes of the Federal Crop Insurance Act by offering crop insurance or reinsurance. 7 U.S.C. § 1508(a)(1). Congress has also authorized the FCIC to "issue regulations, necessary in the conduct of its business." 7 U.S.C. § 1506(l). The regulations that the FCIC has promulgated are set forth in 7 C.F.R. Ch. IV.

**AICI RESPONSE:** Agreed.

4. One of those regulations provides that FCIC "will offer Standard Reinsurance Agreements to eligible Companies under which the [FCIC] will reinsure policies which the Companies issue to producers of agricultural commodities." 7 C.F.R. § 400.164.

**AICI RESPONSE:** Objection. The referenced regulation is one of many regulations issued by the FCIC regarding the government's regulation of crop insurance.

**Corrected Statement:** One of many regulations issued by the FCIC regarding the government's regulation of crop insurance provides that FCIC "will offer Standard Reinsurance Agreements to eligible Companies under which the [FCIC] will reinsure policies which the Companies issue to producers of agricultural commodities." 7 C.F.R. § 400.164.

5. Since 1998, the private insurance companies reinsured by FCIC have sold and serviced all Multi Peril Crop Insurance ("MPCI") policies authorized by the Federal Crop Insurance Act. Def. App. 7.

**AICI RESPONSE:** Objection. Quotation marks omitted.

**Corrected Statement:** "Since 1998, the private insurance companies reinsured by FCIC have sold and serviced all Multi Peril Crop Insurance ("MPCI") policies authorized by the Federal Crop Insurance Act." Def. App. 7.

6. FCIC approves the MPCI Common Crop Insurance Policy and the other policies that private insurance companies issue that are federally reinsured." 7 C.F.R. § 457.8 (emphasis added).

**AICI RESPONSE:** Agreed.

**B. <u>Risk Management Agency ("RMA")</u>**

7. Like FCIC, the Risk Management Agency ("RMA") is also an agency within the United States Department of Agriculture. 7 U.S.C. § 6933(a). The purpose of RMA is to supervise FCIC and administer all programs authorized pursuant to the Federal Crop Insurance Act. 7 U.S.C. § 6933(b)(1)-(2).

**AICI RESPONSE:** Agreed.

8. The Administrator of RMA is appointed by the Secretary of Agriculture, and also serves as Manager of FCIC. 7 U.S.C. § 6933(c)(1)-(2).

**AICI RESPONSE:** Agreed.

9. Ross Davidson became RMA Administrator in March 2002. Def. App. 38 (Davidson 14:18-21).

**AICI RESPONSE:** Agreed.

10. Immediately before his appointment, Mr. Davidson had served as Vice President, Industry Affairs and Vice President, Corporate Finance for USAA, an insurance company, where he was responsible for risk management and structuring financial transactions, among many other duties from 1988 to 2001. Def. App. 39-41 (Davidson 19:4-25:5). Mr. Davidson also has held positions involving risk management and financial analysis for Tesoro Petroleum, Zapata Corporation, and Aetna Life and Casualty. Def. App. 41-43 (Davidson 25:9-35:14).

**AICI RESPONSE:** Objection. Statement is correct but incomplete. Mr. Davidson admitted in his deposition that prior to his appointment as Administrator of the RMA he had no background or experience in the crop insurance industry and had no experience in the analysis of risk in the crop insurance area. RMA/Davidson Depo. 17:8-18; 18:15-23 (Plaintiff's Appendix ("Pl. App.") 5, 6).[2]

**Corrected Statement:** Immediately before his appointment, Mr. Davidson had served as Vice President, Industry Affairs and Vice President, Corporate Finance for USAA, an insurance company, where he was responsible for risk management and structuring financial transactions, among many other duties from 1988 to 2001. RMA/Davidson Depo. 19:4-25:5 (Pl. App. 6). Mr. Davidson also has held positions involving risk management and financial analysis for Tesoro Petroleum, Zapata Corporation, and Aetna Life and Casualty. RMA/Davidson Depo. 25:9-35:14 (Pl. App. 7-10). Prior to his appointment as Administrator of the RMA, Mr. Davidson had no

---

[2] References to Pl. App. are to Plaintiff's Appendix of Exhibits filed pursuant to RCFC 5.2. To avoid unnecessary duplication, included in Plaintiff's Appendix of Exhibits are only those exhibits not included in Defendant's Appendix of Exhibits. Where appropriate, Plaintiff's cross references are to exhibits included in Defendant's Appendix ("Def. App.").

background or experience in the crop insurance industry and had no experience in the analysis of risk in the crop insurance area. RMA/Davidson Depo. 17:8-18; 18:15-23 (Pl. App. 5, 6).

## II. The Standard Reinsurance Agreement ("SRA")

### A. Overview And History

11. Crop insurance providers who wish to sell and service federally reinsured multi-peril crop insurance ("MPCI") policies must sign a Standard Reinsurance Agreement ("SRA") with FCIC. 7 C.F.R. § 400.164.

**AICI RESPONSE:** Agreed.

12. The SRA that was in effect at the time of the proposed transaction was known as the 1998 SRA, because it first took effect during the 1998 reinsurance year, which began on July 1, 1997. Def. App. 375-417 (Depo. Ex. 37).

**AICI RESPONSE:** Agreed.

13. Insurers enter into a separate SRA for each reinsurance year, which runs from July 1st through June 30th. Def. App. 29-30 (Pl. Resp. to Def. RFAs 3-6, 8); Def. App. 375 (Depo. Ex. 37). The 1998 SRA was used during the 1999, 2000, 2001, 2002, 2003, and 2004 reinsurance years. Def. App. 49 (Davidson 57:1-58:8).

**AICI RESPONSE:** Agreed.

14. The first paragraph of the 1998 SRA states "[t]his is a cooperative financial assistance agreement between FCIC and the Company to deliver eligible crop insurance under the authority of the Act." Def. App. 375. The first paragraph also states "[t]his Agreement is authorized by the Act and regulations promulgated thereunder codified in 7 C.F.R. chapter IV.

Such regulations are incorporated into this Agreement by reference." Id.

**AICI RESPONSE:** Objection. The 1998 SRA contains many provisions establishing the rights, duties and obligations of the parties in addition to the one paragraph cited by Defendant.

**B. Key Terms Defined In The 1998 SRA[3]**

15. The "Definitions" section of the 1998 SRA states "'Agreement'" means this Standard Reinsurance Agreement, all Appendices, all referenced documents including Manual 13 and the Approved Manual 14." Def. App. 376 (emphasis added).

**AICI RESPONSE:** Agreed.

16. The "Definitions" section of the 1998 SRA states "'Book of business' means the aggregation of all eligible crop insurance contracts in force between the Company and its policyholders that have a sales closing date within the reinsurance year and are eligible to be reinsured under this Agreement." Def. App. 376.

**AICI RESPONSE:** Agreed.

17. The "Definitions" section of the 1998 SRA states "'Cancellation date' means the date by which the Company or policyholder must notify the other that coverage under an eligible crop insurance contract issued by the Company is canceled for a succeeding crop year. The day following this date is considered as the date a continuous eligible crop insurance contract carried over from the previous crop year is renewed for the subsequent crop year." Def. App. 376.

**AICI RESPONSE:** Agreed.

[3] Defendant uses descriptive terms, like "key" in this and other headings. These reflect Defendant's subjective view and characterization of the referenced provisions or issues and do not constitute uncontroverted statements of fact.

18. The "Definitions" section of the 1998 SRA states "'Carryover crop insurance contract' means eligible crop insurance contract that has been in force for at least one crop year term and continues in force for another crop year term after the cancellation date." Def. App. 376.

**AICI RESPONSE:** Agreed.

19. The "Definitions" section of the 1998 SRA states "'Crop insurance contract' means an agreement (with the terms in effect as of the contract change date) to insure the insurable interest of an eligible producer in a single crop in a single county as provided by the application, the General, or Common Crop Insurance Policy, the Crop Endorsement, the Basic Provisions, the Crop Provisions, the Special Provisions, the Catastrophic Risk Protection Endorsement, as applicable, the Actuarial Table, and any other instrument or endorsement as approved by FCIC." Def. App. 377.

**AICI RESPONSE:** Agreed.

20. The "Definitions" section of the 1998 SRA states "'Eligible crop insurance contract' means a crop insurance contract that is sold and serviced consistent with the [Federal Crop Insurance] Act, 7 C.F.R. chapter IV, FCIC approved regulations and procedure, at applicable rates, terms, and special conditions; having a sales closing date within the reinsurance year, to an eligible producer, covering a crop in an area approved by FCIC; and on forms approved in writing by FCIC." Def. App. 378.

**AICI RESPONSE:** Agreed.

21. The "Definitions" section of the 1998 SRA states "'Eligible producer' means a person who meets all the conditions for eligibility specified in 7 C.F.R. chapter IV." Def. App. 378.

**AICI RESPONSE:** Agreed.

22. The "Definitions" section of the 1998 SRA states "'Reinsurance year' means the period from July 1 of any year through June 30 of the following year and identified by reference to the year containing June. All eligible crop insurance contracts with sales closing dates within the reinsurance year are subject to the terms of the Agreement applicable to that reinsurance year"). Def. App. 379 (emphasis added).

**AICI RESPONSE:** Agreed.

23. The "Definitions" section of the 1998 SRA states "'Sales Closing Date' means the date established by FCIC as the last date on which a producer may apply for an eligible crop insurance contract on a crop in a specific county." Def. App. 380.

**AICI RESPONSE:** Agreed.

**C. Key General Terms Of The 1998 SRA**

24. Section II.A. of the 1998 SRA, titled "General Terms," states "1. Only eligible crop insurance contracts will be reinsured and subsidized under this Agreement." Def. App. 381.

**AICI RESPONSE:** Agreed.

25. Section II.A. of the 1998 SRA, titled "General Terms," states "2. Except as specified below, the Company must offer all approved plans of insurance for all approved crops in any State in which it writes an eligible crop insurance and must accept and approve all applications from all eligible producers." Def. App. 381 (emphasis added).

**AICI RESPONSE:** Objection. The word "contract" is missing from the sentence between the words "insurance" and "and" prior to the underlined text. In addition, Plaintiff notes that as part of the proposed transaction Rain & Hail committed to accept and approve applications for crop insurance from all eligible producers, meaning that no eligible producer would have been left without coverage. As stated by John Joyce in a November 26, 2002 letter to Ross Davidson "[w]e will insure any eligible producer, period." Depo. Ex. 26 (Def. App. 291-93). Mr. Joyce testified "any distortion of the fact that says that Rain & Hail wouldn't accept an eligible producer is just grossly wrong." Rain & Hail Depo. 63:3-6 (Pl. App. 122). Mr. Joyce also testified that RMA's assumption that Rain & Hail's intent was to consolidate the low-risk producers and leave the high-risk producers with other approved carriers was incorrect. Rain & Hail Depo. 67:1-15 (Pl. App. 123).

**Corrected Statement:** Section II.A. of the 1998 SRA, titled "General Terms," states "2. Except as specified below, the Company must offer all approved plans of insurance for all approved crops in any State in which it writes an eligible crop insurance contract and <u>must accept and approve all applications from all eligible producers</u>." Depo. Ex. 37 (Def. App. 381) (emphasis added). With respect to the proposed AICI/Rain & Hail transaction, Rain & Hail committed to accept and approve applications for crop insurance from all eligible producers, meaning that no eligible producer would have been left without coverage. John Joyce advised the RMA specifically that "[w]e will insure any eligible producer, period." Depo. Ex. 26 (Def. App. 291-93). Mr. Joyce also testified "any distortion of the fact that says that Rain & Hail wouldn't accept an eligible

producer is just grossly wrong." Rain & Hail Depo. 63:3-6 (Pl. App. 122). Moreover, Mr. Joyce testified that RMA's assumption that Rain & Hail's intent was to consolidate the low-risk producers and leave the high-risk producers with other approved carriers was incorrect. Rain & Hail Depo. 67:1-15 (Pl. App. 123).

26. Section II.A. of the 1998 SRA, titled "General Terms," states that "3. In exchange for the reinsurance premiums provided by the Company pursuant to this Agreement, FCIC will provide the Company with reinsurance pursuant to the provisions of this Agreement" Def. App. 381 (emphasis added).

**AICI RESPONSE:** Agreed with the exception of Defendant's addition of "emphasis added," which should be deleted. No emphasis was added to the referenced provision.

27. Section II.A. of the 1998 SRA, titled "General Terms," states that "4. All eligible crop insurance contracts reinsured and subsidized under this Agreement must conform to the regulations published at 7 C.F.R., chapter IV or as approved in writing by FCIC." Def. App. 381.

**AICI RESPONSE:** Agreed.

28. Section II.A. of the 1998 SRA, titled "General Terms," states that "5. FCIC will not provide reinsurance, A&O subsidy, or risk subsidy for any eligible or ineligible crop insurance contract that is <u>sold</u> or serviced in violation of the terms of this Agreement, 7 C.F.R., chapter IV, <u>FCIC approved procedures</u> or any written instructions of FCIC." Def. App. 381 (emphasis added).

**AICI RESPONSE:** Agreed. AICI notes that the term "sold" emphasized by Defendant refers to the sale of any crop insurance policy/contract by a Company to an eligible

producer. There is no evidence to support the assertion that the term "sold" refers to the bulk sale or transfer of in-force policies between Companies as has been previously approved by the RMA.

29. Section II.A. of the 1998 SRA, titled "General Terms," states that "7. Only the amount of net book premium authorized by FCIC in the approved Plan of Operations may be reinsured and subsidized under this Agreement." Def. App. 382 (emphasis added).

**AICI RESPONSE:** Agreed with the exception of Defendant's addition of "emphasis added," which should be deleted. No emphasis appears to have been added to the referenced provision.

30. Section II.A. of the 1998 SRA, titled "General Terms," states that "8. To be eligible for an Agreement, or to continue to hold an Agreement: a. The Company must have adequate financial resources at the beginning of the reinsurance year as required by 7 C.F.R. part 400, subpart L. If at any time during the reinsurance year the Company no longer has adequate financial resources, the Company must timely obtain such resources." Def. App. 382.

**AICI RESPONSE:** Agreed.

31. Sections II.B-D. set the terms by which the insurer may designate eligible crop insurance contracts to one of three funds established by FCIC for reinsurance purposes. Def. App. 382-89. Section III sets the terms on which FCIC provides subsidies to the insurer for risk and for administrative and operating expenses incurred in servicing the eligible crop insurance contracts. Def. App. 390-92.

**AICI RESPONSE:** Agreed.

**C. Other Key Terms Of The 1998 SRA**

32. Section V.G.1. of the 1998 SRA, titled "Plan of Operations," states:

> a. This Agreement becomes effective with respect to any reinsurance year upon approval of the Company's Plan of Operations by FCIC. . . .
>
> c. The Company may submit a request to amend an approved Plan of Operations at any time to reflect changing business considerations and sales expectations. Such amendments must be in writing and must be approved by FCIC in writing before implementation by the Company.
>
> d. The Plan of Operations is incorporated by this Agreement by reference. Material failure to follow the Plan of Operations may be a basis for FCIC to terminate this Agreement.

Def. App. 396.

**AICI RESPONSE:** Agreed.

33. Section V.G.2. of the 1998 SRA, titled "General Operations," states "g. The company must use crop insurance contracts, standards, procedures, methods, and instructions as issued or approved by FCIC in the sales, service, and loss adjustment of eligible crop insurance contracts." Def. App. 398 (emphasis added).

**AICI RESPONSE:** Agreed.

34. Section V.I. of the 1998 SRA, titled "Compliance and Corrective Action," states "1. The Company must be in compliance with the provisions of this Agreement, the laws and regulations of the United States, the laws and regulations of the States and locales in which the Company is conducting business under this Agreement, unless such State and local laws and regulations are in conflict with this Agreement, and all bulletins, handbooks, instructions, and procedures of FCIC." Def. App. 398 (emphasis added).

**AICI RESPONSE:** Agreed.

35. Section V.J. of the 1998 SRA, titled "Suspension," states "FCIC may suspend this Agreement for cause due to a material failure to perform or comply with obligations under this Agreement. If this Agreement is suspended for cause: . . . . 2. While suspended, the Company may not sell any new crop insurance contracts under this Agreement." Def. App. 401 (emphasis added).

**AICI RESPONSE:** Agreed.

36. Section V.L. of the 1998 SRA, titled "Disputes and Appeals," states "1. The Company may appeal any actions, finding, or decision of FCIC under this Agreement in accordance with the provisions of 7 C.F.R. 400.169." Def. App. 401.

**AICI RESPONSE:** Objection. AICI disputes that the provision cited by the Defendant applies to claims asserted against the United States for the alleged 5th amendment taking of Plaintiff's property, as more fully discussed in Judge Hodges' August 13, 2004 Order denying Defendant's Motion to Dismiss.

**Corrected Statement:** Section V.L. of the 1998 SRA, titled "Disputes and Appeals," states "1. The Company may appeal any actions, finding, or decision of FCIC under this Agreement in accordance with the provisions of 7 C.F.R. 400.169." Depo. Ex. 37 (Def. App. 401). Consistent with Judge Hodges' August 13, 2004 Order in this case (Pl. App. 482), the referenced section is inapplicable to and does not bar or otherwise affect Plaintiffs' 5th amendment takings claim before this Court.

37. Section V.P. of the 1998 SRA, titled "Disputes and Appeals," states:

> Whenever the Company and its policy issuing company, if applicable, are unable to fulfill their obligations to any

> policyholder by reason of a directive or order duly issued by any Department of Insurance, Commissioner of Insurance, or by any court of law having competent jurisdiction, or under similar authority of any jurisdiction to which the Company is subject, all eligible crop insurance contracts affected by such directive or order that are in force and subject to this Agreement as of the date of such inability or failure to perform will be immediately transferred to FCIC without further action of the Company **by the terms of this Agreement**. FCIC will assume all obligations for unpaid losses whether before or after the date of transfer, and the Company must pay FCIC all funds in its possession with respect to all such eligible crop insurance contracts transferred including, but not limited to, premiums collected. The Company hereby assigns to FCIC the right to all uncollected premiums on all such policies.

Def. App. 402-03 (emphasis added).

**AICI RESPONSE:** Objection. The title of the quoted section is not "Disputes and Appeals." It is "Cut Through and Preemption of State Law." In addition, Plaintiff disputes that under the facts of this case and based on the government's actions, as more fully described in Plaintiff's Statement of Uncontroverted Fact, the referenced provision affects its 5th amendment takings claim.

**Corrected Statement:** Section V.P. of the 1998 SRA, titled "Cut though and Preemption of State Law," states: [remainder of statement agreed].

38. Section V.Y. of the 1998 SRA, titled "Resolution of Disagreements," states:

> If the Company disagrees with an act or omission of FCIC, except those acts implemented through the rulemaking process, the Company shall provide written notice of such disagreement to the Manager of FCIC. Within 10 business days of receipt of notice, the Manager or a designee will schedule a meeting with the company in an attempt to resolve the disagreement. Notwithstanding any other provision in this section, any subsequent decision by FCIC on the act or omission will be final in the administrative process and, therefore subject only to review the by the Board of Contract Appeals in a matter relating to this Agreement or to judicial review.

Def. App. 406 (emphasis added).

**AICI RESPONSE:** Objection. AICI disputes that the provision cited by the Defendant applies to claims asserted against the United States for the alleged 5th amendment taking of Plaintiff's property, as more fully discussed in Judge Hodge's August 13, 2004 Order (Pl. App. 482) denying the government's Motion to Dismiss.

**Corrected Statement:** Section V.Y. of the 1998 SRA, titled "Resolution of Disagreements," states:

> If the Company disagrees with an act or omission of FCIC, except those acts implemented through the rulemaking process, the Company shall provide written notice of such disagreement to the Manager of FCIC. Within 10 business days of receipt of notice, the Manager or a designee will schedule a meeting with the company in an attempt to resolve the disagreement. Notwithstanding any other provision in this section, <u>any subsequent decision by FCIC on the act or omission will be final</u> in the administrative process and, therefore <u>subject only to review the by the Board of Contract Appeals</u> in a matter relating to this Agreement or to judicial review.

Depo. Ex. 37 (Def. App. 406) (emphasis added). Consistent with Judge Hodges' August 13, 2004 Order in this case, the referenced section is inapplicable to and does not bar or otherwise affect Plaintiffs' 5th amendment takings claim before this Court.

**D. <u>Section 4.C(9) of FCIC Crop Insurance Handbook</u>**

39. Each crop year, FCIC issues a Crop Insurance Handbook. Def. App. 1. The crop year differs from the reinsurance year, which runs from July 1 to June 30. The crop year is defined in the Common Crop Insurance Policy as "[t]he period within which the insured crop is

normally grown, regardless of whether or not it is actually grown, and designated by the calendar year in which the insured crop is normally harvested." 7 C.F.R. § 457.8 (emphasis added).

**AICI RESPONSE:** Agreed.

40. Section 2 of the 2002 Crop Insurance Handbook states "Insurance Providers that have a Standard Reinsurance Agreement (SRA) with FCIC must use this handbook or comparable procedures approved by RMA to deliver MPCI coverage." Def. App. 2.

**AICI RESPONSE:** Agreed.

41. Section 4.C(9) of FCIC's 2002 Crop Insurance Handbook, titled "Transfer of Policies," states "[t]o be effective, transfer requests must be signed by the cancellation date and received by the ceding Insurance Provider no later than 45 days after the cancellation date. . . . (9)(b) Requirements. The assuming Insurance Provider must complete and have the insured sign a Cancellation/Transfer of Experience Data Form for each policy (crop) being transferred. . . . (9)(e)2 All Insurance Providers are required to transmit experience (premium and loss data) and APH data to RMA." Def. App. 3.

**AICI RESPONSE:** Objection. The referenced provision is intended to be used when a producer/farmer wants to transfer his or her coverage prior to the cancellation date from one approved crop insurance carrier to another. It was not intended to nor does it contemplate a situation when a crop insurance carrier like AICI intends to transfer its entire book of in-force business to another carrier and leave the business altogether. Nevertheless, in such instances when a carrier is departing the crop insurance business, as was the case in June 2001 when IGF sold its book of in-force MPCI policies to AICI, the FCIC has waived the requirements of Section 4.C(9) of the Crop Insurance Handbook.

Depo. Ex. 2 (Def. App. 209-10); Depo. Ex. 35A (Pl. App. 470). Nothing in Section 4.C(9) of the Crop Insurance Handbook conditions such waiver on the company proposing to acquire another company's policies accepting prior year liabilities. Rain & Hail Depo. 64:17-21 (Pl. App. 122). The RMA unilaterally decided when and on what conditions it would waive the requirements of Section 4.C(9). No written criteria exists for making such determination or the other determinations that the RMA claimed to have used to analyze and reject the proposed Rain & Hail/AICI transaction. *See* Depo. Ex. 35A (Pl. App. 467).

**Corrected Statement:** Section 4.C(9) of FCIC's 2002 Crop Insurance Handbook, titled "Transfer of Policies," states "[t]o be effective, transfer requests must be signed by the cancellation date and received by the ceding Insurance Provider no later than 45 days after the cancellation date. . . . (9)(b) Requirements. The assuming Insurance Provider must complete and have the insured sign a Cancellation/Transfer of Experience Data Form for each policy (crop) being transferred. . . . (9)(e)2 All Insurance Providers are required to transmit experience (premium and loss data) and APH data to RMA." Def. App. 3. This Section was not intended to nor does it contemplate or address the situation when a crop insurance carrier, like AICI, intends to transfer its entire book of in-force business to another carrier after the sales closing date and leave the business altogether. At least four times prior to November 2002, the RMA permitted approved SRA holders, including AICI, to acquire in-force policies of other companies without complying with the requirements of Section 4.C(9). There are no regulations or written criteria outlining

or defining the conditions upon which the RMA will require or not require an acquiring company to comply with the conditions of Section 4.C(9).

42. John Joyce, the former chairman of crop insurance provider Rain and Hail LLC, explained that Section 4.C(9) provides that "annually, before the sales closing date for that particular crop, have that choice that a farmer can make. If they want to change from where they are, make changes in their coverage, they must do so on a signed form prior to the sales closing date. Once the sales closing date is reached, it's all over for that year. Consequently, for Acceptance and Rain and Hail, in my view, to do anything with the business that was referenced here as in[-]force, would have had significant discussion of how to do that with the least possible disruption to the client, to the agent, to everybody else and the maximum assurance of service to that policyholder." Def. App. 109 (Rain & Hail 47:6-21).

**AICI RESPONSE:** Objection. The word "already" between "was" and "referenced was omitted from the quote. In addition, Mr. Joyce did not offer the statement quoted above as an explanation of Section 4.C(9) as stated by the government. Mr. Joyce introduced the statement quoted above by stating "we're having a little communication problem here, I think, over something that traditionally in the crop insurance business is different that what you'd get in a typical [property and casualty] operation or any other type of life, health, whatever, okay? There is an issue that because of the unique exposure periods and number of people involved in a pre-established program, there had to be a set of rules that – so a customer at some point would have arrived at knowing what their coverage was, through what agent and what company." Mr. Joyce then went on to offer the explanation quoted above.

**Corrected Statement:** John Joyce, the former chairman of crop insurance provider Rain and Hail LLC, stated "The -- we're having a little communication problem here, I think, over something that traditionally in the crop insurance business is different that what you'd get in a typical [property and casualty] operation or any other type of life, health, whatever, okay? There is an issue that because of the unique exposure periods and number of people involved in a pre-established program, there had to be a set of rules that – so a customer at some point would have arrived at knowing what their coverage was, through what agent and what company. They annually, before the sales closing date for that particular crop, have that choice that a farmer can make. If they want to change from where they are, make changes in their coverage, they must do so on a signed form prior to the sales closing date. Once the sales closing date is reached, it's all over for that year. Consequently, for Acceptance and Rain and Hail, in my view, to do anything with the business that was already referenced here as in[-]force, would have had significant discussion of how to do that with the least possible disruption to the client, to the agent, to everybody else and the maximum assurance of service to that policyholder. But it never occurred at any depth other than this was just a secondary question of how to handle the in-force. It never got there." Rain & Hail Depo. 46:18-25, 47:1-25 (Pl. App. 118). See also paragraph 41 Corrected Statement.

43. Mr. Joyce testified that "4.C(9) does not provide any real rights to transfer of an in[-]force policy. There's none." Def. App. 108, 109 (Rain & Hail 44:21-23, see also 46:11-16).

**AICI RESPONSE:** Objection. The quote is accurate but Mr. Joyce's comment was in response to the question "[i]s it your understanding that the intent of Section 4.C(9) is to

inform the producer [farmer] who has an in-force policy that his policy is being transferred from one approved or accepted insurance provider to another?" In response, Mr. Joyce stated "I'm going to back up again. I know I sound like a broken record, but we're not agreeing on in-force business." Rain & Hail Depo. 44:14-23 (Pl. App. 117). Mr. Joyce then explained that his understand is that Section 4.C(9) refers to non in-force policies, meaning that, as explained in Corrected paragraph 41, Section 4.C(9) is intended to be used when a producer/farmer wants to change crop insurance companies prior to the sales closing date. It neither addresses nor contemplates the situation where a crop insurance carrier wants to sell and transfer its entire book of business to another carrier and leave the crop insurance business. Rain & Hail Depo. 45:3 (Pl. App. 118).

**Corrected Statement:** Mr. Joyce was asked "[i]s it your understanding that the intent of Section 4.C(9) is to inform the producer [farmer] who has an in-force policy that his policy is being transferred from one approved or accepted insurance provider to another?" In response, Mr. Joyce stated "I'm going to back up again. I know I sound like a broken record, but we're not agreeing on in-force business." Rain & Hail Depo. 44:14-23 (Pl. App. 117). Mr. Joyce then explained that his understand is that Section 4.C(9) refers to non in-force policies meaning that Section 4.C(9) is intended to be used when a producer/farmer wants to change crop insurance companies prior to the sales closing date. It neither addresses nor contemplates the situation where a crop insurance carrier wants to sell and transfer its entire book of business to another carrier and leave the crop insurance business. Rain & Hail Depo. 45:3 (Pl. App. 118); 44:14-23 (Pl. App. 117), see also 46:11-16 (Pl. App. 118)).

44. Section 4.C(9) requires that each policy that is transferred must be individually canceled and rewritten by another insurer. Def. App. 3. Section 4.C(9) does not provide any procedure for transferring a block of policies. Id.

**AICI RESPONSE:** Objection. AICI agrees that Section 4.C(9) does not address the mass or bulk transfer of policies. It was intended to be used when a producer/farmer wants to change crop insurance companies prior to the sales closing date. It neither addresses nor contemplates the situation where a crop insurance carrier wants to sell and transfer its entire book of business to another carrier and leave the crop insurance business. The RMA has nonetheless approved the mass or bulk transfer of policies from one approved SRA holder to another on numerous occasions. One of those transfers involved AICI's purchase of IGF's policies, in which the RMA waived the requirements of Section 4.C(9). Depo. Ex. 2 (Def. App. 209-10). The RMA has also acknowledged that since the 1999 crop insurance year four companies were permitted by the RMA to acquire another company's book of business without satisfying the cancellation and rewrite procedures outlined in Section 4.C(9)the requirements. *See* Depo. Ex. 35A (Pl. App. 470); Depo. Ex. 2 (Def. App. 209-10). There is no evidence that the acquiring companies were advised specifically that a precondition to the government's approval of the proposed acquisition was the acquirer's acceptance of past years' liabilities.

**Corrected Statement:** Section 4.C(9) requires that each policy that is transferred must be individually canceled and rewritten by another insurer. Def. App. 3. Section 4.C(9) does not provide any procedure for transferring a block of policies, id. and was intended to be used when a producer/farmer wants to change crop insurance companies

prior to the sales closing date. The Section neither addresses nor contemplates the situation where a crop insurance carrier wants to sell and transfer its entire book of business to another carrier and leave the crop insurance business. Nevertheless, the RMA has approved the block transfer of policies from one approved SRA holder to another on at least four occasions since 1999. One of those transfers involved AICI's purchase of IGF's policies, in which the RMA did not require AICI to comply with the requirements of Section 4.C(9). Depo. Ex. 2 (Def. App. 209-10); *see also* Depo. Ex. 35A (Pl. App. 470). There is no evidence that each of the acquiring companies were advised specifically that a precondition to the government's approval of the proposed acquisition was the acquiring company's acceptance of past years' liabilities by the acquirer.

## III. American Growers Suffers Large Losses In 2002

### A. Acceptance And Its Subsidiaries

45. John Martin is the chairman, chief executive officer ("CEO"), and president of plaintiff Acceptance Insurance Companies Inc. ("Acceptance") and Acceptance Insurance Company ("AIC"). Def. App. 159 (Martin 7:17-8:20).

**AICI RESPONSE:** Agreed.

46. Mr. Martin was hired as CEO and president of Acceptance in December 1999. Def. App. 161 (Martin 23:24-24:9).

**AICI RESPONSE:** Agreed.

47. Acceptance is a publicly traded insurance holding company. Def. App. 162 (Martin 26:1-7, 79:24-80:3). It has never issued any crop insurance policies. Def. App. 175 (Martin 79:6-23).

**AICI RESPONSE:** Agreed.

48. When Mr. Martin joined Acceptance in December 1999, the company had incurred significant losses both in the property and casualty area as well as in their crop insurance operations, where a product named CRC Plus had caused losses and regulatory problems. Def. App. 160, 162 (Rain & Hail 19:25-20:21, 26:1-18).

**AICI RESPONSE:** Objection. The statement is attributed to Mr. John Martin, not Mr. Joyce. The correct citation is Martin 20:18-21.

49. In December 1999, Acceptance's board of directors had decided to downsize the property and casualty segment and increase the company's commitment to the agricultural risk sector. Def. App. 161 (Rain & Hail 21:2-6).

**AICI RESPONSE:** Objection. The statement is attributed to Mr. John Martin, not Mr. Joyce. The correct citation is Martin 21:2-6.

50. In a June 2002 PowerPoint presentation to then-new RMA Administrator Ross Davidson, Mr. Martin contrasted the Acceptance family corporate structure in 1999 to 2002 to portray that agricultural risk had become the "total focus" of Acceptance and its subsidiaries. Def. App. 162-63 (Rain & Hail 28:18-30:19, 31:20-32:2), Def. App. 314-15 (Depo. Ex. 25, AUS 013988-89).

**AICI RESPONSE:** Objection. Like to two prior statements, this statement is attributed to Mr. John Martin, not Mr. Joyce. Page references should be to Mr. Martin's September 2, 2005 deposition.

51. American Growers Insurance Company, Acceptance Insurance Company ("AIC"), and American Agrisurance, Inc. were wholly owned subsidiaries of Acceptance. Def.

App. 175-76 (Martin 80:18-81:12), Def. App. 315 (Depo. Ex. 35, AUS 013989), Def. App. 29 (Pl. Resp. to Def. RFAs No. 1).

**AICI RESPONSE:** Agreed.

52. The crop insurance business conducted by American Growers and American Agrisurance, Inc. was marketed under the name "AmAg." Def. App. 179 (Martin 109:23-110:9), Def. App. 425-1 (Depo. Ex. 38, AUS 014062).

**AICI RESPONSE:** Agreed.

53. AIC historically was engaged in property and casualty insurance business. Def. App. 422 (Depo. Ex. 38, AUS 014055).

**AICI RESPONSE:** Agreed.

54. Mr. Martin served as President and CEO of American Agrisurance, Inc. in November 2002. Def. App. 284.

**AICI RESPONSE:** Agreed but correct citation is Def. App. 284-285.

55. American Growers entered the 1998 SRA with FCIC for the 1998, 1999, 2002, and 2003 reinsurance years. Def. App. 29-30 (Pl. Resp. to Def. RFAs Nos. 4-5, 8).

**AICI RESPONSE:** Agreed.

56. RMA required AIC to enter the 1998 SRA with FCIC for the 2000 and 2001 reinsurance years as a result of the problems caused by CRC Plus in 1999. Def. App. 174 (Martin 74:6-75:8), Def. App. 506-41.

**AICI RESPONSE:** Objection. The terms "required" and "enter" are incorrect and misleading.

**Corrected Statement:** In March 1999, following the discovery of problems relating to an insurance product known as CRC*plus* AICI agreed to transfer the SRA in effect for the 1999 crop insurance year from American Growers to AICI's subsidiary Acceptance Insurance Company ("AIC").

57. Although American Growers once again became the SRA holder for the 2002 and 2003 reinsurance years, no SRA was ever signed by American Growers after the SRA signed by Mr. Martin for the 2001 reinsurance year. Def. App. 375, 407 (Depo. Ex. 37), Def. App. 511.

**AICI RESPONSE:** Defendant's statement is misleading. Plans of operation were provided to and approved by the FCIC. Moreover, the RMA never provided AICI or is subsidiaries with an SRA to execute for the 2002 crop insurance year.

**Corrected Statement:** In connection with AICI's June 2001 purchase of the crop insurance assets of IGF, the RMA approved the assignment of the 2001 IGF SRA to AICI. Because only a licensed insurance company may be party to an SRA, American Growers submitted an Amended Plan of Operation for the 2002 crop insurance year, incorporating the former IGF business. On October 31, 2001, the RMA approved Growers' 2002 SRA and Plan of Operation and Growers replaced AIC and AICI as the SRA holder. The RMA never requested that AICI, AIC or Growers sign the 2002 crop year SRA. Both Growers and the RMA honored their commitments and obligations under the 2002 crop year SRA. The RMA never notified the company of any deficiency(ies) in its documentation with respect to the 2002 crop year SRA.

58. Mr. Martin understood that RMA required Acceptance and its operating subsidiaries to submit financial statements and plans of operation to RMA so that the companies

"could issue crop insurance policies that were reinsured by the government." Def. App. 173 (Martin 69:20-70:2).

**AICI RESPONSE:** Agreed.

59. American Growers and AIC issued crop insurance policies. Def. App. 167 (Martin 47:1-23).

**AICI RESPONSE:** Agreed.

**B. American Growers Acquires IGF's MPCI Policies**

60. In June 2001, Acceptance purchased the entire book of business of in-force MPCI crop insurance policies of IGF Insurance Company. Def. App. 165-66, 173 (Martin 40:2-44:6, 71:12-14). Mr. Martin testified that IGF's MPCI policies "were assigned to American Growers and so American Growers then became the owner of those policies." Def. App. 168-69 (Martin 52:24-53:1) (emphasis added).

**AICI RESPONSE:** Objection. The statement is properly attributed to Mr. Martin. Mr. Martin clarified "I will only say that they were assigned to American Growers and coded as American Growers issued policies by RMA and the accounting process." Martin Depo. 53:4-7 (Pl. App. 278). In addition, the FCIC specifically approved the AICI/IGF transaction. Depo. Ex. 36 (Def. App. 373).

**Corrected Statement:** In June 2001, AICI, not American Growers, with the specific approval of the FCIC, purchased the entire book of business of in-force MPCI crop insurance policies of IGF Insurance Company. Def. App. 165-66, 173 (Martin 40:2-44:6, 71:12-14). Mr. Martin testified that following the purchase IGF's MPCI policies

"were assigned to American Growers and coded as American Growers issued policies by RMA and the accounting process." Martin Depo. 53:4-7 (Pl. App. 278).

61. Mr. Martin testified that in November 2002, the principal assets that American Growers owned were "[p]olicies issued or assumed by American Growers from other insurance companies." Def. App. 176 (Martin 81:20-82:8). Mr. Martin agreed that the value of the policies was the stream of premiums that they generated. Id. (Martin 82:13-16).

**AICI RESPONSE:** Objection. Mr. Martin specifically rejected the use of the term "principal" in his testimony with respect to American Grower's assets.

**Corrected Statement:** Mr. Martin testified that in November 2002, American Growers' assets included "[p]olicies issued or assumed by American Growers from other insurance companies." Martin Depo. 81:20-82:8 (Pl. App. 285). Mr. Martin agreed that the value of the policies was the stream of premiums that they generated. Id; Martin Depo. 82:13-16 (Pl. App. 285).

62. Mr. Martin testified that he understood that RMA made an exception from its normal transfer procedures to effect a mass transfer of IGF's MPCI policies. Def. App. 169 (Martin 53:13-21) (emphasis added).

**AICI RESPONSE:** Objection. Reference to "emphasis added should be deleted. No emphasis was added to the statement. In response to a later question as to whether RMA's policies would have to be waived to accommodate a bulk transfer of policies, Mr. Martin testified that "what is normal or what RMA would or would not do I don't think is something that I am knowledgeable of." Martin Depo. 126:22-25, 127:2-4 (Pl. App. 296). There is no evidence that the RMA has ever required an acquirer of another

company's entire book of in-force MPCI policies to follow the RMA's "normal transfer procedures," which were intended to permit individual producers/farmers to transfer coverage from one crop insurance carrier to another, provided the transfer takes place prior to the sales closing date. In each instance where an approved carrier proposed to acquired the entire book of in-force policies of another approved carrier, the procedures outlined in Section 4.C(9) of the Federal Crop handbook were not followed or enforced. Depo. Ex. 2 (Def. App. 209-10); Depo. Ex. 35A (Pl. App. 470).

**Corrected Statement:** Mr. Martin testified that he understood that RMA made an exception from its normal transfer procedures to effect a mass transfer of IGF's MPCI policies, Martin Depo. 53:13-21 (Pl. App. 278), but that he does not know what RMA's "normal" procedures are with respect to the bulk transfer of in-force policies from one approved crop insurance provider to another. Martin Depo. 126:22-25, 127:2-4 (Pl. App. 296). The RMA has never required an acquirer of another company's entire book of in-force MPCI policies to follow the RMA's "normal transfer procedures." In each instance where one approved carrier proposed to acquire the entire book of in-force policies from another approved carrier, the procedures outlined in Section 4.C(9) of the Federal Crop handbook were not followed or enforced. Ex. 2 (Def. App. 209-10); Depo. Ex. 35A (Pl. App. 470).

63. Mr. Martin testified that "RMA required the transfer of prior liabilities" from IGF to Acceptance, which he understood RMA had required in prior acquisitions of crop insurance policies. Def. App. 171, 169 (Martin 61:6-21; see also 55:24-56:3).

**AICI RESPONSE:** Objection. Incorrect quotation. In addition, Mr. Martin testified that he "didn't have any independent knowledge of prior transactions," meaning that his understanding of the conditions imposed by the RMA in other transactions was based on information that was provided to Mr. Martin by the RMA.

**Corrected Statement:** In response to the government's question whether where there had been a mass transfer of policies, the acquiring company had taken on prior year liabilities, Mr. Martin testified that he "didn't have any independent knowledge of prior transactions." Mr. Martin then stated that his "understanding was RMA required it in the prior transactions, 'it' being the assumption of the prior liabilities." Def. App. 171, 169 Martin Depo. 61:3-4; 6-21 (Pl. App. 280); see also 55:24-56:3 (Pl. App. 278).

64. Mr. Martin, on behalf of Acceptance, signed a "SRA Assignment and Assumption Agreement" with IGF that states "Acceptance hereby agrees that it will assume all financial responsibilities associated with all crop insurance policies reinsured under the 2001 [SRA] and previous years held by IGF." Def. App. 168 (Martin 50:1-15), Def. App. 373 (Depo. Ex. 36), Def. App. 169 (see also 55:19-23). Acceptance and its subsidiaries honored this commitment. Def. App. 172 (Martin 66:7-16).

**AICI RESPONSE:** Objection. Incomplete. Pursuant to the SRA Assignment and Assumption Agreement dated June 5, 2001, Phyllis W. Honor, Acting Manager of the Federal Crop Insurance Corporation specifically approved the assignment of IGF's in-force policies to AICI ("[t]he FCIC approves this Assignment as of closing." (emphasis added)). Ex. 36 (Def. App. 373). AICI, and not American Growers, executed the SRA

Assignment and Assumption Agreement. Acceptance, and not American Growers, assumed all financial responsibilities associated with the IGF transaction.

**Corrected Statement:** Mr. Martin, on behalf of Acceptance (not American Growers) and with the express approval of the FCIC, purchased the IGF book of in-force crop insurance policies and the renewal rights thereto and signed a "SRA Assignment and Assumption Agreement" with IGF that states "Acceptance hereby agrees that it will assume all financial responsibilities associated with all crop insurance policies reinsured under the 2001 [SRA] and previous years held by IGF." Martin Depo. 50:1-15 (Pl. App. 277), Depo. Ex. 36 (Def. App. 373), see also Martin Depo. 55:19-23 (Pl. App. 278). Acceptance and its subsidiaries honored this commitment. Martin Depo. 66:7-16 (Pl. App. 281).

65. Mr. Martin agreed that had Acceptance not agreed to assume any liabilities of IGF, Acceptance would have had no responsibility for satisfying any liabilities that IGF incurred. Def. App. 170 (Martin 57:16-20).

**AICI RESPONSE:** Agreed but quotation marks omitted.

**Corrected Statement:** Mr. Martin agreed that "had Acceptance not agreed to assume any liabilities of IGF, Acceptance would have had no responsibility for satisfying any liabilities that IGF incurred." Martin Depo. 57:16-20 (Pl. App. 279).

## IV. Acceptance Negotiates Letter Of Intent With Rain and Hail

### A. Rain and Hail

66. In November 2002, John Joyce was the Chairman and senior executive of both Rain and Hail Insurance Service, Inc., a holding company, and its principal operating subsidiary, Rain and Hail LLC ("Rain and Hail"). Def. App. 135-36 (Rain & Hail 183:21-185:22).

**AICI RESPONSE:** Agreed.

67. Rain and Hail was the managing general agent for ACE, an insurance company that had signed an SRA with FCIC for the 2002 reinsurance year. Def. App. 138 (Rain & Hail 196:21-25).

**AICI RESPONSE:** Agreed.

68. Mr. Joyce has worked for crop insurance companies since 1967, and was involved through industry associations in the legislation that led to private companies offering multi-peril crop insurance ("MPCI") policies to farmers. Def. App. 136-37 (Rain & Hail 186:14-190:22). He is familiar with RMA's policies and procedures for federally reinsuring crop insurance policies, and has had oversight at Rain and Hail over the process of issuing MPCI policies to farmers. Def. App. 138 (Rain & Hail 193:17-194:8).

**AICI RESPONSE:** Agreed.

69. Mr. Joyce understood that the SRA incorporates by reference the policies and regulations established by RMA, and commented that "we're all driven by the standard reinsurance agreement and all the referenced documents." Def. App. 138, 139 (Rain & Hail 196:13-17, 198:2-4).

**AICI RESPONSE:** Objection. Mr. Joyce was asked whether he understood "that the Standard reinsurance agreement was something that incorporated the policies and regulations established by the RMA." In response, Mr. Joyce testified "By reference, I

believe it does, yes." Rain & Hail Depo. 196:13-17 (Pl. App. 155). He was later asked "whether that agreement [meaning Rain & Hail's managing general agent agreement with ACE] required Rain & Hail to observe all of the terms of the standard reinsurance agreement. In response, Mr. Joyce testified "sure. I mean, we're all driven by the standard reinsurance agreement and all the referenced documents." Rain & Hail Depo. 197:24-25, 198:1-4 (Pl. App. 156).

**Corrected Statement:** Mr. Joyce was asked whether he understood "that the Standard reinsurance agreement was something that incorporated the policies and regulations established by the RMA." In response, Mr. Joyce testified "By reference, I believe it does, yes." Rain & Hail Depo. 196:13-17 (Pl. App. 155). He was later asked "whether that agreement [meaning Rain & Hail's managing general agent agreement with ACE] required Rain & Hail to observe all of the terms of the standard reinsurance agreement. In response, Mr. Joyce testified "Sure. I mean, we're all driven by the standard reinsurance agreement and all the referenced documents." Rain & Hail Depo.197:24-25, 198:1-4 (Pl. App. 156).

70. Mr. Joyce explained that the SRA has much broader effect than a typical reinsurance agreement between two private parties: "It sets the terms and conditions under the entire operation of the MPCI program under that cooperative agreement that someone mentioned earlier and lays out, along with the references to various attachments, plan of operation, exactly how the program is going to function. So it's a multi[-]purpose agreement. It isn't like a typical insurance agreement where it's strictly a financial authorization. It sets out all kind of things or references." Def. App. 150-51 (Rain & Hail 268:22-269:6).

**AICI RESPONSE:** Agreed.

**B. <u>Negotiations For American Growers' Insurance Policies</u>**

71. ACE was approached by Philo Smith & Co. in the middle of October 2002 regarding buying the book of business crop insurance policies issued by American Growers and marketed by American Agrisurance Company ("AmAg"). Def. App. 143-44 (Rain & Hail 223:13-226:12), Def. App. 418-38 (Depo. Ex. 38).

**AICI RESPONSE:** Objection. The proper name of AmAg is American Agrisurance, Inc., not Company.

**Corrected Statement:** ACE was approached by Philo Smith & Co. in the middle of October 2002 regarding buying the book of business crop insurance policies issued by American Growers and marketed by American Agrisurance, Inc. ("AmAg"). Rain & Hail Depo. 223:13-226:12 (Pl. App. 162), Depo. Ex. 38 (Def. App. 418-38).

72. Mr. Joyce testified that through the transaction proposed in the letter of intent, Rain and Hail was "not buying one of the affiliates. We were buying the book of business, their crop insurance book of business, from Acceptance and/or one of its affiliates, which in this case I believe to be American Growers. That's what we were buying, we were not buying the show. We were buying the renewal list and the rights." Def. App. 134 (Rain & Hail 178:2-14).

**AICI RESPONSE:** Objection. Mr. Joyce's testimony is misquoted.

**Corrected Statement:** Mr. Joyce testified that Rain and Hail was "not buying one of the affiliates. We were buying the book of business, their crop insurance book of business, from Acceptance and/or one of its affiliates, which in this case I believe to be American Growers. That's what we were buying. We were not buying the company, we

were not buying the show. We were buying the renewal list and the rights." Rain & Hail Depo. 178:2-14 (Pl. App. 151).

73. Mr. Martin too testified that ACE and Rain and Hail were "only interested in purchasing the book of business, small B, not the SRA definition. But the primary focus would be MPCI policies. But the primary point of number 1, as I said, was to purchase a book of policies, not a corporate structure." Def. App. 179 (Martin 111:5-112:15).

**AICI RESPONSE:** Agreed.

74. Rain and Hail did not intend to assume any of the prior years' liabilities for American Growers: "without getting rid of those past liabilities, we were not willing to expose our shareholders to all of whatever those potentials may be, whether it be RMA driven or whether it be state litigation driven or where it comes from." Def. App. 127 (Rain & Hail 136:9-14).

**AICI RESPONSE:** Agreed.

75. Rain and Hail was interested in what Mr. Joyce described as AmAg's "a pretty solid book of business that had grown heavy preponderance in the midwest," including "the Dakotas to Nebraska, Iowa, Illinois, Missouri." Def. App. 144, 145 (Rain & Hail 225:4-14, 229:25-230:11). Mr. Joyce testified that profits on crop insurance in the midwest states are attractive "[o]ver most of them and over an extended period of time." Def. App. 145 (Rain & Hail 230:12-19).

**AICI RESPONSE:** Agreed.

76. Rain and Hail determined that it would only be able to retain approximately 50 percent of AmAg's book of business, or $250 million in premiums. Def. App. 148 (Rain & Hail 257:23-258:20).

**AICI RESPONSE:** Objection. John Joyce testified that in mid-November 2002, Rain & Hail estimated that it would retain 50%-60% of the policies it proposed to acquire from AICI. Rain & Hail 258:8-11 (Pl. App. 171). Rain & Hail's estimates varied over time. A few weeks earlier, Mr. Joyce relayed to AICI that he thought that Rain & Hail could realize between a 50% and 65% retention rate. Depo. Ex. 39 (Def. App. 439). Rain & Hail also had various analyses prepared prior to the exchange with AICI of the November 18, 2002 letter of intent that assessed the economics of the proposed transaction under a variety of different economic assumptions. Rain & Hail Depo. 360:13-25, 361:1-6 (Pl. App. 228); Depo. Ex. 33 (Def. App. 305-311).

**Corrected Statement:** Rain and Hail estimated that it would retain between 50-65% of the policies it proposed to acquire from AICI. Rain & Hail Depo. 257:23-258:20 (Pl. App. 171); Dep. Ex. 33 (Def. App. 306), Depo. Ex. 39 (Def. App. 439); Rain & Hail Depo. 258:8-11 (Pl. App. 171); Rain & Hail Depo. 373:19-21 (Pl. App. 231).

77. When Rain and Hail evaluated what portions of AmAg's book of business it expected to retain, it excluded the Texas business (approximately $70 million) because there was a jumbo agent affiliated with AmAg who delivered and managed most of AmAg's business in Texas, which Mr. Joyce testified "created a whole separate set of issues and contractual terms that had to be affixed." Def. App. 147 (Rain & Hail 253:24-254:17, 256:6-14), Def. App. 306, 308 (Depo Ex. 33 – "excluding Texas Business").

**AICI RESPONSE:** Objection. See Response to paragraph 76. Rain & Hail prepared a number of analyses that assessed the economics of the proposed transactions under a variety of assumptions. One of those assumptions excluded Texas business. Rain & Hail Depo. 254:5-25, 255:1-21 (Pl. App. 170).

**Corrected Statement:** At one point during its evaluation of expected retention of the policies it proposed to acquire from AICI, Rain & Hail considered one scenario that would exclude the Texas business (approximately $70 million) because there was a jumbo agent affiliated with AmAg who delivered and managed most of AmAg's business in Texas, which Mr. Joyce testified "created a whole separate set of issues and contractual terms that had to be affixed." Rain & Hail Depo. 253:24-254:17, 256:6-14 (Pl. App. 170), Depo Ex. 33 (Def. App. 306, 308). No final determination was ever made whether Rain & Hail would acquire the Texas book of business; the Texas book of business "required an assumption of its own until we figured it out." Rain & Hail Depo. 256:3-4 (Pl. App. 170).

78. Mr. Joyce testified that "[t]he rate of return in Texas on an underwriting basis was less than what the historical average of the books and business has been" for Rain and Hail. Rain & Hail Depo. 254:24-255:12 (Pl. App. 170).

**AICI RESPONSE:** Objection. Mr. Joyce testified that Rain & Hail discovered that AICI and its subsidiaries' rate of return on the Texas book of business was better than Rain & Hail's. Rain & Hail Depo. 255:4-10 (Pl. App. 170). The statement as proposed suggests that Rain & Hail's rate of return had been better than AICI and its subsidiaries'.

**Corrected Statement:** Mr. Joyce testified that Rain & Hail discovered that AICI and its subsidiaries' rate of return on the Texas book of business was better than Rain & Hail's. Rain & Hail Depo. 255:4-10 (Pl. App. 170).

79. In their initial meeting with Acceptance's representatives, representatives of Rain and Hail said that they did not want the Texas portion of AmAg's book of business because it was a large book and they had a concentration concern. Def. App. 179-80 (Martin 112:22-113:23), Def. App. 439 (Depo. Ex. 39).

**AICI RESPONSE:** Objection. Quotation marks omitted. As noted in AICI's response to paragraph 77, Rain & Hail assessed the economics of the proposed transaction under a variety of assumptions. No final determination was ever made regarding whether Rain & Hail would acquire the Texas book of business.

**Corrected Statement:** At one point during its evaluation of expected retention of the policies it proposed to acquire from AICI, Rain & Hail considered one scenario that would exclude the Texas business. No final determination was ever made whether Rain & Hail would acquire the Texas book of business; the Texas book of business "required an assumption of its own until we figured it out." Rain & Hail Depo. 256:3-4 (Pl. App. 170).

**C. <u>Terms Of November 18, 2002 Letter Of Intent</u>**

80. Acceptance conducted negotiations with Rain and Hail that produced a letter of intent dated November 18, 2002 that recorded the terms of a proposed asset sale of American Growers' MPCI policies and other assets to Rain and Hail. Def. App. 294-302 (Depo. Ex. 29).

**AICI RESPONSE:** Objection. AICI disagrees with this statement to the extent that it identifies only American Growers as the seller of the MPCI policies and other assets and intentional omits reference to AICI. The Letter of Intent, which was prepared by Rain & Hail and sent to AICI, was between AICI, American Growers, AmAg, and their affiliates or subsidiaries designated by it, as sellers, and ACE American Insurance Company and/or Rain & Hail L.L.C. and/or one or more of their affiliates or subsidiaries, as purchaser.

**Corrected Statement:** Acceptance conducted negotiations with Rain and Hail that produced a letter of intent prepared by Rain & Hail dated November 18, 2002 that recorded the terms of a proposed asset sale between AICI, American Growers, AmAg, and their affiliates or subsidiaries designated by it, as sellers, and ACE American Insurance Company and/or Rain & Hail L.L.C. and/or one or more of their affiliates or subsidiaries, as purchaser. Depo. Ex. 29 (Def. App. 294-302).

81. The letter of intent reserved for Rain and Hail the option to decline purchasing five contracts that were not cancelable on 30 days or less written notice, including the contract with AmAg's agent in Texas. Def. App. 157 (Rain & Hail 349:11-20), Def. App. 300 (Depo. Ex. 29, p. 3, ¶ 4).

**AICI RESPONSE:** Agreed.

82. The letter of intent the letter of intent stated that it was not a "binding obligation" on either Acceptance or Rain and Hail "to enter into or consummate the Proposed Transaction," and stated further that the parties' obligations "to consummate the Proposed Transaction shall be subject in all respects to the negotiation, execution, and delivery of a definitive agreement . . . and the satisfaction of the conditions contained in the definitive agreement." Def. App. 294.

**AICI RESPONSE:** Objection. The statement (1) contains a typographic error, and (2) omits reference to "regulatory approval." AICI also notes that John Joyce testified on November 27, 2003 that (a) at the time the RMA rejected the proposed transaction all of the material deal points of the proposed transaction had been negotiated between the parties, and (b) had the RMA approved the transaction as proposed, Rain & Hail would have consummated the transaction proposed by the letter of intent. November 7, 2003 deposition of John Joyce at 35:9-13; 70:15-20 (Pl. App. 242, 251).

**Corrected Statement:** The letter of intent stated that it was not a "binding obligation" on either Acceptance or Rain and Hail "to enter into or consummate the Proposed Transaction," and stated further that the parties' obligations "to consummate the Proposed Transaction shall be subject in all respects to the negotiation, execution, and delivery of a definitive agreement . . . and the satisfaction of the conditions contained in the definitive agreement." The letter of intent provided further that "[p]rior to closing, Seller shall provide to Purchaser proof, satisfactory to Purchaser, of all required governmental, regulatory and third-party consents." Ex. 29 (Def. App. 294). John Joyce testified on November 27, 2003 that (a) at the time the RMA rejected the proposed transaction all of the material deal points of the proposed transaction had been negotiated between the parties, and (b) had the RMA approved the transaction as proposed, Rain & Hail would have consummated the transaction proposed in the letter of intent. November 7, 2003 deposition of John Joyce at 35:9-13; 70:15-20 (Pl. App. 242, 251).

83. Both Mr. Joyce and Mr. Martin agreed that neither party was required to consummate the transaction proposed in the letter of intent. Def. App. 140 (Rain & Hail 209:10-212:2), Def. App. 187-88 (Martin 144:17-145:2).

**AICI RESPONSE:** Objection. Incomplete statement. See Plaintiff's response to paragraph 82.

84. The letter of intent identified the assets that Rain and Hail was buying as the in-force policies and renewal rights, among the other assets listed. Def. App. 141-42 (Rain & Hail 216:22-217:8), Def. App. 300 (Depo. Ex., p. 3, "Assets" ¶¶ 1-5).

**AICI RESPONSE:** Objection. Incomplete statement in so far as it omits reference to AICI. The letter of intent provides that Purchaser will "purchase the assets associated with Seller's [defined as Acceptance Insurance Companies Inc., American Growers Insurance Company, American Agrisurance Inc., and their affiliates or subsidiaries designated by it] crop insurance business on a schedule to be developed.

**Corrected Statement:** The letter of intent provides that Purchaser will "purchase the assets associated with Seller's [defined as Acceptance Insurance Companies Inc., American Growers Insurance Company, American Agrisurance Inc., and their affiliates or subsidiaries designated by it] crop insurance business on a schedule to be developed. Rain & Hail Depo. 216:22-217:8 (Pl. App. 160); Depo. Ex. 29, "Assets" ¶¶ 1-5 (Def. App. 300).

85. Mr. Martin testified that the in-force policies listed as one of the assets that Rain and Hail was purchasing were carried on American Growers' books as assets. Def. App. 181 (Martin 117:19-118:16).

**AICI RESPONSE:** Objection. Statement fails to acknowledge that (a) AICI paid for the assets in question, which were acquired from IGF, and (b) AICI, not American Growers, would have been the recipient of funds paid by Rain & Hail to acquire these assets. Martin Depo. 170:6-15 (Pl. App. 307).

**Corrected Statement:** Mr. Martin testified that the in-force policies listed as one of the assets that Rain and Hail was purchasing were purchased by AICI but were carried on American Growers' books as assets. Martin Depo. 71:12-14; 117:19-118:16 (Pl. App. 282, 294). AICI paid for those assets when they were acquired from IGF and AICI would have would have been the recipient of the minimum payment of $21.5 million from Rain & Hail for those assets. Martin Depo. 170:6-15 (Pl. App. 307); see also, AICI corrected statement 60.

86. Mr. Martin testified that "[m]y understanding is MPCI policies that are in force after the sales closing date are not transferable." Def. App. 183 (Martin 125:20-22).

**AICI RESPONSE:** Objection. Mr. Martin testified that a producer/farmer may not transfer an in-force policy after the sales closing date. The provisions of Section 4.C(9) do not apply and have never been applied to the bulk or mass transfer of one approve crop insurance provider's entire book of in-force policies to another approve crop insurance provider.

**Corrected Statement:** Mr. Martin testified that "[m]y understanding is MPCI policies that are in force after the sales closing date are not transferable." Martin Depo. 125:20-22 (Pl. App. 296). Mr. Martin was referring specifically to the prohibition against a farmer/producer transferring an in-force policy after the policy's sales closing date.

The provisions of Section 4.C(9) that permit a producer/farmer to transfer a crop insurance policy or coverage from one crop insurance provider to another do not apply and have never been applied to the bulk or mass transfer of one approve crop insurance provider's entire book of in-force policies to another approve crop insurance provider.

**D. Acceptance Announces American Growers $130 Million Third Quarter Loss**

87. On November 19, 2002, Acceptance filed its third-quarter Form 10-Q with the United States Securities and Exchange Commission, whose filing had been delayed from November 15, 2002. Def. App. 448-86.

**AICI RESPONSE:** Agreed.

88. The 10-Q reported that American Growers had suffered a $130 million loss in the third quarter. Def. App. 451.

**AICI RESPONSE:** Agreed.

## V. Rain and Hail Discusses Proposed Transaction With RMA

89. Mr. Joyce and other Rain and Hail representatives met in person with Ross Davidson and other RMA representatives at RMA's offices on Wednesday, November 20, 2002 to discuss the proposed transaction with Rain and Hail that was set forth in the Monday, November 18, 2002 letter of intent. Def. App. 294 (Rain & Hail 90:11-93:8; Depo. Ex. 32).

**AICI RESPONSE:** Objection. Incomplete statement. Matters in addition to those addressed specifically in the November 18, 2002 letter were discussed between the parties at the referenced meeting. **[insert].** In addition, the citation omitted by the government is Def. App. 118-119.

90. Mr. Joyce's recollection about who attended the meeting was later recorded in a letter from Rain and Hail's counsel. Def. App. 303.

**AICI RESPONSE:** Agreed.

91. Rain and Hail, with Acceptance's approval, provided a copy of the letter of intent to RMA. Def. App. 121 (Rain & Hail 103:14-104:6).

**AICI RESPONSE:** Agreed.

92. Mr. Joyce also spoke to Mr. Davidson and other RMA representatives by telephone on Thursday, November 21, 2002 and Friday, November 22, 2002. Def. App. 119-20 (Rain & Hail 96:14-98:22), Def. App. 303-04 (Depo. Ex. 32).

**AICI RESPONSE:** Agreed.

93. During the telephone call on November 21, 2002, two additional RMA representatives who had been with RMA for a significant period of time and had a more detailed understanding of how the crop insurance program worked, Kim Arrigo and Garland Westmoreland, participated. Def. App. 122 (Rain & Hail 115:13-22).

**AICI RESPONSE:** Agreed. AICI notes that Ms. Arrigo is an attorney with the USDA. AICI notes further that it received no documents from Ms. Arrigo or Mr. Westmoreland's files and has not received a privilege log of documents withheld from Ms. Arrigo's files as privileged.

### A. <u>Rain and Hail Requests Waivers From RMA</u>

94. Rain and Hail requested that RMA waive its requirements regarding the transfer of insurance policies whose sales closing dates had passed, which Mr. Joyce referred to as "in-force policies": "We needed to make sure that we could handle the in-force policies that were

already written and on the books and that did require RMA cooperation and/or waiver, whatever you wish to call it. And that is contained in 4.C(9), yes." Def. App. 106 (Rain & Hail 26:2-6).

**AICI RESPONSE:** Objection. With respect to the so-called waivers, Mr. Joyce testified "[f]irst of all, again, I'm going to say I'm not sure they're waivers." Rain & Hail Depo. 49:10-11 (Pl. App. 119).

**Corrected Statement:** Rain and Hail requested that RMA approve a bulk transfer of the in-force policies it proposed to acquire from AICI: "We needed to make sure that we could handle the in-force policies that were already written and on the books and that did require RMA cooperation and/or waiver, whatever you wish to call it. And that is contained in 4.C(9), yes." Rain & Hail Depo. 26:2-6; 49:10-11 (Pl. App. 113, 119).

95. Mr. Joyce testified that although Rain and Hail and RMA did not refer specifically to Section 4.C(9), the parties discussed at length Rain and Hail's request that RMA waive its requirements for the transfer of policies: "We didn't particularly talk about 4.C(9). But the idea of an agreement between the two parties of how we were going to handle the in-force premium that was already there, absolutely, that's part and parcel of that whole several segments in there. . . . there was substantial time spent on various sales closing dates, which generates this whole reference to in-force policies and the complications that that brought to the table as far as how to handle that book of business without, I'll say, interruption of the policyholder along with what paper would be issued, what insurance policies would be on it, and the financial implications of that. So yes, that's part and parcel of that whole segment. " Def. App. 106 (Rain & Hail 26:21-27:1, 27:17-28:3) Def. App. 124, 132 (see also Rain & Hail 121:20-122:7, 169:9-20), Def. App. 289-90 (Depo. Ex. 25).

**AICI RESPONSE:** Objection. The government has correctly quoted Mr. Joyce's testimony but, as noted in response to paragraph 94, Mr. Joyce rejected the suggestion that Rain & Hail requested waivers from the RMA. In addition, Mr. Joyce rejected the suggestion that Section 4.C(9) applies in a bulk transfer context.

96. Mr. Joyce testified that the reason that Rain and Hail sought a waiver of Section 4.C(9) was that "Somebody had to deal with the people who already had made a selection of agent, company, et cetera. . . . So Acceptance either had to keep those people – to try to run an operation – now, this is my view, not Acceptance's – had to try to keep together a group of people to service the 2003 business that was already sold. That had to tried to be maintained, or you had to somehow get RMA to allow us– to assume that book of business for service and ongoing policy – yeah, ongoing policy service. . . . there's all kinds of service issues, track issues, records issues, when you start trying to split a year." Def. App. 107 (Rain & Hail 29:21-30:15, 31:8-10).

**AICI RESPONSE:** Objection. Word missing from quote. Also, see response to paragraphs 94-96.

**Corrected Statement:** With respect to Rain & Hail's request that the RMA permit the bulk transfer of AICI's policies to Rain & Hail, Mr. Joyce testified that "Somebody had to deal with the people who already had made a selection of agent, company, et cetera. . . . So Acceptance either had to keep those people – to try to run an operation – now, this is my view, not Acceptance's – had to try to keep together a group of people to service the 2003 business that was already sold. That had to be tried to be maintained, or you had to somehow get RMA to allow us– to assume that book of business for service

and ongoing policy – yeah, ongoing policy service. . . . there's all kinds of service issues, track issues, records issues, when you start trying to split a year." Rain & Hail Depo. 29:21-30:15, 31:8-10 (Pl. App. 114).

97. Mr. Joyce testified that "The big fall sales closing date is . . . September 30th." Def. App. 114 (Rain & Hail 75:24-76:1).

**AICI RESPONSE:** Agreed.

98. Mr. Joyce testified that "we're talking about being here in November – massive numbers of fall seeded winter wheat customers who are out there" whose sales closing date has passed, and who consequently "don't have a choice yet at that point [to transfer to another insurer], but they are entitled to be serviced and taken care of." Def. App. 107 (Rain & Hail 32:6-13).

**AICI RESPONSE:** Agreed.

99. Mr. Joyce testified that RMA required that as a condition of allowing Rain and Hail to step into the shoes of AmAg for the in-force policies, Rain and Hail would be required to assume the liability for all previous years for those policies. Def. App. 157 (Rain & Hail 348:25-349:10).

**AICI RESPONSE:** Agreed.

100. Mr. Joyce testified that "the place that we would agree that RMA – or at least I agree – that RMA – there was a request being made – would have been made or was made to RMA that was an exception to the norm is the in-force policies. That I believe to be correct, because there is no ability to transfer that policy once we have crossed the sales closing date." Def. App. 109 (Rain & Hail 46:2-10).

**AICI RESPONSE:** Objection. Mr. Joyce's testimony refers to the prohibition against a producer/farmer transferring his/her in-force policy after the policy sales closing date. The procedures and requirements of Section 4.C(9) do not contemplate or address the proposed bulk or mass transfer of on approved crop insurance provider's entire book of in-force business to another approved insurance provider.

**Corrected Statement:** Mr. Joyce testified that "the place that we would agree that RMA – or at least I agree – that RMA – there was a request being made – would have been made or was made to RMA that was an exception to the norm is the in-force policies. That I believe to be correct, because there is no ability to transfer that policy once we have crossed the sales closing date." Rain & Hail Depo. 46:2-10 (Pl. App. 118). The latter statement is in specific reference to the prohibition against a producer/farmer transferring his or her in-force crop insurance policy to another carrier after the policy sales closing date. Rain & Hail Depo. 44:21-23 (Pl. App. 117). The procedures and requirements of Section 4.C(9) do not contemplate or address the proposed bulk or mass transfer of on approved crop insurance provider's entire book of in-force business to another approved insurance provider.

101. Mr. Joyce agreed that in order to effect the transaction as proposed by Rain and Hail, RMA would have to grant its permission for Rain and Hail to substitute itself for American Growers on the in-force policies issued by American Growers and start servicing those policies, because "that is an exception to what is normally done." Def. App. 153-1, 153-2 (292:23-293:11, 305:8-306:20).

**AICI RESPONSE:** Agreed.

102. Rain and Hail requested that RMA permit a mass transfer of the in-force American Growers policies to Rain and Hail. Def. App. 128 (Rain & Hail 139:13-19).

**AICI RESPONSE:** Agreed. The request was consistent with the manner in which the RMA had approved other transfers of in-force policies from one federally insured provider to another. See Depo. Ex. 2 (Def. App. 209-10); Depo. Ex. 35A (Pl. App. 470).

103. Mr. Joyce believed that the management of Acceptance understood that when Rain and Hail met with RMA, it was "going to be requesting a waiver of the provisions of Section 4.C(9)." Def. App. 106 (Rain & Hail 27:2-6).

**AICI RESPONSE:** Objection. The referenced statement is an accurate quote but ignores Mr. Joyce's preceding statement that Acceptance and Rain & Hail did not discuss Section 4.C(a). Rain & Hail Depo 26:21 (Pl. App. 13).

**Corrected Statement:** Mr. Joyce testified that the representatives of Acceptance and Rain & Hail "didn't particularly talk about Section 4.C(a)." Rain & Hail Depo. 26:21 (Pl. App. 113).

104. Mr. Martin testified that when he first spoke to Ross Davidson on November 15, 2002 about the proposed acquisition of American Growers' insurance policies, Mr. Martin was aware that Acceptance had assumed liability for IGF's policies for prior years. Def. App. 128 (Martin 138:7-14).

**AICI RESPONSE:** Agreed.

105. Mr. Martin believed that RMA would need to approve plan of operations changes for American Growers as well as Rain and Hail. Def. App. 126-27 (Martin 132:24-133:14).

**AICI RESPONSE:** Agreed but record citation is incorrect. Proper cite is Def. App. 184-185.

106. Rain and Hail also requested that RMA grant Rain and Hail accommodations regarding quality control, compliance reviews, and penalties for late filings for the American Growers policies that Rain and Hail proposed to buy. Def. App. 110 (Rain & Hail 50:12-21), Def. App. 129, 131, 154 ( see also Rain & Hail 141:23-142:18, 157:14-159:4, 322:4-323:10).

**AICI RESPONSE:** Objection. Mr. Joyce testified that Rain & Hail discussed various accommodations with Ross Davidson and the RMA but that in the absence of an agreement regarding the threshold issue of prior year liabilities, discussions regarding the other accommodations never progressed.

**Corrected Statement:** Rain and Hail and the RMA discussed generally accommodations regarding quality control, compliance reviews, and penalties for late filings for the American Growers policies that Rain and Hail proposed to buy. Without an agreement regarding prior year liabilities, these discussions never progressed. Rain & Hail Depo. 50:12-21 (Pl. App. 119), Def. App. 129, 131, 154 ( see also Rain & Hail Depo.141:23-142:18, 157:14-159:4, 322:4-323:10).

**B. RMA Required Rain and Hail To Assume Liability For Prior Years**

107. Ross Davidson, RMA Administrator testified that in past transactions, when one crop insurer bought the book of business from another crop insurer, if the acquiring insurer requested that RMA waive the SRA's requirements that governed the transfer of policies from one insurer to another, RMA required that the acquiring company always assume all liability for

all past years for the policies acquired as a condition for granting the waiver. Def. App. 50-51 (Davidson 64:17-66:7), Def. App. 208-13 (Depo. Ex. 2)

**AICI RESPONSE:** Agreed, but the RMA has not written guidelines or regulations regarding bulk transfers and the conditions upon which the RMA will approve requests to allow bulk transfers of in-force policies from one approved carrier to another.

**Corrected Statement:** The FCIC has elected not to apply the requirements of Section 4.C(9) of the Crop Insurance Handbook in certain instances, including in connection with AICI's June 2001 acquisition of IGF's MPCI policies. Depo. Ex. 2 (Def. App. 209-10); Depo. Ex. 35A (Pl. App. 470). That is because it appears that Section 4.C(9) of the Crop Insurance Handbook is inapplicable to bulk transfers of the in-force policies from one approved crop insurance carrier to another and there is no evidence to suggest that the provision of this section have ever been applied in that context. Moreover, Section 4.C(9) does not address the alleged requirement that a company proposing to acquire another company's policies through a bulk transfer must accept the selling company's prior year liabilities. Rain & Hail Depo. 64:17-21 (Pl. App. 122). The RMA unilaterally decided when and on what conditions it would apply the requirements of Section 4.C(9) in the bulk transfer context. No written criteria exists for making such determination. See Depo Ex. 35A (Pl. App. 467.

108. Mr. Joyce testified that before Rain and Hail met with RMA regarding the proposed purchase of American Growers' policies, "[w]e knew from just – or at least general conversations said that RMA had <u>always</u> required that a transaction of this type, that the assuming company, which would have been Rain and Hail, had to take the old liabilities. And

we simply were not going to do that." Def. App. 104 (Rain & Hail 18:17-23) (emphasis added), Def. App. 153 (see also Rain & Hail 287:9-288:11).

**AICI RESPONSE:** Agreed that the statement is an accurate quote from Mr. Joyce's deposition. Objection to the extent that Mr. Joyce's testimony was in support of his statement that he disagreed with the Government's assertion that it neither approved nor disapproved of the proposed AICI/Rain & Hail transaction. Consistent with AICI's disagreement with the statement in paragraph 107, above, Mr. Joyce testified that "there is nothing in writing or any other documentation to support the theory that you have to take it with you, the old liabilities with you, with the exception of past precedent of RMA." Rain & Hail Depo. 19:1-5 (Pl. App. 111). Mr. Joyce also testified that to the extent Rain & hail wanted the RMA to depart from its past practice, whether or not such practice is authorized by the regulations, "we thought under the circumstances, we had a good chance of being able to get a waiver, if you want to, I'll use your [DOJ attorney John Williamson's] term, waiver, or get an exception to that fact." Rain & Hail Depo. 288:18-22 (Pl. App. 178).

**Corrected Statement:** Mr. Joyce testified that he disagreed with the Government's assertion that the RMA neither approved nor disapproved of the proposed AICI/Rain & Hail transaction. Specifically, Mr. Joyce testified that "there is nothing in writing or any other documentation to support the theory that you have to take it with you, the old liabilities with you, with the exception of past precedent of RMA." Rain & Hail Depo. 19:1-5 (Pl. App. 111). Mr. Joyce testified further that, to the extent Rain & Hail wanted the RMA to depart from its past practices, whether or not such practices are authorized,

"we thought under the circumstances, we had a good chance of being able to get a waiver, if you want to, I'll use your [DOJ attorney John Williamson's] term, waiver, or get an exception to that fact." Rain & Hail Depo. 288:18-22 (Pl. App. 178). In addition, the FCIC elected not to apply the requirements of Section 4.C(9) of the Crop Insurance Handbook in certain instances, including in connection with AICI's June 2001 acquisition of IGF's MPCI policies. Depo. Ex. 2 (Def. App. 209-10); Depo. Ex. 35A (Pl. App. 470). That is because it appears that Section 4.C(9) of the Crop Insurance Handbook is inapplicable to bulk transfers of the in-force policies from one approved crop insurance carrier to another and there is no evidence to suggest that the provision of this section have ever been applied in that context. Moreover, Section 4.C(9) does not address the alleged requirement that a company proposing to acquire another company's policies through a bulk transfer must accept the selling company's prior year liabilities. Rain & Hail Depo. 64:17-21 (Pl. App. 122). The RMA unilaterally decided when and on what conditions it would apply the requirements of Section 4.C(9) in the bulk transfer context. No written criteria exists for making such determination. See Depo Ex. 35A (Pl. App. 467).

109. Mr. Joyce testified that during the November 21, 2002 telephone discussion, "the discussion hinged around the past liabilities." Def. App. 122 (Rain & Hail 116:7-8).

**AICI RESPONSE:** Agreed.

110. Mr. Joyce testified that "RMA said that they would not accept that transaction unless we were willing to take the old liabilities with it. That is my belief and understanding, yes." Def. App. 105 (Rain & Hail 22:14-17). Mr. Joyce also testified that Ross Davidson,

RMA's Administrator, said that "that has been their past practice." Def. App. 105 (Rain & Hail 23:1-3).

**AICI RESPONSE:** Agreed, but see response to paragraphs 107-108.

111. Mr. Joyce testified that "if we did it, we had to take the old liabilities with it. That's a better – maybe a better way to put it." Def. App. 121 (Rain & Hail 103:2-4).

**AICI RESPONSE:** Agreed that the statement is an accurate but AICI objects to the extent the statement is a partial and misleading selective quote from Mr. Joyce's deposition. Mr. Joyce's statement was in response to a question from the government's attorney as to what Mr. Joyce's understanding was of the reasons RMA would not approve or allow the proposed transaction. In response, Mr. Joyce stated that the RMA "would not accept – they would not allow us to complete the transaction. "In their mind, if we did it, we had to take the old liabilities with it. That's a better – maybe a better way to put it." Rain & Hail Depo. 103:2-4 (Pl. App. 132); see also Rain & Hail Depo. 18:17-25, 19:1-5 (Pl. App. 111).

**Corrected Statement:** In response to a question from the government's attorney as to what Mr. Joyce's understanding was of the reasons RMA would not approve or allow the proposed transaction, Mr. Joyce testified that the RMA "would not accept – they would not allow us to complete the transaction. "In their mind, if we did it, we had to take the old liabilities with it. That's a better – maybe a better way to put it." Rain & Hail Depo. 103:2-4 (Pl. App. 132); see also Rain & Hail Depo. 18:17-25, 19:1-5 (Pl. App. 111).

112. Mr. Joyce testified that Rain and Hail abandoned the proposed transaction because "we were not going to assume any potential past liability, period. And we never got past that point. When RMA said that we couldn't do it, the world stopped. But that was clearly known from day one." Def. App. 116 (Rain & Hail 81:12-16).

**AICI RESPONSE:** Objection. As noted in its objection to paragraph 111, Mr. Joyce testified that the RMA advised him that it would not allow or accept the proposed AICI/Rain & Hail transaction. This is consistent with the representation that Mr. Davidson from the RMA made to L. Tim Wagner, the Director of the Nebraska Department of Insurance.

**Corrected Statement:** Mr. Joyce testified that Rain and Hail and AICI did not consummate the proposed transaction because "we were not going to assume any potential past liability, period. And we never got past that point. When RMA said that we couldn't do it, the world stopped. But that was clearly known from day one." Rain & Hail Depo. 81:12-16 (Pl. App. 127). Mr. Joyce also testified that the RMA "would not accept" the proposed transaction. Rain & Hail Depo. 102:19-20 (Pl. App. 132).

113. Rain and Hail was not prepared to accept any indemnifications from Acceptance for American Growers' past year's liabilities "simply because of their financial issues." Def. App. 116 (Rain & Hail 82:17-83:2).

**AICI RESPONSE:** Objection. Paragraph 113 is misleading because it suggests that there had been discussions between AICI and Rain & Hail regarding indemnifications. No such discussions ever took place. Mr. Joyce's statement was in response to a hypothetical. Whether proper assurances could have been provided to assuage Rain &

Hail's concerns was never discussed between the parties. Rain & Hail Depo. 82:17-19 (Pl. App. 127).

**Corrected Statement:** The issue of indemnifications was not discussed between the parties. When asked hypothetically whether Rain & Hail might have accepted an indemnification from AICI, Mr. Joyce testified that Rain and Hail was not prepared to accept any indemnifications from Acceptance for American Growers' past year's liabilities "simply because of their financial issues." Rain & Hail Depo. 82:17-83:2 (Pl. App. 127).

**C. Rain and Hail Planned Not To Retain All American Growers' Agents**

114. Mr. Joyce testified that "[t]here were certain agents out there, because of our other business plans or models and/or past relationships with those agents that on a go[-]forward basis with proper notice we would not guarantee that we would take them all on, and particularly under the terms and conditions under which they were currently operating." Def. App. 113 (Rain & Hail 69:6-13).

**AICI RESPONSE:** Objection. As noted in paragraph 25, above, Section II.A. of the 1998 SRA, titled "General Terms," states "2. Except as specified below, the Company must offer all approved plans of insurance for all approved crops in any State in which it writes an eligible crop insurance and must accept and approve all applications from all eligible producers." Depo. Ex. 37 (Def. App. 381) (emphasis added). The SRA requires Rain & Hail to accept and approve applications from all eligible producers, not to accept or retain all agents.

115. Mr. Joyce testified that the Rain and Hail representatives told RMA that Rain and Hail did not intend to keep all of American Growers' agents, though "[w]e probably didn't say that too loudly." Def. App. 126 (Rain & Hail 132:1-3), Def. App. 288 (Depo. Ex. 23).

**AICI RESPONSE:** Objection. Rain & Hail's complete statement regarding its position with respect to the retention of agents is set forth in its November 26, 2002 letter to RMA. The relevant section of that letter is set forth in AICI's Corrected Statement to ¶ 120, below.

**Corrected Statement:** See Corrected Statement ¶ 120.

116. Mr. Joyce agreed that the agents that Rain and Hail did not pick up would have to find another company. Def. App. 129 (Rain & Hail 141:3-6).

**AICI RESPONSE:** Objection. Rain & Hail's complete statement regarding its position with respect to the retention of agents is set forth in its November 26, 2002 letter to RMA. The relevant section of that letter is set forth in AICI's Corrected Statement to ¶ 120, below.

**Corrected Statement:** See Corrected Statement ¶ 120.

**D. <u>RMA Declined To Grant The Waivers Requested By Rain and Hail</u>**

117. During the Friday, November 22, 2002 telephone conversation, RMA representatives told Rain and Hail "basically what the [November 25, 2002 letter from RMA] says, that they would – could not accept leaving the liabilities behind and the other two or three issues that they raised." Def. App. 124 (Rain & Hail 124:8-11), Def. App. 289-90 (Depo. Ex. 25).

**AICI RESPONSE:** Objection. Incomplete statement. Mr. Joyce also testified that he did not agree with the RMA's logic in rejecting the proposed transaction. Rain & Hail Depo. 124:22 (Pl. App. 137). In addition, by letter dated November 26, 2002, Rain & Hail clarified and corrected certain misstatements in the RMA's November 25, 2002 written notification of its rejection of the proposed transaction. Depo. Ex. 26 (Def. App. 292-93).

**Corrected Statement:** During the Friday, November 22, 2002 telephone conversation, RMA representatives told Rain and Hail "basically what the [November 25, 2002 letter from RMA] says, that they would – could not accept leaving the liabilities behind and the other two or three issues that they raised." Rain & Hail Depo. 124:8-11 (Pl. App. 137), Depo. Ex. 25 (Def. App. 289-90). Mr. Joyce did not agree with the RMA's logic underlying its decision. By letter dated November 26, 2002, Rain & Hail clarified and corrected certain misstatements in the RMA's written notification to Rain & Hail regarding the proposed transaction. Dep. Ex. 26 (Def. App. 292-93).

118. Mr. Joyce recalls some discussion during the November 22, 2002 telephone call about the alternatives proposed by RMA regarding assumption of past years' liabilities, but "it didn't rise to the level of solving the problem in my mind. . . . because it would still wind up with us holding onto the liabilities and we were not going to do that." Def. App. 125, 132 (Rain & Hail 128:11-16; see also 172:6-10).

**AICI RESPONSE:** Agreed.

119. On November 22, 2002, Rain and Hail sent a letter to RMA informing it that Rain and Hail had decided to "discontinue pursuit of the asset purchase outlined in the Non-Binding Letter of Intent. We have notified Acceptance accordingly." Def. App. 288 (Depo. Ex. 23).

**AICI RESPONSE:** Objection. Rain & Hail's discontinuance of its efforts to consummate the proposed transaction followed RMA's decision not to allow or approve aspects of the proposed transaction. Depo. Ex. 23 (Def. App. 288).

**Corrected Statement:** On November 22, 2002, following a telephone conversation between John Joyce and Ross Davidson during which Mr. Davidson advised Mr. Joyce that the RMA would not allow the proposed AICI/Rain & Hail transaction, Rain and Hail sent a letter to RMA confirming the that Rain and Hail had decided to "discontinue pursuit of the asset purchase outlined in the Non-Binding Letter of Intent. We have notified Acceptance accordingly." Depo. Ex. 23 (Def. App. 288).

120. On November 26, 2002, Mr. Joyce sent a letter to Mr. Davidson responding to Mr. Davidson's November 25, 2002 letter to Mr. Joyce. Def. App. 292-93. Mr. Joyce stated that "we were not willing to 'guarantee' that we would continue[] to do business with all agents." Id. 293.

**AICI RESPONSE:** Objection. The selective quote is misleading. Mr. Joyce's entire statement is needed to put the quote in its proper context.

**Corrected Statement:** On November 26, 2002, Mr. Joyce sent a letter to Mr. Davidson responding to Mr. Davidson's November 25, 2002 letter to Mr. Joyce. Depo. Ex. 26 (Def. App. 292-93). Mr. Joyce stated that "with regarding to 2003 fall seeded policies that were already in force and for which the sales closing date had past, we

always intended to honor the agent agreements of Acceptance and pay the agents accordingly. On a going forward basis, we were certain that agents that we did not select would find another company to appoint them. However, we were not willing to 'guarantee' that we would continued [sic] to so business with all agents or that we would offer them 'the same deal' as they presently operated under with Acceptance. We want to be clear that we have never taken the position that we wanted to chose which producers we would insure. We will insure any eligible producer, period. However, if a producer's policy is presently placed with an agent whom we do appoint, it will be necessary for the producer to utilize a different agent, an agent that we have appointed, in order to place the coverage through us. In such situations, we have always stood ready to assist the producer in locating a new agent, if they so choose, or, in the alternative, place the coverage through our customer service center, which is specifically intended to ensure we are able to fulfill our commitment to insure every producer who would like to place coverage with us. Of course, this decision remains the sole providence of the producer." Depo. Ex. 26 (Def. App. 293).

## VI. American Growers Is Placed Into Supervision By The Nebraska Department of Insurance

121. On November 22, 2002, the Director of Insurance for the State of Nebraska entered an Order of Supervision naming American Growers as a respondent. Def. App. 487-491.

**AICI RESPONSE:** Agreed. The actions of the Nebraska Director of Insurance followed conversations with Ross Davidson, Administrator of the RMA, who advised the Director of the Nebraska Department of Insurance that the RMA had rejected the

proposed AICI/Rain & Hail transaction. Wagner Depo. 76:1-23, 77:16-25 (Pl. App. 390).

**Corrected Statement:** On November 22, 2002, following discussions between L. Tim Wagner, the Nebraska Director of Insurance, and Ross Davidson, who advised Mr. Wagner that the RMA has rejected the proposed transaction between AICI and Rain & Hail and during which the MRA and Nebraska Department of Insurance coordinated their actions, the Director of Insurance for the State of Nebraska entered an Order of Supervision naming American Growers as a respondent. Depo. Ex. 63 (Def. App. 487-491).

122. The Order of Supervision included Findings of Fact, which stated that American Growers' policyholder surplus had declined "in excess of 50% in a nine month period, constituting a financial condition which renders the continuation of American Growers' business hazardous to the public and its insureds." Def. App. 488 (first ¶ 4).

**AICI RESPONSE:** Agreed.

123. The Order of Supervision provided that "[d]uring the period of supervision, American Growers shall not undertake, engage in, commit to initiate, accept or renew any insurance business." Def. App. 488 (second ¶ 4).

**AICI RESPONSE:** Agreed.

124. The Order of Supervision prohibited American Growers from transferring any of its MPCI policies. Def. App. 489 (¶¶ (a), (e)).

**AICI RESPONSE:** Misstatement. Order is silent on this issue.

125. At approximately 6:30pm on November 22, 2002, after the Order of Supervision was entered by the Nebraska Department of Insurance, RMA Administrator Ross Davidson sent John Martin at American Growers by facsimile a letter suspending American Growers pursuant to Section V.J of the SRA. Def. App. 282 (Depo. Ex. 21).

**AICI RESPONSE:** Agreed. By letter dated November 25, 2002, AICI responded to Mr. Davidson's November 22, 2002 letter disputing the basis of that letter. AICI nevertheless voluntarily agreed to abide by the conditions set forth in Mr. Davidson's letter.

126. The letter directed American Growers to cease and desist the selling of any new insurance contracts "under its reinsurance agreements with the FCIC," and advising American Growers that FCIC would not reinsure any new insurance contracts. Id.

**AICI RESPONSE:** Same as above. In addition, the statement contains a misquote.

**Corrected Statement:** The letter directed American Growers to cease and desist the selling of any new insurance contracts "under the Standard Reinsurance Agreement" and advising American Growers that FCIC would not reinsure any new insurance contracts. Id.

127. Mr. Martin responded by letter on November 25, 2002. Def. App. 284-85.

**AICI RESPONSE:** Agreed.

128. On December 20, 2002, the district court of Lancaster County, Nebraska entered an Order of Rehabilitation by consent of American Growers. Def. App. 492-98. The Order of Rehabilitation stated that "American Growers is in such condition that the further transaction of

business by American Growers would be hazardous financially to its insureds or creditors or the public." Id. 492 (¶ 2).

**AICI RESPONSE:** Agreed.

129. On March 24, 2005, the Nebraska Department of Insurance entered an Amended Order of Liquidation for American Growers. Def. App. 499-505.

**AICI RESPONSE:** Agreed

**VII. GAO Report**

130. The General Accounting Office ("GAO") prepared a report dated June 2004 that analyzed the collapse of American Growers that occurred in 2002. Def. App. 223-78.

**AICI RESPONSE:** Objection. AICI objects to Defendant's characterization of the referenced GAO report.

**Corrected Statement:** In June 2004 the Unites States General Accounting Office prepared a report titled "Crop Insurance USDA Needs to Improve Oversight of Insurance Companies and Develop a Policy to Address Any Future Insolvencies." The stated purpose of the report was not to analyze the "collapse of American Growers that occurred in 2002" but, rather, "to determine (1) what factors led to the failure of Amerivcan Growers, (2) whether RMA procedures were adequate to monitor companies' financial condition, and (3) hoe effectively and efficiently the RMA handled the dissolution of American Growers." In a criticism of RMA's oversight over the crop insurance program, the GAO recommended that "RMA (1) develop written policies to improve reviews of companies' financial condition, (2) develop written agreements with states to improve coordination on the oversight of companies, and (3) develop a policy clarifying RMA's authority as it relates to federal and state actions and responsibilities when a state regulator takes control of a company." Depo. Ex. 14 (Def. App. 223-24).

131. The GAO report stated "American Growers' failure was the result of a series of company decisions that reduced the company's surplus, making it vulnerable to collapse when widespread drought erased anticipated profits in 2002." Def. App. 235.

**AICI RESPONSE:** Objection. AICI agreed that the United States has correctly quoted the report but objects to the statement because it is a selective quote from the report. Moreover, as Mr. Martin testified, had the proposed transaction, which the Director of the Nebraska Department of Insurance supported, been approved by the RMA, cash sufficient to pay prior year liabilities would have been available and American Growers' failure could have been avoided. Martin Depo. 169:13-25 – 171:1-14 (Pl. App. 307). By letter dated August 4, 2004, AICI also objected to the GAO's report, noting

> The Board of Directors of Acceptance Insurance Companies Inc. has reviewed the June 2004 General Accounting Office Report to Congressional Requesters regarding Crop Insurance titled "USDA Needs to Improve Oversight of Insurance Companies and Develop a Policy to Address any Future Insolvencies." The Report includes an analysis of factors the GAO considered meaningful to the financial circumstances American Growers Insurance Company faced in November of 2002 when the Risk Management Agency refused to approve or allow the sale of certain insurance assets of American Growers to Rain & Hail LLC.
>
> The Board of Directors of Acceptance disputes certain of the conclusions the GAO reached regarding the financial circumstances American Growers faced in November of 2002, as well as the accuracy and/or significance of certain facts the GAO appears to have relied upon in reaching its conclusions. Certain of the conclusions reached are not accurate, and many simply are not fair. The Board of Directors of Acceptance wishes to reiterate, the true cause of the financial difficulties American Growers faced, and the *only* reason taxpayers have been burdened with expense as a result thereof, was the RMA's refusal to approve or allow the sale of certain insurance assets of American Growers to Rain & Hail.

AICI August 4, 2002 letter (Pl. App. 472).

132. The GAO report identified three principal business decisions that led to the company's collapse: the CRC Plus product; payment of agent commissions that were 12 percent higher than other crop insurers; and the IGF acquisition. Def. App. 230.

**AICI RESPONSE:** Objection. See response to paragraph 131, above.

133. The GAO report stated "[w]hether the sale of American Growers' policies to Rain and Hail could have saved taxpayers all or some of the costs of the dissolution if the proposed sale had been completed is unclear. . . . even with the cash infusion from the sale of assets to Rain and Hail, the company may still have been found to be in a financially hazardous condition." Def. App. 267.

**AICI RESPONSE:** Objection. AICI agreed that the United States has correctly quoted the report but objects to the statement because it is a selective quote from the report. AICI notes the GAO's uncertainty in concluding that "the company may still have been found to be in a financially hazardous condition." (emphasis added).

Dated: March 24, 2006

Respectfully Submitted,

/s/ Lewis S. Wiener

Lewis S. Wiener, Esq.
SUTHERLAND ASBILL & BRENNAN LLP
1275 Pennsylvania Avenue, NW
Washington, D.C. 20004
202.383.0140 - phone
202.637.3593 - fax
Counsel for Plaintiff Acceptance Insurance Companies Inc.

OF COUNSEL:
Ronald Massumi, Esq.
Carter L. Williams, Esq.
SUTHERLAND ASBILL & BRENNAN LLP
1275 Pennsylvania Avenue, NW
Washington, D.C. 20004
202.383.0100

Patrick Griffin
Kutak Rock, LLP
The Omaha Building
1650 Farnam Street
Omaha, NE 68102-2186
402.346.6000