**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| ACCEPTANCE INSURANCE COMPANIES INC., ) | |
| Plaintiff, ) | **CASE NO. 03-2794** |
| v. ) | Judge Thomas C. Wheeler |
| THE UNITED STATES OF AMERICA, ) | |
| Defendant. ) | |

**PLAINTIFF'S REPLY IN SUPPORT OF ITS**
**CROSS-MOTION FOR SUMMARY JUDGMENT**

Lewis S. Wiener, Esq.
SUTHERLAND ASBILL & BRENNAN LLP
1275 Pennsylvania Avenue, NW
Washington, D.C. 20004
202.383.0140 - phone
202.637.3593 - fax
Counsel for Plaintiff Acceptance Insurance Companies Inc.

OF COUNSEL:
Ronald Massumi, Esq.
Carter L. Williams, Esq.
SUTHERLAND ASBILL & BRENNAN LLP
1275 Pennsylvania Avenue, NW
Washington, D.C. 20004
202.383.0100

Patrick Griffin, Esq.
Kutak Rock, LLP
The Omaha Building
1650 Farnam Street
Omaha, NE 68102-2186
402.346.6000

May 24, 2006

## TABLE OF CONTENTS


I. INTRODUCTION .......... 1

II. ARGUMENT .......... 2

A. Acceptance is Entitled to Summary Judgment As a Matter of Law .......... 2

1. Acceptance Had a Compensable Interest in the Tangible and Intangible Insurance Assets That Rain & Hail Agreed to Purchase .......... 2

2. The Government Has Not Raised A Genuine Issue of Material Fact Relevant To Whether Acceptance Had A Compensable Interest .......... 8

B. There Are No Issues of Material Fact That Preclude Entry of Summary Judgment in Favor of Acceptance .......... 10

1. The Government Has Raised No Issues of Material Fact That Preclude Summary Judgment on Acceptance's Categorical Taking Claim .......... 10

2. Even If There Were a Genuine Dispute of Material Fact With Respect to Acceptance's Categorical Taking Claim, There Are No Issues of Material Fact That Preclude Summary Judgment on Acceptance's Taking Claim Under the Three-Pronged *Penn Central* Test. .......... 11

a. There is No Genuine Dispute As to the Character of the RMA's Action .......... 12

b. The Government Has Not Raised A Genuine Dispute of Material Fact As To Acceptance's Reasonable Investment-Backed Expectations .......... 14

C. The Government's Jurisdiction and Exhaustion of Administrative Remedies Arguments Remain Entirely Without Merit .......... 16

III. CONCLUSION .......... 19

## TABLE OF AUTHORITIES

*Cases:* *Pages*

*Ambase Corp. v. United States*, 58 Fed. Cl. 32 (2003) .................. 5-7

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .................. 11, 12

*Armstrong v. United States*, 364 U.S. 40 (1960) .................. 15

*Bannum, Inc. v. United States*, 59 Fed. Cl. 241 (Ct. Cl. 2003) .................. 2

*Blanchette v. Connecticut General Ins. Corps.*, 419 U.S. 102 (1974) .................. 18

*Capital Parks, Inc. v. Southeastern Advertising and Sales Systems, Inc.*, 30 F.3d 627 (5th Cir. 1994) .................. 4-5

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .................. 2

*DeLuca v. Atlantic Refining Co.*, 176 F.2d 421 (2d Cir. 1949), *cert. denied*, 338 U.S. 943 (1950) .................. 9

*Global Credit Services, Inc. v. AMISUB*, 508 N.W.2d 836 (Neb. 1993) .................. 4

*Goguen v. Textron, Inc.*, 234 F.R.D. 13 (D. Mass. 2006) .................. 2

*Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 125 S.Ct. 2074 (2005) .................. 15

*Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992) .................. 11

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (U.S. 1986) .................. 9, 14

*Palm Beach Isles Assocs. v. United States*, 231 F.3d 1354 (Fed. Cir. 2000) .................. 11

*Penn Central Transportation Co. v. New York City*, 438 U.S. 104 (1978) .................. 12, 13

*Preseault v. ICC*, 494 U.S. 1, 12 (1990) .................. 17

*Qwest Corp. v. United States*, 48 Fed. Cl. 672 (2001) .................. 17-18

*Renfrow v. United States*, 38 Fed. Cl. 435 (Ct. Cl. 1997) .................. 12

*Ruckelshaus v. Monsanto Co.*, 467 U.S. 986 (1984) .................. 17

*Texas Peanut Farmers v. United States*, 409 F.3d 1370 (Fed. Cir. 2005) .................. 16

*United States v. General Motors Corp.*, 323 U.S. 373 (1945) .......... 3

*Wolf v. Walt*, 530 N.W.2d 890 (Neb. 1995) .......... 4

*Federal Constitution and Statutes*:

U.S. Const. amend V .......... *passim*

7 U.S.C. § 1506(d) .......... 17, 18

28 U.S.C. § 1491(a)(1) .......... 16

*Miscellaneous*:

Federal Rule of Civil Procedure 56(e) .......... 2

Rule 56(h)(2) of the United States Court of Federal Claims .......... 9-10

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| ACCEPTANCE INSURANCE COMPANIES INC., Plaintiff, v. THE UNITED STATES OF AMERICA, Defendant. | **CASE NO. 03-2794** Judge Thomas C. Wheeler |

**PLAINTIFF'S REPLY IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

The Government's Response in Opposition to Acceptance's Cross Motion for Summary Judgment fails to establish that there are any material issues of fact in dispute that would prevent this court from entering judgment in Acceptance's favor as a matter of law. Acceptance held a compensable interest in the tangible and intangible crop insurance assets that Rain & Hail agreed to purchase for in excess of $21.5 million. The Government's actions with respect to Rain & Hail's proposed acquisition rendered Acceptance's interest valueless. For these reasons, as more fully discussed below, and for the reasons set forth in its Cross-Motion for Summary Judgment, Acceptance has established a Fifth Amendment taking and is entitled to summary judgment as a matter of law.[1]

---

[1] Plaintiff files herewith its Supplemental Appendix in Support of Its Consolidated Motion for Summary Judgment and Response in Opposition to Defendant's Renewed Motion to Dismiss or For Summary Judgment, consisting of its verified interrogatory responses. It is noteworthy (and somewhat disingenuous) that the Government has criticized Plaintiff's submission of documents, when the Government has failed to provide an affidavit or done anything else to authenticate or properly move into evidence several of the exhibits in its Appendix. *See, e.g.*, Defendant's

## II. ARGUMENT

### A. Acceptance is Entitled to Summary Judgment As a Matter of Law

#### 1. Acceptance Had a Compensable Interest in the Tangible and Intangible Insurance Assets That Rain & Hail Agreed to Purchase

Acceptance's position is simple: a holding company parent has a cognizable interest in the value of the operating subsidiaries that it owns and the business conducted by and through those subsidiaries. The parent may realize that value by selling its interest in either of two ways -- through a stock sale or an asset sale. Corporate family groups and holding company systems are pervasive in modern commerce and exist precisely because of the assumption that corporate parents do indeed have the right to realize the value of the subsidiaries they own. If the government extirpates that right or acts in such a way as to block the parent from realizing the value of the subsidiaries it owns, then the government must be viewed as having engaged in a compensable taking.

With its invocation of the corporate veil-piercing doctrine and "alter ego" theory, the Government's argument confounds the nature of this case. Nothing Acceptance has asserted

Opposition to Plaintiff's Cross-Motion for Summary Judgment and Reply in Support of Defendant's Renewed Motion to Dismiss for Lack of Subject Matter Jurisdiction Or, in the Alternative, For Summary Judgment (hereinafter "Govt. Opp.") at 14-15. In fact, it is questionable whether the Government has responded adequately to Plaintiff's supported motion for summary judgment. In *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986), the Supreme Court found that Federal Rule of Civil Procedure 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* The Government has not supported its responsive filings as required by Rule 56(e). Moreover, "[a]lthough evidence presented by a non-movant in relation to a summary judgment motion need not be admissible at trial, *Celotex Corp.*, 477 U.S. at 324, the Court may not grant summary judgment to a moving party based solely on evidence that arguably may not be adduced and admitted at trial." *Bannum, Inc. v. United States*, 59 Fed. Cl. 241, 244 (Ct. Cl. 2003); *see also Goguen v. Textron, Inc.*, 234 F.R.D. 13, 16 (D. Mass. 2006) ("Generally speaking, evidence must be admissible at trial in order to be considered on summary judgment...[i]n order to be admissible at trial, a document must be authenticated."). The Government, as a cross-movant for summary judgment, should have provided some evidentiary basis to authenticate its documents.

requires that the separate corporate identities of Acceptance and American Growers be ignored.[2] Nor does Acceptance need to assert as an element of its motion for summary judgment that legal title to the crop insurance assets of American Growers belonged to anyone other than American Growers. Acceptance asserts simply that as the sole owner of American Growers it had the right to engage in a transaction to liquidate the tangible and intangible assets of American Growers so as to realize the value of its interest in that subsidiary.[3] The ability to engage in a transfer to realize the value of the enterprise conducted through American Growers is self-evidently a compensable interest. Indeed, Rain & Hail was to have *compensated* Acceptance for *that interest* in the transaction that the RMA blocked. The government's destruction of Acceptance's ability to realize the value of its investment in American Growers makes the government liable to Acceptance for the value denied. Nothing in this chain of logic requires repudiation of the general concepts of separate corporate identity.

The Government's reliance on cases concerning "piercing of the corporate veil" adds nothing to the analysis of this case. Veil-piercing is an equitable doctrine by which a court in

---

[2] The Government's implication that the proceeds Acceptance would have received from the acquisition by Rain & Hail are offset by the amount "American Growers owes FCIC," Govt. Opp. at 3, as a result of the costly and unnecessary state insolvency proceedings that the RMA's own actions precipitated is disingenuous at best. Moreover, it does not detract from the real point here, that Acceptance had a compensable interest in the value of the crop insurance business conducted through its wholly-owned insurance company subsidiary, and was only stripped of the ability to realize that interest by the RMA's interdiction of the Rain & Hail transaction.

Had the RMA permitted Acceptance to transfer the crop insurance business to Rain & Hail, a stable and highly experienced crop insurer, there would have been no need for the Nebraska insurance commissioner to place American Growers in receivership, and indeed the commissioner himself judged the desirability of the proposed transaction from both a "business perspective" and "an insurance regulator's perspective," to be "a no-brainer." Wagner Depo. at 20:23-21:1.

[3] "Property" within the meaning of the Takings Clause encompasses much more than just legal title. The term "property" denotes the "rights inhering in the citizen's relation to the physical thing, as the right to possess, use and dispose of it. * * * The constitutional provision is addressed to every sort of interest the citizen may possess." *United States v. General Motors Corp.*, 323 U.S. 373, 378 (1945).

particular circumstances may allow a plaintiff injured by the acts of a defendant corporation to "look through" that corporation in order to obtain recovery from the parent or shareholders of the offending corporation. Nothing of the sort is involved here. The defendant here is the United States. Acceptance's taking claim does not depend in any way on reference to any theory of veil-piercing.

The Government cites the veil-piercing case of *Global Credit Services, Inc. v. AMISUB*, 508 N.W.2d 836, 842 (Neb. 1993), for the proposition that "the doctrine of separate corporate existence does not break down merely because a corporation is a subsidiary, even if wholly owned by a parent." This is a truism that Acceptance does not challenge. In the context of veil-piercing cases, this general principle is stated as a prelude to the exposition of what exceptional circumstances may be held to permit the equitable disregard of the separate corporate existence in order for the plaintiff to impose liability on the corporation's parent or shareholders.[4] *See id.* at 842-44; *Wolf v. Walt*, 530 N.W.2d 890, 896 (Neb. 1995). The factors that may allow for veil-piercing are of no moment here, because there is no plaintiff attempting to pierce a corporate defendant's veil. So, beyond recitation of the undisputed "doctrine of separate corporate existence," the veil-piercing cases are unilluminating.

The Government's quotations from *Capital Parks, Inc. v. Southeastern Advertising and Sales Systems, Inc.*, 30 F.3d 627, 629 (5th Cir. 1994), are misleading to the extent that they are used to counter Acceptance's assertion that it had a cognizable interest in realizing the value of its wholly-owned subsidiary by way of a commercial transfer to a third party, whether structured as a stock sale or an asset sale. There the court was called upon to construe a "right of first

---

[4] "Proceedings seeking disregard of the corporate entity to impose liability on a shareholder for a corporation's debt or other obligation are equitable actions." *Global Services*, 508 N.W.2d at 683.

refusal" agreement running in favor of Capital Parks. The agreement between the parent, Southeastern, and Capital Parks gave Capital Parks a right of first refusal option to purchase Southeastern's wholly-owned subsidiary, Waco. The agreement would be triggered by a third-party offer to purchase Waco by way of a stock or asset sale, i.e., "with respect to the purchase of all the issued and outstanding capital stock or substantially all of the operating assets of [Waco]." *Id.* at 628 (quoting the agreement). As the court put it, "Capital's right of first refusal triggers only when Southeastern receives a bona fide written offer to purchase Waco."[5] *Id.* at 629. As it happened, however, a third party made an offer for the stock and assets of the *parent*, Southeastern, not the subsidiary. As such, the offer was not within the scope of the right of first refusal agreement, because it "merely involve[d] the transfer of the parent corporation's stock and assets, and therefore [did] not affect the ownership of assets held by the subsidiary." *Id.* The court's construction of the agreement is clearly correct. The offer was not an offer to buy either the stock or the assets of the subsidiary. But that said, it is impossible to see what relevance *Capital Parks* has to the question here of whether Acceptance had a compensable interest in the value of its wholly-owned subsidiary, American Growers, and the value of the crop insurance business conducted by that wholly-owned subsidiary.

The Government concludes its discussion of the compensable interest issue with a citation to *Ambase Corp. v. United States*, 58 Fed. Cl. 32 (2003), as if that case delivers the *coup de grace* to Acceptance's takings claim. In fact, the opposite is true. Ambase stands for the proposition that a corporate parent *can* recover on a takings claim if the government destroys the

---

[5] Note that the Fifth Circuit here correctly construes both an offer for the subsidiary's stock or an offer for substantially all its assets, as described in the right of first refusal agreement, as an "offer to purchase" the subsidiary, Waco. The court thus recognizes the point made by Acceptance, that for present purposes whether the transaction is structured as a stock sale or an asset sale is a distinction without a difference.

value of the subsidiary, and thus directly supports Acceptance's position in this litigation.

Ambase was one of the "*Winstar*-related" cases growing out of the abrogation, by Congress' passage of FIRREA, of prior contracts between the government and numerous thrifts regarding the accounting treatment of goodwill. FIRREA outlawed the previously agreed to treatment, leading to the collapse of many thrifts. At their heart, the "*Winstar*-related" cases are "government contract" cases in that the key element is a contract between the government and a private party, which contract is subsequently breached by a later government action. In such cases, as Acceptance pointed out in its previous submission (Acceptance Opp. at 12-13), "when the alleged 'taking' consists of no more than the impairment by contrary government action of a private party's contract rights under a contract between that party and the government, the remedy is an action for breach of contract, rather than a Fifth Amendment 'takings' claim." As further explained in *Ambase*: "[I]f relief may be had for a contract breach by the government through an action in contract * * *, an alternative remedy is unavailable through a takings action for that breach of contract." * * * The takings clause is thus a residuary clause that addresses those legal harms done by the government that are not covered by the traditional remedial schemes of contract, tort, taxation, patent, or other areas of federal statute." 58 Fed. Cl. at 40.

Ambase Corporation was a bank holding company that held 100% of the stock of another holding company, which in turn owned 100% of an operating subsidiary, Carteret Savings Bank.[6] Upon passage of FIRREA and the prohibition of the favorable treatment of goodwill previously agreed to by the government, Carteret could no longer count the goodwill toward its capital requirements and was thereby forced into insolvency. Ambase contended that it was

---

[6] Ambase Corporation and the intermediate holding company, the upstream shareholders, are referred to collectively throughout the opinion as "Ambase," *id.* at 34, and this usage will likewise apply here.

entitled under the Takings Clause to compensation in an amount equal to the fair market value of Carteret prior to FIRREA and the resultant insolvency. *Id.* at 49. Among other things, the Government argued that "Ambase lacks a direct takings claim because in the event the imposition of FIRREA on Carteret's goodwill contracts were deemed a taking, it would be a taking of the thrift's property and not the stockholder's property." *Id.* This point proved to be the dispositive factor in the case – but only because Carteret *did* have a remedy against the government for breach of contract.

Summarizing the principles behind its decision the court stated:

> Simply put, Ambase's takings claim is that the government took its bank, for which it paid $266 million, by not honoring the goodwill contracts * * *.
>
> * * *
>
> [T]he issue in this case is whether an action by the government against the corporation, that *destroys the corporation's value*, can be the legal cause of the *shareholder's* loss in value. The answer seems to the Court to depend on what the character of the government action was. If the government's action is legally compensable under some remedial system then the answer appears to be that there is no legal cause that would justify a takings claim. In this case that is clearly the situation. The government's breach of contract creates in the *corporation*, here Carteret, a cause of action against the government. If Carteret prevailed in the breach of contract action, the corporation would be restored to the position it would have been in and *the shareholder would have lost nothing* by the government's action. Therefore, the takings claim can only exist if there is no remedy other than a takings claim for the government's breach of contract. * * * But clearly there is a contract remedy.

*Id.* at 51-52 (emphasis added).

Thus, the clear import of the case is that the shareholder corporations would have had a takings claim for the destruction of their subsidiary's value, but for the fact of the alternative contract remedy available to the subsidiary. In the present case, there is no alternative contract remedy because this is not a government contracts case. Therefore, under *Ambase*, Acceptance

does have standing to bring a takings claim for the destruction of the value of its wholly-owned subsidiary.

### 2. The Government Has Not Raised A Genuine Issue of Material Fact Relevant To Whether Acceptance Had A Compensable Interest

The Government attempts to create an issue of material fact as to whether Acceptance had a compensable interest by arguing that Acceptance makes contradictory assertions regarding the interest that it possessed in American Grower's crop insurance policies. The Government notes first Acceptance's assertion that it, and not American Growers, was to benefit from the sale of assets pursuant to the terms of the November 18, 2002 letter of intent. Govt. Opp. at 26. Then, the Government cites Acceptance's assertion that the money it was to receive from Rain & Hail would have been kept available to pay prior-year claims by American Growers' policyholders. *Id.* To create its alleged contradiction, the Government then takes a statement from Tim Wagner's deposition out of context, stating that "NDOI Director Tim Wagner testified that he would have blocked any transaction that permitted Acceptance rather than American Growers to retain any funds from Rain and Hail, because he wanted to ensure that American Growers would have as much cash as possible to pay claims." *Id.* Although Acceptance agrees that Tim Wagner made such a statement, it disagrees that this in any way creates an issue of material fact that would preclude the entry of summary judgment in its favor.

Read in its proper context, Wagner's statement means that he *would have* been concerned by a transaction whereby Acceptance received the money from the Rain & Hail deal and retained it, *i.e.* without making it available to pay policyholder claims. This, however, would not have happened. Wagner's testimony shows that he understood that the proceeds of the transaction would have been used by Acceptance to pay prior year losses. PPFUF ¶ 129; Wagner Depo. 53:2-25-54:1-12 (Pl. App. 385). Support for this interpretation of Wagner's understanding of the

proposed transaction is reflected in his testimony "[I] didn't understand or grasp or comprehend the – how this transaction would have been a negative to the taxpayer because it would have put at least $21 million in the taxpayers' pocket, in a sense." Wagner Depo. 26:2-8 (Pl. App. 378). Testimony of John Martin, Acceptance's CEO, as well as other evidence, confirms that the proceeds from the proposed transaction would have been available to cover any policyholder loss claims that may have arisen from prior policy years. *See* Martin Depo: 170:7-15 (Pl. App. 307); Depo. Ex. 29 (Def. App. 294); Martin Depo: 131: 10-17 (Pl. 297).

In any event, the issue of what Acceptance would have done with the money is immaterial. The material issue of fact is whether or not Acceptance had a compensable interest that was rendered valueless as a result of the Government's action. The fact that Acceptance would have received the money from the transaction is sufficient to establish the fact that it had a compensable property interest, regardless of whether it would have used the money to satisfy prior year liabilities. The Government's speculation as to what Tim Wagner would or would not have approved is not sufficient to raise a genuine issue of material fact regarding Acceptance's property interest. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-587 (U.S. 1986) ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.") (citing *DeLuca v. Atlantic Refining Co.*, 176 F.2d 421, 423 (2d Cir. 1949) (L. Hand, J.), *cert. denied*, 338 U.S. 943 (1950)).[7] In short, Wagner's testimony does not, as the Government

---

[7] Many of the Government's alleged disputes with Plaintiff's Counterstatement of Proposed Findings of Uncontroverted Fact are argument, as the Government relies on unsupported allegations and makes no effort to set forth specific facts showing a genuine issue for trial, in contravention of the Rule 56(e) admonition that "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response must set forth specific facts showing that there is a genuine issue for trial." RCFC 56(e). For one example among many, in response to Plaintiff's Proposed Finding No. 2, the Government merely

asserts, raise a genuine issue of material fact as to whether or not Acceptance had a compensable property interest.

### B. There Are No Issues of Material Fact That Preclude Entry of Summary Judgment in Favor of Acceptance

#### 1. The Government Has Raised No Issues of Material Fact That Preclude Summary Judgment on Acceptance's Categorical Taking Claim

The uncontroverted facts establish that the RMA's rejection of the proposed Acceptance/Rain & Hail transaction resulted in a categorical taking of Acceptance's property. Although the Government has attempted to raise genuine issues of fact with regard to Acceptance's property interest, albeit unsuccessfully, it does not even challenge the fact that the result of the RMA's action was that Acceptance was deprived of all of the value of its tangible and intangible crop insurance interests and the business conducted through that its wholly owned subsidiary. As a result, Acceptance is entitled to summary judgment on its categorical taking claim.

Instead of admitting the obvious, that the inevitable result of the RMA's action was a deprivation of all the economic value of Acceptance's tangible and intangible crop insurance interests, the Government argues that it was the Nebraska Department of Insurance ("NDOI"), not the RMA, that "deprived American Growers of 'all economically beneficial use' of its MPCI." Govt. Opp. at 22. Thus, the Government tries to manufacture a genuine issue of material fact by pointing its finger at the NDOI. However, the Government ignores the fact that

contends that it "disagrees that the cited passage supports the proposed finding that Acceptance made the purchase of IGF's policies with 'the explicit approval and encouragement of FCIC,'" yet provides no basis and cites no record evidence in support of its objection, nor proposes any revised finding of fact. It is therefore at least questionable that Defendant has complied with Rule 56(h)(2). *See* RCFC 56(h)(2) ("If the opposing party does not agree with the proposed finding, it shall note the basis for its objection and may draft a proposed revision of the finding directly below the challenged finding.").

the NDOI was in constant communication with Ross Davidson regarding the RMA's decision to reject the proposed transaction and would have never entered its order of supervision but for the RMA's decision to reject the proposed Acceptance/Rain & Hail transaction. Thus, by rejecting this transaction, the RMA prevented Acceptance from realizing any of the value of the assets. It was only after the RMA's action, and in concert with the RMA, that the NDOI placed American Growers under supervision, and thus eliminated any possibility that Acceptance could sell its crop insurance assets elsewhere. Wagner Depo: 35:2-13 (Pl. App. 380).

But for the action of the RMA, Acceptance would have received in excess of $21.5 million for the crop insurance business that Rain & Hail had agreed to purchase. Instead, it received nothing. The RMA thus effected a categorical taking of Acceptance's crop insurance assets. *See Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1017 (1992); *Palm Beach Isles Assocs. v. United States,* 231 F.3d 1354, 1357 (Fed. Cir. 2000).

**2. Even If There Were a Genuine Dispute of Material Fact With Respect to Acceptance's Categorical Taking Claim, There Are No Issues of Material Fact That Preclude Summary Judgment on Acceptance's Taking Claim Under the Three-Pronged *Penn Central* Test.**

To defeat Acceptance's motion for summary judgment on its non-categorical taking claim, the Government must raise a genuine dispute of material fact that is outcome determinative. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The only facts that are outcome determinative with regard to Acceptance's non-categorical taking claim relate to the three elements of the *Penn Central* test, namely, the economic impact of its action on Acceptance, the character of the governmental action, and the extent to which the action interfered with the plaintiff's reasonable investment-backed expectations. As discussed above, the Government has not raised a genuine dispute as to the economic impact of the RMA's action on Acceptance. The Government likewise fails to raise issues of fact that would be outcome-

determinative under the other two prongs of the *Penn Central* test. *Penn Central Transportation Co. v. New York City*, 438 U.S. 104 (1978).

**a. There is No Genuine Dispute As to the Character of the RMA's Action**

The Government attempts to raise an issue of material fact as to the character of the RMA's action by disputing Acceptance's statement that the RMA effected a taking "because it 'distributed or made available' American Growers' MPCI policies to other insurers after NDOI placed American Growers in supervision." Govt. Opp. at 27 (quoting Acceptance Opp. at 18). The Government argues that Ross Davidson testified "that RMA did not distribute or make available American Growers' policies to other insurers, but rather allowed policyholders to choose a new insurer." *Id.* Accepting the Government's argument as true, this statement is insufficient to raise a genuine issue of material fact for at least two reasons. First, there is no distinction between the Government making policies available to other insurers and the Government allowing policyholders to choose a new insurer. Second, no distinction would be material to Acceptance's taking claim. It simply does not matter what the RMA did with the policies after it acted in the public interest to strip Acceptance of its compensable interest by blocking the sale to Rain & Hail. *Anderson*, 477 U.S. at 248; *Renfrow v. United States*, 38 Fed. Cl. 435, 444 (Ct. Cl. 1997) ("Disputes over facts which are not outcome determinative under governing law will not preclude the entry of summary judgment."). The fact is policies that Rain & Hail would have paid in excess of $21.5 million for were transferred to and assumed by Rain & Hail and other competitors of Acceptance for free. Moreover, the Government transferred or made the policies available for transfer without requiring the new insurers to accept prior year liabilities, and allowed new insurers to select their own agents—thereby consummating the same

transaction that it rejected, with the sole difference of eliminating RMA's perceived risk of litigation in exchange for the value of Acceptance's interest in the assets that we transferred.

The Government also attempts to raise a genuine issue of fact by stating that Acceptance and Rain & Hail entered into a non-binding letter of intent, and that the deal was subject to a due diligence review, not just RMA approval. Govt. Opp. at 26. Again, the Government fails to controvert a material issue. Whether or not Rain & Hail was conducting a due diligence review of the transaction after signing the letter of intent does not controvert the fact that the RMA's action effected a taking of Acceptance's property. The fact is that the RMA rejected the transaction, thereby taking Acceptance's compensable interests in the tangible and intangible insurance assets that would have been sold to Rain & Hail. Apparently, the Government believes that because the deal was contingent on due diligence in addition to RMA approval, the Government should be exonerated from taking Acceptance's property. Clearly, that is not the case.

The Government's final attempt to raise a genuine issue of material fact with regard to the character of the RMA's action is equally unavailing. One of the three prongs of the *Penn Central* analysis requires an assessment of the nature of the government's conduct. Here, in the face of an explanation of the nature of the Government's conduct, the Government argues that Acceptance's exposition of the circumstances of the RMA's action (e.g. governmental conduct) might be relevant to an APA challenge, but are immaterial to a takings claim. Govt. Opp. at 27. Instead of attempting to establish genuine issues of material fact that it believes affect Acceptance's takings claim, the Government attempts to controvert facts that the Government itself suggests are immaterial. For example, the Government accuses Acceptance of asserting a cross-motion for summary judgment that "is more akin to an APA action, by challenging RMA's

action to deny the waivers requested by Rain and Hail as arbitrary and capricious." Govt. Opp. at 27. The Government continues by stating that "Acceptance's counsel asked RMA Administrator Ross Davidson during his deposition if the written analysis that Mr. Davidson prepared was a 'decision-making document,' as if this were an APA case." *Id.* Strangely, after suggesting that facts going to whether or not the RMA's action was arbitrary or capricious are immaterial, the Government attempts to controvert each of those facts.

The closest the Government comes to controverting a material fact is its challenge to Acceptance's assertion that the RMA's desire to minimize, presumably in the public interest, the risk of lawsuits against the government was the chief concern that drove RMA to deny the waivers requested by Rain & Hail. Yet once again, the Government fails to create a genuine issue of material fact. In various responses to Plaintiff's Proposed Findings of Uncontroverted Facts, the Government takes issue with Acceptance's characterization of the fear of liability as the RMA's overriding concern. However, the Government never explains what was the overriding concern, if not that, or otherwise counters Plaintiff's contention, other than to say that "the risk of costly lawsuits was only one of the sub-factors that RMA considered in reaching its decision." Govt. Resp. to PPFUF ¶¶ 64. This assertion simply does not logically contradict Acceptance's assertion that the main "sub-factor" was in fact the perceived liability risk. Such vague non-sequiturs are clearly not enough to establish a genuine issue of material fact. *Matsushita*, 475 U.S. at 586-87.

**b. The Government Has Not Raised A Genuine Dispute of Material Fact As To Acceptance's Reasonable Investment-Backed Expectations**

The Government argues that "any property interest that Acceptance held in the insurance policies was subject to the SRA and the FCIC regulations and handbooks that the SRA incorporates * * * includ[ing] Section 4.C(9) of the FCIC Crop Insurance Handbook." Govt.

Opp. at 16. Although Section 4.C(9) is not applicable to bulk transfers, such as the one proposed in the Acceptance/Rain & Hail transaction, even if it did apply, it would still be insufficient to create a genuine issue as to whether or not the RMA took Acceptance's compensable interest.

The plain language of Section 4.C(9) reveals that it is inapplicable in the bulk sales context when a company is selling its entire book of in-force policies and is leaving the business entirely. Instead, Section 4.C(9) applies only in situations where a policyholder wants to transfer crop insurance carriers. In such a case, the policyholder must affirmatively elect to change carriers by executing a cancellation and transfer of experience form as provided in Section 4.C(9) prior to the policy's sales closing date.

However, even if Section 4.C(9) applied in the bulk sales context, that does not controvert the key fact in this case that the RMA asserted that it possessed regulatory discretion to permit or prohibit the transfer of the crop insurance business at issue, and in fact exercised that discretion to block the transaction for the public interest, and thereby forced Acceptance alone to bear a "public burden, which in all fairness and justice, should be borne by the public as a whole." *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528 (2005) (quoting *Armstrong v. United States*, 364 U.S. 40, 49 (1960)). Indeed, the memorandum that reflected the logic of the RMA's action, shows that the rejection was motivated by the "[t]axpayer [c]ost" of "lawsuits from adverse agent/producer selection by R&H." Def. App. at 279 (RMA's Analysis of Proposed Transaction). Notably, that document does not mention Section 4.C(9) as a reason for rejecting the proposed transaction. Section 4.C(9) is not the issue; the RMA's asserted authority to pass on the allowability of a proposed transaction is the issue.

Thus, the applicability of Section 4.C(9), even if controverted, is immaterial to whether or not the Government action effectuated a taking.

### C. The Government's Jurisdiction and Exhaustion of Administrative Remedies Arguments Remain Entirely Without Merit

Although the Government has presented its jurisdictional and exhaustion of administrative remedies arguments in the context of its reply in support of its Renewed Motion to Dismiss, all pending motions are potentially affected by these jurisdictional arguments, including Acceptance's Cross-Motion for Summary Judgment. Thus, Acceptance will briefly explain why these arguments are incorrect as a matter of law.

First, the Government once again misconstrues the breadth of the Federal Circuit's holding in *Texas Peanut Farmers v. United States*, 409 F.3d 1370, 1374 (Fed. Cir. 2005). Although the Government correctly quotes the opinion as stating that "Congress granted district courts exclusive jurisdiction over claims against the FCIC," the Government ignores the court's subsequent characterization of its holding as being that "a suit that is properly characterized as an action against the FCIC for breach of contract must be brought in district court, and that those restrictions cannot be avoided by naming the United States as defendant even though the action is properly one against the FCIC." *Id.* at n.5. As Acceptance has maintained throughout this action, it is only claims in breach of contract that must be brought in district court.

Moreover, nothing in *Texas Peanut Farmers* suggests that the Federal Crop Insurance Act satisfies the strict standards for removing this Court's Tucker Act jurisdiction to hear Fifth Amendment takings claims.[8] As the Supreme Court has made clear, Tucker Act jurisdiction is available unless a party challenging the Court's jurisdiction can show affirmatively and

---

[8] The Tucker Act states in pertinent part: "The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1).

unambiguously that such jurisdiction has been withdrawn by an act of Congress. *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986 (1984); *Qwest Corp. v. United States*, 48 Fed.Cl. 672 (2001).

Defendant does not acknowledge -- let alone satisfy -- the analysis required by *Ruckelshaus* and *Qwest* and has not made even a perfunctory effort to establish that 7 U.S.C. § 1506(d), which grants the federal district courts jurisdiction over suits against the FCIC, divests this court of Tucker Act jurisdiction in suits against the sovereign alleging a Fifth Amendment taking. Reference to *Qwest* and *Monsanto* demonstrates that this Court's jurisdiction over a takings claim can be displaced only by an act of Congress that is *unequivocally* intended to preclude such jurisdiction. Indeed, to reach this conclusion the Defendant must also negate the possibility that Congress was content to permit *concurrent* jurisdiction over such claims in the district courts as well as the Court of Federal Claims. *Qwest*, 48 Fed.Cl. at 686 ("even if the judicial review provision is construed as empowering federal district courts to hear takings claims * * * under [the provision], there is no basis to conclude that Congress explicitly meant to withdraw the Tucker Act jurisdiction of the Court of Federal Claims to hear those claims as well").

In *Monsanto*, the Supreme Court stated that for this Court's jurisdiction to be displaced, there must be "an unambiguous intention to withdraw the Tucker Act remedy." 467 U.S. at 1019. No such "unambiguous intention" can be found if the enactment in question does not expressly "address the liability of the Government to pay just compensation should a taking occur." *Id.* at 1018-19. The same conclusion was reached in *Preseault v. ICC*, 494 U.S. 1, 12 (1990) (relying on *Monsanto*).[9]

---

[9] As noted in *Qwest*, the question is not whether the statute at issue expresses an affirmative showing of Congressional intent to permit recourse to the Tucker Act takings remedy in the Court of Federal Claims, since such recourse is presumed unless prohibited. Rather, the question

The Government's argument regarding exhaustion of administrative remedies is equally specious, and based on a fundamental misunderstanding of the nature of this case. Once again, the Government asserts that "[b]ecause this dispute arises from the SRA, Acceptance was required to demonstrate that American Growers exhausted its administrative remedies before this suit was filed." Govt. Opp. at 10-11. Yet as Acceptance has repeatedly stated, and as is evident from the pleadings, this is not a breach of contract case, but rather a Fifth Amendment takings case. Thus, the administrative procedures that the Government argues that Acceptance failed to follow are simply not applicable in the context in which this case was brought.

is whether Congress has "*withdrawn*" the Tucker Act's general grant of jurisdiction to the Court of Federal Claims to hear takings claims. *Qwest*, 48 Fed.Cl. at 685-86 (quoting *Blanchette v. Connecticut General Ins. Corps.*, 419 U.S. 102, 126 (1974)). Further, a later enactment "will not be read as wholly or even partially amending a prior one unless there exists a 'positive repugnancy' between the provisions of the new and those of the old that cannot be reconciled." *Id.* at 686 (quoting *Blanchette*, 419 U.S. at 126). Applying these principles, the court noted that the judicial review provision of the federal Telecommunications Act contains "no reference to the Tucker Act or takings claims," that the two acts "are perfectly capable of co-existence and the Tucker Act long predates the Telecom Act," and that even if the latter allows takings claims to be brought under its judicial review provision it would "simply be an instance of concurrent jurisdiction." *Id.* Summarily, the court concluded that "it is clear that Congress did not withdraw the Tucker Act jurisdiction of the Court of Federal Claims to hear Fifth Amendment takings claims arising under the Telecom Act." *Id.* The *Qwest* analysis yields the same result here. There are no indicia whatsoever that Section 1506(d) was intended to amend the Tucker Act's grant of jurisdiction to this Court or to withdraw the Tucker Act remedy.

## III. CONCLUSION

For the foregoing reasons, and the reasons set forth in Acceptance's Cross-Motion for Summary Judgment, the Court should grant Acceptance's Motion for Summary Judgment.

Dated: May 24, 2006

Respectfully Submitted,

/s/ Lewis S. Wiener
Lewis S. Wiener, Esq.
SUTHERLAND ASBILL & BRENNAN LLP
1275 Pennsylvania Avenue, NW
Washington, D.C. 20004
202.383.0140 - phone
202.637.3593 - fax
Counsel for Plaintiff Acceptance Insurance Companies Inc.

OF COUNSEL:
Ronald Massumi, Esq.
Carter L. Williams, Esq.
SUTHERLAND ASBILL & BRENNAN LLP
1275 Pennsylvania Avenue, NW
Washington, D.C. 20004
202.383.0100

Patrick Griffin, Esq.
Kutak Rock, LLP
The Omaha Building
1650 Farnam Street
Omaha, NE 68102-2186
402.346.6000