IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ACCEPTANCE INSURANCE COMPANIES. INC., | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 03-2794<br>Judge Wheeler |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

DEFENDANT'S RESPONSE TO PLAINTIFF'S RESPONSE TO QUESTIONS PROPOUNDED IN THE COURT'S ORDER OF JUNE 14, 2006

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

MARK A. MELNICK
Assistant Director

DAVID B. STINSON
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor, 1100 L St., N.W.
Washington, D.C. 20530
Tele: (202) 307-0163
Fax: (202) 514-8624

Attorneys for Defendant

OF COUNSEL:

DONALD A. BRITTENHAM, JR.
Attorney
Department of Agriculture

July 10, 2006

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

1. Does the "law of the case" doctrine prevent the Court from reconsidering the issues decided in Judge Hodges' August 13, 2004 order? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

2. What is the relationship between the RMA and the FCIC? . . . . . . . . . . . . . . . . . . . . . 3

3. Are the actions complained of in this case the responsibility of RMA, FCIC, or both? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

4. What regulations, rules, practices, or contract provisions govern the agency's review of proposed transfers of Multi-Peril Crop Insurance (MPCI) policies from one insurer to another, and which agency is responsible for this review? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

5. What ultimately happened to the MPCI policies at issue in this case? Were they transferred to other insurance carriers? Did the new carrier assume liabilities from American Growers Insurance Company? Did Plaintiff or American Growers receive any compensation from the transfer of these policies? . . . . . . . . . . . . . . . . . . . . . . . . . . 8

6. Is Plaintiff required to exhaust its administrative remedies before the AgBCA pursuant to 7 U.S.C. § 6912(e) and 7 C.F.R. § 400.169(a), (d), prior to filing suit in this Court? . . . . . . . . . . . . . . . . . . . . . . . . . 15

# TABLE OF AUTHORITIES

Pages

FEDERAL CASES

In re Compagnie Generale Maritime,
993 F.3d 841 (Fed. Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Mendenhall & CMI Corp. v. Barber-Greene Co.,
26 F.3d 1573 (Fed. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

National Crop Ins. Servs. v. FCIC,
351 F.3d 346 (8th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15-16

Rolls-Royce Ltd. v. United States,
176 Ct. Cl. 694, 364 F.2d 415 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Texas Peanut Farmers v. United States,
409 F.3d 1370 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-2,6,17

Texas Peanut Farmers v. United States,
59 Fed. Cl. 70 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

FEDERAL STATUTE

7 U.S.C. § 1501 et seq. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

7 U.S.C. § 1506(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2,6

7 U.S.C. § 1506(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

7 U.S.C. § 1506(p) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

7 U.S.C. § 1508(j) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

7 U.S.C. § 1516 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

7 U.S.C. § 6912(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

7 U.S.C. § 6933(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3,5

7 U.S.C. § 6933(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3,5-6

7 U.S.C. § 6933(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

**TABLE OF AUTHORITIES (Cont.)**

Pages

7 U.S.C. § 6933(b)(2) . . . . 4-5

7 U.S.C. § 6933(d) . . . . 5

28 U.S.C. § 1491 . . . . 4

FEDERAL REGULATIONS

7 C.F.R. § 2.15(b)(3)(ii) . . . . 3

7 C.F.R. § 400.164 . . . . 9

7 C.F.R. § 400.165 . . . . 9

7 C.F.R. § 400.170 . . . . 9

7 C.F.R. § 457.8 . . . . 11

7 C.F.R. § 400.169(a), (d) . . . . 15

MISC.

FCIC Crop Insurance Handbook, Section 4.C(9) . . . . passim

RCFC 10(a) . . . . 4

www.rma.usda.gov/news/managers/2002/PDF/mgr-02-022.pdf . . . . 10

www.rma.usda.gov/news/managers/2003/PDF/mgr-03-005.pdf . . . . 10-12

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ACCEPTANCE INSURANCE COMPANIES, INC., | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 03-2794<br>Judge Wheeler |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

DEFENDANT'S RESPONSE TO PLAINTIFF'S RESPONSE TO QUESTIONS PROPOUNDED IN THE COURT'S ORDER OF JUNE 14, 2006

Pursuant to this Court's order dated June 26, 2006, defendant respectfully submits the following response to the bench memorandum submitted by plaintiff to the Court during oral argument in this case on June 26, 2006.

1. Does the "law of the case" doctrine prevent the Court from reconsidering the issues decided in Judge Hodges' August 13, 2004 order?

The law of the case doctrine does not prevent the Court from reconsidering the issues decided in the previous August 13, 2004 order. The bench memorandum submitted by Acceptance Insurance Company ("Acceptance") concedes this point. Pl. Mem. 1.[1] Contrary to Acceptance's assertion, the Government does not seek "a second 'bite' at the arguments" previously considered by Judge Hodges, nor does the Government believe that reassignment of this case to the current Court has declared "open season" upon issues addressed in Judge Hodges' August 13, 2004 order. Pl. Mem. 2. Rather, the Government properly has raised its jurisdictional concerns based upon the Federal Circuit's decision in Texas Peanut Farmers v. United States, 409 F.3d 1370 (Fed. Cir. 2005).

[1] "Pl. Mem. ___" refers to plaintiff's bench memorandum. "Pl. Mem. Ex. ___" refers to the exhibits attached to plaintiff's bench memorandum.

At the time Judge Hodges issued his order, he addressed the Court of Federal Claims' earlier decision in that case, Texas Peanut Farmers v. United States, 59 Fed. Cl. 70 (2003), and did not have the benefit of the Federal Circuit's decision on appeal. In that decision, the Federal Circuit issued precedent binding upon this Court, holding (1) "Congress may withdraw any grant of Tucker Act jurisdiction," and (2) that the "plain meaning" of 7 U.S.C. §§ 1506(d) and 1508(j) is that "Congress granted district courts exclusive jurisdiction over claims against the FCIC." Texas Peanut Farmers, 409 F.3d at 1373-74 (emphasis added). The conclusion from Texas Peanut Farmers is that Congress has withdrawn Tucker Act jurisdiction from this Court to consider claims against FCIC. Plaintiff offers no argument in support of the proposition that this "withdraw" of Tucker Act jurisdiction applies only to contract claims and not to takings claims.

The fact that Acceptance has decided to ignore the fact that its claim here arises out of duties defined by contract, and, instead, has chosen to characterize its contract claim as a taking, does not provide proper justification for finding Texas Peanut Farmers inapplicable to plaintiff's complaint. Pl. Mem. 4. The Federal Circuit's decision in Texas Peanut Farmers applies to this case and requires dismissal of plaintiff's claims. The law of the case doctrine is not a bar here.

Contrary to Acceptance's suggestion, the Government has not engaged in "strategic delay." Id. Indeed, renewing our motion for dismissal at the same time we filed our motion for summary judgment helped further the interests of efficiency and judicial economy by presenting all of our legal issues to this Court for consideration at one time, as opposed to doing so in piece meal fashion. Moreover, we note that, even if there had been no change in the law, this Court would not be precluded from reconsidering Judge Hodges' August 13,

2004 order if it believed the jurisdictional determination set forth in the order was incorrect. A court may raise issues of subject matter jurisdiction sua sponte at any time. In re Compagnie Generale Maritime, 993 F.3d 841, 848 (Fed. Cir. 1993). Moreover, lack of jurisdiction can not be waived. Rolls-Royce Ltd. v. United States, 176 Ct. Cl. 694, 702, 364 F.2d 415, 420 (1966).

Acceptance challenges our argument that "the law of the case doctrine only applies once a judgment or appellate decision has been rendered." Pl. Mem. 3 (quoting Def. Opp. 5). From this argument, Acceptance suggests that "law of the case does not involve preclusion after final judgment." Pl. Mem. 3 (quoting Mendenhall & CMI Corp. v. Barber-Greene Co., 26 F.3d 1573, 1582 (Fed. Cir. 1994)). Our argument did not address "final judgment." Rather, we addressed judgment in the context of a district court action or appellate action. Acceptance's misreading of our argument should be rejected.

2. What is the relationship between the RMA and the FCIC?

As set forth more fully in Defendant's Proposed Findings of Uncontroverted Fact ("DPFUF"), nos. 1-8, Congress established RMA in 1996 and placed FCIC under the authority of RMA. 7 U.S.C. § 6933(a) & (b). The administrator of RMA also serves as administrator of FCIC. 7 C.F.R. § 2.15(b)(3)(ii). Thus, RMA supervises FCIC and administers the Federal Crop Insurance Program for FCIC.

Acceptance is correct that FCIC statutorily is granted rule making authority. Pl. Mem. 7; 7 U.S.C. §§ 1506(e) ("The Corporation may adopt, amend, and repeal bylaws, rules, and regulations governing the manner in which its business may be conducted and the powers granted to it by law may be exercised and enjoyed"), 1506(p) ("The Secretary and the Corporation are each authorized to issue such regulations as are necessary to carry out this

chapter") . However, because of its oversight of FCIC, RMA is involved in the actual process of originating any rule making upon behalf of FCIC. 7 U.S.C. § 6933(b)(1)-(2).

Acceptance argues, without support, that "in a takings claim based upon the regulatory acts of the RMA, the FCIC, or both in concert, the proper defendant is the sovereign, the United States, and neither the RMA or the FCIC is a proper party." Pl. Mem. 8. Acceptance's argument exalts form over substance. In any action filed in the United States Court of Federal Claims pursuant to the Tucker Act, the United States is always the named defendant, not the agency. 28 U.S.C. § 1491; RCFC 10(a). As such, whether Acceptance chose to file a contract claim, or a takings claim, in this Court, the United States, not FCIC or RMA would be the named defendant. In the event Acceptance were to file a contract claim in the district court (which is the court that Acceptance readily admits would have jurisdiction to consider such a claim), or a takings claim in the district court, the named defendant there could be either FCIC, RMA, or both. Indeed, we note that, in its bench memorandum, Acceptance acknowledges that "[f]or purposes of a takings claim, however, it is immaterial whether the direct actor was RMA, the FCIC, or both." Pl. Mem. 9.

We are aware of no requirement that, in district court, a takings claim must be filed against the United States and not the agency acting upon behalf of the United States, nor are we aware of any precedent suggesting that a district court would lack jurisdiction to consider such an action simply because it was filed against the United States and not the specific agency. Certainly, Acceptance offers no authority in support of either point.

3. <u>Are the actions complained of in this case the responsibility of RMA, FCIC, or both?</u>

The actions complained of in this case were the responsibility of both RMA and FCIC, in that RMA took certain actions upon behalf of FCIC. Rain & Hail requested a

waiver of procedures that arose out of the Standard Reinsurance Agreement ("SRA") and the FCIC 2002 Crop Insurance Handbook that was incorporated by reference into the contract. In that regard, RMA was called upon to determine, upon FCIC's behalf, whether certain FCIC procedures should be waived. This is because RMA acts in the name of FCIC in carrying out FCIC administrative functions. 7 U.S.C. § 6933(a) & (b).

With respect to crop insurance policies and administration of the Federal crop insurance program, the authority for operating and funding this program derives from the Federal Crop Insurance Act. 7 U.S.C. § 1501 et seq. RMA acts upon behalf of FCIC in providing "[a]dministration and oversight of . . . all programs authorized under the Federal Crop Insurance." 7 U.S.C. § 6933(b)(2). The funding of the program is reserved specifically for FCIC. 7 U.S.C. § 1516. Specifically, section 1516(a) authorizes appropriations for funding the Federal crop insurance program for mandatory and discretionary expenses. By contrast, RMA's funding is accomplished in a separate Department of Agriculture appropriation which covers administrative expenses of RMA, such as salaries. 7 U.S.C. § 6933(d). As such, RMA acts upon behalf of FCIC every time it makes a financial decision not related to its own appropriation.

In this case, RMA/FCIC received a request from Rain and Hail to waive procedures contained in the FCIC handbook. FCIC had the responsibility to respond because (1) the request involved an FCIC program administered pursuant to the Federal Crop Insurance Act, and (2) the request was for waiver of procedures that were required by the SRA and FCIC was the legal entity that entered into the SRA for the Government. Because RMA is the agency that functions upon behalf of FCIC to administer the program in FCIC's name, RMA

acted directly upon behalf of FCIC in responding to the request for a waiver of FCIC procedure.

Acceptance, in its bench memorandum, admits that RMA acts on behalf of FCIC, providing "'supervision of the Federal Crop Insurance Corporation' and 'administration and oversight of all aspects . . . of all programs authorized under the Federal Crop Insurance Act.'" Pl. Mem. 6 (quoting 7 U.S.C. § 6933(b)). Acceptance also admits "that the issue of which entity was 'responsible' does not have any pertinence to a takings claim." Pl. Mem. 10. Based upon these admissions, pursuant to 7 U.S.C. § 1506(d), Acceptance's action properly should have been brought in district court as it concerns a claim against the FCIC (whether that be, as Acceptance notes, RMA, FCIC or both). 7 U.S.C. § 1506(d); Texas Peanut Farmers, 409 F.3d at 1374.

The actions here were taken by RMA upon behalf of FCIC, pursuant to the pertinent SRA and the FCIC regulations incorporated therein. While Acceptance attempts to cast the actions of FCIC and RMA as being taken in their "regulatory capacity," Pl. Mem. 10, in actuality, they were taken pursuant to terms of a contractual agreement (indeed Rain & Hail, like American Growers, had entered an SRA with FCIC).

4. What regulations, rules, practices, or contract provisions govern the agency's review of proposed transfers of Multi-Peril Crop Insurance (MPCI) policies from one insurer to another, and which agency is responsible for this review?

During the course of operating the Federal crop insurance program, it is not generally a function of FCIC/RMA to review proposed transfers of crop insurance policies for the purpose of approving such transfers. A transfer may occur without FCIC/RMA's approval. Indeed, the SRA, which incorporates the FCIC Handbook, define the circumstances pursuant

to which a transfer may be accomplished that do not require any type of concurrence of, or approval by, FCIC/RMA.

Specifically, section 4.C(9) of the FCIC Handbook, entitled "Transfer of Policies," states "[t]o be effective, transfer requests must be signed by the cancellation date and received by the ceding Insurance Provider no later than 45 days after the cancellation date." DPFUF 41. Section 4.C(9)(b), Requirements, provides that "[t]he assuming Insurance Provider must complete and have the insured sign a Cancellation/Transfer of Experience Data Form for each policy (crop) being transferred. Id. Section 4.C(9)(e)2 provides that "[a]ll Insurance Providers are required to transmit experience (premium and loss data) and APH data to RMA." Id.

Mr. John Joyce, former chairman of Rain and Hail LLC, understood the importance of Section 4.C(9), stating that "annually, before the sales closing date for that particular crop," there is a "choice that a farmer can make. If they want to change from where they are, make changes in their coverage, they must do so on a signed form prior to the sales closing date. Once the sales closing date is reached, it's all over for that year. Consequently, for Acceptance and Rain and Hail, in my view, to do anything with the business that was referenced here as in[-]force, would have had significant discussion of how to do that with the least possible disruption to the client, to the agent, to everybody else and the maximum assurance of service to that policyholder." DPFUF 42.

Section 4.C(9) requires that each policy that is transferred must be individually canceled and rewritten by another insurer. DPFUF 44. Section 4.C(9) does not set forth specific procedures for transferring a block of policies. Id. From this, Acceptance argues that 4.C(9) "clearly has nothing to do with bulk transfers from one crop insurer to another."

Pl. Mem. 12. Acceptance's argument ignores the fact that section 4.C(9) sets forth the FCIC requirements regarding transfers of in-force policies. The fact that "bulk transfers" are not specifically discussed in the section does not somehow render inapplicable the FCIC requirements set forth in section 4.C(9) concerning transfers of in-force policies.

This point was understood was understood by Rain and Hail when it requested that RMA waive the prohibition on transferring American Growers' in-force policies to Rain and Hail. DPFUF ¶¶ 94-103. For example, Mr. Joyce testified, "[w]e needed to make sure that we could handle the in-force policies that were already written and on the books and that did require RMA cooperation and/or waiver, whatever you wish to call it. And that is contained in 4.C(9), yes." DPFUF ¶ 94.

RMA, acting upon behalf of FCIC, is responsible for implementing the requirements of the SRA and the FCIC Handbook, including the provisions of 4.C(9).

5. What ultimately happened to the MPCI policies at issue in this case? Were they transferred to other insurance carriers? Did the new carrier assume liabilities from American Growers Insurance Company? Did Plaintiff or American Growers receive any compensation from the transfer of these policies?

The decision of FCIC/RMA to deny Rain & Hail's request of a waiver of the FCIC cancellation/re-write procedure was an event that occurred prior to the order of supervision issued by the Nebraska Department of Insurance ("NDOI"). To the extent the Court believes that RMA/FCIC's actions subsequent to issuance of the NDOI order of supervision are relevant to this case, we set forth below the circumstances regarding transfer of policies.

On November 22, 2002, NDOI issued the order of supervision to American Growers stating that it could not "undertake, engage in, commit to initiate, accept, or renew any insurance business." DPFUF 121, 123. The order was based upon a determination made by the Director of the NDOI that American Growers was in "hazardous financial condition,"

because its policyholder surplus in 2002 had declined from $75,435,582 to $11,092,213 in just nine months. DPFUF 121; Def. App. 488 (first ¶ 4). According to NDOI, such a large reduction in a short period of time constituted a "financial condition which render[ed] continuation of American Growers' business hazardous to the public and its insureds." Id.

Insurance providers who participate in the Federal crop insurance program must enter an SRA with FCIC. 7 C.F.R. §§ 400.164-65, 400.170. American Growers had entered into such an agreement and was bound by its terms. DPFUF 12. Section II.A.2 of the SRA states that "the Company must offer all approved plans of insurance for all approved crops in any state in which it writes an eligible crop insurance contract and must accept and approve all applications from all eligible producers." DPFUF 25. The NDOI order stated that American Growers no longer could accept applications and write new crop insurance contracts during the period of supervision, which in turn prohibited American Growers from performing its obligations under the terms of the SRA, and was a breach of the agreement. DPFUF 123; Def. App. 488 (second ¶ 4). Section V.I.1 of the SRA provided that "the Company must be in compliance with the provisions of [the SRA, as well as] the laws and regulations of the United States, the laws and regulations of the states and locales in which the Company is conducting business, . . . and all FCIC bulletins, handbooks, instructions, and procedures of FCIC." DPFUF 34. Thus, pursuant to the SRA, American Growers was required to follow state law and, therefore, could not disregard the NDOI order.

With American Growers in supervision, it no longer could fulfill the terms of the SRA and was unable to fulfill its obligations to policyholders. Section V.P of the SRA, a provision designed to protect policyholders, provides "[w]henever the Company . . . [is] unable to fulfill their obligations to any policyholder by directive or order duly issued by any

Department of Insurance, Commissioner of Insurance, or by any court of law having competent jurisdiction . . . all eligible crop insurance contracts affected by such directive or order that are in force and subject to this Agreement as of the date of such inability or failure to perform will be immediately transferred to FCIC without further action of the Company by the terms of this Agreement." DPFUF 37. This section also states that "FCIC will assume all obligations for unpaid losses whether occurring before or after the date of transfer, and the Company must pay all funds in its possession with respect to all eligible crop insurance contracts transferred including, but not limited to, premiums collected." Id. Thus, pursuant to the SRA, American Growers forfeited any rights that it had to its book of business.

With American Growers under supervision by NDOI and unable to fulfill its obligations to its policyholders, FCIC developed a procedure for a smooth transition of policies to other solvent participating companies to provide policyholders with service for 2003. The procedures were issued in the form of "manager's bulletins" and were issued on December 18, 2002 (MGR-02-022) and March 6, 2003 (MGR-03-005). Pl. Mem. App. Ex. 4.[2] The December 18th bulletin states that because of the extraordinary action taken by NDOI, American Growers was required to notify its agents that they had the primary opportunity and responsibility to place all Federally reinsured American Growers policies with another approved insurance provider in accordance with the procedures established in the bulletin. Id. at 2. Policies reinsured pursuant to the Federal crop insurance program are continuous policies that remain in effect from year to year until cancelled or terminated by

---

[2] The second manager's bulletin, dated March 5, 2003, is available at: www.rma.usda.gov/news/managers/2003/PDF/mgr-03-005.pdf. The December 18, 2002 bulletin also is available at: www.rma.usda.gov/news/managers/2002/PDF/mgr-02-022.pdf.

the date contained in the policy terms. As such, policies that are not terminated or cancelled by the appropriate date remain in force. 7 C.F.R. § 457.8 (setting forth policy, see section 2).

The December 18th bulletin recognized a distinction between policies and contracts that were in force (i.e., the cancellation date had passed and the policy was active with American Growers for the 2003 crop year), and policies and contracts that still could be cancelled and re-written with a new insurance provider pursuant to the transfer procedures set forth in the FCIC Handbook (i.e., the sales closing date had not yet passed and the 2003 crop insurance contract was not yet active). Pl. Mem. Ex. 4 at 2-3. The sales closing date is important because section 2(e)(8) of the 2003 common crop insurance policy provides that once a policy is terminated or cancelled with an insurance provider, the policyholder must reapply for insurance by the sales closing date to receive coverage. 7 C.F.R. § 457.8 (setting forth common crop insurance policy). In addition, section 3(b) of the common crop insurance policy states the policyholder cannot change the coverage level, price election, or amount of insurance any time after the sales closing date. Id. Therefore, to receive or change coverage, such actions must occur no later than the sales closing date.

Because some policies already were in force and because those policies were beyond the cancellation and sales closing dates, the bulletin instructed agents to transfer such policies to other insurance providers by January 31, 2003. Pl. Mem. Ex. 4 at 2. Upon transfer, the assuming insurance provider was required to report certain policyholder information to RMA for policy tracking purposes. Id. For the second group of policies, where the sales closing date had not yet passed, the bulletin provided that the policies must be transferred by the applicable sales closing date for the insured crop. Id. at 3. Because the cancellation dates for

these policies had not yet passed, the procedures outlined in section 4(c)(9) of the FCIC Handbook were applicable and had to be followed. Id.

The bulletin did not specify the particular insurance provider to which an agent must transfer the policies. Pl. Mem. Ex. at 2-3. However, in the event agents were unable to transfer the policies by a specified date, RMA would randomly assign policies to one of the approved insurance providers. Pl. Mem. Ex. 4 at 4. Insurance providers were required to accept all policies transferred to them (whether considered high risk or otherwise), unless the premium for the policies exceeded the amount that the company was approved to write. Id.

The March 6, 2003 bulletin contained procedures regarding the policies not transferred from American Growers to another insurance provider by the dates specified in the previous bulletin. www.rma.usda.gov/news/managers/2003/PDF/mgr-03-005.pdf. The procedures set forth in both of the bulletins were carried out, with a majority of the policies transferred to other insurance providers by the insurance agents, and the remaining policies randomly assigned to the insurance providers in accordance with the March 6th bulletin.

As noted above, pursuant to the SRA, when NDOI issued its order of supervision to American Growers, the liability for American Growers previous policies (prior to the 2003 crop year) became the responsibility of FCIC and FCIC had no basis or authority to forward such liability on to the insurance providers who had assumed the 2003 policies. The assuming company had liability only for the 2003 crop year since they insured only the 2003 policy. This is a situation different from one where a company purchases the assets (and liabilities) of another company and takes over the liabilities. Here, the 2003 policies were assigned to companies out of necessity so that Federally reinsured policyholders would have a viable insurance provider for their 2003 crop insurance policies.

American Growers (in supervision) did not receive any compensation for the transfers. However, no compensation was due. Indeed, RMA expended over $40 million on American Growers subsequent to issuance of the NDOI order of supervision. See defendant's response to PFFUF 130. American Growers forfeited any value that it may have had in its book of business when it placed itself in a position where it could not legally fulfill the terms of the SRA. Once NDOI stepped in because of American Growers' poor financial status, FCIC was required to protect policyholders and assure that their policies were carried by other approved companies who could carry out the terms of the SRA, and the Federal crop insurance program in general, for policyholders. Not only was FCIC required to step in and protect the integrity of the program, but it did so automatically by operation of the terms of the SRA.

Acceptance argues "that by rejecting the Acceptance/Rain & Hail transaction, the Government prevented Acceptance from realizing any of the value of its assets." Pl. Mem. 14. Acceptance is incorrect. First, the Government did not "reject" the transaction. FCIC/RMA declined to grant a waiver of the prohibition against transfer of in-force policies set forth in the FCIC Handbook, section 4.C(9). FCIC/RMA does not have authority to "reject" proposed purchases of insurance companies or individual policies. It was Rain & Hail that decided not to pursue the transaction. DPFUF 112. Second, even if Rain & Hail had been granted the requested waiver of procedure, Acceptance had only a non-binding Letter of Intent with Rain & Hail. As it was non-binding, Rain and Hail had the right not to consummate the transaction (regardless of any decision by RMA) during its due diligence review. DPFUF ¶ 83.

Acceptance also argues that NDOI acted "in concert with the RMA" when it "placed American Growers into regulatory supervision." Pl. Mem. 14. This is incorrect. NDOI acted based upon its own authority. NDOI Director Tim Wagner testified that NDOI made its own independent determination to enter an order of supervision based upon American Grower's financial statements with NDOI, which were a sufficient basis for the order. Pl. App. 395, 400 (Wagner 95:3-17, 115:7-14); Def. App. 487 ¶ 3.

Acceptance also argues that RMA "took control of those policies for which Rain & Hail had been willing to pay in excess of $21.5 million and transferred them (as described in Bulletin No.: MGR-02-022 (December 18, 2002)) to Acceptance's former competitors, free of charge." Pl. Mem. 14; see Def. Resp. to PPFUF ¶¶ 59, 60, 117, 124, 125. What Acceptance ignores is that once NDOI entered the November 22, 2002 order of supervision, the "cut-through" section of the SRA provided that the in-force policies "will be immediately transferred to FCIC without further action of the Company by the terms of this Agreement . . . and the Company must pay FCIC all . . . premiums collected. The Company hereby assigns to FCIC the right to all uncollected premiums on all such policies." DPFUF ¶ 37.

Acceptance likewise argues that "the Government afforded itself the opportunity to consummate a transaction virtually identical to the transaction proposed between Acceptance and Rain & Hail." Pl. Mem. 14. Acceptance offers no record support for this allegation other than its own conjecture. Indeed, Acceptance offers no comparison of which policies Rain & Hail would have obtained had it decided to consummate the transaction as compared to the policies it actually obtained subsequent to the NDOI's order of supervision. While Acceptance argues "the Government relieved itself – at Acceptance's expense – of the

potential liability it feared," Pl. Mem. 14, in fact, the Government ultimately spent over $40 million to keep American Growers operating during supervision so that policy holder's claims could be timely processed and paid for past policies. See defendant's response to PFFUF 130; Pl. App. 57-58 (Davidson Tr. 219-20). Of course, while Acceptance is quick to claim it is owed $21.5 million of American Grower's assets, Acceptance is unwilling to accept responsibility of American Grower's liabilities that were paid by the Government.

6. Is Plaintiff required to exhaust its administrative remedies before the AgBCA pursuant to 7 U.S.C. § 6912(e) and 7 C.F.R. § 400.169(a), (d), prior to filing suit in this Court?

Question 6 inquires whether exhaustion of administrative remedies is required "prior to filing suit in this Court." June 26, 2006 Order (emphasis added). Exhaustion of administrative remedies is required before Acceptance could file its suit in district court. That is, once proceedings at the AgBCA were complete, Acceptance could then file suit in district court, not this Court.

Our previous filings exhaustively address the basis for our exhaustion argument and we do not restate them here. However, two points raised by Acceptance in its memorandum require comment.

First, Acceptance cites National Crop Ins. Servs. v. FCIC, 351 F.3d 346 (8th Cir. 2003), as support for its proposition that it is not required to exhaust its administrative remedies. Pl. Mem. 17. Acceptance's reliance upon National Crop is misplaced.

In that case, the companies claimed that a manager's bulletin issued by FCIC for informational purposes unlawfully changed the terms of the contracts that the companies had with policyholders and caused greater liability for the companies than the contracts would

have provided. The companies sued FCIC for full indemnification for any amounts that policyholders might recover in the underlying suit.

The court held that FCIC's administrative appeals regulation required filing of administrative appeals "when a dispute between an insurance company and the FCIC, pertains to coverage under a reinsurance contract." 351 F.3d at 349. The court stated that because the insurance companies alleged that the FCIC informational bulletin unlawfully expanded coverage under the contract between the companies and the insured, and did not allege that the bulletin altered the terms of the reinsurance contract itself between the companies and FCIC, the expanded liability issue fell outside of the SRA. Accordingly, appeal to the AgBCA was not required.

Here, Acceptance does not claim that FCIC unlawfully changed the terms of a contract that it had with an insured to expand policy coverage. Rather, this case pertains to terms of the SRA. The only action taken by FCIC/RMA in this case was the denial of a request for waiver of FCIC procedure that Rain & Hail was required to follow pursuant to the SRA. Of course, Rain & Hail requested this waiver to assure that it did not breach the SRA through noncompliance with the FCIC procedure and to confirm that it would receive reinsurance coverage. Thus, unlike the companies in National Crop, Rain & Hail requested that FCIC disregard a term of the SRA so that it could avoid what otherwise would be a breach of the SRA.

Second, Acceptance argues that it is not required to exhaust its administrative remedies because "this case is not an action against the FCIC to enforce the provisions of the SRA or to redress the breach of those provisions." Pl. Mem. 19. Acceptance is incorrect. Acceptance's action challenges the decision of FCIC/RMA not to grant a waiver of a contract

provision. However, because Acceptance recognizes (and has admitted in this litigation) that this Court has no jurisdiction to consider such contract claims against FCIC, Acceptance instead has characterized its case as a challenge to a regulatory action. This Court must look beyond plaintiff's characterization of its case. Texas Peanut Farmers, 409 F.3d at 1372 (court must look to "true nature of the action in determining the existence or not of jurisdiction"). Indeed, but for the SRA and the FCIC Handbook, there would be no relationship between Rain & Hail and the Government or American Growers and the Government upon which Acceptance could bring an action. The rights and duties of each party arise out of the SRA and the FCIC regulations incorporated by reference. Acceptance's attempt to turn its contract claim into a regulatory challenge is improper and should be rejected.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Mark A. Melnick
MARK A. MELNICK
Assistant Director

OF COUNSEL:

DONALD A. BRITTENHAM, JR.
Attorney
Department of Agriculture

s/ David B. Stinson
DAVID B. STINSON
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor, 1100 L St., N.W.
Washington, D.C. 20530
Tele: (202) 307-0163
Fax: (202) 514-8624

July 10, 2006

Attorneys for Defendant

CERTIFICATE OF FILING

I hereby certify that on July 10, 2006, a copy of the foregoing "DEFENDANT'S RESPONSE TO PLAINTIFF'S RESPONSE TO QUESTIONS PROPOUNDED IN THE COURT'S ORDER OF JUNE 14, 2006" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ David B. Stinson