No. 03-2794
(Judge Wheeler)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ACCEPTANCE INSURANCE
COMPANIES INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

# DEFENDANT'S MOTION TO DISMISS

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

MARK A. MELNICK
Assistant Director

MICHAEL N. O'CONNELL
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
1100 L St., N.W., 8th floor
Washington, D.C. 20530
Tel: (202) 353-1618
Fax: (202) 514-8624

Attorneys for Defendant

OF COUNSEL:

KIMBERLEY E. ARRIGO
Senior Counsel
Office of the General Counsel
U.S. Department of Agriculture
1400 Independence Ave., S.W.
Washington, D.C. 20250

April 30, 2008

# TABLE OF CONTENTS


DEFENDANT'S MEMORANDUM. . . . . . . . . . 1

QUESTIONS PRESENTED. . . . . . . . . . 1

STATEMENT OF THE CASE. . . . . . . . . . 2

I. Nature Of The Case. . . . . . . . . . 2

II. Statement Of Facts . . . . . . . . . . 2

ARGUMENT. . . . . . . . . . 3

I. Standard Of Review . . . . . . . . . . 3

II. The United States Cannot Be Held Liable For A Taking Where It Has Caused The Loss Of A Sale To A Third Party . . . . . . . . . . 4

III. FCIC/RMA Do Not Have Authority To Approve or Disapprove Sales Of Assets From One Insurer To Another . . . . . . . . . . 8

A. Acceptance Does Not Allege That FCIC/RMA Acted Pursuant To The Contract . . . . . . . . . . 10

B. Neither The FCIA, Nor Its Regulations, Provide FCIC/RMA Authority To Reject Sales Of Property. . . . . . . . . . . 13

C. The Legislative History Of Major Amendments To The FCIA Contain No Suggestion That Congress Intended FCIC/RMA To Possess Authority To Reject Sales Of Property. . . . . . . . . . . 15

CONCLUSION . . . . . . . . . . 18

## TABLE OF AUTHORITIES

### CASES

767 Third Avenue Associates v. United States,
48 F.3d 1575 (Fed. Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 8

Acceptance Ins. Cos. Inc. v. United States,
72 Fed. Cl. 299 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Air Pegasus of D.C., Inc. v. United States,
424 F.3d 1206 (Fed. Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

Armijo v. United States,
663 F.2d 90 (1981).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Bell Atlantic Corp. v. Twombly,
127 S. Ct. 1955 (2007).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Conley v. Gibson,
355 U.S. 41 (1957).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

Daves v. Hawaiian Dredging Co.,
114 F.Supp. 643, 645 (D. Hawaii 1953) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

Del-Rio Drilling Programs, Inc. v. United States,
146 F.3d 1358 (Fed. Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Hooe v. United States,
218 U.S. 322 (1910).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Kearney & Trecker Corp. v. United States,
688 F.2d 780 (Ct. Cl. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

NBH Land Co. v. United States,
576 F.2d 317 (Ct. Cl. 1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 18

NL Industries, Inc. v. United States,
839 F.2d 1579 (Fed. Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

North Am. Transp. & Trading Co.,
253 U.S. 330 (1920).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Omnia Commercial Co., Inc., v. United States,
261 U.S. 502 (1923). . . . . . . . . . . 5, 6, 7, 8

Palmyra Pacific Seafoods, LLC v. United States,
80 Fed. Cl. 228 (2008). . . . . . . . . . . 7

Papasan v. Allain,
478 U.S. 265, 286 (1986) . . . . . . . . . . . 3

Paradissiotis v. United States,
304 F.3d 1271 (Fed. Cir. 2002). . . . . . . . . . . 6

Regional Rail Reorganization Cases,
419 U.S. 102 (1974). . . . . . . . . . . 8

Tellabs, Inc. v. Makor Issues & Rights, Ltd.,
127 S.Ct. 2499 (2007). . . . . . . . . . . 11

## STATUTES

7 U.S.C. § 1501. . . . . . . . . . . 13

7 U.S.C. § 1502. . . . . . . . . . . 13

7 U.S.C. § 1503. . . . . . . . . . . 13

7 U.S.C. § 1505. . . . . . . . . . . 14

7 U.S.C. § 1506. . . . . . . . . . . 15

7 U.S.C. § 1507. . . . . . . . . . . 13

7 U.S.C. § 1508. . . . . . . . . . . 14

7 U.S.C. § 6933. . . . . . . . . . . passim

7 U.S.C. § 6933(b)(1). . . . . . . . . . . 13

Federal Crop Insurance Act of 1980, Pub. L. 96-365. . . . . . . . . . . 16

The Federal Crop Insurance Reform and Department of Agriculture Reorganization
Act of 1994, Pub. L. 103-354. . . . . . . . . . . 17

Federal Agricultural Improvement and Reform Act of 1996, Pub. L. 104-127, § 194(a), 110 Stat. 945. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Agricultural Risk Protection Act of 2000, Pub. L. 106-224, 114 Stat. 358. . . . . . . . . . . . . . . . . . 17

**CONGRESSIONAL REPORTS**

H.R. Rep. 96-430, 1980 U.S.C.C.A.N. 3068. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

H.R. Rep. 106-300(II), 1999 WL 742916. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

S. Rep. 103-301 at 2, 1994 WL 324136. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ACCEPTANCE INSURANCE COMPANIES INC., Plaintiff, | ) | |
| v. | ) | No. 03-2794 (Judge Wheeler) |
| THE UNITED STATES, Defendant. | ) | |

**DEFENDANT'S MOTION TO DISMISS**

Pursuant to Rule 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC"), defendant respectfully submits this motion to dismiss for failure to state a claim upon which relief may be granted.

DEFENDANT'S MEMORANDUM

QUESTIONS PRESENTED

1. Whether Acceptance has pled a taking of a sale of property upon which relief may be granted.

2. Whether the Federal Crop Insurance Corporation ("FCIC") or Risk Management Agency ("RMA") have the authority to approve or reject sales of property from one insurer to another.

## STATEMENT OF THE CASE

### I. Nature Of The Case

Acceptance Insurance Companies Inc. ("Acceptance") asserts a Fifth Amendment takings claim based upon its former ownership of American Growers Insurance Company ("American Growers").

### II. Statement Of Facts

FCIC and RMA are agencies within the Department of Agriculture. Amended Complaint ("Am. Co.") ¶¶ 3-4. RMA supervises FCIC. Id. at ¶ 4. FCIC provides reinsurance to private insurers offering crop insurance to farmers. Id. at ¶ 6. This reinsurance relationship between FCIC and private insurers is governed by a contract referred to as the Standard Reinsurance Agreement ("SRA"). Id.

Acceptance owned American Growers, a crop insurer that had entered into an SRA with FCIC. Id. at ¶ 7. On or about November 17, 2002, Acceptance entered into a letter of intent with Rain and Hail, LLC ("Rain and Hail") for the sale of certain property that Acceptance alleges that it owned. Id. at ¶ 10. Rain and Hail thereafter met with RMA to discuss the proposed sale. Id. at ¶ 14. Acceptance alleges that, subsequent to this meeting, RMA informed Rain and Hail that RMA would not approve the sale. Id. at ¶ 15. Acceptance alleges that, by not approving, or rejecting, the sale, RMA took Acceptance's property. Id. at ¶ 24.

Acceptance alleges that the fair market value of the property taken by RMA/FCIC is at least $21.5 million. Id. at ¶ 27. Acceptance does not allege in the amended complaint that the Government took title to the property in question.

# ARGUMENT

## I. Standard Of Review

For 50 years, the standard of review for a Rule 12(b)(6) motion was governed by "the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957). Recently, in Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955 (2007), the Supreme Court discarded the "no set of facts" language in Conley and replaced it with a heightened pleading standard.

The Court started with Rule 8(a)(2) of the Federal Rules of Civil Procedure, which, like its counterpart RCFC 8(a)(2), requires "a short and plain statement of the claim showing that the pleader is entitled to relief" in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Bell Atlantic, 127 S.Ct. at 1964. Although not required to set forth detailed factual allegations, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. . . ." Id. at 1964-65 (citing Papasan v. Allain, 478 U.S. 265, 286 (1986)). The factual allegations pled in the complaint "must be enough to raise a right to relief above the speculative level." Id. at 1965 (citing 5 Wright & Miller Federal Practice and Procedure § 1216, pp. 235-36 (3d ed. 2004)).

Applying this standard to § 1 of the Sherman Act, the Court held that stating "a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made." Id. The Court noted that the "need at the pleading stage for allegations plausibly suggesting (not merely consistent with) agreement reflects the threshold requirement of

Rule 8(a)(2) that the 'plain statement' possess enough heft to 'sho[w] that the pleader is entitled to relief.'" Id. at 1966. Thus, "when the factual allegations in a complaint, however true, could not raise a claim of entitlement to relief, "'this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court.'" Id. at 1966 (quoting 5 Wright & Miller § 1216 at 233-34 (quoting Daves v. Hawaiian Dredging Co., 114 F.Supp. 643, 645 (D. Hawaii 1953))).

Noting that the "no set of facts" language in Conley "has been questioned, criticized and explained away long enough," the Supreme Court held that "this famous observation has earned its retirement." Id. at 1969. The Court described the phrase as "an incomplete, negative gloss on an accepted pleading standard: once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." Id. (Emphasis added). Conley "described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival." Id. (Footnote omitted).

Thus, to survive a motion to dismiss for failure to state a claim, Acceptance must have alleged sufficient facts to establish a claim of entitlement to relief. As demonstrated below, the amended complaint does not meet this standard.

## II. The United States Cannot Be Held Liable For A Taking Where It Has Caused The Loss Of A Sale To A Third Party

Acceptance's amended complaint ("Am. Co."), in general terms, describes the transaction at issue as follows: 1) Acceptance was a party to a letter of intent with Rain and Hail dated November 18, 2002 (Am. Co. at ¶ 10); 2) the letter of intent proposed the sale of property to Rain

and Hail (Id.); 3) after discussions between Rain and Hail and RMA, RMA stated that it would not approve (or reject) the sale (Am. Co. ¶¶ 13-16); and 4) this rejection constituted a taking of Acceptance's property (Am. Co. ¶ 24). Even if the Court considers these four factual assertions as true for purposes of this motion to dismiss, the Court should first consider whether Governmental actions that cause the loss of a sale by contract from one private party to another can ever result in a taking where the Government did not actually take the contract in question. According to longstanding Supreme Court precedent, such actions by the Government can never be a taking. Omnia Commercial Co., Inc., v. United States, 261 U.S. 502 (1923).

In Omnia, the plaintiff, as buyer, had a contract with a seller through which it could buy a large quantity of steel plate at a below market price. Id. at 507. The Government requisitioned the seller's entire steel production and directed it not to comply with its contract with the plaintiff. Id. The plaintiff filed suit alleging that the Government had committed a taking, causing it to incur "losses in a large sum." Id. at 508. After the Court of Claims dismissed the action, the Supreme Court affirmed.

The Court first explained that, although a contract is property within the meaning of the Fifth Amendment,"destruction of, or injury to, property is frequently accomplished without a 'taking' in the constitutional sense." Id. There are many Governmental operations that injure or destroy the value of property, but no remedy is available. Id. at 508-09. Accordingly, the law provides no remedy for consequential loss or injury resulting from lawful Governmental action. Id. at 510.

Applying this law to the context of a contractual transaction, the Supreme Court in Omnia held that if "a contract or other property is *taken* for public use, the government is liable; but if

injured or destroyed by lawful action, without a taking, the government is not liable." Id. at 510. (Emphasis in original). The Court acknowledged the plaintiff's argument that the steel was so closely identified with the contract "that the taking of the former, ipso facto, took the latter." Id. However, the Court rejected this argument because it "confound[ed] the contract with its subject-matter." Id. The Court explained that the "essence" of an executory contract is the exchange of promises in which each party comes under obligation to the other and acquires a reciprocal right to enforce the obligation. Id. The Government had not acquired the contractual obligation and the right to enforce it. Id. at 510-11. The Court pointed out that if the seller had failed to provide the steel, the Government would have had no right to enforce the contract; similarly, if the Government had not paid for the steel the seller's remedy would not have been enforcement of the contract. Id. at 511. As a result, the Court rejected Omnia's taking claim, concluding that "[f]rustration and appropriation are essentially different things," and only the latter is compensable under the Fifth Amendment. Id. at 513.

The Federal Circuit and this Court have relied upon Omnia to reject a wide variety of takings claims where the Government, acting in either a regulatory or commercial capacity, has caused the loss of the benefits of a contract or frustrated business expectations. Air Pegasus of D.C., Inc. v. United States, 424 F.3d 1206 (Fed. Cir. 2005) (rejecting takings claim where the Federal Aviation Administration refused to allow lessee of heliport to resume flights post-September 11, 2001); Paradissiotis v. United States, 304 F.3d 1271 (Fed. Cir. 2002) (rejecting claim that regulatory taking occurred when Government prohibited exercise of stock options pursuant to Libyan sanctions regulations); 767 Third Avenue Associates v. United States, 48 F.3d 1575 (Fed. Cir. 1995) (rejecting lessor's takings claims where Government had shut

down operations of tenants, causing tenants to default on leases); NL Industries, Inc. v. United States, 839 F.2d 1578 (Fed. Cir. 1988) (rejecting takings claim brought by transport company that had a contract with a spent fuel processor and, as a result, built a fleet of transportation equipment only to have Government ban reprocessing); Kearney & Trecker Corp. v. United States, 688 F.2d 780 (Ct. Cl. 1982) (rejecting takings claim where Government had ordered acceleration of delivery of product, causing delay to another customer that then canceled its order). Accord Palmyra Pacific Seafoods, LLC v. United States, 80 Fed. Cl. 228 (2008) (designation of area as wildlife refuge did not take fishing licenses rendered worthless by designation). Omnia applies with equal force regardless of whether the plaintiff was the buyer or seller in relation to the contract in question. Kearney & Trecker, 688 F.2d at 783.

The common thread in all of these cases is that the Government has performed an action that benefits the public at the expense of the plaintiff and its contractual transaction, precisely what Acceptance alleges here. Am. Co. ¶¶ 16-17. Omnia recognized that the plaintiff in these cases has suffered an undeniable loss, but held that the destruction of the plaintiff's economic expectations does not rise to the level of a taking in the constitutional sense. Omnia, 261 U.S. at 508. As the Federal Circuit has explained, a plaintiff in these circumstances is not entitled to compensation because "there is a significant difference between an *injury* to one's property interest and a *taking* of one's property interest." Air Pegasus, 424 F.3d at 1216 (emphasis in original).

Therefore, even if we assume for the sake of argument that the non-binding letter of intent at issue here rises to the level of a contract, Acceptance's amended complaint still fails to state a claim upon which relief may be granted. While Acceptance alleges the existence of a

letter of intent that made provisions for the sale of property to Rain and Hail, and that Government actions caused that sale not to take place, it fails to allege other essential elements of the cause of action. It fails to allege that the Government stepped into the shoes of Acceptance for purposes of the letter of intent and acquired whatever rights Acceptance had to enforce Rain and Hail's promises pursuant to that letter of intent. See Omnia, 261 U.S. at 510-11. Instead, its amended complaint focuses upon the Government's alleged refusal to "approve" the sale and Acceptance's loss of the $21.5 million sales price. Am. Co. at ¶¶ 10-17. Thus, it is in no different position than the contractors (or parties to a lease) in Omnia, 767 Third Avenue Associates, NL Industries, and other cases cited above that failed to receive money that they expected to receive through their private contracts because of the Government's actions. E.g., NL Industries, 839 F.2d at 1579 (holding that contractor who lost sale of transportation services to nuclear fuel reprocessor after building a "costly fleet of transportation equipment" that became "useless" after the Government banned reprocessing could not recover under a takings theory because the "frustration of a business by loss of a customer was not a taking"). Accordingly, Omnia and the line of cases it engendered bar Acceptance's claim.

## III. FCIC/RMA Do Not Have Authority To Approve or Disapprove Sales Of Assets From One Insurer To Another

For the United States to be liable for an alleged taking, the officials responsible for causing the taking must have been "duly authorized" to effectuate the taking, "either directly by Congress or by the official upon whom Congress conferred the power." United States v. North Am. Transp. & Trading Co., 253 U.S. 330, 333 (1920); Regional Rail Reorganization Cases, 419 U.S. 102, 127 n. 16 (1974) ("'The taking of private property by an officer of the United States for

public use, without being authorized, expressly or by necessary implication, to do so by some act of Congress, is not the act of the Government,' and hence recovery is not available in the Court of Claims.") (quoting Hooe v. United States, 218 U.S. 322, 336 (1910)). In the regulatory taking context, the actions of Government agents must be a "natural consequence of Congressionally approved measures." NBH Land Co. v. United States, 576 F.2d 317, 319 (Ct. Cl. 1978).

The Tucker Act provides this Court with jurisdiction over takings claims because they are founded "upon the Constitution"; claims based upon executive actions that were not authorized by Congress, however, are not claims founded "upon the Constitution" but rather are claims based upon executive actions taken in violation of the Constitution. Hooe, 218 U.S. at 335-36. If the Government action is unauthorized, "the acts of defendant's officers may be enjoinable, but they do not constitute taking effective to vest some kind of title in the government and entitlement to just compensation in the owner or former owner." Del-Rio Drilling Programs, Inc. v. United States, 146 F.3d 1358, 1362 (Fed. Cir. 1998) (quoting Armijo v. United States, 663 F.2d 90, 95 (1981)).

As this Court noted in its earlier opinion, the parties, in their cross motions for summary judgment, are in dispute with respect to the reasons that Acceptance and Rain and Hail did not complete the sale outlined in their letter of intent. Acceptance Ins. Cos. Inc. v. United States, 72 Fed. Cl. 299, 302 and 302, fn. 4 (2006). Acceptance has alleged throughout this lawsuit that the Government stated that it would not approve, or rejected, the sale. Am. Co. ¶¶ 15, 17; see also plaintiff's counterstatement of proposed findings of uncontroverted fact, ¶¶ 62-63. While the Government has contended that it did not reject, or refuse to approve, this sale (see defendant's proposed findings of uncontroverted fact, ¶¶ 89-120), the Court need not decide this

dispute. That is because there is an underlying truth here: even if Acceptance's version of events is true, the complaint fails to state a claim upon which relief can be granted because RMA/FCIC do not possess authority to approve or reject sales of assets from one insurer to another.

In this section of our brief, we examine Acceptance's allegation that RMA possessed authority to approve or reject its sale to Rain and Hail. Co. ¶ 4. We look at two possible sources of authority for RMA/FCIC to approve or reject sales of property from one insurer to another: 1) the contract (SRA) between FCIC and American Growers; and 2) authority contained in the Federal Crop Insurance Act and other statutes. In subsection A below, we demonstrate that Acceptance is not alleging that there is any provisions in the SRA which provides authority to RMA/FCIC to approve or reject sales of property from one insurer to another. In subsections B and C below, we establish that there is nothing in the Federal Crop Insurance Act, or its legislative history, that suggests Congress intended RMA/FCIC to have such authority.

A. <u>Acceptance Does Not Allege That FCIC/RMA Acted Pursuant To The Contract</u>

As Acceptance states in its amended complaint, FCIC provides reinsurance to private crop insurance companies, with whom it enters into a contract, the SRA. Am. Co. ¶ 6. The amended complaint cites no provision in the SRA which would allow RMA/FCIC to approve or reject sales of property from one insurer to another. Consequently, it does not allege that RMA/FCIC breached any such provision. In the amended complaint, Acceptance instead suggests that RMA's authority to approve or reject sales is based upon a statute, not the contract:

> The Office of Risk Management, or Risk Management Agency ("RMA"), was created by the Federal Crop Insurance Reform Act of 1994 and supervises the FCIC, 7 U.S.C. § 6933. Pursuant to this authority, the RMA enjoys the authority to regulate the crop

> insurance industry, including the authority to approve or disapprove of transactions affecting the FCIC.

Am. Co. ¶ 4.

Similarly, in its June 26, 2006 "Plaintiff's Responses To Questions Propounded In The Court's Order Of June 14, 2006" (see Docket no. 66) Acceptance did not allege that the SRA provided authority to RMA/FCIC to approve or reject sales of property from one insurer to another. At page 10 of this document, Acceptance stated that it "has been unable to identify any explicit authority for the RMA to review or pass upon the permissibility of the bulk transfer of a book of crop insurance", the property at issue here. However, Acceptance went on to argue that "[i]t would be possible to argue, of course, that such a function is within the penumbral authority of the RMA to administer the federal crop insurance program in the best interests of the public. . ." Id.

In its appeal to the Federal Circuit, Acceptance emphasized during oral argument that it never asked the agency to waive any provisions of the SRA, nor does it allege that RMA/FCIC violated the SRA. Appendix ("App.") 6 at 17-20; App. 7 at 2-8.[1] After hearing this argument

---

[1] In considering a Rule 12(b)(6) motion, the Court must consider the complaint "as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S.Ct. 2499, 2509 (2007) (citing 5B Wright & Miller § 1357 (3rd Ed. 2004 and Supp. 2007)). According to the Wright & Miller section relied upon by the Supreme Court, the matters that may be considered include "matters of public record, orders, [and] items appearing in the record of the case. . ." The audio of the Federal Circuit argument is available to the public on that court's web site at: http://www.cafc.uscourts.gov/oralarguments/. However, we have attached a written transcript for ease of reference. In the alternative, if the Court does not wish to consider the material outside of the amended complaint that we have cited, we respectfully request the Court to treat this as a motion for summary judgment pursuant to RCFC 12(b).

from Acceptance, the Federal Circuit panel then inquired into the basis of the Government's authority to approve or reject sales of property, if the lawsuit was not based upon the SRA:

> CIRCUIT JUDGE: Excuse me, two questions. One, what is the -- you said the government can properly, it has it in its power to prevent a sale of assets, correct?
>
> MR. WEINER: Under certain circumstances, yes.
>
> CIRCUIT JUDGE: What is the basis for that? Is there a regulation that provides that?
>
> MR. WEINER: In this case, there is no specific regulation that gives the administrator of the RMA authority to accept or reject transactions. The administrator of the RMA does have overall authority to regulate the crop insurance industry. And it's under that, that broad umbrella of authority that the administrator obviously believed he had the authority to accept or reject this transaction, as he had other transactions.
>
> CIRCUIT JUDGE: Where is that -- where is that authority set forth? Is that in a statute or a regulation?
>
> MR. WEINER: It's in the statue and it can be found generally at 7 U.S.C. 6933(b)(1).

App. 9. This argument is consistent with the Acceptance's citation to 7 U.S.C. § 6933 in paragraph 4 of the amended complaint.

Thus, Acceptance has had multiple opportunities to cite a provision in the SRA that provided authority to RMA/FCIC to approve or reject the sale at issue here. It has not done so. As it stated to the Federal Circuit, it is not complaining about "a breach of the underlying reinsurance contract." App. 6 at 18-19. Rather, the basis of its complaint is "the regulatory action of denying the sale, a hypothecation of the property, [RMA] saying you cannot sell your property from Party A to Party B." Id. at 19-21. As we establish in subsections B and C below,

RMA/FCIC have no regulatory authority to approve, reject, or deny sales, or to say to a company that it cannot sell its property to Party B.

B. Neither The FCIA, Nor Its Regulations, Provide FCIC/RMA Authority To Reject Sales Of Property

The statute cited by Acceptance to the Federal Circuit, 7 U.S.C. 6933(b)(1), is from the Federal Agricultural Improvement and Reform Act of 1996, Pub. L. 104-127, § 194(a), 110 Stat. 945. It created the RMA and provided that:

> The Office of Risk Management shall have jurisdiction over the following functions:
>
> (1) Supervision of the Federal Crop Insurance Corporation.

7 U.S.C. 6933(b)(1). This statute did not grant RMA any powers beyond those powers that FCIC already possessed. Thus, the inquiry turns upon whether FCIC possessed authority to approve or reject sales of property from one insurer to another. Because we see no language in the Federal Crop Insurance Act, ("FCIA") that suggests that Congress intended FCIC to possess a general power to review and approve sales of property between two private insurers, Acceptance's claim fails as a matter of law because it cannot establish that FCIC had the authority to perform the acts it has alleged.

The FCIA, 7 U.S.C. § 1501 et seq., sets forth the purposes, powers and organization of FCIC. The FCIA provides at § 1502 that it "is the purpose of this chapter to promote the national welfare by improving the economic stability of agriculture through a sound system of crop insurance and providing the means for the research and experience helpful in devising and establishing such insurance." At § 1503, the FCIA created the FCIC to carry out the purposes of the act.

Management of FCIC is vested in a board of directors whose members consist of the FCIC manager, who is a non-voting member, and nine other members. 7 U.S.C. § 1505(a)(2). The manager of FCIC has "such power and authority as may be conferred by the Board." Id. at § 1505(d). The manager of FCIC is also its chief executive officer (id.) and the administrator of RMA. 7 U.S.C. § 6933(c)(2).

FCIC's powers to offer crop insurance and reinsurance are identified in 7 U.S.C. § 1508. The authority granted by Congress includes the powers to: offer catastrophic risk and additional levels of insurance; establish premiums; determine eligibility of farmers; establish underwriting rules that ensure that yield coverage is provided to eligible farmers; and to provide for adjustment of claims for losses. Id. at § 1508(b)(d)(f)(g) and (j).

In § 1508(k), Congress established FCIC's obligations to "the maximum extent practicable, provide reinsurance to insurers approved by the Corporation that insure producers of any agricultural commodity. . . ." 7 U.S.C. § 1508(k)(1). Subsections 1508(k)(2) & (3) provide that this reinsurance must be provided on terms consistent with sound reinsurance principles and that the insurers must bear a sufficient portion of the risk for the policies to be sold in a sound and prudent manner. Subsection 1508(k)(4) provides the terms for reimbursement of the expenses to sell and service the policies.

There is nothing in subsection 1508(k) that provides FCIC authority to approve or reject sales of crop insurance policies. In fact, the exercise of any such authority would be in contravention of subsection 1507(c) of the FCIA, which provides:

> the Board shall, to the maximum extent possible, . . . (3) encourage the sale of Federal crop insurance through licensed private insurance agents and brokers and give the insured the right to

> renew such insurance for successive terms through such agents and brokers. . .

Thus, it is the right of the agent and producer to determine where the business is placed. FCIC does not have the authority to interfere with that right.

FCIC's general powers are identified in 7 U.S.C. § 1506. They include the powers to purchase, hold, or lease real property; to sue or be sued in its corporate name; to issue regulations governing the manner in which its business may be conducted and the powers granted to it by law may be exercised and enjoyed; to determine the character and necessity for its expenditures; and to settle claims. Id. at § 1506(c)(d)(e)(i) and (j). Finally, it has such powers "as may be necessary or appropriate for the exercise of the powers herein specifically conferred upon the Corporation and all such incidental powers as are customary in corporations generally." Id. at § 1506(k).

There is nothing in these statutory provisions that suggests that Congress intended FCIC to possess a general power to review and approve sales of property between two private insurers. Nor do we see anything in the legislative history of the FCIA that would support reading a grant of such power into the act.

C. The Legislative History Of Major Amendments To The FCIA Contain No Suggestion That Congress Intended FCIC/RMA To Possess Authority To Reject Sales Of Property

We have been unable to identify anything in the legislative history of the major amendments to the FCIA that identifies a Congressional intent that FCIC possess the authority to reject the sale of property between private parties. Generally, the legislative history indicates that Congress created FCIC with limited functions. Although Congress has expanded the crop

insurance program, those expansions were intended to make crop insurance available in more areas, for more crops, and at a lower cost. There is nothing in the legislative history of the acts expanding FCIC that suggests a Congressional intent to empower FCIC to review sales of property from one insurer to another.

Congress enacted the FCIA in 1938, but for more than 40 years, Federal crop insurance functioned essentially as a "pilot program." H.R. Rep. 96-430, 1980 U.S.C.C.A.N. 3068, 3072. Despite the enactment of the FCIA during the Great Depression, more than 40 years later about half of the counties in the country, and most of the 200 crops produced by farmers, were not yet protected by crop insurance. Id. Congress enacted the Federal Crop Insurance Act of 1980, Pub. L. 96-365, to address some of these shortcomings. According to the House Report, the purpose of this act was to expand the program so that crop insurance would be available in all counties and on all crops. 1980 U.S.C.C.A.N. at 3070. It attempted to assure that premiums were affordable by requiring FCIC to pay a portion of the premium cost, and included reinsurance provisions to enable private insurers to offer crop insurance policies. Id. It also provided for the phase out of a disaster payment program as crop insurance became generally available. Id.

As a result of the 1980 amendments, private insurers that entered into an SRA with FCIC became the primary means of providing crop insurance to farmers. S. Rep. 103-301 at 2, 1994 WL 324136. 14 years later, Congress found that participation in the program increased after the 1980 amendments but remained "below levels deemed necessary to be regarded as the principal vehicle for disaster assistance." Id. at 1. "Insured acreage peaked at about 40-45 percent of the total acreage planted to insurable crops in 1988-89, but more commonly has been in the 30-35 percent range." Id. Despite an annual crop insurance cost of $900 million to the Government, in

the six years leading up to 1994, Congress had to spend an average of $1.5 billion in crop disaster payments. Id. at 2. Congress found that the "repeated availability of ad hoc relief has been a disincentive for many producers to participate in the Federally backed crop insurance program." Id. at 3. Moreover, the amount of payments in the event of a disaster varied widely, with some farmers receiving 50 percent of their losses, while others received 100 percent. Id. at 3. Congress also noted that the price of the programs was rising and that the "public rightly questions the point of having two expensive programs trying to address a single recurring problem - crop disaster aid." Id. The Federal Crop Insurance Reform and Department of Agriculture Reorganization Act of 1994, Pub. L. 103-354, attempted to address these issues by combining crop insurance and disaster aid into a single, unified on-budget program. Id. at 4. All commodities raised for food or fiber, and industrial crops were covered by the act. Id.

Six years later, Congress again amended the FCIA in the Agricultural Risk Protection Act of 2000, Pub. L. 106-224, 114 Stat. 358. The preamble to this act described it as "[a]n Act to amend the Federal Crop Insurance Act to strengthen the safety net for agricultural producers by providing greater access to more affordable risk management tools and improved protection from production and income loss, to improve the efficiency and integrity of the Federal crop insurance program." The House Report described the purpose of the act as to "increase premium subsidies to reduce the cost to producers of purchasing crop insurance" and also to "encourage development of and provide subsidies for privately developed crop insurance products." H.R. Rep. 106-300(II) at 2, 1999 WL 742916.

In summary, FCIC operates a crop insurance program as a means to provide protection to farmers. There is nothing in the FCIA, its legislative history, or the overall legal framework in

which FCIC operates that suggests that the assumption of a power to review the sale of property from one insurer participating in the program to another is a "natural consequence of Congressionally approved measures." NBH Land, 576 F.2d at 319. Acceptance's citation to 7 U.S.C. § 6933 provides little support for its claim. There is no logical reason that the assumption of a power by RMA to review sales of property between two private parties would be a natural consequence of Congress' creation of RMA to supervise FCIC when there is no evidence that FCIC ever had such power. Thus, Acceptance's amended complaint fails to state a claim upon which relief may be granted and should be dismissed by the Court.

## CONCLUSION

For the foregoing reasons, defendant respectfully requests that the Court dismiss Acceptance's amended complaint for failure to state a claim upon which relief may be granted.

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Mark A. Melnick
MARK A. MELNICK
Assistant Director

OF COUNSEL:

KIMBERLEY E. ARRIGO
Senior Counsel
Office of the General Counsel
U.S. Department of Agriculture
1400 Independence Ave., S.W.
Washington, D.C. 20250

s/ Michael N. O'Connell
MICHAEL N. O'CONNELL
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
1100 L St., N.W., 8th floor
Washington, D.C. 20530
Tel: (202) 353-1618
Fax: (202) 514-8624

April 30, 2008

Attorneys for Defendant

# INDEX TO APPENDIX


| Document | Pages |
| --- | --- |
| Federal Circuit Transcript | 1-28 |

CERTIFICATE OF SERVICE

I certify under penalty of perjury that on this 30th day of April, 2008, a copy of the foregoing "DEFENDANT'S MOTION TO DISMISS" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Michael N. O'Connell