**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| ACCEPTANCE INSURANCE COMPANIES INC., | ) | |
| Plaintiff, | ) | |
| v. | ) | CASE NO. 03-2794C |
| | ) | Judge Thomas C. Wheeler |
| UNITED STATES OF AMERICA | ) | |
| Defendant. | ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S**
**APRIL 30, 2008 MOTION TO DISMISS**

Lewis S. Wiener, Esq.
SUTHERLAND ASBILL & BRENNAN LLP
1275 Pennsylvania Avenue, NW
Washington, D.C. 20004-2415
202.313.0140 - phone
202.637.3593 - fax
Counsel for Plaintiff Acceptance Insurance Companies, Inc.

OF COUNSEL:
Ronald R. Massumi, Esq.
G. Brendan Ballard, Esq.
SUTHERLAND ASBILL & BRENNAN LLP
1275 Pennsylvania Avenue, NW
Washington, DC 20004-2415
202.383.0100

Patrick Griffin, Esq.
KUTAK ROCK, LLP
The Omaha Building
1650 Farnam Street
Omaha, NE 68102-2186
402.346.6000

June 20, 2008 Attorneys for Plaintiffs

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............ ii

I. INTRODUCTION ............ 1

II. DISCUSSION ............ 2

A. Legal Standard ............ 2

B. *Omnia Commercial Co., Inc. v. United States* Does Not Bar Acceptance's Takings Claim ............ 2

1. Facts Underlying the Proposed Acceptance/Rain & Hail Transaction ............ 3

2. Meaning and Effect of *Omnia* ............ 5

3. *Omnia* Precludes Takings Claims Where Government Action Deprives a Plaintiff of a Contractual Expectancy, but not Where the Government Deprives a Plaintiff of a Present Property Interest ............ 6

4. *Omnia* Precludes Takings Claims Where Government Action was not Directed at the Plaintiff and Where the Harm to the Plaintiff was Merely Consequential or Derivative. ............ 11

C. The RMA has Plenary Authority to Regulate the Crop Insurance Industry, Including the Authority to Review and Approve the Bulk Transfer of Crop Insurance Business From one Insurer to Another. ............ 14

III. CONCLUSION ............ 18

## TABLE OF AUTHORITIES

**CASES:**

*767 Third Avenue Associates v. United States*, 48 F.3d 1575 (Fed. Cir. 1995)..................9, 11, 12

*Air Pegasus of D.C., Inc. v. United States*, 424 F.3d 1206 (Fed. Cir. 2005)........................ 8-9, 12

*Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007) ..................................................2, 14, 17

*Board Machine, Inc. v. United States*, 49 Fed. Cl. 325 (2001)....................................................16

*Cienega Gardens v. United States*, 331 F.3d 1319 (Fed. Cir. 2003) ...........................................13

*Esch v. United States*, 77 Fed. Cl. 582 (2007) ..................................................................................2

*Kearney & Trecker Corp. v. United States.*, 688 F.2d 780 (Ct. Cl. 1982), *cert. denied*,
460 U.S. 1051 (1983)........................................................................................... 9-10, 12

*NL Industries, Inc. v. United States*, 12 Cl. Ct. 391 (1987), *aff'd*, 839 F.2d 1578 (Fed.
Cir. 1988) ...............................................................................................................9, 12

*Omnia Commercial Co., Inc. v. United States*, 261 U.S. 502 (1923) .................................. *passim*

*Palmyra Pacific Seafoods, L.L.C. v. United States*, 80 Fed. Cl. 228 (2008) ............................9, 12

*Paradissiotis v. United States*, 304 F.3d 1271 (Fed. Cir. 2002) ...................................... 10-11, 12

*Regional Rail Reorganization Cases*, 419 U.S. 102 (1974) ........................................................16

*Tulare Lake Basin Water Storage District v. United States*, 49 Fed. Cl. 313 (2001).............. 5, 7-8

**STATUTES AND RULES:**

7 U.S.C. § 1501 *et seq*.......................................................................................................3, 15

7 U.S.C. § 6933........................................................................................................1, 2, 15, 17

RCFC 12(b)(6) .............................................................................................................................2

## I. INTRODUCTION

The Government has now filed its third Motion to Dismiss, raising two new arguments not asserted in its previous Motions to Dismiss or in its pending Motion for Summary Judgment.[1] The first argument is based on *Omnia Commercial Co., Inc. v. United States,* 261 U.S. 502 (1923), which the Government contends bars Acceptance's takings claim. The Government's argument that *Omnia* precludes a takings claim in this case misses the mark. *Omnia* bars a takings claim only when the plaintiff had a mere expectancy under an executory contract. It does not apply when the plaintiff had a present property interest at the time of the government action, such as Acceptance had in its crop insurance business. *Omnia* also is limited to circumstances where the government action was not directed at the plaintiff, such that the injury to the plaintiff was merely "consequential" or "derivative." In this case, the RMA directly regulated and effectuated a taking of Acceptance's property by disapproving its intended sale of its crop insurance business to Rain & Hail. The injury to Acceptance was, therefore, direct and personal, not consequential or derivative.

The Government next argues that the RMA's review and disapproval of the proposed sale of the crop insurance business from Acceptance to Rain & Hail was not "authorized," and hence can not support a takings claim. This argument fails because the statute creating the RMA, 7 U.S.C. § 6933, sets forth its authority in the broadest possible terms. The statute states that the

---

[1] As pointed out in Acceptance's Opposition to Supplemental Briefing (Apr. 22, 2008), the Government made no showing of good cause why these arguments could not have been raised much earlier in this litigation. *Omnia Commercial Co., Inc. v. United States* has been on the books since 1923 and the scope of the RMA's authority is the same as it was on the day this case was filed in 2003. Acceptance has been unnecessarily prejudiced, as the Government has advanced new dismissal theories seemingly every time that new defense counsel has taken over this case, causing Acceptance to suffer unwarranted cost and delay in responding to piecemeal litigation and successive arguments that should have been put forth at the outset of this case.

RMA shall have "[a]dministration and oversight of *all aspects* * * * of *all programs* authorized under the Federal Crop Insurance Act (7 U.S.C. 1501 et seq.)." 7 U.S.C. § 6933(b)(2) (emphasis added). The Government also fails to reconcile its argument with the fact that the RMA has historically exercised the power to review and approve transactions such as the one at issue here, entirely in keeping with its mandate to oversee all aspects of all programs under the Federal Crop Insurance Act ("FCIA").

## II. DISCUSSION

### A. Legal Standard

To survive a motion to dismiss for failure to state a claim upon which relief can be granted, the Court "do[es] not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1960 (2007); *see also* RCFC 12(b)(6). Moreover, the Court "'must accept as true all the factual allegations in the complaint, and * * * indulge all reasonable inferences in favor of the non-movant.'" *Esch v. United States*, 77 Fed.Cl. 582, 588 (2007) (quoting *Sommers Oil Co. v. United States*, 241 F.3d 1375, 1378 (Fed. Cir. 2001)). Based on this standard, the Government's Third Motion to Dismiss fails as a matter of law because: 1) *Omnia* does not apply to the takings claim that Acceptance has alleged; and 2) the statute that sets forth the authority of the RMA does not support the argument that the alleged actions of the RMA were "unauthorized."

### B. *Omnia Commercial Co., Inc. v. United States* Does Not Bar Acceptance's Takings Claim

The Government first contends that *Omnia* compels dismissal of this case because the United States did not take any contract between Acceptance and Rain & Hail for the purchase of Acceptance's crop insurance business. The Government is correct, there was no taking of the contract—but Acceptance has *never alleged* there was.

Acceptance consistently has alleged that by blocking Acceptance from selling a valuable book of crop insurance business and then distributing that same book of business to the other crop insurers in the marketplace, the RMA effected a taking of Acceptance's in-force crop insurance policies and related crop insurance business. Here, the property allegedly taken was not a contract, as was the case in *Omnia*, but rather the insurance portfolio and associated assets that constituted Acceptance's crop insurance business—property valued in the proposed arms-length transaction with Rain & Hail at in excess of $50 million.

### 1. Facts Underlying the Proposed Acceptance/Rain & Hail Transaction

In November of 2002, Acceptance's licensed crop insurance subsidiary, American Growers Insurance Company, announced that it had suffered a $130 million loss in the third quarter. Govt's Proposed Findings of Uncontroverted Fact (Feb. 10, 2006) at ¶¶ 87, 88. This loss caused American Growers' policyholder surplus to fall far below the amount required by its state insurance regulator, the Nebraska Department of Insurance. *Id*. at ¶ 122.[2]

Given American Growers' impaired surplus, the federal and state regulators, the RMA, and the Nebraska Department of Insurance, knew that if Acceptance was prevented from selling its crop insurance business, the Nebraska Department of Insurance would immediately take control of American Growers and begin the process leading to liquidation. Plaintiff's Counterstatement of Proposed Findings of Uncontroverted Fact (Mar. 24, 2006) at ¶¶ 59 (an

---

[2] In the world of insurance, unexpectedly high losses in a given period can create a "surplus crisis" suddenly leaving the insurer without the surplus state law may require to continue doing business. The surplus crisis is a matter of impaired corporate capital at a particular point in time; it does *not* mean that the long term profitability of the underlying book of business is impaired. If an insurer's book of business has the prospect of being profitable over the long term, the insurer can sell that book to another insurer that has the capital to assume that business and manage it for future profit. In this case, Acceptance decided to sell its crop insurance business to Rain & Hail, a financially strong crop insurer with the capital to take on the additional business. Rain & Hail was willing to buy that book of business because it knew it was valuable.

internal RMA memo noted "if the purchase does not take place * * * RMA will distribute policyholder files to other companies"); Pl. App.[3] 7, Depo. of Tim Wagner, Director of the Nebraska Department of Insurance at pp. 34, 114-15 (the director of the RMA was aware that Mr. Wagner would have to initiate proceedings upon rejection of the Rain & Hail transaction). As it understood would happen based on a prior discussion with the Director, on the very day the RMA refused to approve the sale of the crop insurance assets to Rain & Hail, the Nebraska Department of Insurance took control of American Growers, freezing the business and prohibiting transfer of any crop insurance policies. *See* Govt's Proposed Findings of Uncontroverted Fact at ¶¶ 117-124.

Because the RMA has plenary authority over federally subsidized crop insurance, the RMA controlled the disposition of the crop insurance portfolio in the liquidation. The RMA distributed the policies to other crop insurers—Acceptance's former competitors—and Acceptance received nothing. These were the same policies Acceptance could have sold to Rain & Hail for in excess of $50 million, but for the RMA's regulatory action rejecting the Acceptance-Rain & Hail transaction.

It is quite true that the Government did not "take" the Acceptance-Rain & Hail contract as the Government alleges. But that is entirely beside the point. The "taking" here was the RMA's taking of the value of Acceptance's crop insurance business, its exercise of control over the crop insurance policies, and its redistribution of the policies to other private crop insurers, all in the name of the public good.

---

[3] "Pl. App." as used herein refers to Plaintiff's Appendix in Support of it Consolidated Motion for Summary Judgment and Response in Opposition to Defendant's Renewed Motion to Dismiss or for Summary Judgment (Mar. 24, 2006) (filed as confidential under the Protective Order).

### 2. Meaning and Effect of *Omnia*

In *Omnia*, the plaintiff contracted with a steel company to purchase a large quantity of steel to be produced during World War I. Because of the need for steel for the war effort, the Government requisitioned all the steel company's production, making the steel no longer available for sale to the buyer. The buyer argued that this constituted a taking of its "right of priority" to the steel expected to be produced and thereby a taking of the buyer's "property in the contract" for public use without just compensation. *Id*. at 508. Thus, as the issue was framed in *Omnia*, the "contract in question was property within the meaning of the Fifth Amendment" and the property allegedly taken was the buyer's side of that contract.[4] *Id.*

The Court held, in essence, that the buyer's contract was merely frustrated by the Government's action upon the seller, but not taken, because that would require the Government to step into the contractual shoes of the buyer and assume all of its rights and obligations under the contract. *Id.* at 510-11. If a party asserts that its property interest in an executory contract was taken, "the contract holder can recover only if the government has actually appropriated the contract itself, *i.e.*, stepped into the shoes of the contracting party and assumed the rights and responsibilities under the contract." *Tulare Lake Basin Water Storage Dist. v. United States*, 49 Fed. Cl. 313, 317-18 (2001) (citing *Omnia*, 261 U.S. 510-511). Thus, the Government takes a party's executory contract by, in effect, novating the contract to substitute itself in place of that party.

As discussed more fully below, for a takings claim to be precluded by *Omnia*, at least one

---

[4] A contract "may be defined to be a transaction between two or more persons, in which each party comes under an obligation to the other, and each reciprocally acquires a right to whatever is promised by the other." *Omnia*, 261 U.S. at 510 (quoting *Dartmouth College v. Woodward*, 4 Wheat. 629, 654 (4 L. Ed. 629) 1819)).

of two factors must be present, neither of which is present in this case. First, *Omnia* bars a takings claim where the government action deprives a plaintiff of a mere contractual expectancy, but not where the Government deprives a plaintiff of a present property interest. In this case, Acceptance had a present property interest in its book of crop insurance business. Second, *Omnia* bars a takings claim only where the government action was not directed at the plaintiff, meaning the harm caused was merely consequential or derivative. In this case, the RMA directly regulated Acceptance in blocking the transaction with Rain & Hail and ultimately redistributing Acceptance's policies to third parties

### 3. ***Omnia* Precludes Takings Claims Where Government Action Deprives a Plaintiff of a Contractual Expectancy, but not Where the Government Deprives a Plaintiff of a Present Property Interest.**

*Omnia* involves the situation where a buyer under an executory contract is, by government action directed at the seller or at third parties generally, prevented from purchasing that which was the subject matter of the contract. The buyer has no takings claim because it had only a "contractual expectancy," but never a present property interest in the subject matter he or she hoped to obtain under the contract. Although the paradigm has been broadened in later cases to include parties other than buyers, for *Omnia* to preclude a takings claim, the plaintiff must possess no more than a contractual expectancy in the goods, services, or revenues it hopes to receive under the contract, as opposed to a present property interest in the subject of the government regulation.

The situation here is vastly different and the *Omnia* paradigm does not fit. In this case, Acceptance's crop insurance business was the subject of the government regulation. And, as Acceptance has consistently argued throughout this case, Acceptance had a present property interest in that business, including the right of alienation to realize the value of that property interest. When the RMA prevented Acceptance from selling the book of business to Rain &

Hail, thereby preventing Acceptance from realizing the value of the business, that act constituted a regulatory taking of a cognizable property interest.

*Omnia* applies to preclude a takings claim where the only thing a party has lost is an expectancy under a contract. Such a "contractual expectancy" is not a present property interest. Where the party has a separate cognizable property interest, *Omnia* does not apply. This distinction between a mere "contractual expectancy" and a present property right in the subject matter of the government regulation is well illustrated in *Tulare Lake Basin Water Storage Dist. v. United States*, 49 Fed.Cl. 313 (2001). There, the plaintiffs were California water users who claimed that their contractually-conferred right to use of water was taken from them without just compensation when the Government imposed water use restrictions pursuant to the Endangered Species Act. *Id.* at 314-16. The Government, invoking *Omnia*, argued that the restrictions merely frustrated the contract but did not appropriate it, since the Government neither substituted itself as a contracting party nor assumed any of the rights or responsibilities under the contract. *Id.* at 317. Based on the distinction between a "contractual expectancy" and a present property right, the Court of Federal Claims rejected this argument:

> *Omnia*'s distinction between a contract that has been appropriated and one that has merely been frustrated is relevant only where the contract right that is claimed remains separate and distinct from the property that is the subject of the contract. Put differently, *Omnia* addresses those situations in which a litigant claims a contract right with regard to the property (*e.g.*, the right to buy it at a certain price) but cannot claim ownership of the property, since title to the property has not yet passed to the party seeking compensation. [Citation omitted]. Under those circumstances, the contract holder can recover only if the government has actually appropriated the contract itself, *i.e.*, stepped into the shoes of the contracting party and assumed the rights and responsibilities under the contract. But that is not our case.

*Id.* at 317-18.

The Court further explained that, unlike *Omnia*, where the plaintiff could claim only a

contractual expectancy, but not a present property interest in the steel, the plaintiffs in *Tulare* did have a present property interest in use of the water conferred by contract from the Department of Water Resources. *Id.* at 318. The Court concluded it was "a property interest sufficiently matured to take it out of the realm of an *Omnia* analysis." *Id.*

Similarly, in the present case, the gravamen of the takings claim is not the effect on a party's mere contractual expectancy, but the effect on the *present property interest* Acceptance had in its crop insurance business. This case, however, is even more clearly outside the *Omnia* paradigm than *Tulare Lake*, because Acceptance is not arguing that a contract right, presently possessed or otherwise, was taken by the Government. Instead, Acceptance is arguing that, separate and independent of its contract with Rain & Hail, Acceptance's property interest in its in-force crop insurance policies was taken by the RMA. Specifically, RMA's regulatory action, aimed directly at Acceptance's planned sale of its crop insurance business, prevented Acceptance from realizing the value of that business, placed Acceptance's crop insurance portfolio under the de facto control of the RMA, and resulted, under the RMA's direction, in the actual transfer of the portfolio to third parties without any compensation to Acceptance. That constitutes a categorical regulatory taking of Acceptance's crop insurance business.

Furthermore, the distinction between contractual expectancy and present property interest makes this case distinguishable from the cases cited by the Government. Govt's Mot. at 6-8. In those cases, the plaintiffs bringing the takings claims possessed a mere expectancy of a benefit under a contract, but did not possess a present property interest in the subject of the government regulation. In *Air Pegasus of D.C., Inc. v. United States*, 424 F.3d 1206 (Fed. Cir. 2005), the Government's prohibition on the operation of helicopters in Washington D.C. in the days following the September 11, 2001 terrorist attacks was not a taking because the plaintiff, the

lessee and operator of a heliport, did not have a present property interest in the helicopters, but merely a contractual expectancy in revenues from the helicopters' use of the heliport. *Id.* at 1216. Similarly, in *767 Third Ave. Assocs. v. United States*, 48 F.3d 1575 (Fed. Cir. 1995), the Government's closure of Yugoslavia's consulate was not a taking because the plaintiff, the lessor of the consulate building, did not lose the building in which it held a present property interest, but merely lost a contractual expectation of future income from rents paid by Yugoslavia. *Id.* at 1582-83.

In *Palmyra Pac. Seafoods, L.L.C. v. United States*, 80 Fed. Cl. 228 (2008), the Government's designation of land as a refuge and resulting closure to commercial fishing was not a taking because the plaintiff, the holder of a private commercial fishing license, did not have a present property interest in the land, which was the subject of the governmental restriction, but merely a contractual expectancy in the use of the land for commercial fishing.

In *NL Indus., Inc. v. United States*, 12 Cl. Ct. 391, 393-94 (1987), *aff'd*, 839 F.2d 1578 (Fed. Cir. 1988), the Government's prohibition on a company's operation of a nuclear reprocessing facility was not a taking, where the plaintiff, a party who had contracted with the company to transport nuclear waste to the reprocessing facility, did not have a present property interest in the reprocessing facility, but merely a contractual expectation to revenues from providing services to the company that owned the reprocessing facility. 12 Cl. Ct. at 393-95.

*Kearney & Trecker Corp. v. United States.*, 688 F.2d 780 (Ct. Cl. 1982), *cert. denied*, 460 U.S. 1051 (1983), also stands for the proposition that *Omnia* does not preclude a takings claim if the plaintiff has a present property interest in the subject of the government action. In *Kearney*, the plaintiff was the manufacturer of a complicated kind of machine called a "Moduline," each one of which took two years to make. The manufacturer had entered into contracts with both

Lockheed and Rolls Royce to manufacture and sell to each of them a Moduline. 688 F.2d at 780-81. Lockheed's Moduline order was for use in an Air Force project and, through the Defense Production Act, the Government commanded acceleration of the device's delivery date. *Id.* at 781. That forced the manufacturer to divert a Moduline that was being manufactured for Rolls Royce and modify it to meet Lockheed's expedited order. *Id*. Consequently, the delivery date for Rolls Royce, "whose Moduline was delivered to Lockheed," would be delayed, likely for several months. *Id*. Rolls Royce, therefore, canceled its order. *Id.*

The manufacturer sued, arguing that the Government had committed a taking of the Moduline that had been intended for Rolls Royce. The Court rejected this contention because the plaintiff had in fact been paid the price originally negotiated for the Moduline that was to go to Lockheed. Thus, there was not an *uncompensated* taking of the Moduline in contravention of the Fifth Amendment, rather "the negotiated price constituted just compensation." *Id*. at 782.

> The only property of the plaintiff that the directive "took" was the Moduline intended for Rolls Royce but diverted to Lockheed. The plaintiff received for that Moduline the same compensation for which it had agreed to deliver a Moduline to Lockheed, i.e., cost plus a fixed fee. We cannot say that this amount did not constitute just compensation for the Moduline.

*Id*. This holding *supports* Acceptance's position. As Acceptance has alleged, the Government took Acceptance's crop insurance book of business and diverted it to other crop insurers, for its regulatory purposes, in light of its perception of the public good. But, exactly the contrary of *Kearney*, Acceptance received no just compensation. Acceptance received nothing. *Kearney* thus bolsters Acceptance's claim that it suffered an uncompensated taking of its crop insurance business. [5]

---

[5] One other case cited by the Government only mentions *Omnia* in a chain cite and falls within a different line of cases that has no relevance here. The plaintiff in *Paradissiotis v. United*

#### 4. *Omnia* Precludes Takings Claims Where Government Action was not Directed at the Plaintiff and Where the Harm to the Plaintiff was Merely Consequential or Derivative.

Another material limitation on the scope of *Omnia* is that *Omnia* applies to preclude takings claims where the injury to contractual expectations is only "consequential" or "derivative" of an action taken against third parties or of general applicability, *i.e.*, only government actions "*not* directed against the takings claimant." *767 Third Ave. Assocs.*, 48 F.3d at 1581 (emphasis added). If the action is specifically directed at the plaintiff, then *Omnia does not* preclude the plaintiff from alleging a cognizable takings claim, even if that claim is premised solely on a contractual expectancy. Thus, in this case, even if Acceptance's takings claim was not premised on its present property interest in its book of crop insurance business, it still would have a potential takings claim based on the RMA's direct action against Acceptance in preventing the sale to Rain & Hail.

---

*States*, 304 F.3d 1271 (Fed. Cir. 2002), was a citizen of Cyprus who had been found to be a Libyan agent. While his U.S. assets were frozen under the Libyan Sanctions Regulations, certain stock options he had expired. He argued that "the Office of Foreign Assets Control should have permitted him to exercise his stock options and then retained the proceeds of that transaction in a blocked, interest-bearing account. The failure to follow that course, he contends, constituted a compensable taking." *Id*. at 1274. The Court rejected that contention because economic sanctions for national security reasons would be meaningless if those subject to sanction could recoup their losses by filing a takings claim:

> [V]alid regulatory measures taken to serve substantial national security interests may adversely affect individual contract-based interests and expectations, but those effects have not been recognized as compensable takings for Fifth Amendment purposes. As applied to economic sanctions such as orders blocking transactions and freezing assets, that principle disposes of any suggestion that the United States could freeze Libyan assets in this country only if it were prepared to pay the cost of any losses resulting from the freeze. Economic sanctions would hardly be sanctions if the foreign targets of the sanctions could simply stand in line to be compensated for the losses those sanctions caused them.

*Id*. at 1275.

In all the cases the Government cites, a main reason for dismissal under *Omnia* was that the Government's actions were not targeted at the party bringing the takings claim, but rather were acts of general applicability or were acts targeted at the party with whom the contract was formed. *Palmyra Pac. Seafoods, L.L.C.*, 80 Fed. Cl. at 233 ("The Government is not liable to plaintiffs for a taking because the government actions at issue did not address plaintiffs or their licensors or regulate plaintiffs' operations under their licenses."); *Air Pegasus of D.C., Inc.*, 424 F.3d at 1216 ("Air Pegasus, which did not itself own or operate any helicopters does not allege that the FAA's restrictions regulated its operations under the lease [of a heliport]. Instead, Air Pegasus basically alleges that the FAA, by regulating helicopters owned by third parties, frustrated its business expectations at the South Capitol Street heliport."); *767 Third Ave. Assocs.*, 48 F.3d at 1582 ("[*Omnia*] is applicable to this case because the government here did not take action against Sage. It may have frustrated the achievement of Sage's contractual rights with the SFRY, but that did not amount to a taking."); *NL Indus., Inc.*, 839 F.2d at 1579 (dismissing NL Industries' takings claim because government action targeted at AGNS frustrated NL Industries' contract with AGNS); *Kearney & Trecker Corp.*, 688 F.2d at 782-83 (no taking of a contract where the frustration of the contract was an "unintended incident" of the government action); *Paradissiotis*, 304 F.3d at 1272-75 (dismissing takings claim where Government's prohibition on exercise of stock options in American company pursuant to Libyan Sanction Regulations, resulting in expiration of options while plaintiff-owner's assets were frozen, was not aimed at plaintiff but rather was aimed at putting pressure on Libyan government by preventing its representatives from engaging in profitable economic activity).

In contrast to the aforementioned cases where the courts found that *Omnia* precluded cognizable takings claims, in the present case, the Government's actions were targeted at

Acceptance, the party bringing the takings claim, to prohibit Acceptance from selling its crop insurance business.

In this regard, the present case *is* like *Cienega Gardens v. United States*, 331 F.3d 1319 (Fed. Cir. 2003), in which the Court found that *Omnia* did not apply. Although in *Cienega Gardens* the plaintiffs' property interest was based on a contract, the Court still found that *Omnia* did not apply because the government regulation was aimed at the plaintiff and the harm was not consequential or derivative. The Federal Circuit stated:

> The trial court cited *Omnia* for the principle that "consequential loss or injury resulting from lawful government action" does not amount to a taking. Citation of this principle in the context of ELIHPA and LIHPRHA is inapt. The trial court implied that, under *Omnia*, if the government is not a party to a contract, the effect of legislation on a private contract can only be consequential and there can be no taking of a contract right. O*mnia* does not support any such rule. The proposition in *Omnia* about consequential loss or injury refers to legislation targeted at some public benefit, which *incidentally* affects contract rights, not, as in this case, legislation *aimed at the contract rights themselves in order to nullify them.* * * * The enactment of ELIHPA and LIHPRHA directly and intentionally abrogated the contracts. *The effect on the contracts is, therefore, not merely consequential.*

*Id.* at 1334-35 (citations omitted; emphasis added).

Like *Cienega Gardens* and unlike *Omnia*, the Government's action in this case sought to regulate the plaintiff. Indeed, the RMA's action in refusing to approve the sale of the policies from Acceptance to Rain & Hail and redistributing the policies to third parties to alleviate the agency's concerns about potential litigation against it was aimed directly at Acceptance. As such, the harm to Acceptance was not consequential or derivative. Accordingly, *Omnia* principles do not bar a takings claim in this case.

The foregoing analysis demonstrates that for *Omnia* to preclude a takings claim, either: 1) the plaintiff must have a mere expectancy under a contract, but not a present property interest;

or 2) the government action must not be directed at regulating the plaintiff and thus the harm caused must be merely consequential or derivative. In all the cases the Government cites, these factors were present. Because *neither* of the defining factors of the *Omnia* paradigm exist in the case at bar, *Omnia* does not preclude Acceptance from bringing a takings claim. Moreover, because *Omnia* is inapplicable, the Government has made no showing that Acceptance has failed to state a claim upon which relief can be granted, and the Government's Motion to Dismiss on the basis of *Omnia* fails as a matter of law. *Twombly*, 127 S. Ct. at 1960-73.

### C. The RMA has Plenary Authority to Regulate the Crop Insurance Industry, Including the Authority to Review and Approve the Bulk Transfer of Crop Insurance Business From one Insurer to Another.

The Government argues that "the complaint fails to state a claim upon which relief can be granted because RMA/FCIC do not possess authority to approve sales of assets from one insurer to another." Govt's Mot. at 10. According to the Government, such authority cannot be derived from the Standard Reinsurance Agreement (SRA) that the Federal Crop Insurance Corporation ("FCIC") enters into with every federally regulated crop reinsurer or from the pertinent statutes. Acceptance does not contest that such authority does not arise from the SRA; rather, the regulatory authority granted to the RMA by statute includes the authority to review and approve or disapprove the type of transaction proposed between Acceptance and Rain & Hail.

As the Government's own account of the evolution of the crop insurance statutes plainly indicates, the federally subsidized and federally reinsured market for crop insurance is a creation of the federal government, and Congress consistently has passed measures to expand that market so as to replace direct disaster relief payments with a crop insurance regime. Govt's Mot. at 13-17. The entire system is dependent upon the reinsurance made available to private crop insurers through a government owned corporation, the FCIC, that exists for that single purpose. Crop insurers cannot access that reinsurance without being qualified by the Government to do so, and

once qualified they can only obtain the reinsurance by entering into the SRA. To put it plainly, the crop insurance industry as we know it was created by, and is entirely a creature of, the Government.

While the Government correctly points out that the RMA's authority to approve or disapprove bulk transfers of crop insurance from one insurer to another is nowhere specifically enumerated, the statute that created the RMA does not, and does not need to, specifically list particular functions or actions authorized. That is because the congressional grant of authority is plenary and all encompassing. The statute states that the RMA shall have "administration and oversight of *all aspects* * * * of *all programs* authorized under the Federal Crop Insurance Act (7 U.S.C. 1501 et seq.)." 7 U.S.C. § 6933(b)(2) (emphasis added). There can be no doubt that this language is indeed a grant of plenary authority. Consequently, it can not plausibly be argued that the RMA lacks authority to oversee transfers of major blocks of crop insurance business. Moreover, the RMA consistently has exercised such authority. *See* Plaintiff's Counterstatement of Proposed Findings of Uncontroverted Fact at ¶ 19 (referring to Ross Davidson testimony concerning the agency's approval of prior bulk sale transactions). As described by Mr. Davidson, the procedure is that "the management representatives of the purchasing company typically would come to us and meet with RMA management and verbally describe, orally describe, the proposed transaction, the general terms of the transaction; and then follow up with -- we would always request something in writing that shows, you know, the proposed agreement with the seller; and then ask for more information." *Id*. at ¶ 44 (quoting Davidson testimony).

Acceptance was keenly aware of the RMA's procedure and authority in this area because of its prior experience in 2001 in buying the crop insurance portfolio of another crop insurer, IGF Insurance Company. *Id*. at ¶¶ 2-4. In that instance, the FCIC worked closely with Acceptance in

shaping the transaction and then explicitly approved the transfer in writing. *Id*. at ¶ 2, 4 (Phyllis Honor, the Acting Manager of the FCIC at the time, indicated the Government's approval by noting on the assignment agreement "FCIC *approves* this Assignment." (emphasis added)). In accordance with established practice, the RMA also was intimately involved in the proposed Acceptance-Rain & Hail transaction, reviewing the letter of intent and engaging in detailed in-person and telephonic discussions with the parties, as well as the Director of the Nebraska Department of Insurance. *Id*. at ¶¶ 45-67 (detailing meeting and discussions during the week of November 18-22, 2002). On November 22, 2002, RMA staff met to discuss the proposed sale and decided not to approve it. *Id*. at ¶¶ 61-62. The RMA communicated its rejection of the transaction to Acceptance, Rain & Hail and the Director of the Nebraska Department of Insurance. *Id*. at ¶¶ 62-67; Pl. App. 7, Depo. of Tim Wagner, Director of the Nebraska Department of Insurance at p. 77 (the RMA's Ross Davidson told Tim Wagner on November 22 that "they were not going to approve the transaction").

In determining whether an action was "authorized" for purposes of a takings claim, the standard is whether the actor "was authorized, expressly or by necessary implication, to do so by some act of Congress." *Regional Rail Reorganization Cases*, 419 U.S. 102, 127 n.16 (quoting *Hooe v. United States*, 218 U.S. 322, 336 (1910)). In *Board Machine, Inc. v. United States*, 49 Fed. Cl. 325, 333 (2001), the Court stated that "an act is presumed to be authorized if it is arguably within the scope of the actor's duties, *unless clearly precluded*." (Emphasis added.) The Court further noted that the Government could not "point to cases in which a court found that the Government performed an unauthorized act *in the absence of an express statement of preclusion*." *Id*. at 334 (emphasis added).

Here, the Government obviously can not "point to any express statement of preclusion,"

nor can it argue that oversight of block transfers between regulated crop insurers in a market that owes its very existence to the federal government is not "expressly or by necessary implication" within the plenary authority language of Section 6933(b)(2). Moreover, it cannot deny that it does in practice actively exercise the prerogative to review and approve or disapprove proposed transfers, and that it did exercise that authority in rejecting the transaction in this case.

Although the Government's motion contains an extensive discussion ostensibly devoted to the subject of statutory authority (pp. 13-18), nowhere does the Government quote Section 6933(b)(2), analyze the language of that Section, or in any way attempt to demonstrate that it renders the RMA's action in blocking the transfer of Acceptance's crop insurance business "unauthorized."[6] What the plain language of Section 6933(b)(2) really precludes is the Government's entire argument that the takings claim in this case is infirm because the RMA's action was unauthorized.

Because the Government has not shown that the RMA's regulatory action as alleged in this case was precluded by statute, there is no foundation for the assertion that Acceptance has failed to state a cognizable takings claim on grounds of absence of agency authority. The Government's Motion to Dismiss fails as a matter of law. *Twombly*, 127 S. Ct. at 1960-73.

---

[6] At one point, the Government avers that Section 6933 "did not grant the RMA any powers beyond those that FCIC already possessed." Govt's Mot. at 13. There is no citation or support supplied for this proposition. Nor is it entitled to any credence. The FCIC is a corporation created primarily to perform the proprietary function of entering into reinsurance contracts with crop insurers. The most logical rationale for the creation of the RMA is that an entity like the FCIC should not be in the position of regulating and overseeing itself. Congress apparently saw the need for a separate agency to undertake the regulation and oversight of the entire federal crop insurance program, including "supervision of the Federal Crop Insurance Corporation." 7 U.S.C. § 6933(b)(1). Congress implemented the separation of functions by granting the new agency plenary regulatory and oversight authority.

## III. CONCLUSION

For the reasons stated herein, Defendant's Third Motion to Dismiss should be denied.

Dated: June 20, 2008

Respectfully submitted,

/s/ Lewis S. Wiener______________
Lewis S. Wiener, Esq.
SUTHERLAND ASBILL & BRENNAN LLP
1275 Pennsylvania Avenue, NW
Washington, D.C. 20004-2415
202.313.0140 - phone
202.637.3593 - fax
Counsel for Plaintiff Acceptance Insurance Companies, Inc.

OF COUNSEL:
Ronald R. Massumi, Esq.
G. Brendan Ballard, Esq.
SUTHERLAND ASBILL & BRENNAN LLP
1275 Pennsylvania Avenue, NW
Washington, DC 20004-2415
202.383.0100

Patrick Griffin, Esq.
KUTAK ROCK, LLP
The Omaha Building
1650 Farnam Street
Omaha, NE 68102-2186
402.346.6000

**CERTIFICATE OF SERVICE**

The undersigned certifies that on this 20th day of June 2008, a true and correct copy of the foregoing Plaintiff's Response to Defendant's April 30, 2008 Motion to Dismiss was sent via e-mail and first class mail, postage prepaid, to the following Defendant's counsel of record:

Michael N. O'Connell
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
1100 L St., N.W., 8th floor
Washington, D.C. 20530
202.353.1618 - phone
202.514.8624 - fax
Michael.OConnell@usdoj.gov

/s/ Lewis S. Wiener______________
Lewis S. Wiener, Esq.