No. 03-2794
(Judge Wheeler)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ACCEPTANCE INSURANCE
COMPANIES INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

# DEFENDANT'S REPLY TO PLAINTIFF'S RESPONSE TO MOTION TO DISMISS

GREGORY G. KATSAS
Assistant Attorney General

JEANNE E. DAVIDSON
Director

MARK A. MELNICK
Assistant Director

MICHAEL N. O'CONNELL
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
1100 L St., N.W., 8th floor
Washington, D.C. 20530
Tel: (202) 353-1618
Fax: (202) 514-8624

OF COUNSEL:

KIMBERLEY E. ARRIGO
Senior Counsel
Office of the General Counsel
U.S. Department of Agriculture
1400 Independence Ave., S.W.
Washington, D.C. 20250

July 7, 2008

Attorneys for Defendant

## TABLE OF CONTENTS

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I. Acceptance Misconstrues *Omnia*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

A. Acceptance's Claim Is Weaker Than That Considered In *Omnia* . . . . . . . 2

B. The Court Should Not Adopt The Holding In *Tulare Lake Basin* . . . . . . . 5

C. Acceptance's Allegation That RMA's Actions Were Directed At Acceptance Establish Nothing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

D. Acceptance's Reliance Upon The *Cienega VIII* Decision Is Misplaced. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

II. RMA Does Not Have The Plenary Power That Acceptance Contends . . . . . . . . 11

III. In The Alternative, The Government Is Entitled To Dismissal Of Acceptance's Claims Relating To Policies RMA Did Not Distribute. . . . . . . . . . 15

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

## TABLE OF AUTHORITIES

### CASES

Allegretti & Co. v. County of Imperial,
42 Cal. Rptr. 3d 122 (Cal. Ct. App. 2006). . . . . 7

Board Machine, Inc. v. United States,
49 Fed. Cl. 325 (2001). . . . . 14, 15, 16

Car Carriers, Inc. v. Ford Motor Co.,
745 F.2d 1101 (7th Cir. 1984). . . . . 3

Casitas Municipal Water Dist. v. United States,
76 Fed. Cl. 100 (2007). . . . . 7

Cienega Gardens v. United States,
331 F.3d 1319 (Fed. Cir. 2003). . . . . 9, 10

Hendler v. United States,
952 F.2d 1364 (Fed. Cir. 1991). . . . . 11, 12

Huntleigh USA Corp v. United States,
525 F.3d 1370 (Fed. Cir. 2008). . . . . 7, 8, 10

Kaiser Aetna v. United States,
444 U.S. 164 (1979).. . . . . 5

Kearney & Trecker Corp. v. United States,
688 F.2d 780 (Ct. Cl. 1982). . . . . 8, 9

Klamath Irrigation District v. United States,
67 Fed. Cl. 504 (2005). . . . . 7

Loretto v. Teleprompter Manhattan CATV Corp.,
458 U.S. 419 (1982).. . . . . 4

Mitchell Arms v. United States,
7 F.3d 212 (Fed. Cir. 1993). . . . . 11

NBH Land Co. v. United States,
576 F.2d 317 (Ct. Cl. 1978). . . . . 14

Nollan v. California Coastal Comm'n,
483 U.S. 825 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Omnia Commercial Co., Inc., v. United States,
261 U.S. 502 (1923). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Regional Rail Reorganization Cases,
419 U.S. 102 (1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Tulare Lake Basin Water Storage Dist. v. United States,
49 Fed. Cl. 313 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 7

## STATUTES

7 U.S.C. § 1501 .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

7 U.S.C. § 1507(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

7 U.S.C. § 1508. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

7 U.S.C. § 6933(b)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

12 U.S.C. § 1701 .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ACCEPTANCE INSURANCE COMPANIES INC., | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 03-2794 (Judge Wheeler) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**DEFENDANT'S REPLY TO PLAINTIFF'S RESPONSE TO MOTION TO DISMISS**

Pursuant to Rules 7.2(c) and 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC"), defendant respectfully submits this reply to plaintiff's response to defendant's April 30, 2008 motion to dismiss.

ARGUMENT

I. Acceptance Misconstrues *Omnia*

In our opening brief, we established that Acceptance's amended complaint fails to state a claim upon which relief can be granted because its allegations at most establish that the Government frustrated its letter of intent with Rain and Hail, LLC ("Rain and Hail") and that the Government cannot be held liable for a Fifth Amendment taking in such a case pursuant to Omnia Commercial Co., Inc., v. United States, 261 U.S. 502 (1923). In its brief, Acceptance makes two arguments why Omnia does not bar its claim. First, it argues that "Omnia bars a takings claim where the government action deprives a plaintiff of a mere contractual expectancy, but not where the Government deprives a plaintiff of a present property interest." Acceptance Brief ("Acc. br.") at 6. Second, it argues that "Omnia bars a takings claim only where the

government action was not directed at the plaintiff, meaning the harm caused was merely consequential or derivative." Id. Neither of these arguments can withstand scrutiny.

A. Acceptance's Claim Is Weaker Than That Considered In *Omnia*

Acceptance attempts to distinguish Omnia by arguing that the Omnia plaintiff had a "mere contractual expectancy" while Acceptance had a "present property interest" that takes it outside the holding in Omnia. Acc. br. at 6. The Supreme Court in Omnia did not distinguish between a contractual expectancy and a present property interest for takings purposes, or classify the plaintiff's claim into one or the other. However, assuming for the moment that there is a distinction between a contractual expectancy and a present property interest, the Omnia dispute fell into the latter category. The Supreme Court specifically held that "[t]he contract in question was property within the meaning of the Fifth Amendment." Id. at 508. Moreover, with respect to the steel that was the subject of that contract, the Court stated that "this product in the absence of governmental interference would have been delivered in fulfillment of the contract . . . ." Id. at 510.

Based upon the allegations in the amended complaint, Acceptance's case is weaker than the plaintiff in Omnia, which had a binding contract that would have been performed but for the actions of the Government. Id. at 508, 510. Acceptance had no contract, only a letter of intent. Amended Complaint ("Am. Co.") ¶ 10. Acceptance concedes that this letter of intent was non-binding. Appendix to motion to dismiss ("App.") at 5, line 9. Thus, its claim starts from a weaker position than Omnia's claim. Similarly, although at pages eight to ten of its brief Acceptance attempts to distinguish other cases in the Omnia line, Acceptance is also in a weaker position than those plaintiffs because they had binding contracts or leases.

In its amended complaint, Acceptance pled that, but for the actions of the Government "to reject the proposed sale, the transaction would have taken place. . . ." Am. Co. ¶ 17. However, even if we assume for purposes of this motion that its non-binding letter of intent would have matured into a binding contract, and that the transaction would have been completed, just as the Supreme Court assumed in Omnia, Acceptance is in no better position than the Omnia plaintiff. All Acceptance had was a contract from which it did not realize its hoped for monetary gain, just like the plaintiff in Omnia. See Omnia, 261 U.S. at 507 ("The contract was of great value, and if carried out would have produced large profits.").

In its brief, in an apparent attempt to distance itself from Omnia, Acceptance recasts its complaint and attempts to plead new facts as follows:

> . . . Acceptance is not arguing that a contract right, presently possessed or otherwise, was taken by the Government. Instead, Acceptance is arguing that, separate and independent of its contract with Rain & Hail, Acceptance's property interest in its in-force crop insurance policies was taken by RMA. Specifically, RMA's regulatory action, aimed directly at Acceptance's planned sale of its crop insurance business, prevented Acceptance from realizing the value of that business, placed Acceptance's crop insurance business under the de facto control of the RMA, and resulted, under the RMA's direction, in the actual transfer of the portfolio without any compensation to Acceptance.

Acc. br. at 8. Acceptance's attempt to add the allegations, not contained in its amended complaint, that its crop insurance business was placed under the de facto control of the Risk Management Agency ("RMA") and that RMA directed the transfer of its portfolio to other insurers should be disregarded by the Court. See Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101, 1107 (7th Cir. 1984) (a complaint may not be amended by the briefs in opposition to a motion to dismiss; consideration of a motion to dismiss is limited to the pleadings.).

With respect to Acceptance's statement that it is not arguing that a contract right was taken by the Government but is instead arguing that, separate and independent of its contract with Rain & Hail, Acceptance's property interest in its in-force crop insurance policies was taken by RMA, this statement is inconsistent with the amended complaint. Acceptance alleged no takings action by RMA in the amended complaint other than a refusal to approve the transaction proposed in the letter of intent. Amended Complaint ("Am. Co.") 14-17. It has not alleged that RMA forbade a sale of insurance policies to any other insurer, nor has it alleged that RMA took any other action with respect to these policies while Acceptance controlled American Growers.[1] Nor has it identified any damages it has suffered, other than the alleged loss of the sale to Rain and Hail after the alleged disapproval by RMA. E.g., Acc. br. at 3; Am Co. ¶ 12. Thus, regardless of how Acceptance attempts to re-characterize its claim, its case rises or falls on its ability to state a claim that RMA committed a taking when it refused to approve the transaction outlined in the letter of intent. Omnia bars that claim for the reasons set forth in our opening brief.

Furthermore, Acceptance's claim that it had a "property interest in its in-force crop insurance policies" is not correct. As the Supreme Court has explained, "[W]e have repeatedly held that, as to property reserved by its owner for private use, "the right to exclude [others is] 'one of the most essential sticks in the bundle of rights that are commonly characterized as

---

[1] Acceptance does make the allegation throughout its brief that RMA eventually distributed the polices to other insurers but, as evidenced by Acceptance's brief, this did not occur until after the State of Nebraska had taken control of American Growers. Acc. br. at 4 ("on the very day the RMA refused to approve the sale . . . the Nebraska Department of Insurance took control of American Growers, freezing the business . . ."). We discuss the issue of RMA's alleged re-distribution of policies in part III below.

property.'" Nollan v. California Coastal Comm'n, 483 U.S. 825, 831(1987) (quoting Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 433 (1982), quoting Kaiser Aetna v. United States, 444 U.S. 164, 176 (1979)).

Acceptance did not possess exclusive rights to the crop insurance policies in its book of business. Section 507(c)(3) of the Federal Crop Insurance Act ("FCIA") (7 U.S.C. 1507(c)) states that:

> the Board shall, to the maximum extent possible, . . . (3) encourage the sale of Federal crop insurance through licensed private insurance agents and brokers and give the insured the right to renew such insurance for successive terms through such agents and brokers. . . .

This means that the insured and the agent control what approved insurance provider insures the policy. Agents can at any time move their entire book of policies from one approved insurance provider to another depending on who is offering the most attractive terms. In such circumstances, the previous approved insurance provider cannot prevent the transfer of such policies to a rival approved insurance provider. While an insurer has the benefits from such policies while they are writing the insurance, it cannot be said to possess such policies because they do not have the power to control whether such policies are moved to another approved insurance provider.

B. The Court Should Not Adopt The Holding In *Tulare Lake Basin*

The arguments in Acceptance's brief are based in large part upon this Court's holding in Tulare Lake Basin Water Storage Dist. v. United States, 49 Fed. Cl. 313 (2001). Tulare Lake involved California water users who claimed that their contractually-conferred rights to use water were taken when the Government imposed water use restrictions pursuant to the Endangered

Species Act. Id. at 314. Applying California property law, the Court distinguished Omnia, reasoning that in Omnia the plaintiff had what the Court described as "only a contract expectancy," while the Tulare Lake plaintiff had "a property interest sufficiently matured to take it out of the realm of an Omnia analysis." Id. at 318. The Court went on to rule that the case should be analyzed as a physical, rather than regulatory, taking and that a taking had, in fact, occurred. Id. at 319-24.

In our view, Tulare Lake was incorrectly decided. In Omnia, the Supreme Court specifically stated that "[t]he contract in question was property within the meaning of the Fifth Amendment" and would have been performed but for the actions of the Government. Omnia, 261 U.S. at 508, 510. Thus, it is clear from the Omnia opinion that the Supreme Court viewed that plaintiff as having a "present property interest" in the contract. The present property interest of the plaintiff in Omnia was not fundamentally different from the property interest in Tulare Lake.

In any event, Tulare Lake does not help Acceptance. To the extent that the Tulare Lake approach can be reconciled with Omnia, Acceptance cannot allege that its property interest was as mature as either the Tulare Lake or Omnia plaintiff. Acceptance did not have "a contract expectancy" as the Court in Tulare Lake described the Omnia contract. Tulare Lake, 49 Fed. Cl. at 318. Acceptance had only a non-binding letter of intent, or what might be described as an "expectancy to have a contract." If Acceptance's contract rights were not as mature as those of the plaintiff in Omnia, it cannot logically contend that its contract rights were equivalent to those of the Tulare Lake plaintiff. Thus, as stated above, there are no allegations contained in the

amended complaint that support placing Acceptance upon a higher footing than the plaintiff in Omnia.[2]

C. Acceptance's Allegation That RMA's Actions Were Directed At Acceptance Establish Nothing

Acceptance's second attempt to distinguish Omnia is its argument that Omnia only bars a takings claim where the Government action was not directed at the plaintiff. Acc. br. at 6. It argues that, in the Omnia line of cases, the Government's actions were acts of general applicability or were targeted at the party with whom the contract was formed, whereas, in this case, RMA's actions were directed at Acceptance. Acc. br. at 11-12.

The Federal Circuit rejected a similar argument in an opinion issued after we filed our initial brief. In Huntleigh USA Corp v. United States, 525 F.3d 1370 (Fed. Cir. 2008), the court of appeals relied upon Omnia to reject a takings claim brought by a company with airport passenger and screening contracts that lost its contracts after the Government took control of airport screening post-September 11, 2001 and the market for such services disappeared. Id. at 1375. Similar to Acceptance, the Huntleigh plaintiff argued that Omnia did not apply because it "involved governmental regulation applicable to one party that resulted in a loss to a third party" whereas in its own case the Government action "applied directly to the contracts between the

[2] Although not directly addressing the Tulare Lake court's Omnia analysis, later decisions have been critical of the court's overall approach, including a decision by the same judge as in Tulare Lake. See Klamath Irrigation District v. United States, 67 Fed. Cl. 504, 538 (2005) ("Tulare appears to be wrong on some counts, incomplete in others and, distinguishable, at all events."); Allegretti & Co. v. County of Imperial, 42 Cal. Rptr. 3d 122, 132 (Cal. Ct. App. 2006) (rejecting Tulare Lake, citing Klamath favorably); Casitas Municipal Water Dist. v. United States, 76 Fed. Cl. 100, 104-06 (2007). See also Klamath, 67 Fed. Cl. at 538, fn. 59 (listing articles in which "Tulare has been the subject of intense criticism by commentators.")

airlines and Huntleigh. . . ." Id. at 1378. The Federal Circuit rejected this argument. The court held that:

> As far as Omnia is concerned, the facts of that case were more favorable to the plaintiff, Omnia, than the facts of this case are to Huntleigh. As seen, in Omnia, the government's actions were directed squarely at the contractual relationship that existed between Allegheny and Omnia. The government requisitioned the steel plate that was meant for Omnia and directed Allegheny not to comply with its contract with Omnia. Omnia, 261 U.S. at 507, 43 S.Ct. 437. Yet, the Court held, there was no taking because, "[a]s a result of this lawful governmental action the performance of the contract was rendered impossible. It was not appropriated, but ended."

Id. at 1381. Thus, because the Federal Circuit has already held that the Government actions in Omnia were directed squarely at the contractual relationship, Acceptance's attempt to distinguish Omnia fails.

Similarly, Acceptance's argument is refuted by other cases we cited. For example, in Kearney & Trecker Corp. v. United States, 688 F.2d 780 (Ct. Cl. 1982), the Government used authority provided by Congress in the Defense Production Act of 1950 to order the plaintiff to expedite delivery of a "Moduline." Id. at 781. While the Government had its own Moduline contract with the plaintiff, ordering the plaintiff to expedite delivery pursuant to this act allowed the Government to move ahead of other customers for purposes of delivery, causing the plaintiff to lose a sale (and the associated profits) to another customer that canceled due to the delayed delivery. Id. In its opinion, the Court of Claims specifically noted that the directive under the act "required the plaintiff to expedite delivery" but compensation was not due pursuant to Omnia because this action "merely frustrated the performance of the plaintiff's contract with Rolls Royce." Id. at 783 (emphasis added).

In the present matter, the amended complaint does not support Acceptance's argument that the Government's action was directed at Acceptance. Rather, the amended complaint alleges a meeting occurred between RMA and Rain and Hail concerning the proposed sale, after which RMA told Rain and Hail that RMA would not approve the sale. Am. Co. ¶¶ 14-15. Thus, this case is similar to Omnia, which involved dealings between the Government and the non-plaintiff party to the contract. Omnia, 262 U.S. at 511. However, even if the Court assumed for purposes of this motion that RMA's actions were directed at Acceptance, and that the letter of intent would have become a binding contract, RMA "merely frustrated the performance of the plaintiff's contract with" Rain and Hail. Kearney & Trecker, 688 F.2d at 783. Acceptance, like the Kearney & Trecker plaintiff, merely lost a sale for which no compensation is due.

D. Acceptance's Reliance Upon The *Cienega VIII* Decision Is Misplaced

Acceptance also relies upon the Federal Circuit's decision in Cienega Gardens v. United States, 331 F.3d 1319 (Fed. Cir. 2003) ("Cienega VIII"). Cienega VIII involved housing programs established pursuant to the National Housing Act, 12 U.S.C. §§ 1701 et seq. Cienega VIII, 331 F.3d at 1325. In these programs, the Department of Housing and Urban Development ("HUD") provided the plaintiff real estate developers mortgage insurance, which facilitated low-interest, 40-year mortgages. Id. In return, HUD and the plaintiffs entered into regulatory agreements that placed a variety of restriction upon the plaintiffs. Id. HUD regulations then in effect would have allowed the plaintiffs to prepay the mortgages after 20-years and then exit the program. Id.

When the participation of property owners approached the 20-year mark, Congress became concerned that many would exit the program and that the availability of low-income

housing would be adversely effected. Id. at 1326. Congress then responded by enacting two statutes that ultimately had the effect of preventing the plaintiffs from exiting the program for a period of several years. Id. The property owners filed suit, contending that the Government committed a regulatory taking when Congress enacted these statutes and abrogated their right to prepay the mortgages. Id. at 1323.

This Court, relying in part upon Omnia, granted the Government summary judgment. Cienega VIII, 331 F.3d at 1334. The Federal Circuit reversed, relying upon the Supreme Court's statement in Omnia that: "[i]n the present case the effect of the requisition was to bring the contract to an end, not to keep it alive for the use of the government." Omnia, 261 U.S. at 513. The Federal Circuit held that Omnia was inapplicable because the Government, by preventing the plaintiffs from prepaying their mortgages, had kept the contracts alive for the use of the Government. Cienega VIII, 331 F.3d at 1335.

Cienega VIII does not take Acceptance outside the holding of Omnia. There is no allegation in the amended complaint that the actions of the Government somehow kept the letter of intent between Acceptance and Rain and Hail alive for the use of the Government, or kept it alive for any purpose. Indeed, Acceptance's case has been built upon the allegation that the sale did not occur (Am. Co. ¶¶ 15-17) and that after the sale fell through, the State of Nebraska took control of American Growers. Acc. br. at 4. Thus, the facts in the amended complaint are essentially the same as those in Omnia because the alleged actions of the Government caused the letter of intent to come to an end.[3]

---

[3] In addition, as the Federal Circuit explained in the recent Huntleigh decision, the taking in Cienega VIII was based upon an allegation that the Government effected a taking when it unilaterally altered by statute the terms of its agreements with the property owners. Huntleigh,

## II. RMA Does Not Have The Plenary Power That Acceptance Contends

Acceptance argues at pages 14-17 of its brief that RMA has "plenary authority" to reject sales of assets from one insurer to another. However, assuming this were a true description of the legal framework in which RMA operates, RMA still could not be held to have conducted a taking compensable under the Fifth Amendment when it allegedly refused to approve the transaction outlined in the letter of intent. Acceptance posits a world where RMA has plenary power to review asset sales, but the consequence of refusing to approve such a sale is that RMA becomes liable for the purchase price of those policies. The Supreme Court addressed a similar argument in Omnia:

> The government took over during the war railroads, steel mills, shipyards, telephone and telegraph lines, the capacity output of factories and other producing activities. If appellant's contention is sound, the government thereby took and became liable to pay for an appalling number of existing contracts for future service or delivery, the performance of which its action made impossible. This is inadmissible.

Omnia, 261 U.S. at 513.

As the Federal Circuit has explained, the "chief and one of the most valuable characteristics of the bundle of rights commonly called 'property' is 'the right to sole and exclusive possession - the right to *exclude* strangers, or for that matter friends, but especially the Government.'" Mitchell Arms v. United States, 7 F.3d 212, 215 (Fed. Cir. 1993) (quoting Hendler v. United States, 952 F.2d 1364, 1374 (Fed. Cir. 1991)). In Mitchell Arms, the court of appeals held "'that enforceable rights sufficient to support a taking claim against the United

---

525 F.3d at 1381. Here, Acceptance makes no allegation that RMA unilaterally altered the terms of the Standard Reinsurance Agreement.

States cannot arise in an area voluntarily entered into and one which, from the start, is subject to pervasive Government control.'" Id. at 216 (quoting Mitchell Arms, Inc. v. United States, 26 Cl. Ct. 1, 5 (1992)). The court explained that the reason "'enforceable rights sufficient to support a taking claim' cannot arise in such an area is that when a citizen voluntarily enters such an area, the citizen cannot be said to possess 'the right to *exclude*.'" Id. (quoting Hendler v. United States, 952 F.2d 1364, 1374 (Fed. Cir. 1991)). The "reason the citizen cannot be said to possess 'the right to exclude' is that the citizen is in an area subject to government control." Id. In this case, if RMA had plenary power over asset sales as Acceptance alleges, Acceptance could not have possessed an ownership interest in its assets protected by the Fifth Amendment because the sale of such assets would have been subject to pervasive Government control.

Acceptance alleges at pages 15 and 17 of its brief that the source of RMA's authority to reject proposed sales of assets from one insurer to another is 7 U.S.C. § 6933(b)(2), which provides:

> b) Functions of Office of Risk Management
>
> The Office of Risk Management shall have jurisdiction over the following functions:
>
> * * * *
>
> (2) Administration and oversight of all aspects, including delivery through local offices of the Department, of all programs authorized under the Federal Crop Insurance Act (7 U.S.C. 1501 et seq.).

Specifically, Acceptance relies upon the "all aspects . . . of all programs" language. Acceptance also argues, on page 17, footnote six of its brief, that the Government's argument that section 6933 did not grant to RMA any powers beyond that which the Federal Crop Insurance

Corporation ("FCIC") already had, is not "entitled to any credence" based upon a public policy argument that "an entity like the FCIC should not be in the position of regulating and overseeing itself."

The problem with these arguments is that they fail to acknowledge the relationship between RMA and FCIC. FCIC is the entity provided the program authorities in the FCIA. However, once RMA was created, Congress discontinued funding for salaries and expenses of FCIC. Congress only appropriated funding for the salaries and expenses of RMA. Therefore, FCIC is an agency without the personnel to carry out its mission so it relies upon RMA to perform that function. This is accomplished because section 6933 authorizes RMA to administer the crop insurance program pursuant to the FCIA. It does so upon behalf of FCIC.

What is more important is that RMA is not provided any greater authority than to carry out the programs pursuant to the FCIA. With respect to the crop insurance programs, the only authority FCIC and RMA possess is to create those programs and offer them directly to producers, which they no longer do, or offer them through approved insurance providers under the reinsurance program. 7 U.S.C. § 1508. Therefore, the Government was correct in its assertion that RMA has the same authorities as FCIC and those authorities are wholly contained in the FCIA.

Acceptance also alleges that RMA historically has exercised the authority to approve sales of crop insurance policies. This is incorrect. Section 4.C.(9) of the Crop Insurance Handbook ("Handbook") contains the procedures for the transfer of policies from one approved insurance provider to another. See App. to defendant's motion for summary judgment at 3. Nowhere in those procedures does it specify that the approval of RMA or FCIC is required. All

the approved insurance provider must do is follow such cancellation and rewrite provisions in the Handbook and the policy automatically transfers.

Acceptance's allegation is also irrelevant. As we established in our opening brief, the standard for authority to perform a taking is that the Government official must have been "authorized, expressly or by necessary implication, . . . by some act of Congress . . . " to take the private property at issue. Regional Rail Reorganization Cases, 419 U.S. 102, 127 n. 16 (1974). Acceptance seems to be making an argument, that, in the absence of express or implied authority from Congress, an agency can essentially seize a takings power, but cites no case law in support of such an argument. This argument is inconsistent with precedent that stresses the requirement that the Court consider whether Congress has authorized the action. For example, in NBH Land Co. v. United States, 576 F.2d 317, 319 (Ct. Cl. 1978), the Court of Claims explained that "[c]ases of 'inverse' taking without physical invasion or ouster are not very numerous, and when they occur . . . this court has been careful to consider the role of Congress, and the taking, if not expressly authorized or directed by Congress, at least is a natural consequence of Congressionally approved measures."

Finally, Acceptance also provides two quotations to this Court's opinion in Board Machine, Inc. v. United States, 49 Fed. Cl. 325, 333-34 (2001) that, stripped out of their context, initially appear to support Acceptance's argument. These quotations actually appear in the opinion after the Court has granted the Government's motion to dismiss because the agency actions were unauthorized. Id. at 332. In the section of the opinion that Acceptance is quoting, the Court is essentially putting forward for discussion a proposal for a change in law that, more than seven years later, has not been adopted by the Supreme Court. The Court suggests that

"future courts might consider a broader conceptualization of 'authorized' for takings analysis purposes, the foundation of which is that an act is presumed to be authorized if it is arguably within the scope of the actor's duties, unless clearly precluded." Id. at 333.

"Clearly precluded" is different than "authorized, expressly or by necessary implication" and is not a correct statement of current law. Moreover, at pages 14-15 of our brief we did identify statutory language precluding RMA/FCIC authority to approve or reject sales of crop insurance policies. As we established above, the exercise of any such authority would be in contravention of subsection 1507(c) of the FCIA, which provides:

> the Board shall, to the maximum extent possible, . . . (3) encourage the sale of Federal crop insurance through licensed private insurance agents and brokers and give the insured the right to renew such insurance for successive terms through such agents and brokers. . . .

Thus, it is the right of the agent and producer to determine where the business is placed. FCIC does not have the authority to interfere with that right.

## III. In The Alternative, The Government Is Entitled To Dismissal Of Acceptance's Claims Relating To Policies RMA Did Not Distribute

Acceptance repeatedly makes the allegation in its brief (but not the amended complaint) that RMA distributed the American Growers crop insurance policies to other insurers. Acc. br. at 3, 4, 6, 13. Although the Court should disregard this allegation, if the Court relies upon it, the Court should also note that Acceptance does not explain why the Government is not entitled to dismissal with respect to policies that RMA did not distribute to other insurers. Thus, the Government is at least entitled to judgment with respect to any policies it did not distribute.

Such a ruling would reduce the number of polices at issue by more than 90-percent, with a corresponding reduction in the amount of potential damages.

Although there is no evidence before the Court with respect to the number of policies that RMA distributed after the State of Nebraska placed American Growers in receivership, a report of the Government Accountability Office ("GAO") on this topic illustrates the effect on the evidence and scope of potential damages at trial that dismissal of non-RMA distributed policies would have. See http://www.gao.gov/new.items/d04517.pdf. As explained by the GAO, after Nebraska took control of American Growers, farmers and their insurance agents were responsible for finding a new insurance company, but RMA agreed to find a new insurer for those who were unable to do so. Id. at 20. As a result, according to the GAO, farmers or their agents transferred about 323,000 policies to other insurers, leaving RMA to assign only about 26,500 policies. Id. Accordingly, if the Court were to conduct a trial to determine if Acceptance is entitled to damages for policies that RMA distributed, the trial would be about 26,500 policies, not 350,000 policies, and Acceptance's potential damages would be reduced by a corresponding amount.

## CONCLUSION

For the foregoing reasons, and for the reasons stated in our opening brief, defendant respectfully requests that the Court dismiss Acceptance's amended complaint for failure to state a claim upon which relief may be granted.

Respectfully submitted,

GREGORY G. KATSAS
Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Franklin E. White, Jr. for
MARK A. MELNICK
Assistant Director

OF COUNSEL:

KIMBERLEY E. ARRIGO
Senior Counsel
Office of the General Counsel
U.S. Department of Agriculture
1400 Independence Ave., S.W.
Washington, D.C. 20250

s/ Michael N. O'Connell
MICHAEL N. O'CONNELL
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
1100 L St., N.W., 8th floor
Washington, D.C. 20530
Tel: (202) 353-1618
Fax: (202) 514-8624

July 7, 2008

Attorneys for Defendant

CERTIFICATE OF SERVICE

I certify under penalty of perjury that on this 7th day of July, 2008, a copy of the foregoing "DEFENDANT'S REPLY TO PLAINTIFF'S RESPONSE TO MOTION TO DISMISS" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Michael N. O'Connell